UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,

*Plaintiff,*

VS.                                                            Civil Action No.


RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL D.
COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;
RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; LISA
PINSONNEAULT, CARL BEAUREGARD, in their individual and official capacities; GERO
MEYERSIEK

*Defendants*

## COMPLAINT AND DEMAND FOR JURY TRIAL


Plaintiff Mary Seguin ("Seguin" or "Plaintiff"), citizen of the State of Texas, sues for

damages in excess of $1,000,000.00 from Defendants RHODE ISLAND DEPARTMENT OF HUMAN

SERVICES ("RI DHS" or "Defendant(s)") in its official capacity; MICHAEL D. COLEMAN

{"Coleman" or "Defendant(s)"), DEBORAH BARCLAY ("Barclay" or "Defendant(s)") in their

individual and official capacities; RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its

official capacity; LISA PINSONNEAULT ("Pinsoneault" or "Defendant(s)"), CARL BEAUREGARD

("Beauregard" or "Defendant(s)") in their individual and official capacities; and GERO

MEYERSIEK Gero Meyersiek ("Meyersiek" or "Defendant(s)").  Such damages arise out of

Defendants':  Misrepresentation; Negligent Misrepresentation; Tort of Deceit; Bad Faith;

Reckless Indifference to the Rights of Seguin; Abuse of process; Breach of Duty; Rhode Island

Government Tort Liability Act pursuant to R.I.G.L. § 9-31-1; 42 U.S. Code § 1983 federal civil rights violation; Civil RICO, and states the following in good support of this Complaint:

## NATURE OF THE ACTION

1. This is a tort liability, Rhode Island Government Tort Liability Act under R.I.G.L. § 9-31-1, Civil RICO and 42 U.S. Code § 1983 federal civil rights case under the Fourth Amendment of the United States Constitution as applied to the States under the United States Constitution's Fourteenth Amendment for the Defendants' individual and collective unlawful violations under color of state law of Plaintiff's constitutional right to protection to equal protection to a fair trial against the Defendants' unlawful perjury, subornation of perjury and conspiracy to commit perjury in the state tribunal of Rhode Island, for the purpose of concealing public government records, documents and evidence as they relate to breach of contract, false accounting and acts of tort and tort liability by the Defendants against the Texas Plaintiff. The aforesaid public government records relate to the Defendants' seizures of Plaintiff's Texas properties for "interest" claim that was already waived by Meyersiek and fully forgiven by RI OCSS under the State's Debt Compromise Policy, per contract terms between the Plaintiff and Defendant RI OCSS and Defendant Meyersiek. This is further a case of state tort claims for breach of specific duty to the Plaintiff. The Defendants conspired to knowingly make false material declaration under oath or affirmation in open court of the Superior Court of Rhode Island in the pending litigation, ***Mary Seguin v. Rhode Island Department of Human Service et al., PC-2022-07215,*** (brought by Plaintiff under the Rhode Island Access to Public Records Act, R.I.G.L. sec. 38-2-1, *et seq*., ("APRA") filed on December 29, 2022), for the purpose of dismissing the

APRA action through perjury, subornation of perjury and conspiracy by the Defendants. Defendants in open court represented to the trier state tribunal that the Rhode Island Attorney General, who, to date, never entered appearance in that proceeding, is the attorney of record for the defendants there, Rhode Island Department of Human Service et al., for the purpose of arguing in open court dismissal of that action under the claim of insufficiency of process (citing the Rhode Island Government Tort Liability Act, R.I.G.L. sec. 9-28-1 et al) and lack of jurisdiction, for the purpose of obstructing Plaintiff's access to public government records as they relate to debt validation and debt verification that contain evidence relating to tortious and unlawful activities by the Defendants. In so doing, the Defendants implicated the Attorney General, the Office of the Attorney General and individual staff attorneys of the Office of the Attorney General. As such, the Plaintiff hereby reserves the right to amend this Complaint as appropriate at the appropriate time. These issues are not waived and are expressly reserved for pleading, motion, briefing and action with expedition consistent with orderly procedure and as appropriate. Reasonable time for this purpose is respectfully requested.

2. Defendants are liable to the Plaintiff in breach of special duty, moreover implicating the Attorney General is in breach of special duty to the Plaintiff, conspired to knowingly make false material declaration under oath or affirmation in open court of the Superior Court of Rhode Island, committed unlawful violations of Plaintiff's constitutional and state rights under color of state law in bad faith and with malicious purpose in reckless and knowing disregard of Plaintiff's rights.

## I.    JURISDICTION AND VENUE

1. Plaintiff is a citizen of the State of Texas and the amount in controversy exceeds $75,000.00. This Court has subject-matter jurisdiction pursuant to Title 28, Section 1332 of the United States Code (28 U.S.C. § 1332).

2. Plaintiff also brings this action pursuant 42 U.S.C. § 1983 for violations of civil rights under the Fourth and Fourteenth Amendments to the United States Constitution.

3. This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) (civil rights); 28 U.S.C. § 1367 provides supplemental jurisdiction over the state law tort claims that arose from the same common nuclei of facts.

4. Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 1391(b). Defendants' primary employment is in this district, and Defendants' independent and collective malicious and unlawful violations under color of state law of Plaintiff's constitutional rights giving rise to the claims herein accrued within this district.

5. At all material times, Defendants committed these unlawful violations under color of state law in bad faith and with malicious purpose in reckless and knowing disregard of Plaintiffs' rights.

6. These tort liability, state tort liability, conspiracy and constitutional law violations are "capable of repetition, yet evading review." *Roe v. Wade*, 410 U.S. 113, 125 (1973) (citing *Southern Pacific Terminal Co. v. ICC*, 219 U. S. 498, 515 (1911), *Moore v. Ogilvie*, 394 U. S. 814, 816 (1969), *Carroll v. Princess Anne*, 393 U. S. 175, 178-179 (1968), *United States v. W. T. Grant Co*., 345 U. S. 629, 632-633 (1953)).

## II.    PARTIES

7.  Plaintiff Mary Seguin ("Seguin" or "Plaintiff") is an adult female citizen of Texas.

8.  Defendant Rhode Island Department of Human Services ("RI DHS") is a political subdivision

    of the State of Rhode Island

9.  Defendant Rhode Island Department of Human Services, Office of Child Support Services

    ("RI OCSS") is a political subdivision of the State of Rhode Island.

10. Defendant Gero Meyersiek is and has been at all material times a resident of Rhode Island.

11. Defendant MICHAEL D. COLEMAN is and has been at all material times the Deputy Chief

    Counsel of Rhode Island Department of Human Services ("RI DHS"). Michael D. Coleman is a

    State employee.

12. Defendant Deborah A. Barclay is and has been at all material times the Chief Legal Counsel

    o f Rhode Island Department of Human Services ("RI DHS").  Barclay is a State employee.

13. Defendant LISA PINSONNEAULT is and has been at all material times the Legal Counsel of RI

    OCSS.  Pinsonneault is a State employee.

14. Defendant CARL BEAUREGARD is and has been at all material times the Legal Counsel of RI

    OCSS.  Beauregard is a State employee.

15. The named Defendants implicated the Attorney General, the Office of the Attorney General

    and individual staff attorneys of the Office of the Attorney General.  As such, the Plaintiff

    hereby reserves the right to amend this Complaint as appropriate at the appropriate time.

    These issues are not waived and are expressly reserved for pleading, motion, briefing and

action with expedition consistent with orderly procedure and as appropriate.  Reasonable

time for this purpose is respectfully requested.

### III.    FACTUAL ALLEGATIONS

16.  All transactions, acts and communications between the Texas Plaintiff and the RI State

Defendants were conducted via wire or mail: telephone, email, bank wire transfer,

electronic official WebEx Hearing of the Courts of the State of Rhode Island by wire, wire or

mail.  No transactions were conducted in person.

17. On December 7, 2021, the Rhode Island Department of Human Services Office of Child

Support ("RI OCSS") and Meyersiek entered into a contract with Seguin in which the State

by and through RI OCSS forgave the full interest portion of the child support debt and

Meyersiek waived interest, in consideration of Seguin paying a lump-sum payoff amount of

$104,185.98.  Under its agreement with Seguin, RI OCSS forgave the full interest of the child

support debt under the State's Debt Compromise Policy.  Under his agreement with Seguin,

Meyersiek waived interest.

18. The contract was also brokered by the Rhode Island Department of Human Services Office

of Child Support Services ("RI OCSS") under Rhode Island's and the RI OCSS's Debt

Compromise Policy[1] as it applies to child support debt, with both Gero Meyersiek (the

custodial parent) and RI OCSS as parties to the agreement, whereby Meyersiek waived

interest and RI OCSS agreed to forgive the full portion of interest debt in consideration of

---

[1] Pursuant to its policy, Rhode Island Office of Child Support Services routinely compromises state-owed arrears, as per written communication provided by the federal Administration for Child and Families, U.S. Department of Health and Human Services, 330 C Street, S.W., Washington, D.C. 20201.

Seguin paying the very large sum of $104,185.98 in one lump-sum to pay off all child support arrears.[2]  The child (Seguin's daughter) for which child support was ordered was already emancipated at the time of contract formation and over twenty-two years of age. This is a three-party contract binding Seguin, RI OCSS and Meyersiek, that was brokered *and* agreed to by RI OCSS under its Debt Compromise Policy.  Under the Debt Compromise Policy, the State of Rhode Island's political subdivision, RI OCSS, is authorized to compromise child support debt, act as the broker of debt compromise agreements between the noncustodial parent and the custodial parent to forgive child support debt, and enter into binding agreements to compromise debt among the three parties of: (1) the noncustodial parent, (2) the State, and (3) the custodial parent.[3]  Under its Debt Compromise Policy, Defendant RI OCSS, in agreement with the contract terms of interest waiver and interest debt forgiveness by the State, emailed a written advisement from Defendant Caballeros on the morning of December 7, 2021, to Seguin in Texas that said, "….accounting says to pay $104,185.98 by bank wire transfer to RI OCSS's child support collection bank account" with bank wire instructions to RI OCSS's bank account.  Defendant Caballeros represented to the Plaintiff that there was no interest because Meyersiek waived interest and interest was forgiven, and the $104,185.98 payoff was calculated by the RI OCSS's accounting department.  Seguin justifiably relied on RI OCSS's email written advisement and payoff offer, accepted on the same day, and Seguin, per agreement,

---

[2] John Langlois's, Deputy Chief Counsel of RI OCSS, representation at Rhode Island Executive Office of Health and Human Services ("RI EOHHS") Appeal Office Prehearing Conference on October 5, 2022.

[3] Pursuant to its policy, Rhode Island Office of Child Support Services routinely compromises state-owed arrears, as per written communication provided by the Federal Administration for Child and Families, U.S. Department of Health and Human Services, 330 C Street, S.W., Washington, D.C. 20201.

executed on the agreement via payment by bank wire transfer the lump sum payoff amount of $104,185.98 in consideration of Meyersiek and RI OCSS's debt compromise policy authority waiving interest and forgiving the interest portion of the debt.  These terms were offered, accepted and executed by RI OCSS, who was also the broker agent for both Seguin and Meyersiek, on December 7, 2021.  RI OCSS acted in the dual capacity of broker agent for both Meyersiek and Seguin, as well as being a party to the payoff agreement, under its Debt Compromise Policy.[4]  Rhode Island's Debt Compromise Policy authorized RI OCSS to agree to forgive arrears with Seguin, and also broker a debt compromise agreement between the noncustodial ("Seguin") and custodial ("Meyersiek") parents.

19. <u>Subsequent to</u> Seguin paying by bank wire the payoff amount to RI OCSS's bank account, Gero Meyersiek "changed his mind" regarding interest waiver, in breach of contract, kept Seguin's lump sum payoff payment made in consideration of Meyersiek's waiver of interest, and told RI OCSS to "put interest back on the system"[5] without disclosure or notice to Seguin.   Then, RI OCSS, in breach of its contract with Seguin forgiving the interest under its Debt Compromise Policy, and in breach of duty to Seguin, actually did what Meyersiek's told the agency to do: the agency put interest back on the RI OCSS system that Meyersiek demanded in breach of its interest forgiveness agreement with Seguin, and failed to disclose or notice Seguin that the agency "put interest back on the system."  In breach of contract and in breach of duty to Seguin, RI OCSS not just failed to, but subsequently

---

[4] Pursuant to its policy, Rhode Island Office of Child Support Services routinely compromises state-owed arrears, as per written communication provided by the Federal Administration for Child and Families, U.S. Department of Health and Human Services, 330 C Street, S.W., Washington, D.C. 20201.
[5] Per RI OCSS Case Tracking Case History Documentation entry by Kevin Tighe; John Langlois's, Deputy Chief Counsel of RI OCSS, representation at Rhode Island Executive Office of Health and Human Services ("RI EOHHS") Appeal Office Prehearing Conference on October 5, 2022.

<u>refused</u> to disclose to Seguin <u>and withheld from Seguin</u> documentation and records of Meyersiek's change of mind of interest waiver in breach of contract *subsequent* to Seguin's lumpsum payoff payment, and RI OCSS's own actions in breach of contract of interest forgiveness with Seguin by executing on Meyersiek's breach-of-contract demand placing interest back on the RI OCSS system, in breach of its contract with Seguin. Similarly to Meyersiek, RI OCSS failed to return Seguin's lump-sum payoff payment wire transfer to RI OCSS's child support collection bank account and kept Seguin's payment without disclosure to Seguin of Meyersiek's and the agency's own "change of mind" breach of contract subsequent to Seguin making the payoff payment of the lump sum $104,185.98. As quickly as two days subsequent to Seguin wire-transferring her good faith lump sum payoff payment to RI OCSS's child support collection bank account, RI OCSS started to place liens and levy on Seguin's property in Texas without notice or disclosure to Seguin, including seizing the bank account from which Seguin wired the lump sum payoff payment in good faith, for the very large amount of $75,638.00. This very large sum of $75,638.00 to this day is unexplained and RI OCSS refuses to provide Seguin with an accounting explanation of how RI OCSS calculated this very large amount. Without giving Seguin any explanation or accounting calculation of how $75,638.00 was calculated, RI OCSS further thwarted, then denied, Seguin's good faith requests and right to her case records for accounting and legal explanation, pursuant to Seguin's several subsequent requests for documentation and calculation explanation.

20. Seguin knew that the payoff agreement she entered into brokered by RI OCSS was a contract with both Gero Meyersiek and RI OCSS. Seguin is and has been aware of RI OCSS's

policy of forgiving state-owed arrears.  At least 36 states and the District of Columbia have debt compromise options available to noncustodial parents, including Rhode Island.[6] Compromise means the partial or full forgiveness or reduction of child support debt. Compromise of child support debt is an official department of human services policy promulgated through Federal Commissioner Tangular Gray by the Office of the Child Support Enforcement of the Administration of Children and Families in the U.S. Department of Health and Human Services.  Rhode Island represented that it officially has a Debt Compromise Policy and is one of the 36 states nationwide that adopted debt compromise options available to noncustodial parents.[7]

21. Defendants knew and should have known that the payoff agreement with Seguin was a good faith contract with both Gero Meyersiek and with RI OCSS, and knew and should have known RI OCSS's child support payoff agreement with Seguin is authorized and entered into under the State's official policy of forgiving interest and other state-owed arrears. Defendant RI OCSS and its employees actively brokered the contract terms and agreed to the waiver of interest and forgiveness of interest under the authority by the State to compromise arrears debt under its Debt Compromise Policy.[8]  Under this Debt Compromise Policy, the RI OCSS acted as the agent to both Seguin and Meyersiek to waive interest debt, and entered into agreement with Seguin to forgive interest debt, and agree to the waiver of

---

[6] Per written communication provided by Commissioner Tangular Gray, Office of Child Support Enforcement, Administration for Child and Families, U.S. Department of Health and Human Services, 330 C Street, S.W., Washington, D.C. 20201.

[7] Pursuant to its policy, Rhode Island Office of Child Support Services routinely compromises state-owed arrears, as per written communication provided by the Federal Administration for Child and Families, U.S. Department of Health and Human Services, 330 C Street, S.W., Washington, D.C. 20201.

[8] *Id.*

interest by Meyersiek.  As such, RI OCSS owes a duty to Seguin for its capacity in brokering the interest waiver and interest debt compromise agreement, and is party to the agreement it brokered that compromised the interest debt by waiver of interest, under the authority of the State's Debt Compromise Policy that compromises child support debt.  Compromise means the partial or full forgiveness or reduction of child support debt.[9]  RI OCSS and Meyersiek entered into a contract with Seguin that forgave the full interest portion of the child support debt, in consideration of Seguin paying a lump-sum payoff amount of $104,185.98.  Under its agreement with Seguin, RI OCSS forgave the full interest of the child support debt under authority under the State's Debt Compromise Policy.

22. Subsequent to RI OCSS obeying Meyersiek's instruction to RI OCSS to "put the interest back on the system," in breach of Meyersiek's and RI OCSS's waiver of interest in breach of both parties' agreement with Seguin, RI OCSS started seizing Seguin's Texas bank account from which she wired the payoff $104,185.98 payment, and Texas assets through notices of liens and levy (some issued "offline" that Seguin never received notices of in the mail) on Seguin's property for the very large sum of $75,638.00, without notice to Seguin as they relate to Seguin's bank account in the State of Texas, and without providing any explanation what it was for or how the very large amount was computed/calculated, and without providing any justification, and without providing any accounting explanation for the calculation of the $75,638.00 lien.

23. Defendants knew and should have known that there was no probable cause for seizure of Seguin's property for "interest" debt that was already waived and fully forgiven under

---

[9] "State Child Support Agencies with Debt Compromise Policies," U.S. Department of Health and Human Services Publication, 2021, 2022.  Inquiries: OCSE.DPT@acf.hhs.gov

contractual agreement with Seguin.  It must be noted RI OCSS did not return or reject Seguin's lump sum payment wired to its own support collection bank account.  Nor did RI OCSS disclose to Seguin the material fact that RI OCSS "put interest back on the system" subsequent to Seguin's bank transfer payment.  On the contrary, RI OCSS's December 2021 entries in their case tracking record for Seguin's case file showed a preoccupation to ensure Seguin's December 7, 2021 payment would not be reversible, while simultaneously "put the interest back on the system" without any regard to disclosure to Seguin on its material change of breaching its full forgiveness enforcement property seizure for "interest" adopted by RI OCSS, which lacked any probable cause.[10]

24. Per documentation of Seguin's *Rhode Island Department of Human Services Office of Child Support Services ("RI OCSS") Case Tracking Case History* documentation, RI OCSS is Gero Meyersiek's ("Meyersiek") agent and Meyersiek is RI OCSS's principal, labeled as "Client."[11] RI OCSS acted as Meyersiek's agent and formed an agent relationship.  Meyersiek is the Custodial Parent and Seguin is the Noncustodial Parent.  RI OCSS also owes Seguin a duty to administer child support fairly and with accuracy.  RI OCSS also owes Seguin a duty in its capacity as the dual broker of debt forgiveness under the State's Debt Compromise Policy, between the noncustodial parent and the custodial parent.  (Seguin's daughter, Julia, was emancipated on April 21, 2018, and is an adult twenty-two years old).

25. Notwithstanding the relationship between Defendants RI OCSS and Meyersiek, RI OCSS also owes duty to Seguin, who is the noncustodial-parent citizen of Texas.  Among the many duties RI OCSS owes and has owed to Seguin include the duty of broker agent to Seguin,

---

[10] Per RI OCSS Case Tracking Case History Documentation entries by Kevin Tighe.
[11] Per RI OCSS Case Tracking Case History Documentation stating Gero Meyersiek is "D Client."

duty of performing on contract agreement with Seguin, duty of disclosure, duty of acting in good faith and duty to respect Seguin's due process rights, including disclosure of how RI OCSS calculated interest arrears, what and why and how RI OCSS collects "interest arrears" that RI OCSS Defendants knew and should have known Meyersiek waived interest claim per contract agreement RI OCSS brokered and agreed to itself.

26. The December 7, 2021 contract that Meyersiek entered into with Seguin, waiving all interest in consideration of a lump sum payment of $104,185.98 by Seguin to pay off all child support arrears Seguin owed,[12] was brokered by Meyersiek's agents, RI OCSS officials, (who also owe Seguin, the non-custodial parent, a duty as collectors of child support):

    a.  Kevin Tighe, Esq.;

    b.  Frank DiBiase, Esq.;

    c.  Monique Bonin (Finance Administrator for the State of Rhode Island);

    d.  Wendy Fobert (RI OCSS Accounting Department);

    e.  Karla Callaberos AKA Karla Samsoya (Seguin's case agent).

27. These RI OCSS agents also acted in the dual capacity of agent to Seguin in brokering the agreement. The agency, by its Debt Compromise Policy, entered into agreement with Seguin in which the agency forgave the interest, which Meyersiek waived.

28. Seguin accepted paying the lump sum amount of $104,185.98 in consideration of Meyersiek's waiver of interest and RI OCSS's forgiveness of interest that RI OCSS advised Seguin in writing via email on December 7, 2021, and on the same day paid the $104,185.98

---

[12] John Langlois, Deputy Chief Counsel of RI OCSS representation at RI EOHHS Appeal Office Prehearing Conference on October 5, 2022.

in one lump sum in consideration of Meyersiek's waiver of interest and RI OCSS's forgiving

interest debt on December 7, 2021, thereby executed the contract.

29. The December 7, 2021 good faith contract was brokered by RI OCSS, (whose actions

advanced the interest of Meyersiek and whose actions are condoned by Meyersiek), in

Providence, Rhode Island, acting as agent to both Meyersiek *and Seguin*, for $104,185.98

which waived Meyersiek's claim for interest[13]and RI OCSS's forgiving interest debt.  RI OCSS

accepted the terms of contract between Meyersiek and Seguin that it brokered, and

entered into agreement with Seguin to honor the terms of the contract it brokered and

accepted with Seguin.  Under its agreement with Seguin, RI OCSS forgave the interest

portion of the arrears debt, pursuant to its Debt Compromise Policy.

30. Having established the contract terms, agent-relationship(s) between Meyersiek and RI

OCSS, RI OCSS's contract with and duty to Seguin, the location and time, Seguin now

proceeds to lay out the facts forthwith, with specificity, of all the acts, events, transactions,

occurrences, and omissions giving rise to the claims in this lawsuit.

31. For about two months, from October 2021 to November 2021, Seguin in Texas, through her

Texas attorney, Bruce Coane, Esq., repeatedly contacted the Rhode Island Department of

Human Services Office of Child Support Services ("RI OCSS") to pay off in full her child

support obligations.  Seguin learned in October 2021 of a hold on her passport renewal

placed by RI OCSS.  From October 2021 to November 2021, Seguin's Texas Attorney

---

[13] John Langlois, Deputy Chief Counsel of RI OCSS representation at RI EOHHS Appeal Office Prehearing Conference on October 5, 2022, and comment entered on December 6, 2021 by Kevin Tighe, counsel of RI OCSS, on Seguin's RI OCSS Case Tracking Case History Documentation.

repeatedly contacted RI OCSS to request Seguin's case file in order to ascertain all arrears owed in order to pay off all arrears.

32. However, RI OCSS refused to discuss Seguin's case with Seguin's Texas Attorney and stated it would only discuss Seguin's case directly with Seguin alone, without counsel.

33. Unbeknownst to Seguin, while on the one hand RI OCSS refused to discuss Seguin's case with Seguin's Texas Attorney, on the other hand RI OCSS counsel Kevin Tighe ("Tighe"), (who upon information and belief is a Deputy Chief Counsel of RI OCSS) instead contacted Meyersiek's private attorney, Barbara Grady.  Upon information and belief, Tighe and Meyersiek communicated a number of times in detail regarding Seguin's Texas Attorney's contact to RI OCSS and planned to deprive Seguin of counsel by refusing to discuss Seguin's case with Seguin's Texas Attorney.  Upon information and belief, Tighe and Meyersiek and Grady primarily communicated telephonically to minimize written email and paper trail. Seguin forms this belief based on RI OCSS's written and verbal representations to Seguin that it withheld records (that would include notes made of phone conversations and archived emails) from Seguin of its communication with Meyersiek regarding Meyersiek's waiver of interest.

34. On or about December 6, 2021, Tighe initiated contact with Meyersiek's lawyer to broker a deal in which Meyersiek waives interest and RI OCSS forgives the debt portion of the arrears.  Tighe told Meyersiek and his lawyer Barbara Grady that RI OCSS had removed the interest data off the computer case management system in Seguin's case.  This means that Seguin would see $0.00 under "Interest" in her RI OCSS Statement of Account online account when she logs into her account online.  This online account is designed by RI OCSS,

advertised on their website, as the sole portal "child support case management tool" for Noncustodial Parents to review RI OCSS's record of Court Ordered child support, RI OCSS's arrearage calculations, enable non-custodial parents to set up child support payments and review RI OCSS's record of posted child support payments.  All online account publication of key information such as "Total arrears due," "Interest," and "Payments Made," is within the sole control of RI OCSS.  Essentially, RI OCSS advertises on its own website to non-custodial parents to rely on the figures published by RI OCSS in their RI OCSS online account.  This tool is advertised as a form of service to non-custodial parents.

35. On and about December 6, 2021, Tighe explicitly asked Meyersiek if he would agree to waive interest or if he "wants the interest put back on the system," and Meyersiek explicitly waived interest and instructed Tighe "not to put the interest on the system."  Meyersiek condoned the "taking off" of interest in the system.  Upon information and belief, anticipating Seguin will have to eventually directly contact RI OCSS herself since RI OCSS stonewalled Seguin's Texas lawyer's attempts to obtain Seguin's files to pay off child support, Meyersiek and Tighe planned to have Seguin access her RI OCSS online account, where RI OCSS posted a Total Due Arrears for $93,214.58 and $0.00 interest, so as to conceal from Seguin their manipulation of her arrears account she would see as soon as she was led by RI OCSS to log on.  The RI OCSS agreement brokers include Kevin Tighe, Esq.; "KWC;" Wendy Fobert (accounting department), Monique Bonin (Finance Administrator for the State of Rhode Island); Frank DiBiase,Esq. (Chief Legal Counsel); Timothy Flynn, Esq., Adam Dias ( Accounting Department), Karla Caballeros AKA Karla Samasoya (case agent), per Seguin's RI OCSS Case Tracking System record that RI OCSS released to Seguin on

December 22, 2022 through the RI APRA (Rhode Island Access to Public Records Act)

request she petitioned to the Secretary of EOHHS (Executive Office of Human and Health

Services) Ana Novais, on December 1, 2022.[14]  EOHHS "manages" the Rhode Island

Department of Human Services, of which RI OCSS is a sub-department.  (RI OCSS denied

Seguin's numerous record requests for accounting records and records of Meyersiek's

waiver of interest from her own case file over twelve times from October 2021 to the

present, only allowing her access to her RI OCSS online account.  The content of Seguin's RI

OCSS online account has been manipulated by the agency - through its arbitrary taking off

interest and putting interest back on at will - and RI OCSS has control of what arrears

numbers to publish online at all times.  RI OCSS's practice of arbitrarily "taking off" and

"putting back on interest" at will without proper disclosure or explanation of these material

changes to Seguin, effectively and knowingly made false representations to Seguin of

inaccurate arrears numbers online in her online account, which RI OCSS then told Seguin to

rely on.  Although RI OCSS has a duty to disclose material differences in their published

arrears online from what they allege Seguin owes behind the scenes caused by their "taking

interest off the system," RI OCSS withheld from Seguin this very material unlawful practice

of maintaining multiple books of accounts and bookkeeping of several sets of arrears in

Seguin's case.  This practice is illegal under general accepted accounting principles and

practices.  RI OCSS's concealment from Seguin its removal of interest from the system

manually by RI OCSS is further unlawful.  RI OCSS's practice of keeping multiple sets of

books in Seguin's case is prohibited by federal deceptive trade practices, federal fair debt

---

[14] Per RI OCSS Case Tracking Case History Documentation.

collection practices and all other applicable consumer protection laws, both federal and state. The Office of Child Support Enforcement of the U.S. Department of Health and Human Services defines a non-custodial parent as a "consumer" of the Office of Child Support Services. RI OCSS represented at least six sets of books of accounts of alleged arrears from December 2021 to November 2022:

    a.  $93,214.56 Total Due on December 6, 2021, online, as of November 30, 2021.

    b.  $104,185.98 Total Payoff Amount on December 7, 2021.

    c.  $75,638.00 on a Notice of Intent to Lien dated March 3, 2022. RI OCSS rescinded this figure based on alleged unspecified errors on October 14, 2022.

    d.  $73,000.00 per RI OCSS Deputy Chief Counsel John Langlois's representation at the agency administrative appeal Pre-hearing held on October 5, 2022.

    e.  $55,000.00 on RI OCSS correspondence with Meyersiek on October 13, 2022.

    f.  $75,623.71 Total Due for "Interest," online, as of November 30, 2022.

36. RI OCSS refused to provide Seguin any accounting explanation for how RI OCSS calculated the ever-changing very large sums of alleged arrears of $93,214.56 or $104,185.98 or RI OCSS's claims for interest that was already waived by agreement for $75,638.00 or $73,000.00 or $55,000.00 or $75,623.71 despite Seguin's over twelve requests to RI OCSS. Collecting child support by arbitrarily "taking interest off the system" and "putting interest This conduct is outright illegal, unconstitutional, and willful. It is illegal, unconstitutional and willfully in bad faith to collect child support from Plaintiff in Texas to Plaintiff's detriment and economic harm, in this manner that is prohibited by common law, by due process, and by interstate commerce regulatory statutes such as the Deceptive Trade

Practices Act and the Fair Debt Collection Practices Act for the private sector.  The Fair Debt Collection Practices Act mandates that the collector provide an itemization of the current amount of the debt that reflects interest, fees, payments, and credits since a particular date that the debtor may be able to recognize or verify with records.  At the very minimum, RI OCSS is similarly required to provide Seguin the same itemization of any amount it claims is owed that reflects interest, payments, and credits, which Seguin is entitled to by law and by constitutional due process guarantees.  Instead, not only did RI OCSS breach its duty to Seguin, breached the contract with Seguin, but additionally manipulated the accounting of arrears calculations, illegally kept at least six sets of books that produced at least six different very large amounts in arrears while concealing and withholding from Seguin the itemization of any amount it claims is owed that reflects interest, payments, and credits, denied and violated Seguin's due process rights from November 2021 to the present, breached the contract with Seguin subsequent to Seguin's payment of the agreed upon payoff amount, then seized her properties without probable cause for "interest" claims that were already waived, then withheld from Seguin access to her file that should contain the itemization of any amount RI OCSS claims is owed (RI OCSS's conduct is similar to the conduct of abusive and predatory debt collectors who withheld from consumers proof or itemization of claimed debt owed, which Congress addressed by enacting the Fair Debt Collection Practices Act for the protection of consumers from predatory debt collection):

37. In or about November 2021, RI OCSS gave Seguin's Texas Attorney the contact information for her account's "case agent," an agent named Karla Caballeros ("Caballeros" or "Karla" or

"Karla Caballeros"), for Seguin to contact directly in order to obtain requested information on arrears owed.

38. After two months of stonewalling by RI OCSS who refused to discuss Seguin's case with Seguin's Texas Attorney and conditioning Seguin's access to arrears information by discussion with only herself directly and without counsel, Seguin had no choice but to directly contact on her own the RI OCSS case agent Caballeros whose phone contact RI OCSS gave her Texas attorney for Seguin to call to pay off child support in full.

39. On or about December 6, 2021, Seguin telephoned Caballeros and again reiterated in good faith that she wanted to pay off arrears in full. Caballeros, acting as Meyersiek's agent and per instruction by Tighe, directed Seguin to log on to her RI OCSS online account for the first time, and told her to pay off the Total Arrears Due figure shown online of $93,214.56 as of November 30, 2021. $0.00 Interest was recorded on Seguin's online account as of November 30, 2021. The $0.00 Interest displayed by RI OCSS was represented by Caballeros as the waiver of interest by Meyersiek, which the agency represented was accurate, in that the agency forgave the interest portion of the arrears, which interest Meyersiek had waived. Caballeros also told Seguin that Caballeros also has access and can simultaneously view the $0.00 interest on Seguin's online account as well as the published information contained therein. Seguin justifiably relied on the representation by Caballeros, whom RI OCSS represented was Seguin's "account case manager" and the published written information displayed on her RI OCSS online account to be true, complete, and accurate with no other material facts withheld, omitted or concealed. After RI OCSS's and Meyersiek's deprivation of Seguin's representation by counsel in her good

faith dealing with RI OCSS to pay off her child support account, RI OCSS had a special duty to

Seguin as dual agent to Seguin brokering the agreement with Seguin as dual agent to

Seguin, and entering into agreement with Seguin in good faith for Seguin to pay off child

support as she expressly sought to do, unblock her passport renewal and close her child

support case.

40. On or about December 6, 2021, Caballeros communicated to Tighe of Seguin's intentions to

pay all arrears in full.  Tighe in turn called Meyersiek's attorney "to advise, and to discuss if

Meyersiek wants the interest put back on the case."  Meyersiek, through his private lawyer,

Barbara Grady, told Tighe, acting as Meyersiek's agent, that he agreed to waive interest to

get Seguin to pay a lump sum payment of $104,185.98.[15] Tighe met with other aforesaid RI

OCSS actors, Monique Bonin and Frank DiBiase, acting as Meyersiek's agent, to discuss the

details relative to RI OCSS's brokering the contract.[16]

41. On the early morning of December 7, 2021, at approximately 8:47 a.m., Caballeros emailed

Seguin saying "Accounting says to pay $104,185.98" with bank wire instructions directing

Seguin to pay off all arrears in one lump sum to RI OCSS's bank account for child support

collections[17]. Upon information and belief, Tighe designated Caballeros be the front person

interface to broker the deal with Seguin, while he led the brokering of the deal.  Caballeros

told Seguin to pay the $104,185.98 in one lump sum in consideration of waiver of interest

and forgiving of interest.  Seguin asked Caballeros what was the extra $10,971.42 on top of

the online Total Arrears $93,214.56 (as of November 30, 2021) for ($93,214.56 was

---

[15] Per John Langlois, Deputy Chief Counsel of RI OCSS representation at RI EOHHS Appeal Office Prehearing Conference on October 5, 2022; Per RI OCSS Case Tracking Case History Documentation entry by Kevin Tighe.
[16] Per RI OCSS Case Tracking Case History Documentation entry by Kevin Tighe.
[16] Per RI OCSS Case Tracking Case History Documentation entry by Kevin Tighe.
[17] Email from Caballeros to Seguin, dated December 7, 2021 at 8:47 a.m.

displayed on her online account that Caballeros represented only the day before as the total arrears due). Caballeros told Seguin that it was for "medical" that was not included in the $93,214.56 Total Arrears shown on Seguin's RI OCSS online account they both reviewed together just the day before.  Caballeros told Seguin there was no interest because Meyersiek waived interest and interest was forgiven.  Although RI OCSS failed to provide Seguin with an itemized accounting of how RI OCSS calculated $104,185.98, Seguin justifiably relied on the written advisement from RI OCSS's Caballeros's email representation that RI OCSS's "Accounting" Department "says," to be an accurate calculation of "medical" added on to the $93,214.56 that was published in Seguin's online account just the day before, and that the $104,185.98 excluded interest, which was waived by Meyersiek and forgiven by RI OCSS.  Seguin in good faith accepted and agreed, and on the same day paid $104,198.98 in one lump sum to pay off child support immediately that day on December 7, 2021.  Seguin accepted to pay $104,185.98 in one lump sum payment in consideration of Meyersiek's waiver of interest and RI OCSS's forgiving interest.  Seguin executed on the contract on the same day, December 7, 2021, paying by bank wire transfer to RI OCSS's support collection bank count at Citizens Bank.  Additionally, Seguin in good faith communicated with Caballeros of RI OCSS confirming her payment by wire transfer. Seguin in good faith finalized, executed, and communicated to RI OCSS her execution of the contract to pay off arrears in full.

42. In good faith, subsequent to making her bank wire transfer, Seguin asked Caballeros on and about December 7, 2021 when Seguin would see the posting of the lump sum payment of $104,185.98 on her RI OCSS online account.  Caballeros told Seguin that due to the

upcoming Christmas and New Year holidays, it may take up to two months for it to post for her to see it.  Seguin justifiably relied on RI OCSS's representation at the time.  Upon information and belief, this misrepresentation to Seguin was calculated to put Seguin off something being wrong, to allow RI OCSS, acting as Meyersiek's agent, to subsequently immediately and clandestinely lien and levy Seguin's property without notice or disclosure to Seguin with impunity.

43. Subsequent to Seguin's payment of the large lump of $104,185.98 in consideration of Meyersiek waiving interest, Meyersiek "changed his mind about waiving interest,"[18] in breach of contract.  Meyersiek never noticed Seguin of his "change of mind."  Instead, Meyersiek communicated to Tighe to "put the interest back on the system."  Unbeknownst to Seguin, and according to Seguin's RI OCSS Case Tracking Record, Tighe similarly "put the interest back on the system" immediately, in breach of RI OCSS's payoff contract with Seguin that forgave interest debt, failed to disclose or notice Seguin of the agency putting interest back on the system in breach of its agreement with Seguin forgiving interest debt, and all the while acting to ensure Seguin's wire transfer payment of $104,198.98 would not be reversible.  RI OCSS, in its capacity acting as broker agent to Seguin and having an agency duty to Seguin, failed to notify Seguin of Meyersiek's breach of contract that RI OCSS itself brokered, accepted, and entered into with Seguin for a lump sum payoff in consideration of waiver of interest and its forgiveness of interest debt, but instead ensured that Seguin's pay off lump sum payment of the large sum of $104,185.98 was NOT reversible, showing no regard for Seguin's rights.  Meyersiek and RI OCSS, by and through Tighe, kept Seguin's

---

[18] Per RI OCSS Case Tracking Case History Documentation entry by Kevin Tighe; Per John Langlois, Deputy Chief Counsel of RI OCSS representation at RI EOHHS Appeal Office Prehearing Conference on October 5, 2022

payment, and put interest back on the system without disclosing to Seguin their collective breach of contract and actions.  Unbeknownst to Seguin, and according to Seguin's RI OCSS Case Tracking Record, Kevin Tighe made entries on December 9, 2021 that the funds of Seguin's $104,185.98 bank wire payment arrived, and immediately Tighe put into action plans to lien Seguin's bank account from which the bank wire transfer was made on the same day Seguin's funds arrived, December 9, 2021[19].  This immediate contract breach occurred less than forty-eight (48) hours after Seguin's bank wire payment in execution of the contract.  This goes to show the bait-and-switch intent and states of mind of the Defendants.

44. Unbeknownst to Seguin, on December 8, 2021 upon receipt of Seguin's bank wire transfer, Wendy Fobert ("Fobert") made several accounting adjustments to Seguin's account and made entries in Seguin's account on December 9, 2021: "correct CP medical arrears as interest of $6,028.75 was added to principal in error. Released $104185.98 wire transfer received 12/08/21 to NON FIP Principal $93214.56, CP Medical Principal $8675.00 and Medicaid Principal $2296.42."[20]  At all times, defendant Fobert, or Caballeros or Tighe, or anyone else at RI OCSS never noticed nor disclosed to Seguin an explanation of this error and adjustment made by Fobert, or Caballeros, or Tighe, or anyone at RI OCSS.  The aforementioned-Defendants have a duty to disclose accounting adjustment explanations when there appears to be an error for $6,028.75 which is not a small amount.  Even more troubling, Seguin is unable to ascertain with certainty what these "errors" and accounting adjustment and allocations are for or to their accuracy because RI OCSS refuses to this day

---

[19] Per RI OCSS Case Tracking Case History Documentation entry by Kevin Tighe.
[20] Per RI OCSS Case Tracking Case History Documentation entry by Wendy Fobert dated December 9, 2021.

to release to Seguin her case file's accounting records with itemization of the amounts RI

OCSS claims is owed, that reflects interest, payments, and credits since a particular date

that Seguin may be able to recognize or verify with records, despite Seguin making over

twelve (12) account record requests.  Seguin has no way to validate or verify the accuracy or

inaccuracy of any of the alleged "errors" or alleged arrears amounts.

45. Unbeknownst to Seguin, on December 10, 2021, Adam Dias at RI OCSS made the entry in

Seguin's account that says "Made adjustment to correct accidental adjustment that made

CP medical negative. It is supposed to be $6,028.75."[21]  Again, multiple undisclosed and

unexplained errors by the accounting department of RI OCSS occurred in succession that

were never disclosed to Seguin.  Seguin is entitled by right to review RI OCSS's book-keeping

of her account.  At all times, Seguin never received any communication or disclosure or

explanation of this error and adjustment from any of the named Defendants.  Seguin is

unable to ascertain with certainty what these "errors" and accounting adjustment and

allocations are for or to their accuracy because RI OCSS refuses to this day to release to

Seguin her case file's accounting records after over twelve (12) account record requests.

46. Unbeknownst to Seguin, Tighe, on December 14, 2021, cut a check for Meyersiek of

Seguin's payment.[22]  Tighe's entry in Seguin's RI OCSS Case Tracking record history omits

specifying the amount on the check, therefore, Seguin is, at this juncture, unable to

determine how much the check was for due to RI OCSS's continuous denial of Seguin's right

to access accounting calculation of alleged arrears in her own case file.

---

[21] Per RI OCSS Case Tracking Case History Documentation entry by Adam Dias dated December 10, 2021.
[22] Per RI OCSS Case Tracking Case History Documentation entry by Kevin Tighe on December 14, 2021.

47. Unbeknownst to Seguin, on December 14, 2022, Tim Flynn ("Flynn"), another RI OCSS employee acting on behalf of Meyersiek, "mailed admin. Subpoena and request for info" to Seguin's bank.[23]  This act was never communicated to Seguin by any of Meyersiek's agents at RI OCSS.  RI OCSS's adverse actions against Seguin in breach of contract and penalizing Seguin after she executed the contract in good faith lack probable cause for issuances of subpoena into her bank account or property for "interest" claims that were already waived, per contract, that involved multiple attorneys with titles "Deputy Chief Counsel" on the side of Defendant RI OCSS and involved private counsel for Meyersiek, Barbara Grady, Esq.  This waiver of interest agreed to by RI OCSS and Meyersiek was well informed, valid, and binding.  Seguin suffered from defendant RI OCSS's seizure of her property for alleged interest without probable cause, after the RI OCSS forgave the interest debt as per agreement.

48. Unbeknownst to Seguin, on January 4, 2021, Tim Flynn ("Flynn"), on behalf of Meyersiek, and both in breach of contract, spoke with "Marie" at Seguin's bank in Texas from which she wired the lump sum payoff payment to RI OCSS regarding a subpoena that Flynn had sent to the bank regarding Seguin's bank account.  This act was never communicated to Seguin by Flynn nor any of Meyersiek's agents at RI OCSS.[24]

49. Unbeknownst to Seguin, on January 12, 2022, Flynn received letter from Seguin's bank stating Seguin has a checking account at the bank.  Flynn immediately "created an offline notice of intent to lien Seguin's account.  Faxed and mailed copies to Seguin's bank.  Will

---

[23] Per RI OCSS Case Tracking Case History Documentation entry by Tim Flynn on December 14, 2022.
[24] Per RI OCSS Case Tracking Case History Documentation entry by Tim Flynn on January 4, 2022.

notice Seguin via mail at the ten day mark."[25]  This act was never communicated to Seguin by any of Meyersiek's agents.  Seguin never received the Notice of Lien.  Upon information and belief, Flynn never mailed the requisite notice so as to ensure the continuation of clandestine seizure of Seguin's property.  This belief is reasonably formed on the basis that there is no entry by Flynn at the ten day mark on or about January 22, 2022 of actually noticing "offline" Seguin via mail at the ten day mark of RI OCSS's "offline" notice of intent to lien made on January 12, 2022, showing among other things, the consistent pattern of reckless disregard for Seguin's rights. Upon information and belief, this lien was in the amount of $75,638.00 for alleged interest. Seguin suffered distress after discovering defendants' seizure of her property without probable cause for $75,638.00 for alleged interest that RI OCSS had forgiven and Meyersiek had waived, in breach of contract.

50. Unbeknownst to Seguin, on February 21, 2022, Flynn "mailed and faxed OFFLINE RI OCSS's perfected notice of lien to Seguin's bank regarding Seguin's account.  Copy mailed to Seguin."[26]  Seguin never received the "offline" Notice of Perfected Lien.  RI OCSS's failure to send notice to Seguin of RI OCSS's "offline" generated notices of liens is calculated to deprive Seguin of her due process right to refute and dispute the notice of lien on her property.  Upon information and belief, Flynn never mailed the requisite notice so as to ensure the continuation of clandestine seizure of Seguin's property, and taking advantage of the fact that she recently had undergone surgery.  This is reasonably formed on the basis that there is no entry by Flynn at the ten day mark on or about January 22, 2022 of actually noticing Seguin via mail at the ten day mark, showing among other things, the consistent

---

[25] Per RI OCSS Case Tracking Case History Documentation entry by Tim Flynn on January 12, 2022.
[26] Per RI OCSS Case Tracking Case History Documentation entry by Tim Flynn on February 21, 2022

pattern of reckless disregard for Seguin's rights.  Upon information and belief, this perfected lien was in the amount of $75,638.00 for alleged interest. Seguin suffered distress after discovering defendants' seizure of her property without probable cause for $75,638.00 for alleged interest that RI OCSS had forgiven and Meyersiek had waived, in breach of contract.

51. Unbeknownst to Seguin, Tighe and other agents of Meyersiek at RI OCSS sometime after Seguin's payment of $104,185.98 programmed the system to place a lien on any and all Seguin's property that the Title IV-D Agency program participates in.  RI OCSS contracted with several third-party organizations, corporations and entities for the purpose of identifying Seguin's and non-custodial parents' properties for the collection of child support arrears.  However, RI OCSS engaged said third parties for the collection of interest arrears that were already waived by Meyersiek and forgiven by RI OCSS, in consideration of Seguin's lump sum payoff payment, in breach of good faith contract with Seguin.  RI OCSS's contracting of third parties for the purpose of seizing Seguin's properties for interest that was already waived in breach of contract was never communicated to Seguin for the purpose of ensuring the Defendants could continue to covertly seize Seguin's property. Upon information and belief, RI OCSS contracted with third parties to lien Seguin's property in the amount of $75,638.00 for alleged interest. Seguin suffered distress after discovering defendants' seizure of her property without probable cause for $75,638.00 for alleged interest that RI OCSS had forgiven and Meyersiek had waived, in breach of contract.

52. The RI OCSS's Case Tracking System records on March 4, 2022 that on March 3, 2022 "KWS1263 <u>created</u> the lien off insurance asset form."[27]  KWS1263, upon information and

---

[27] Per RI OCSS Case Tracking Case History Documentation entry dated March 4, 2022.

belief, is the code name entered by an unnamed person to contract with third parties, pursuant to Tighe's instruction, to place liens on Seguin's property. This was never communicated to Seguin by any of Meyersiek's agents at RI OCSS.

53. Out of the blue, Seguin received in the mail on March 15, 2022, a Notice of Intent to Lien by RI OCSS on her insurance property dated March 3, 2022, for the very large amount of $75,638.00 without any explanation, no accounting and no documented justification. Upon information and belief, this lien, in the amount of $75,638.00, was for alleged interest. Seguin suffered distress after discovering defendants' seizure of her property without probable cause for $75,638.00 for alleged interest that RI OCSS had forgiven and Meyersiek had waived, in breach of contract

54. On April 1, 2022, Seguin emailed a timely written appeal to RI OCSS of the March 3, 2022 lien. Upon information and belief, RI OCSS forwarded Seguin's written appeal to the Rhode Island Executive Office of Human and Health Services ("RI EOHHS") Appeals Office. RI EOHHS is designated as the State's Single Agency under Title IX of the Social Security Act that has been authorized by the State to hear all appeals stemming from actions by several state agencies, including enforcement actions by the RI OCSS.

55. A Perfected Notice of Lien in the amount of $75,638.00 was created on April 4, 2022, per the record entry made on April 5, 2022 by "KWS1263" who created the lien[28], in violation of applicable Federal and state laws, rules and regulations, as Seguin made timely written appeal. This was never communicated to Seguin by any of Meyersiek's agents at RI OCSS. On or about April 8, 2022, Seguin received in the mail this April 4, 2022 perfected lien and

---

[28]Per RI OCSS Case Tracking Case History Documentation entry dated April 4, 2022.

emailed RI OCSS Caballeros in protest, requesting the removal of the Perfected Lien, since

Seguin had timely appealed the March 3, 2022 notice of intent to lien.  Upon information

and belief, this perfected lien, in the amount of $75,638.00, was for alleged interest. Seguin

suffered distress after discovering defendants' seizure of her property without probable

cause for $75,638.00 for alleged interest that RI OCSS had forgiven and Meyersiek had

waived, in breach of contract.

56. Instead of removing the Perfected Lien pending the outcome of Seguin's appeal, Seguin

received an email from Paul Gould ("Gould"), Chief of Legal Services of RI OCSS, on April 11,

2022 saying he sent Seguin's insurance company to remove the lien.  However, Seguin's

insurance did not receive this alleged removal communication from Gould.  Nor is there any

record of Gould's removal of the perfected lien in Seguin's Case Tracking Record.[29] (The

entries do not show any entry by Gould on or about April 11, 2022.  The next entry would

be dated April 28, 2022, recorded by Flynn, saying he mailed notice of levy to Seguin's bank

regarding a lien on Seguin's bank account, copy mailed to Seguin.  Again, as this mailing was

done "offline," Seguin never received a copy of a notice of levy from Flynn).  Upon

information and belief, RI OCSS's failure to remove the perfected lien, in the amount of

$75,638.00, was for alleged interest. Seguin suffered distress after discovering defendants'

failure to remove the perfected lien pending the outcome of her appeal, constituting

continuing seizure of her property without probable cause for $75,638.00 for alleged

interest that RI OCSS had forgiven and Meyersiek had waived, in breach of contract.

---

[29] Per RI OCSS Case Tracking History Documentation for the month of April 2022.

57. Upon information and belief, Gould misrepresented to Seguin and never removed the perfected lien, as John Langlois ("Langlois"), counsel of record for RI OCSS for the duration of the appeal, and who is the Deputy Executive Legal Counsel of RI OCSS, would later say at the October 5, 2022 Prehearing Conference to the RI EOHHS Appeals Executive Hearing Officer, Deb DeStefano ("EHO"), that the perfected lien was still in place and that the "system" had generated it because Seguin's written appeal was sent on April 1, 2022, which did not give RI OCSS time to make adjustments in the system to stop the perfected lien from going out.  Langlois even objected to the removal of the April 4th Perfected Notice of Lien on October 5, 2022, showing that the Notice of Perfected Lien was never removed, as misrepresented by Gould.  Indeed, on October 14, 2022 RI OCSS issued a Recission of the Notice of Perfected Lien, showing Gould did not remove the April 4th Perfected Notice of Lien.  Seguin suffered distress after discovering defendants' failure to remove the perfected lien pending the outcome of her appeal, constituting continuing seizure of her property without probable cause for $75,638.00 for alleged interest that RI OCSS had forgiven and Meyersiek had waived, in breach of contract.

58. Further, on October 14, 2022, Langlois issued a Notice of Recission of Notice of Lien AND Notice of Perfected Lien, implying that Gould never removed the perfected lien, implying he lied to Seguin of its removal on April 11, 2022.  Obviously, there is no need to issue a recission of the perfected lien on October 14, 2022 if the Perfected Lien was already removed in April 2022 as Gould claimed.  Seguin suffered distress after discovering defendants' failure to remove the perfected lien pending the outcome of her appeal,

constituting continuing seizure of her property without probable cause for $75,638.00 for

alleged interest that RI OCSS had forgiven and Meyersiek had waived, in breach of contract.

59. From April 1, 2022 to October 5, 2022, the counsels of record for RI OCSS during Seguin's RI

EOHHS administrative appeal of the March 3, 2022 lien for $75,638.00 were John Langlois

and Paul Gould, to whom Seguin made over ten requests for her case file records pursuant

to her right to her case file, as outlined in RI regulation 210-RICR-10-05-2 *et seq*. and per

federal regulations for the single state agency fair hearing (RI EOHHS Appeal Fair Hearing)

pursuant to 42 CFR sec 431.242(a)(1) and 42 CFR sec 431.242(a)(2) that set the procedural

requirement for a single state agency EOHHS's Appeal Fair Hearing, stipulating that the

appellant, Seguin, has  the right to his/her case file and must have access to her case file;

without access to her case file, Seguin's exercise of the procedural right to question and

refute the agency's evidence set forth in 431.242€ is then deprived.  This is consistent with

discovery.  431.202 requires that the State Plan must provide sections 431.205 through

431.246 of this subpart are met.  In addition to procedural safeguards, the aforesaid

sections set forth the authority to provide corrective actions against errant agency conduct.

60. However, Meyersiek's agents, the RI OCSS actors, and RI OCSS on its own, denied Seguin

access to her case file over and over again for over ten times.  The RI EOHHS continued

scheduled hearings for three times, the maximum number allowed by regulation for good

cause shown, namely due to the fact that RI OCSS had outright denied or ignored Seguin's

record requests and denied Seguin access to her records, throughout the appeal process.

61. Seguin submitted to the RI EOHHS Appeals Office evidence of the good faith contract Seguin

entered into with Meyersiek that was brokered, accepted, and agreed to in contract by RI

OCSS in December 2021, whereby Seguin paid off her child support in full in consideration of Meyersiek's waiving of interest and RI OCSS forgiving interest, including submissions of the screenshots taken of her online account on December 6, 2021 when she was told by RI OCSS to log on to her RI OCSS online account by Caballeros representing that it showed $93,214.56 as total arrears due and $0.00 of Interest representing waiver of interest and forgiveness of interest debt, as of November 30, 2021; Seguin additionally submitted the email dated December 7, 2021 where RI OCSS told her "accounting says" to wire transfer $104,185.98 in one lump sum to pay off child support in full; Seguin further submitted bank transfer records evidencing her wire transfer of the agreed upon amount on December 7, 2022, showing Seguin's execution of the contract.  RI OCSS produced no documentation throughout the appeals process of any kind, be it documentation in support of their notices of liens on Seguin's property issued without probable cause, or documentation supporting RI OCSS's claim for interest when interest was waived and forgiven.

62. The RI EOHHS Appeals Office and EHO scheduled a Prehearing Conference on October 5, 2022 for the purpose of addressing RI OCSS obstruction of access to Seguin's case file.

63. At the October 5, 2022 Prehearing, the EHO stated that based on Seguin's evidentiary submissions, the burden of proof lies with RI OCSS to show arrears of $75,638.00 on the lien is owing.  Only then did Langlois say the following:

> "EHO: The agency will have to submit proof of the allegation for arrears to support their position.
> Langlois: The reason why I asked earlier whether Mary spoke to Karla after she made the payment was because there was a change of circumstances right after that.  I don't know if anyone in my agency had ever explained that to Mary.
> Seguin: Wait a minute, wait a minute,

EHO: Wait Mary, I know what you asked for, let me get to what John just said, so John, you said there was a change in circumstances subsequent to her making a payment but before the notice of lien went out?

Langlois: Yeah.

EHO: OK, so

Langlois: Can I just back up and explain what happened, 99% of this is a misunderstanding

EHO: OK?

Seguin: Including what was on the screenshot, was that a misunderstanding??

Langlois: Can I speak without being shouted over?

Seguin: I am flabbergasted, really.

Langlois: What happened in this case is when Mary's representative, her attorney, called us in late November 2021, and said she wants her passport released and what does she have to do to release her passport, they put her in touch with Karla who gave her the $104,185.98 number. Where that number came from, was one of our attorneys contacted the custodial parent, Gero Meyersiek, so we contacted his attorney, it wasn't me, it was someone in my office, and said if she's willing to make a $104K to pay off the principle, would you agree to waive the $73K in interest? He said yes. So Karla notified Mary that if she paid the $104K, it would be paid in full because he was wiling to waive the interest and accept just the principal. What happened was the day after Karla spoke to Mary to wire in the $104K the attorney for Mr. Meyersiek contacted us again and said he changed his mind, please put the interest back on the system, so we did. So the number that was given to her on the day it was given to her was correct, the $104K, because he was waiving the interest, but then changed his mind, so we put the interest back on the system, because he was waiving the interest, and that interest was put back on the system and that's why the system is now saying she owes $73K. That's why in March when the system saw that she had some sort of personal injury insurance in the system, our system was showing she owed $73K so we issued the lien. But that was what happened, he changed his mind the next day and that's what messed up the numbers. So that's how all this happened,it was a pure misunderstanding, I don't know whether anyone has ever explained that to Mary how that happened.

EHO: OK, Mary, did anyone ever explain that to you before?

Seguin: No. No one ever explained any of that. This is why I am asking for my case file, I think this is more basis to ask for my entire case file from 2020. It's news to me for example and its new

information to me that your office's lawyer would not talk to me directly but would be picking up the phone and calling the attorney for the custodial parent.  And then not saying you were doing this deal.  I never offered $104K.  You had determined this number, and that's why I am looking for documentation as to whether this is something you guys do in every case.

EHO: OK, John, are you intending to submit then, the documentation showing the full balance, which would include the principle and the interest before she paid the $104k, and then what happened after, you're prepared to submit documentation to show everything that you said just happened.

Langlois: Yes.  I can show the account balance before he agreed to waive the interest.  And I can show you the account balance after she made the payment. And then when we put the interest back on the system.

EHO: And you're going to testify as to why it all occurred, I mean basically what you just told us.

Langlois: Yes.

Seguin: But the screenshot on December 6th showed $93K."

64. John Langlois described the meeting of minds by RI OCSS, Meyersiek and Seguin.  Langlois stated, "..when Mary's representative, her attorney, called us in late November 2021, and said she wants her passport released and what does she have to do to release her passport, they put her in touch with Karla who gave her the $104,185.98  number.  Where that number came from, was one of our attorneys contacted the custodial parent, Gero Meyersiek, so we contacted his attorney, it wasn't me, it was someone in my office, and said if she's willing to make a $104K to pay off the principal, would you agree to waive the $73K in interest? He said yes.  So Karla notified Mary that if she paid the $104K, it would be paid in full because he was wiling to waive the interest and accept just the principal."  John Langlois also described an offer made by Karla Caballeros, the consideration ($104,185.98 for waiver of interest), and acceptance and execution on contract by Seguin that occurred

on December 7, 2021 when Seguin wired the bank payment of $104,185.98.  John Langlois also described Meyersiek's and RI OCSS's breach of contract subsequent to Seguin making the payment that occurred the day after the offer by Karla Caballeros and acceptance by Mary Seguin: "What happened was the day after Karla spoke to Mary to wire in the $104K the attorney for Mr. Meyersiek contacted us again and said he changed his mind, please put the interest back on the system, so we did."

65. In addition to the waiver of interest, Caballeros also represented RI OCSS forgave interest debt, which Seguin accepted, then executed by making payment of the $104,185.98 on the same day of the offer, December 7, 2021.

66. Seguin never offered $104,185.98.  RI OCSS, in brokering the agreement, had a duty to represent the true facts, but misrepresented the facts to Seguin.  Seguin never stated to RI OCSS, the broker agent, to offer "$104k."  The "$104k" was an amount that RI OCSS represented to Seguin on December 7, 2021 that its own accounting department had calculated, adding "medical" to the $93,214.58 that was published on Seguin's RI OCSS online account just the day before on December 6, 2021.   Defendant Karla Caballeros represented to Seguin on December 6, 2021 that $93,214.58 was calculated by RI OCSS to be the accurate total arrears as of November 30, 2021.  Karla Caballeros represented to Seguin the $0.00 interest published on the RI OCSS account represented waiver of interest by Meyersiek, and forgiveness of interest debt.  RI OCSS, as brokering agent, represented to Seguin that $104,185.98 represented adding "medical" to $93,214.58.  Caballeros represented to Seguin to pay the $104,185.98 in one lump sum in consideration of waiver of interest and forgiving interest debt.  Seguin told RI OCSS she sought to pay off all arrears.

67.  Seguin never offered $104,185.98; that was an amount RI OCSS represented to Seguin that was calculated by its accounting department that added "medical" to $93,214.98.  RI OCSS breached its duty to Seguin as agent brokering the agreement by representing to Seguin that $104,185.98 is calculated by adding "medical", and then concealing the accounting calculation from Seguin *how* $104,185.98 calculation had incorporated "medical."  John Langlois's statement does not describe "medical" added to $93,214.58.  As the broker agent, RI OCSS is obligated to give Seguin a true representation of the facts.  Seguin suffered distress after learning RI OCSS misrepresented the facts to Seguin.

68. On or about October 11 to October 13 2022, after the October 5, 2022 Prehearing conference, Langlois emailed Meyersiek's private lawyer, Barbara Grady, and again asked if Meyersiek "would waive interest to resolve the case."[30]  Grady emailed that "Meyersiek is willing to accept $55,00 which is approximately 50% of what is owed."  Langlois had represented at the October 5, 2022 Prehearing that interest was $73,000 in December 2021, therefore, consistent with a pattern of made up numbers whereby neither Meyersiek nor his RI OCSS agents would show Seguin the accounting calculations of alleged interest arrears, clearly Defendants manufacture and fabricate large varying and unjustified amounts of total interest at all times: obviously $55,000 is not half of $73,000.  To this email, Langlois replied that "I think we both know that there is zero possibility that Mary Seguin will agree to pay ANY interest."  None of this correspondence was communicated to Seguin.  Consistent with all RI OCSS's conduct prior to the October 5, 2022 Prehearing, Langlois also never explained or disclosed his own correspondence with Meyersiek about

---

[30] Langlois emails dated October 9 to October 13, 2022.

waiving interest, establishing a consistent pattern of behavior of concealment and misrepresentation, and with all collective actions taken together, deceit to Seguin. Moreover, Langlois never provided Seguin with the accounting he promised to at the Prehearing either.  Upon information and belief, similarly to Tighe, Langlois met with the Defendants and discussed the plan with Meyersiek, through telephonic correspondence offline to avoid creating a paper trail, to type up a Notice of Recission on October 14, 2022 that claimed there are unspecified errors in the Notices of Liens, but arrears are still owing and it will continue to enforce arrears,[31] calculated to deprive the EOHHS Appeals Office of jurisdiction so that he would not have to testify to Meyersiek's waiving interest, the breach of contract, bad faith and subsequent conduct and actions of Meyersiek's agents at RI OCSS in the RI EOHHS Appeals Hearing.  Langlois filed a motion to dismiss Seguin's RI EOHHS administrative appeal, pleading that the number $75,638.00 on the lien simply "no longer exists," just like that, without explanation and with impunity.  RI OCSS's actions show they disregard any duty owed to Seguin to explain or justify their very large alleged arrears numbers in the substantial levels of $73k or $75K  that change or subsequently refuted by them, at will.  It should be noted that the number $75,638.00 on the lien does not match the $73,000 interest that Langlois repeatedly claimed was on the system before and after Seguin made the $104,185.98 in December 2021, showing that RI OCSS's refusal to show Seguin's case records is motivated by, among others, cover up of manufactured, manipulated and false numbers for interest claims which Meyersiek had already waived and

---

[31] October 14, 2022 Notice of Recission of Lien – See attached Exhibit.

RI OCSS already forgave, in consideration of Seguin's lump sum payment of $104,185.98 as per contract.

69. Tighe and all relevant actors of RI OCSS acting on behalf of Meyersiek, never communicated to Seguin about Meyersiek "changed his mind" after Seguin accepted and paid the $104,198.98 in lump sum per the agreement brokered by Meyersiek's agent, RI OCSS, from December 7, 2021 to October 5, 2022.  RI OCSS also acted as dual agent to Seguin in the broker of the contract.  RI OCSS also entered into agreement with Seguin to forgive the interest that Meyersiek waived.  RI OCSS Case Tracking Records and RI OCSS conduct show Tighe and RI OCSS actors and Meyersiek never intended to disclose to Seguin Meyersiek's or the agency's breach of the contract: Tighe's record entries never show he saw a need to inform Seguin of anything his dealings with Meyersiek and his private lawyer Barbara Grady in breach of his duty to Seguin as her agent brokering the deal; instead, unbeknownst to Seguin, his entries and subsequent actions show he only cared about and acted to ensure getting Seguin's $104,185.98 payment in hand, set in motion actions to lien Seguin's bank account as early as December 9, 2021 as soon as the $104,185.98 was in hand by asking Tim Flynn to subpoena her bank account for the purpose of placing a lien on it[32]; the same record shows, unbeknownst to Seguin, Tim Flynn issuing "offline" a notice of lien on January 12, 2022 against Seguin's bank account from which she made the bank wire transfer payment; Tim Flynn's entry comment says he mailed the notice himself, but Seguin never received the notice of lien in the mail;  Tighe, an attorney who, upon information and belief based on website information, is a Deputy Chief Counsel of RI OCSS and acting as

---

[32] Per RI OCSS Case Tracking Case History Documentation entry by Kevin Tighe.

Meyersiek's agent, but also has a duty to Seguin as broker agent of the deal and party to agreement with Seguin forgiving interest, consciously and covertly put in place actions to lien Seguin's bank account and property, to conceal and cover up from Seguin the immediate breach of the contract brokered by RI OCSS (that he led, as the attorney versed in contract agreements and the law) acting as Meyersiek's agent, and consciously hid from Seguin of their breach in order to allow them to pocket the $104,185.98 lump sum payment and go about placing liens on Seguin's property without Seguin's knowledge.  Meyersiek took Seguin's $104,195.98 payment and kept it, all the while his agents at RI OCSS went about attaching liens on Seguin's bank account from which she made the wire transfer payment the day Seguin's payment was in hand. Meyersiek and RI OCSS never communicated or noticed in any shape or form to Seguin regarding their active enforcement of placing liens on any and all property of Seguin's they could find for "interest" that Meyersiek had waived.

70. To date, there is no documentation available to Seguin as to what amount in interest was "put back on" the system in Seguin's case file by Tighe and Meyersiek, but the RI OCSS's system generated a placement of lien on Seguin's person injury insurance claim for the amount of $75,638.00 on March 3, 2022.

71. On November 29, 2022 the RI EOHHS Appeals Office issued judgment dismissing Seguin's appeal citing the Recission of the liens caused RI EOHHS to lose jurisdiction over the issue when the adverse lien action by RI OCSS was withdrawn.

72. On December 1, 2022, Seguin filed a petition to the Secretary of RI EOHHS, Ana Novais, pursuant to the RI Access to Public Records Act, for her case file records.

73. On December 3, 2022, Seguin logged on to her RI OCSS online account and discovered that RI OCSS posted a Statement of Account as of November 30, 2022, that says $75,231.00 for interest, recorded $0.00 payment in December 2021, and no where in her account records her $104,185.98 payment made on December 7, 2021. Shocked at the prima facie accounting fraud, Seguin filed on December 5, 2022 a Rule 59 Motion for Hearing to the RI EOHHS Appeals Office, attaching the screenshot of the online account taken on December 3, 2022, based on newly discovered evidence. Langlois filed objections claiming December 2021 evidence is not newly discovered evidence and that it had been available to Seguin. This self-incriminates himself that the prima facie fraudulent recording of $0.00 payment for Seguin's $104,185.98 payment in December 2021 was available to HIM for the duration of Seguin's Appeal.

74. Seguin filed on December 9, 2022 a Rule 60 Motion for Default Judgment based on the fabrication and manufacturing of accounting records in Seguin's file, and on December 14, 2022 filed a Rule 26 and Rule 37 Motion for sanctions. Langlois filed objections to all Seguin's motions.

75. On January 10, 2023, the RI EOHHS issued judgment indicating that RI EOHHS lacked jurisdiction over Seguin's appeal subsequent to RI OCSS's recission of the liens, categorized as the "adverse actions." The state administrative appeal thus concluded.

76. On December 13, 2022, Defendant Lisa Pinsonneault, another legal counsel at RI OCSS sent Seguin an email saying that Seguin's RI APRA request for records was denied and states the basis of denial is nonsegregable. However, Defendant Pinsonneault advised Plaintiff her case records would be release before December 31, 2022. Pinsonneault further advised

Plaintiff to appeal the agency RI APRA denial to the Attorney General under R.I.G.L. sec. 38-2-8.

77. In relevant parts, R.I.G.L. sec. 38-2-8 states: "(b) If the custodian of the records or the chief administrative officer determines that the record is not subject to public inspection, the person or entity seeking disclosure may file a complaint with the attorney general. The attorney general shall investigate the complaint and if the attorney general shall determine that the allegations of the complaint are meritorious, he or she may institute proceedings for injunctive or declaratory relief on behalf of the complainant in the superior court of the county where the record is maintained. Nothing within this section shall prohibit any individual or entity from retaining private counsel for the purpose of instituting proceedings for injunctive or declaratory relief in the superior court of the county where the record is maintained.; (c) The attorney general shall consider all complaints filed under this chapter to have also been filed pursuant to the provisions of § 42-46-8(a), if applicable.; (d) Nothing within this section shall prohibit the attorney general from initiating a complaint on behalf of the public interest."

78. On December 16, 2023, Plaintiff received a letter from Ms. Lisa Martinelli, Esq., Executive Legal Counsel of the Rhode Island Executive Office of Health and Human Services, stating that she is writing on behalf of Secretary Ana Novais, that the documents under Plaintiff's APRA request are in the possession and control of the Department of Human Services, and that she has been assured by Paul Gould, Esq., Executive Legal Counsel of the Defendant agency RI OCSS, that Plaintiff's requested files will be released. Moreover, Ms. Martinelli's letter advises the Plaintiff to appeal the agency RI APRA denial to the Attorney General

under R.I.G.L. sec. 38-2-8.  Ms. Martinelli's December 16, 2022 letter is copied to Defendant

Deborah A. Barclay and Paul Gould, Esq., Executive Legal Counsel of the Defendant RI OCSS.

79. On December 22, 2022, Lisa Pinsonneault released a partial record of Seguin's file that

included the RI OCSS case history tracking record in Seguin's file that is referenced

throughout this Complaint.   However, Pinsonneault emailed Seguin that RI OCSS withheld

all records related to telephonic communications, including notes made of phone

conversations that Tighe had with Meyersiek and his private attorney Barbara Grady in

December 2021 regarding Meyersiek's waiver of interest, taking interest off the system and

putting interest back on the system.  Also withheld from the record release are the critical

accounting records showing how interest calculations were made by RI OCSS, including

records showing the "interest before Seguin made her payment," "interest when Seguin

made her payoff payment," and "interest subsequent to Seguin's payoff payment" that

Langlois agreed to provide Seguin and the Hearing Officer in the telephonic Prehearing

Conference on October 5, 2022.  Instead, RI OCSS purposely released a pile of pleadings that

were submitted by both Seguin and RI OCSS to the RI EOHHS Appeals Office during the

agency administrative appeal hearing from April 2022 to December 2022, rendering the

record release purposely non-responsive to Seguin's record request, since RI OCSS knew

and should have known that Seguin did not ask for these appeal pleadings that Seguin

already has copies of, but that material and central to affording Seguin her right to refute RI

OCSS's property seizure for "interest" that was already waived, are the records Seguin has a

right to access to in her case file those records relating to RI OCSS's brokering of the

contract with Seguin whereby interest was waived in consideration of Seguin's lump sum payoff payment for the very large sum of $104,185.98.

80. None of the above written RI APRA denials stated a pending litigation or foreseeable litigation or investigation, or foreseeable legal action by the RI APRA agency against the RI APRA requester, the Plaintiff, as the basis of the agency RI APRA denial.

81. R.I.G.L. sec. 38-2-8(b) vests the Rhode Island Attorney General and the Office of the Attorney General, a political subdivision of the State of Rhode Island, with the duty of investigating submitted complaints and if found meritorious, instituting a legal action on behalf of the complainant in the Superior Court.

82. The Office of the Attorney General posts on its official website under The Open Government section the following information:



83. The plain text of R.I.G.L. sec. 38-2-8 vests the Rhode Island Attorney General with duties of an administrative tribunal defined, under Rule 1.0m of Article V. Rules of Professional Conduct, that states in relevant parts, "(m) "Tribunal" denotes a court, an arbitrator in a binding

arbitration proceeding or a legislative body, administrative agency or other body acting in an adjudicative capacity. A legislative body, administrative agency or other body acts in an adjudicative capacity when a neutral official, after the presentation of evidence or legal argument by a party or parties, will render a binding legal judgment directly affecting a party's interests in a particular matter."  The Attorney General, under RIGL sec. 38-2-8(b), is further vested with the duty under 4.1 of the Rules of Professional Conduct: "Rule 4.1. Truthfulness in statements to others. In the course of representing a client a lawyer shall not knowingly: (a) make a false statement of material fact or law to a third person; or (b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6. (As adopted by the court on February 16, 2007, eff. April 15, 2007.)

84. Additional applicable Rules of Professional Conduct and duties governing the Attorney General under RIGL sec. 38-2-8(b) are as follows:

    a. Rule 1.12 "Rule 1.12. Former judge, arbitrator, mediator or other third-party neutral. (a) Except as stated in paragraph (d), a lawyer shall not represent anyone in connection with a matter in which the lawyer participated personally and substantially as a judge or other adjudicative officer or law clerk to such a person or as an arbitrator, mediator or other third-party neutral, unless all parties to the proceeding give informed consent, confirmed in writing. (b) A lawyer shall not negotiate for employment with any person who is involved as a party or as lawyer for a party in a matter in which the lawyer is participating personally and substantially as a judge or other adjudicative officer or as an arbitrator, mediator or other third-party neutral. A lawyer serving as a law clerk to a judge or other adjudicative officer may negotiate for employment with a party or lawyer

involved in a matter in which the clerk is participating personally and substantially, but only after the lawyer has notified the judge or other adjudicative officer. (c) If a lawyer is disqualified by paragraph (a), no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in the matter unless: (1) the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and (2) written notice is promptly given to the parties and any appropriate tribunal to enable them to ascertain compliance with the provisions of this rule. (d) An arbitrator selected as a partisan of a party in a multimember arbitration panel is not prohibited from subsequently representing that party. (As adopted by the court on February 16, 2007, eff. April 15, 2007.) COMMENTARY [1] This Rule generally parallels Rule 1.11. The term "personally and substantially" signifies that a judge who was a member of a multimember court, and thereafter left judicial office to practice law, is not prohibited from representing a client in a matter pending in the court, but in which the former judge did not participate. So also the fact that a former judge exercised Revised June 2017 administrative responsibility in a court does not prevent the former judge from acting as a lawyer in a matter where the judge had previously exercised remote or incidental administrative responsibility that did not affect the merits. Compare the Comment to Rule 1.11. The term "adjudicative officer" includes such officials as judges pro tempore, referees, special masters, hearing officers and other parajudicial officers, and also lawyers who serve as part-time judges. Application Canons C(2), D(2), and E(2) of the Code of Judicial Conduct provide that a continuing part-time judge, periodic part-time judge or judge pro tempore may not "act as a lawyer in any proceeding in which he served as a judge or in any other proceeding related thereto." Although phrased differently from this

Rule, those Rules correspond in meaning. [2] Like former judges, lawyers who have served as arbitrators, mediators or other third party neutrals may be asked to represent a client in a matter in which the lawyer participated personally and substantially. This Rule forbids such representation unless all of the parties to the proceedings give their informed consent, confirmed in writing. See Rule 1.0(e) and (b). Other law or codes of ethics governing third-party neutrals may impose more stringent standards of personal or imputed disqualification. See Rule 2.4. [3] Although lawyers who serve as third-party neutrals do not have information concerning the parties that is protected under Rule 1.6, they typically owe the parties an obligation of confidentiality under law or codes of ethics governing third-party neutrals. Thus, paragraph (c) provides that conflicts of the personally disqualified lawyer will be imputed to other lawyers in a law firm unless the conditions of this paragraph are met. [4] Requirements for screening procedures are stated in Rule 1.0(k). Paragraph (c)(1) does not prohibit the screened lawyer from receiving a salary or partnership share established by prior independent agreement, but that lawyer may not receive compensation directly related to the matter in which the lawyer is disqualified. [5] Notice, including a description of the screened lawyer's prior representation and of the screening procedures employed, generally should be given as soon as practicable after the need for screening becomes apparent."

b.  Rule 1.2(b) "Rule 1.2. Scope of representation and allocation of authority between client and lawyer. (a) Subject to paragraphs (c) and (d), a lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to settle a matter. In

a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify. (b) A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social or moral views or activities. (c) A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law. (d) Limited Scope Representation. A lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent. The client must provide knowing and informed consent as part of the written limited scope representation engagement or retainer agreement. Upon entering into a written limited scope representation engagement or retainer agreement, an attorney/client relationship arises between the client and lawyer. (1) For limited scope representation matters involving only the provision of drafting services, such as drafting a pleading, motion, or other written submission. The lawyer shall sign the document(s) and disclose thereon his or her identity and the nature and extent of the assistance that he or she is providing to the tribunal and to all parties to the litigation. The lawyer shall also indicate on the written document that his or her signature does not constitute an entry of appearance or otherwise mean that the lawyer represents the client in the matter beyond assisting in the preparation of the document(s). The attorney/client relationship between the client and the lawyer engaged to provide limited scope drafting services shall terminate in accordance with Rule 1.16(d) upon the filing of all document(s) the lawyer was engaged

to draft. (2) For limited scope representation matters involving court proceedings in connection with, in addition to, or independent of the provision of drafting services. The lawyer shall make a limited appearance on behalf of the otherwise unrepresented client by filing an Entry of Limited Appearance. This Entry of Limited Appearance cannot be filed until the otherwise unrepresented client also files a pro se appearance in the case. The Entry of Limited Appearance shall state precisely the court event to which the limited appearance pertains. A lawyer may not file an Entry of Limited Appearance for more than one court event in a civil case without leave of the court and the written consent of the client. A lawyer may not enter a limited appearance for the sole purpose of making evidentiary objections. A limited appearance also shall not allow both a lawyer and a litigant to argue at the same court event during the period of the limited appearance. (3) Termination of Limited Scope Representation. Upon completion of a limited scope representation conducted pursuant to Rule 1.2(d)(2), a lawyer shall withdraw by filing a Notice of Withdrawal of Limited Appearance in the court in which the appearance was made, with Revised June 2017 written notice to the client. No formal motion to withdraw is required and the Notice of Withdrawal of Limited Appearance when filed will be treated as a withdrawal as a matter of course when the lawyer certifies that the purpose for which the appearance was entered has been accomplished and that written notice of the withdrawal has been given to the client. The Notice of Withdrawal of Limited Appearance shall include the client's name, address, and telephone number, unless otherwise provided by law. The lawyer must file a Notice of Withdrawal of Limited Appearance for each court event for which the lawyer has filed an Entry of Limited Appearance. Such withdrawal shall be done as soon as practicable. A lawyer who seeks to withdraw before the purpose of the limited

appearance has been accomplished may do so only on motion and with notice. Upon the submission of the Notice of Withdrawal of Limited Appearance in accordance with this subsection, the representation of the client is terminated in accordance with Rule 1.16(d). (4) A pleading, motion, Entry of Limited Appearance, Notice of Withdrawal of Limited Appearance, or any other document filed by a lawyer making a limited appearance under subsections 1 through 3 shall comply with the requirements of Rule 1.2(d). COMMENTARY Effect of Limited Scope Representation Rules [1] The amendments made to this Rule are intended to set forth parameters for the fair and effective provision of limited scope representation services in this state and inform attorneys involved in litigation on the basis of a limited scope representation agreement of their ethical and professional responsibilities and obligations. These changes are in no way meant to supplant the authority of the lower courts' rules of civil procedure or rules of practice in the conduct of proceedings before them. Allocation of Authority between Client and Lawyer [2] Paragraph (a) confers upon the client the ultimate authority to determine the purposes to be served by legal representation, within the limits imposed by law and the lawyer's professional obligations. The decisions specified in paragraph (a), such as whether to settle a civil matter, must also be made by the client. See Rule 1.4(a)(1) for the lawyer's duty to communicate with the client about such decisions. With respect to the means by which the client's objectives are to be pursued, the lawyer shall consult with the client as required by Rule 1.4(a)(2) and may take such action as is impliedly authorized to carry out the representation. [3] On occasion, however, a lawyer and a client may disagree about the means to be used to accomplish the client's objectives. Clients normally defer to the special knowledge and skill of their lawyer with respect to the means to be used to accomplish their objectives, particularly with respect

to technical, legal and tactical matters. Conversely, lawyers usually defer to the client regarding such questions as the expense to be incurred and concern for third persons who might be adversely affected. Because of the varied nature of the matters about which a lawyer and client might disagree and because the actions in question may implicate the interests of a tribunal or other persons, this Rule does not prescribe how such disagreements are to be resolved. Other law, however, may be applicable and should be consulted by the lawyer. The lawyer should also consult with the client and seek a mutually acceptable resolution of the disagreement. If such efforts are unavailing and the lawyer has a fundamental disagreement with the client, the lawyer may withdraw from the representation. See Rule 1.16(b)(4). Revised June 2017 Conversely, the client may resolve the disagreement by discharging the lawyer. See Rule 1.16(a)(3). [4] At the outset of a representation, the client may authorize the lawyer to take specific action on the client's behalf without further consultation. Absent a material change in circumstances and subject to Rule 1.4, a lawyer may rely on such an advance authorization. The client may, however, revoke such authority at any time. [5] In a case in which the client appears to be suffering diminished capacity, the lawyer's duty to abide by the client's decisions is to be guided by reference to Rule 1.14. Independence from Client's Views or Activities [6] Legal representation should not be denied to people who are unable to afford legal services, or whose cause is controversial or the subject of popular disapproval. By the same token, representing a client does not constitute approval of the client's views or activities. Agreements Limiting Scope of Representation [7] The scope of services to be provided by a lawyer may be limited by agreement with the client or by the terms under which the lawyer's services are made available to the client. When a lawyer has been retained by an insurer to represent an insured, for

example, the representation may be limited to matters related to the insurance coverage. A limited representation may be appropriate because the client has limited objectives for the representation. In addition, the terms upon which representation is undertaken may exclude specific means that might otherwise be used to accomplish the client's objectives. Such limitations may exclude actions that the client thinks are too costly or that the lawyer regards as repugnant or imprudent. [8] Although this Rule affords the lawyer and client substantial latitude to limit the representation, the limitation must be reasonable under the circumstances. If, for example, a client's objective is limited to securing general information about the law the client needs in order to handle a common and typically uncomplicated legal problem, the lawyer and client may agree that the lawyer's services will be limited to a brief telephone consultation. Such a limitation, however, would not be reasonable if the time allotted was not sufficient to yield advice upon which the client could rely. Although an agreement for a limited representation does not exempt a lawyer from the duty to provide competent representation, the limitation is a factor to be considered when determining the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation. See Rule 1.1. [9] An agreement for a limited scope representation creates the same attorney/client relationship between the client and the lawyer engaged to conduct the limited scope representation as if the parties had entered into a traditional, full-service agreement. Lawyers providing limited scope representation services pursuant to this Rule remain duty-bound to adhere to all obligations imposed by the Rules of Professional Conduct. The provisions of this Rule providing for limited scope representation are not intended in any way to undermine or limit a lawyer's duties or responsibilities to his or her clients or the court. [10] The

provisions of this Rule providing for entry and withdrawal of limited appearances confer no rights upon any lawyer and remain at all times subject to the discretion of the judicial officer before whom the limited scope representation matter is pending. A judicial officer may Revised June 2017 deny or revoke an entry or withdrawal of limited appearance at any time. Factors a trial justice may consider when denying or revoking an entry or withdrawal of limited appearance include, but are not limited to, situations where such entry or withdrawal would disrupt the proceedings, strain judicial resources, or otherwise pose an undue burden on the court or the other parties to the matter. [11] All agreements concerning a lawyer's representation of a client, including limited scope representation agreements, must accord with the Rules of Professional Conduct and other law. See, e.g., Rules 1.1, 1.5, 1.8 and 5.6. Criminal, Fraudulent and Prohibited Transactions [12] Paragraph (d) prohibits a lawyer from knowingly counseling or assisting a client to commit a crime or fraud. This prohibition, however, does not preclude the lawyer from giving an honest opinion about the actual consequences that appear likely to result from a client's conduct. Nor does the fact that a client uses advice in a course of action that is criminal or fraudulent of itself make a lawyer a party to the course of action. There is a critical distinction between presenting an analysis of legal aspects of questionable conduct and recommending the means by which a crime or fraud might be committed with impunity. [13] When the client's course of action has already begun and is continuing, the lawyer's responsibility is especially delicate. The lawyer is required to avoid assisting the client, for example, by drafting or delivering documents that the lawyer knows are fraudulent or by suggesting how the wrong doing might be concealed. A lawyer may not continue assisting a client in conduct that the lawyer originally supposed was legally proper but then discovers is criminal or

fraudulent. The lawyer must, therefore, withdraw from the representation of the client in the matter. See Rule 1.16(a). In some cases, withdrawal alone might be insufficient. It may be necessary for the lawyer to give notice of the fact of withdrawal and to disaffirm any opinion, document, affirmation or the like. See Rule 4.1. [14] Where the client is a fiduciary, the lawyer may be charged with special obligations in dealings with a beneficiary. [15] Paragraph (c) applies whether or not the defrauded party is a party to the transaction. Hence, a lawyer must not participate in a transaction to effectuate criminal or fraudulent avoidance of tax liability. Paragraph (c) does not preclude undertaking a criminal defense incident to a general retainer for legal services to a lawful enterprise. The last clause of paragraph (c) recognizes that determining the validity or interpretation of a statute or regulation may require a course of action involving disobedience of the statute or regulation or of the interpretation placed upon it by governmental authorities. [16] If a lawyer comes to know or reasonably should know that a client expects assistance not permitted by the Rules of Professional Conduct or other law or if the lawyer intends to act contrary to the client's instructions, the lawyer must consult with the client regarding the limitations on the lawyer's conduct. See Rule 1.4(a)(5)"

c.  Rule 1.4(a)(5): "Rule 1.4. Communication. (a) A lawyer shall: Revised June 2017 (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules; (2) reasonably consult with the client about the means by which the client's objectives are to be accomplished; (3) keep the client reasonably informed about the status of the matter; (4) promptly comply with reasonable requests for information; and (5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer

knows that the client expects assistance not permitted by the Rules of Professional

Conduct or other law."

d.  Rule 2.4 "Rule 2.4. Lawyer serving as third-party neutral. (a) A lawyer serves as a third-

party neutral when the lawyer assists two or more persons who are not clients of the

lawyer to reach a resolution of a dispute or other matter that has arisen between them.

Service as a third-party neutral may include service as an arbitrator, a mediator or in

such other capacity as will enable the lawyer to assist the parties to resolve the matter.

(b) A lawyer serving as a third-party neutral shall inform unrepresented parties that the

lawyer is not representing them. When the lawyer knows or reasonably should know

that a party does not understand the lawyer's role in the matter, the lawyer shall explain

the difference between the lawyer's role as a third-party neutral and a lawyer's role as

one who represents a client. (As adopted by the court on February 16, 2007, eff. April

15, 2007.) Revised June 2017 COMMENTARY [1] Alternative dispute resolution has

become a substantial part of the civil justice system. Aside from representing clients in

dispute-resolution processes, lawyers often serve as third-party neutrals. A third-party

neutral is a person, such as a mediator, arbitrator, conciliator or evaluator, who assists

the parties, represented or unrepresented, in the resolution of a dispute or in the

arrangement of a transaction. Whether a third-party neutral serves primarily as a

facilitator, evaluator or decision maker depends on the particular process that is either

selected by the parties or mandated by a court. [2] The role of a third-party neutral is

not unique to lawyers, although, in some court connected contexts, only lawyers are

allowed to serve in this role or to handle certain types of cases. In performing this role,

the lawyer may be subject to court rules or other law that apply either to thirdparty

neutrals generally or to lawyers serving as third-party neutrals. Lawyer-neutrals may

also be subject to various codes of ethics, such as the Code of Ethics for Arbitration in Commercial Disputes prepared by a joint committee of the American Bar Association and the American Arbitration Association or the Model Standards of Conduct for Mediators jointly prepared by the American Bar Association, the American Arbitration Association and the Society of Professionals in Dispute Resolution. [3] Unlike nonlawyers who serve as third-party neutrals, lawyers serving in this role may experience unique problems as a result of differences between the role of a third-party neutral and a lawyer's service as a client representative. The potential for confusion is significant when the parties are unrepresented in the process. Thus, paragraph (b) requires a lawyer-neutral to inform unrepresented parties that the lawyer is not representing them. For some parties, particularly parties who frequently use dispute-resolution processes, this information will be sufficient. For others, particularly those who are using the process for the first time, more information will be required. Where appropriate, the lawyer should inform unrepresented parties of the important differences between the lawyer's role as third-party neutral and a lawyer's role as a client representative, including the inapplicability of the attorney-client evidentiary privilege. The extent of disclosure required under this paragraph will depend on the particular parties involved and the subject matter of the proceeding, as well as the particular features of the dispute-resolution process selected. [4] A lawyer who serves as a third-party neutral subsequently may be asked to serve as a lawyer representing a client in the same matter. The conflicts of interest that arise for both the individual lawyer and the lawyer's law firm are addressed in Rule 1.12. [5] Lawyers who represent clients in alternative dispute-resolution processes are governed by the Rules of Professional Conduct. When the dispute-resolution process takes place before a

tribunal, as in binding arbitration (see Rule 1.0(m)), the lawyer's duty of candor is governed by Rule 3.3. Otherwise, the lawyer's duty of candor toward both the third-party neutral and other parties is governed by Rule 4.1"

e.  Rule 3.3. Candor toward the tribunal. (a) A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer; Revised June 2017 (2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or (3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably believes is false. (b) A lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal. (c) The duties stated in paragraphs (a) and (b) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by Rule 1.6. (d) In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse. (As adopted by the court on February 16, 2007, eff. April 15, 2007.) COMMENTARY [1] This Rule governs the conduct of a lawyer who is representing a client in the proceedings of a tribunal. See Rule 1.0(m) for the definition of "tribunal." It

also applies when the lawyer is representing a client in an ancillary proceeding conducted pursuant to the tribunal's adjudicative authority, such as a deposition. Thus, for example, paragraph (a)(3) requires a lawyer to take reasonable remedial measures if the lawyer comes to know that a client who is testifying in a deposition has offered evidence that is false. [2] This Rule sets forth the special duties of lawyers as officers of the court to avoid conduct that undermines the integrity of the adjudicative process. A lawyer acting as an advocate in an adjudicative proceeding has an obligation to present the client's case with persuasive force. Performance of that duty while maintaining confidences of the client, however, is qualified by the advocate's duty of candor to the tribunal. Consequently, although a lawyer in an adversary proceeding is not required to present an impartial exposition of the law or to vouch for the evidence submitted in a cause, the lawyer must not allow the tribunal to be misled by false statements of law or fact or evidence that the lawyer knows to be false. Representations by a Lawyer [3] An advocate is responsible for pleadings and other documents prepared for litigation, but is usually not required to have personal knowledge of matters asserted therein, for litigation documents ordinarily present assertions by the client, or by someone on the client's behalf, and not assertions by the lawyer. Compare Rule 3.1. However, an assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry. There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation. The obligation prescribed in Rule 1.2(d) not to Revised June 2017 counsel a client to commit or assist the client in committing a fraud applies in litigation. Regarding compliance with Rule 1.2(d), see the Comment to that Rule. See

also the Comment to Rule 8.4(b). Legal Argument [4] Legal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal. A lawyer is not required to make a disinterested exposition of the law, but must recognize the existence of pertinent legal authorities. Furthermore, as stated in paragraph (a)(2), an advocate has a duty to disclose directly adverse authority in the controlling jurisdiction that has not been disclosed by the opposing party. The underlying concept is that legal argument is a discussion seeking to determine the legal premises properly applicable to the case. Offering Evidence [5] Paragraph (a)(3) requires that the lawyer refuse to offer evidence that the lawyer knows to be false, regardless of the client's wishes. This duty is premised on the lawyer's obligation as an officer of the court to prevent the trier of fact from being misled by false evidence. A lawyer does not violate this Rule if the lawyer offers the evidence for the purpose of establishing its falsity. [6] If a lawyer knows that the client intends to testify falsely or wants the lawyer to introduce false evidence, the lawyer should seek to persuade the client that the evidence should not be offered. If the persuasion is ineffective and the lawyer continues to represent the client, the lawyer must refuse to offer the false evidence. If only a portion of a witness's testimony will be false, the lawyer may call the witness to testify but may not elicit or otherwise permit the witness to present the testimony that the lawyer knows is false. [7] The duties stated in paragraphs (a) and (b) apply to all lawyers, including defense counsel in criminal cases. In some jurisdictions, however, courts have required counsel to present the accused as a witness or to give a narrative statement if the accused so desires, even if counsel knows that the testimony or statement will be false. The obligation of the advocate under the Rules of Professional Conduct is subordinate to such requirements. See also Comment [9]. [8] The prohibition against offering false

evidence only applies if the lawyer knows that the evidence is false. A lawyer's reasonable belief that evidence is false does not preclude its presentation to the trier of fact. A lawyer's knowledge that evidence is false, however, can be inferred from the circumstances. See Rule 1.0(f). Thus, although a lawyer should resolve doubts about the veracity of testimony or other evidence in favor of the client, the lawyer cannot ignore an obvious falsehood. [9] Although paragraph (a)(3) only prohibits a lawyer from offering evidence the lawyer knows to be false, it permits the lawyer to refuse to offer testimony or other proof that the lawyer reasonably believes is false. Offering such proof may reflect adversely on the lawyer's ability to discriminate in the quality of evidence and thus impair the lawyer's effectiveness as an advocate. Because of the special protections historically provided criminal defendants, however, this Rule does not permit a lawyer to refuse to offer the testimony of such a client where the lawyer reasonably believes but does not know that the testimony will be false. Unless the lawyer knows the testimony will be false, the lawyer must honor the client's decision to testify. See also Comment [7]. Revised June 2017 Remedial Measures [10] Having offered material evidence in the belief that it was true, a lawyer may subsequently come to know that the evidence is false. Or, a lawyer may be surprised when the lawyer's client, or another witness called by the lawyer, offers testimony the lawyer knows to be false, either during the lawyer's direct examination or in response to cross-examination by the opposing lawyer. In such situations or if the lawyer knows of the falsity of testimony elicited from the client during a deposition, the lawyer must take reasonable remedial measures. In such situations, the advocate's proper course is to remonstrate with the client confidentially, advise the client of the lawyer's duty of candor to the tribunal and seek the client's cooperation with respect to the withdrawal or correction

of the false statements or evidence. If that fails, the advocate must take further remedial action. If withdrawal from the representation is not permitted or will not undo the effect of the false evidence, the advocate must make such disclosure to the tribunal as is reasonably necessary to remedy the situation, even if doing so requires the lawyer to reveal information that otherwise would be protected by Rule 1.6. It is for the tribunal then to determine what should be done - making a statement about the matter to the trier of fact, ordering a mistrial or perhaps nothing. [11] The disclosure of a client's false testimony can result in grave consequences to the client, including not only a sense of betrayal but also loss of the case and perhaps a prosecution for perjury. But the alternative is that the lawyer cooperate in deceiving the court, thereby subverting the truth-finding process which the adversary system is designed to implement. See Rule 1.2(d). Furthermore, unless it is clearly understood that the lawyer will act upon the duty to disclose the existence of false evidence, the client can simply reject the lawyer's advice to reveal the false evidence and insist that the lawyer keep silent. Thus the client could in effect coerce the lawyer into being a party to fraud on the court. Preserving Integrity of Adjudicative Process [12] Lawyers have a special obligation to protect a tribunal against criminal or fraudulent conduct that undermines the integrity of the adjudicative process, such as bribing, intimidating or otherwise unlawfully communicating with a witness, juror, court official or other participant in the proceeding, unlawfully destroying or concealing documents or other evidence or failing to disclose information to the tribunal when required by law to do so. Thus, paragraph (b) requires a lawyer to take reasonable remedial measures, including disclosure if necessary, whenever the lawyer knows that a person, including the lawyer's client, intends to engage, is engaging or has engaged in criminal or fraudulent conduct related

to the proceeding. Duration of Obligation [13] A practical time limit on the obligation to rectify false evidence or false statements of law and fact has to be established. The conclusion of the proceeding is a reasonably definite point for the termination of the obligation. A proceeding has concluded within the meaning of this Rule when a final judgment in the proceeding has been affirmed on appeal or the time for review has passed. Ex Parte Proceedings [14] Ordinarily, an advocate has the limited responsibility of presenting one side of the matters that a tribunal should consider in reaching a decision; the conflicting position is expected to be presented by the opposing party. However, in any ex parte proceeding, such as an application for a temporary restraining order, there is no balance of presentation by opposing advocates. The Revised June 2017 object of an ex parte proceeding is nevertheless to yield a substantially just result. The judge has an affirmative responsibility to accord the absent party just consideration. The lawyer for the represented party has the correlative duty to make disclosures of material facts known to the lawyer and that the lawyer reasonably believes are necessary to an informed decision. Withdrawal [15] Normally, a lawyer's compliance with the duty of candor imposed by this Rule does not require that the lawyer withdraw from the representation of a client whose interests will be or have been adversely affected by the lawyer's disclosure. The lawyer may, however, be required by Rule 1.16(a) to seek permission of the tribunal to withdraw if the lawyer's compliance with this Rule's duty of candor results in such an extreme deterioration of the client-lawyer relationship that the lawyer can no longer competently represent the client. Also see Rule 1.16(b) for the circumstances in which a lawyer will be permitted to seek a tribunal's permission to withdraw. In connection with a request for permission to withdraw that is premised on a client's misconduct, a lawyer may reveal information

relating to the representation only to the extent reasonably necessary to comply with this Rule or as otherwise permitted by Rule 1.6. Rule 3.4. Fairness to opposing party and counsel. A lawyer shall not: (a) unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act; (b) falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law; (c) knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists; (d) in pretrial procedure, make a frivolous discovery request or fail to make reasonably diligent effort to comply with a legally proper discovery request by an opposing party; (e) in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused; or (f) request a person other than a client to refrain from voluntarily giving relevant information to another party unless: (1) the person is a relative or an employee or other agent of a client; and (2) the lawyer reasonably believes that the person's interests will not be adversely affected by refraining from giving such information. (As adopted by the court on February 16, 2007, eff. April 15, 2007.) COMMENTARY [1] The procedure of the adversary system contemplates that the evidence in a case is to be Revised June 2017 marshalled competitively by the contending parties. Fair competition in the adversary system is secured by prohibitions against destruction or concealment of evidence, improperly influencing witnesses, obstructive tactics in discovery procedure, and the like. [2]

Documents and other items of evidence are often essential to establish a claim or defense. Subject to evidentiary privileges, the right of an opposing party, including the government, to obtain evidence through discovery or subpoena is an important procedural right. The exercise of that right can be frustrated if relevant material is altered, concealed or destroyed. Applicable law in many jurisdictions makes it an offense to destroy material for purpose of impairing its availability in a pending proceeding or one whose commencement can be foreseen. Falsifying evidence is also generally a criminal offense. Paragraph (a) applies to evidentiary material generally, including computerized information. Applicable law may permit a lawyer to take temporary possession of physical evidence of client crimes for the purpose of conducting a limited examination that will not alter or destroy material characteristics of the evidence. In such a case, applicable law may require the lawyer to turn the evidence over to the police or other prosecuting authority, depending on the circumstances. [3] With regard to paragraph (b), it is not improper to pay a witness's expenses or to compensate an expert witness on terms permitted by law. The common law rule in most jurisdictions is that it is improper to pay an occurrence witness any fee for testifying and that it is improper to pay an expert witness a contingent fee. [4] Paragraph (f) permits a lawyer to advise employees of a client to refrain from giving information to another party, for the employees may identify their interests with those of the client. See also Rule 4.2.

f.  Rule 8.4: "Rule 8.3. Reporting professional misconduct. (a) A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority. Revised

June 2017 (b) A lawyer who knows that a judge has committed a violation of applicable rules of judicial conduct that raises a substantial question as to the judge's fitness for office shall inform the appropriate authority. (c) This rule does not require disclosure of information otherwise protected by Rule 1.6. (d) This rule shall not apply to members of the Confidential Assistance Committee ("the committee") of the Rhode Island Bar Association ("the Association") regarding information received in their capacity as Committee members, acting in good faith, unless it appears to the members that the attorney in question is failing to desist from the violation or is failing to cooperate with a program of assistance to which the attorney has agreed, or is engaged in the perpetration of fraud or embezzlement, or when disclosure is required to protect the public from substantial harm. (e) Except as provided by the preceding subsection (d), no information received, gathered or maintained by the Committee, or by an employee of the Association in connection with the work of the Committee, may be disclosed to any person or be subject to discovery or subpoena in any administrative or judicial proceeding, except upon the express written release of the subject attorney, or by order of a court of competent jurisdiction. However, the Committee may refer any attorney to a professional assistance entity, and may, in good faith, communicate information to the entity in connection with the referral. If information obtained by a member of the Committee or an employee of the Association gives rise to reasonable suspicion of a direct threat to the health or safety of the subject attorney or other person, then the obligation of confidentiality set forth in this subsection (e) shall not apply, and the Committee member or Association employee may make such communications as are necessary for the purpose of avoiding or preventing the threat. (f) Members of the Committee shall be immune from civil liability for actions taken in good faith in the

course of performing their duties. (As adopted by the court on February 16, 2007, eff. April 15, 2007.) COMMENTARY [1] Self-regulation of the legal profession requires that members of the profession initiate disciplinary investigation when they know of a violation of the Rules of Professional Conduct. Lawyers have a similar obligation with respect to judicial misconduct. An apparently isolated violation may indicate a pattern of misconduct that only a disciplinary investigation can uncover. Reporting a violation is especially important where the victim is unlikely to discover the offense. [2] A report about misconduct is not required where it would involve violation of Rule 1.6. However, a lawyer should encourage a client to consent to disclosure where prosecution would not substantially prejudice the client's interests. [3] If a lawyer were obliged to report every violation of the Rules, the failure to report any violation would itself be a professional offense. Such a requirement existed in many jurisdictions but proved to be unenforceable. This Rule limits the reporting obligation to those offenses that a self-regulating profession must vigorously endeavor to prevent. A measure of judgment is, therefore, required in complying with the provisions of this Rule. The term "substantial" refers to the seriousness of the possible offense and not the quantum of evidence of which the lawyer is aware. A report should be made to the disciplinary counsel unless some other agency, such as a peer review agency, is more appropriate in the circumstances. Similar considerations apply to the reporting of judicial misconduct. Revised June 2017 [4] The duty to report professional misconduct does not apply to a lawyer retained to represent a lawyer whose professional conduct is in question. Such a situation is governed by the Rules applicable to the client-lawyer relationship. Rule 8.4. Misconduct. It is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so,

or do so through the acts of another; (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects; (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; (d) engage in conduct that is prejudicial to the administration of justice, including but not limited to, harmful or discriminatory treatment of litigants, jurors, witnesses, lawyers, and others based on race, national origin, gender, religion, disability, age, sexual orientation or socioeconomic status; (e) state or imply an ability to influence improperly a government agency or official or to achieve results by means that violate the Rules of Professional Conduct or other law; or (f) knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law. (As adopted by the court on February 16, 2007, eff. April 15, 2007.) COMMENTARY [1] Lawyers are subject to discipline when they violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so or do so through the acts of another, as when they request or instruct an agent to do so on the lawyer's behalf. Paragraph (a), however, does not prohibit a lawyer from advising a client concerning action the client is legally entitled to take. [2] Many kinds of illegal conduct reflect adversely on fitness to practice law, such as offenses involving fraud and the offense of willful failure to file an income tax return. However, some kinds of offenses carry no such implication. Traditionally, the distinction was drawn in terms of offenses involving "moral turpitude." That concept can be construed to include offenses concerning some matters of personal morality, such as adultery and comparable offenses, that have no specific connection to fitness for the practice of law. Although a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. Offenses involving

violence, dishonesty, breach of trust, or serious interference with the administration of justice are in that category. A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation. [3] A lawyer who, in the course of representing a client, knowingly manifests by words or conduct, bias or prejudice based upon race, gender, religion, national origin, disability, age, sexual orientation or socioeconomic status, violates paragraph (d) when such actions are prejudicial to the administration of justice. Legitimate advocacy respecting the foregoing factors does not violate paragraph (d). A judicial finding that peremptory challenges were exercised on a discriminatory basis does not alone establish a violation of this rule.  [4] A lawyer may refuse to comply with an obligation imposed by law upon a good faith belief that no valid obligation exists. The provisions of Rule 1.2(d) concerning a good faith challenge to the validity, scope, meaning or application of the law apply to challenges of legal regulation of the practice of law. [5] Lawyers holding public office assume legal responsibilities going beyond those of other citizens. A lawyer's abuse of public office can suggest an inability to fulfill the professional role of lawyers. The same is true of abuse of positions of private trust such as trustee, executor, administrator, guardian, agent and officer, director or manager of a corporation or other organization."

g.  Rule 3.7: "Rule 3.7. Lawyer as witness. (a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless: (1) the testimony relates to an uncontested issue; (2) the testimony relates to the nature and value of legal services rendered in the case; (3) disqualification of the lawyer would work substantial hardship on the client. (b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule

1.7 or Rule 1.9. (As adopted by the court on February 16, 2007, eff. April 15, 2007.)

COMMENTARY [1] Combining the roles of advocate and witness can prejudice the tribunal and the opposing party and can also involve a conflict of interest between the lawyer and client. Advocate-Witness Rule [2] The tribunal has proper objection when the trier of fact may be confused or misled by a lawyer serving as both advocate and witness. The opposing party has proper objection where the combination of roles may prejudice that party's rights in the litigation. A witness is required to testify on the basis of personal knowledge, while an advocate is expected to explain and comment on evidence given by others. It may not be clear whether a statement by an advocate-witness should be taken as proof or as an analysis of the proof. [3] To protect the tribunal, paragraph (a) prohibits a lawyer from simultaneously serving as advocate and necessary witness except in those circumstances specified in paragraphs (a)(1) through (a)(3). Paragraph (a)(1) recognizes that if the testimony will be uncontested, the ambiguities in the dual role are purely theoretical. Paragraph (a)(2) recognizes that where the testimony concerns the extent and value of legal services rendered in the action in which the testimony is offered, permitting the lawyers to testify avoids the need for a second trial with new counsel to resolve that issue. Moreover, in such a situation the judge has firsthand knowledge of the matter in issue; hence, there is less dependence on the adversary process to test the credibility of the testimony. [4] Apart from these two exceptions, paragraph (a)(3) recognizes that a balancing is required between the interests of the client and those of the tribunal and the opposing party. Whether the tribunal is likely to be misled or the opposing party is likely to suffer prejudice depends on the nature of the case, the importance and probable tenor of the lawyer's testimony, and the probability that the lawyer's testimony will conflict with

that of other witnesses. Even if there is risk of such prejudice, in determining whether the lawyer should be disqualified, due regard must be given to the effect of disqualification on the lawyer's client. It is relevant that one or both parties could reasonably foresee that the lawyer would probably be a witness. The conflict of interest principles stated in Rules 1.7, 1.9 and 1.10 have no application to this aspect of the problem. [5] Because the tribunal is not likely to be misled when a lawyer acts as advocate in a trial in which another lawyer in the lawyer's firm will testify as a necessary witness, paragraph (b) permits the lawyer to do so except in situations involving a conflict of interest. Conflict of Interest [6] In determining if it is permissible to act as advocate in a trial in which the lawyer will be a necessary witness, the lawyer must also consider that the dual role may give rise to a conflict of interest that will require compliance with Rules 1.7 or 1.9. For example, if there is likely to be substantial conflict between the testimony of the client and that of the lawyer the representation Revised June 2017 involves a conflict of interest that requires compliance with Rule 1.7. This would be true even though the lawyer might not be prohibited by paragraph (a) from simultaneously serving as advocate and witness because the lawyer's disqualification would work a substantial hardship on the client. Similarly, a lawyer who might be permitted to simultaneously serve as an advocate and a witness by paragraph (a)(3) might be precluded from doing so by Rule 1.9. The problem can arise whether the lawyer is called as a witness on behalf of the client or is called by the opposing party. Determining whether or not such a conflict exists is primarily the responsibility of the lawyer involved. If there is a conflict of interest, the lawyer must secure the client's informed consent, confirmed in writing. In some cases, the lawyer will be precluded from seeking the client's consent. See Rule 1.7. See Rule1.0(b) for the definition of

"confirmed in writing" and Rule 1.0(e) for the definition of "informed consent." [7]

Paragraph (b) provides that a lawyer is not disqualified from serving as an advocate because a lawyer with whom the lawyer is associated in a firm is precluded from doing so by paragraph (a). If, however, the testifying lawyer would also be disqualified by Rule 1.7 or Rule 1.9 from representing the client in the matter, other lawyers in the firm will be precluded from representing the client by Rule 1.10 unless the client gives informed consent under the conditions stated in Rule 1.7.

85. Defendant Lisa Pinsonneault emailed the Plaintiff that the Defendant RI OCSS did not file a motion against the Plaintiff in December 2022.

86. Posted on the official website of the State of Rhode Island, Office of the Attorney General states, pursuant to R.I.G.L. § 38-2-2(4) and **Pontarelli v. Rhode Island Dept. of Education, 176 A.3d 472 (R.I. 2018)**, public records are, "Material regardless of physical form or characteristics made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency." R.I.G.L. § 38-2-3(a) and **Borkowski v. City of Warwick, PR 22-11** state**,** "all records maintained or kept on file by any public body *** shall be public records and every person or entity shall have the right to inspect and/or copy those records"

87. On December 29, 2022, pursuant to the appeal procedure advisement contained in the December 13, 2022 APRA denial letter from Defendant Lisa Pinsoneault and the in the December 16, 2022 APRA denial letter from Ms. Lisa Martinelli that is copied to Defendant Deborah Barclay and Defendant RI OCSS by and through Paul Gould, the Plaintiff, Mary Seguin ('Seguin/Plaintiff") filed the APRA action in Superior Court under R.I.G.L. § 38-2-1 *et seq.,* appealing the December 13, 2022 denial email by Defendant RI OCSS of Plaintiff's request for records <u>and</u> RI EOHHS's letter dated December 16, 2022, both of which advised the Plaintiff to appeal agency denial under R.I.G.L. § 38-2-8. (§ 38-2-8 and) R.I.G.L. § 38-2-9(a) vest the Superior Court with sole jurisdiction over civil

actions brought under R.I.G.L. § 38-2-8., *Mary Seguin v. Rhode Island Department of Human Service et al., PC-2022-07215.*  The Plaintiff filed the same complaint to the Rhode Island Attorney General.  The Rhode Island Attorney General is aware of the case.

88. The Attorney General's Office's Open Government sent the Plaintiff an email dated January 19, 2023 identifying Plaintiff's complaint sent to the Office of the Attorney General to be identical to the Complaint alleged in the Superior Court APRA action under R.I.G.L. § 38-2-1 *et seq.*, *Mary Seguin v. Rhode Island Department of Human Service et al., PC-2022-07215,* and therefore yielded jurisdiction to the Superior Court.  By authority vested by R.I.G.L. § 38-2-8, the Attorney General found that Plaintiff's Complaint in Superior Court alleges the same APRA allegations raised in the complaint to the Office of the Attorney General, and has therefore yielded to the Superior Court's jurisdiction.  By *yielding to the Superior Court's jurisdiction*, the Attorney General found Plaintiff's APRA allegations raised in the Complaint in Superior Court to be under the Superior Court's *jurisdiction*.

89. The Plaintiff filed in Superior Court a Motion to Advance pursuant to R.I.G.L. § 38-2-9(c) that in relevant part states, "the Actions brought under this chapter may be advanced on the calendar upon motion of any party…," and scheduled a hearing in that matter on the Special Cause Calendar on January 12, 2023 via WebEx Hearing.  R.I.G.L. § 38-2-8 jurisdiction is material, as the plain reading of this statutory provision makes clear R.I.G.L. § 38-2-8 vests the Rhode Island Attorney General with third-party neutral adjudication/judicial jurisdiction to interpret R.I.G.L. § 38-2-1 *et seq, and the issue of jurisdiction was already adjudged by the Rhode Island Attorney General, communicated in writing via Email, to be an APRA complaint and simply yielded jurisdiction to the Superior Court, as the Plaintiff also filed the same APRA*

*allegations with the Attorney General in Plaintiff's complaint.* The principle of **Res Judicata** on the issue of jurisdiction makes clear that jurisdiction of the Plaintiff's APRA complaint is settled within the Superior Court of Rhode Island, pursuant to both R.I.G.L. § 38-2-8 and R.I.G.L. § 38-2-9.

90. The letter from the Attorney General is dated January 19, 2023 and makes no mention that the Attorney General is the attorney of record for the Defendant RI OCSS in the RI APRA action in Superior Court **Mary Seguin v. Rhode Island Department of Human Service et al., PC-2022-07215** which is required disclosure under the law and Article V, Rules of Professional Conduct.

91. Within this context, entered the appearance of Defendant Coleman, Deputy Legal Counsel of the Department of Human Services.  Coleman entered a limited scope representation "Notice of **Special Appearance**" on January 10, 2023 in this matter, **Mary Seguin v. Rhode Island Department of Human Service et al., PC-2022-07215** that states the scope of his appearance is to raise "issues are presented regarding standing, service and sufficiency of process, subject matter jurisdiction, personal jurisdiction and other strictly procedural and jurisdictional defenses.  Affirmative defense may be offered at the appropriate time, but are not advanced in this Special Appearance."

92.  Coleman's January 10, 2023 "Notice of Special Appearance" is the only entry of appearance on record.  The Defendants in the action **Mary Seguin v. Rhode Island Department of Human Service et al., PC-2022-07215** never filed an entry of appearance.  In fact, other than Coleman's limited scope representation entry of appearance entitled "Notice of Special

Appearance," there is no other entry of appearance in *Mary Seguin v. Rhode Island Department of Human Service et al., PC-2022-07215.*

93. The Rhode Island Supreme Court issued an Order dated May 23, 2017 that amended **Article V "Rules of Professional Conduct"** and the Rules of Professional Conduct **RULE 1.2 SCOPE OF REPRESENTATION AND ALLOCATION OF AUTHORITY BETWEEN CLIENT AND LAWYER**, states under subsection **(d)(2)** "For limited scope representation matters involving court proceedings in connection with, in addition to, or independent of the provision of drafting services. The lawyer shall make a limited appearance on behalf of the otherwise unrepresented client by filing an Entry of Limited Appearance. This Entry of Limited Appearance cannot be filed until the otherwise unrepresented client also files a pro se appearance in the case. The Entry of Limited Appearance shall state precisely the court event to which the limited appearance pertains.  A lawyer may not file an Entry of Limited Appearance for more than one court event in a civil case without leave of the court and the written consent of the client.  A lawyer may not enter a limited appearance for the sole purpose of making evidentiary objections.  A limited appearance also shall not allow both a lawyer and a litigant to argue at the same court event during the period of the limited appearance."

94. The Defendants RI DHS, RI OCSS and Michael Coleman flouted **RULE 1.2 SCOPE OF REPRESENTATION AND ALLOCATION OF AUTHORITY BETWEEN CLIENT AND LAWYER**, under subsection **(d)(2),** throughout the entire proceeding in *Mary Seguin v. Rhode Island Department of Human Service et al., PC-2022-07215.*

95. Within the above-described context, the January 12, 2023 WebEx hearing proceeding in **_Mary Seguin v. Rhode Island Department of Human Service et al., PC-2022-07215._** held, scheduled on the calendar by the Plaintiff, to hear Plaintiff's Motion to Advance pursuant to R.I.G.L. § 38-2-9(c).

96. At the January 12, 2023 WebEx hearing proceeding in the Rhode Island Superior Court presided by Judge David Cruise, Defendant Coleman, an Officer of the Court, emphatically represented in open court to the trial tribunal that he does not represent the Defendants. Defendant Coleman went on to emphasize that the Attorney General is the attorney of record for the Defendants in **_Mary Seguin v. Rhode Island Department of Human Service et al., PC-2022-07215_**.  Predicated on his representation in open court to the Court that the Attorney General is the attorney of record for the Defendants, Defendant Coleman went on to attack that court's jurisdiction over the defendants for insufficiency of process, alleging that pursuant to the Rhode Island Government Tort Liability Act, R.I.G.L. § 9-31-1, *et seq*., the Plaintiff failed to serve the Summons and Complaint in that matter to the Attorney General, and it is insufficient process to serve the Defendants directly in that matter.

97. Moreover, more than half a dozen staff attorneys of the Rhode Island Department of Human Services also appeared at the WebEx hearing in that matter on January 12, 2023. These defendant staff attorneys appeared via the court link provided by the Rhode Island Court system for WebEx Hearings to parties and counsels of record before the bar line, not through the link provided for Public Access to WebEx court hearings.  These attorneys were not identified by the Court, did not identify themselves, and Plaintiff recalls identifying only a few of them through their WebEx sign-in user names: (1) Deborah A. Barclay, Esq.; (2) Lisa

Pinsonneault, Esq.; and (3) Carl Beauregard, Esq.  The Plaintiff does not recall the other

names.  Defendant Wendy Fobert appeared.  Upon information and belief, none of the

named defendants in that matter who are staff attorneys (e.g., Kevin Tighe, Esq., Frank

DiBiaise, Esq., John Langlois, Esq., Paul Gould, Esq.) were present at the January 12, 2023

WebEx hearing.  None of the named defendants entered appearance in that matter.  No

entry of appearance was entered on behalf of the defendant agency in that matter.

98. Subsequent to Coleman's representation in open court to the Court that he is not the

Defendants' lawyer and that the attorney of record for the Defendants in that matter is the

Rhode Island Attorney General, and subsequent to Coleman's attack on the Court's

jurisdiction over the defendants for insufficiency of process based on his allegation that the

Summons and Complaint in that matter was not served upon the Attorney General citing

the Rhode Island Government Tort Liability Act, R.I.G.L. § 9-31-1, *et seq*., Judge Cruise called

on the aforesaid Carl Beauregard, Esq., staff attorney of the Defendant agency, RI Office of

Child Support Services, who is not a named defendant in that matter and who never

entered appearance in that matter, to argue the case.  Defendant Beauregard never refuted

Coleman's representation to the Court in open court that Coleman is not the Defendants'

attorney and that the Attorney General is attorney of record for the Defendants.  In fact,

none of the RI DHS attorneys who appeared at the January 12, 2023 hearing refuted

Coleman's representation to the Court that he is not the Defendant's attorney and that the

Attorney General is the attorney of record for the Defendants.

99. Defendant Coleman and Defendant Barclay are senior staff lawyers at the Defendant agency

RI DHS (Rhode Island Department of Human Services).  Deborah Barclay's name appears on

the APRA denial letter to the Plaintiff from Ms. Lisa Martinelli, Esq., dated December 16, 2023, that advises the Plaintiff of the right to appeal agency APRA denials to the Office of the Attorney general pursuant to R.I.G.L. § 38-2-8.  Lisa Pinsonneault is  the staff lawyer of the Defendant agency, RI OCSS, who denied the Plaintiff's agency APRA request via email on December 13, 2023.  Therefore, on the record, based on the electronic sign-in history of the Rhode Island Court's WebEx hearing on January 12, 2023, the Defendant agency staff lawyers who appeared at the WebEx hearing, all had direct knowledge or are direct State actors materially relating to the Plaintiff's APRA Complaint in that matter, ***Mary Seguin v. Rhode Island Department of Human Service et al., PC-2022-07215***.  Upon information and belief, Coleman committed perjury under RIGL sec. 11-33-1, as he knows fully well that the third party neutral status of the Attorney General under RIGL sec. 38-2-8 requires the Attorney General by special duty under the law, to make disclosure to the Plaintiff, as the Plaintiff filed the same APRA Complaint to the Attorney General under RIGL sec. 38-2-8. Defendant Barclay is the copied on the APRA denial letter to the Plaintiff on December 16, 2022 and knew that Ms. Martinelli advised the Plaintiff to file appeals of agency APRA denials to the Attorney General under RIGL sec. 38-2-8.  Defendant Pinsonneault personally sent the December 13, 2022 APRA denial letter to the Plaintiff, also advising Plaintiff of appeal of agency APRA denial pursuant to RIGL sec. 38-2-8.  As Officers of the Court, Defendants Barclay and Pinsonneault knew the Rules of Professional Conduct prohibits the representation by the Attorney General of the Defendants when they advised the Plaintiff to appeal APRA denials to the Attorney General under RIGL 38-2-8, and prohibits the representation by the Attorney General when Plaintiff's APRA Complaint that is identical to

the one pending in Superior Court, is filed with the Attorney General under RIGL 38-2-8.

Coleman lied to the court in a ruse to get the court to dismiss the APRA action by

pretending he is not the attorney of record for the defendants and lying that the Attorney

General is, so that he could attack the court's jurisdiction over the defendants for

insufficiency of process by also misrepresenting in open court Plaintiff's APRA action as a

Government Tort Liability Action, thereby claiming that the Attorney General should be

served and affirmatively declaring the Attorney General is the counsel of record for the

defendants.  For all Defendant agency staff lawyers who appeared at the January 12, 2023

WebEx hearing in that matter, to fail to refute Coleman's representation to the Court in

open court in that matter that he is not the Defendants' lawyer and that the Attorney

General is the Defendants' attorney of record, for the explicitly court-demonstrated

"Special Entry of Appearance" purpose of attacking this Court's jurisdiction over the

Defendants for insufficiency of process citing the Rhode Island Government Tort Liability

Act, R.I.G.L. § 9-31-1, *et seq*, is material, prejudicial to the Plaintiff, and their inactions

constitute insubordination of perjury, violative of Civil RICO and the Rhode Island

Government Tort Liability Act, R.I.G.L. § 9-31-1, *et seq*.  Upon information and belief, the

defendant lawyers conspired before the hearing to lie to the court that Coleman is not the

defendants' lawyer and that the Attorney General is the defendants' lawyer while

misrepresenting in open court the pro se Plaintiff's APRA complaint is a tort liability action,

in a ruse/scheme to deceive the court to dismiss the case for insufficiency of process, as the

Government Tort Liability Act's provides actions brought under it shall be served on the

Attorney General.  Defendants' ruse worked; taking the cue from Defendant Coleman and

the silent affirmation of the named Defendant Officers of the Court gathered present at the WebEx hearing, Judge Cruise complained that the Plaintiff's APRA Complaint is too long (it is 20 pages in length) and that he doesn't get it. The silent Defendant Officers of the Court were present for this very purpose, to participate in the subornation of Coleman's perjury in open court, as none of them is a named defendant in that matter and none had entered appearance in the matter either.

100. Even more troubling, Judge Cruise called on Defendant Beauregard, who never entered appearance in that matter and who is not a named defendant in that case, to argue the case for the defendants, even after Defendant Coleman represented in open court that he appeared in limited scope to argue jurisdiction issues, he is not the attorney of record and that the Attorney General is the attorney of record for the defendants. Defendant Beauregard had a duty to honesty to the tribunal but breached the duty. Beauregard echoed Defendant Coleman's lie. When Plaintiff objected, Defendant Coleman represented in open court that Beauregard is an "observer." Judge Cruise tagged on, "I allowed it."

101. The January 12, 2023 WebEx hearing culminated in Judge Cruise denying Plaintiff's Motion to Advance brought under RIGL sec. 38-2-1, et al.

102. Per the January 19, 2023 letter from the Open Government Division of the Office of the Attorney General, the Attorney General states his Office is aware of the pending APRA matter in Superior Court and yielded jurisdiction of Plaintiff's APRA Complaint filed with the Attorney General to the Superior Court. The Attorney General's letter never stated the Attorney General is the attorney of record of the Defendants in the letter, after stating his Office is aware of the APRA matter in Superior Court. The Attorney General never entered

his appearance on behalf of the Defendants in the Superior Court APRA matter. The

Attorney General never entered his limited appearance in the Superior Court APRA matter

to refute Coleman's representation to the Court that the Attorney General is the attorney of

record for the Defendants, which is in itself troubling, as the Office of Attorney General has

been aware of the Superior Court matter, at least as early as the January 19, 2023 letter

from the Open Government Division of the Office of Attorney General, as so stated by the

letter.

103.    The Rhode Island Supreme Court issued an Order dated May 23, 2017 that amended

**Article V "Rules of Professional Conduct"** and the Rules of Professional Conduct **RULE 1.2**

**SCOPE OF REPRESENTATION AND ALLOCATION OF AUTHORITY BETWEEN CLIENT AND**

**LAWYER**, also regulates limited representation outside of court proceedings. Nevertheless,

what is clear and unequivocally definite is that the Defendants, by and through Coleman's

representation to the Court that the Attorney General is the Defendants' attorney of record

in this matter at the WebEx hearing on January 12, 2023, implicated an appearance of

impropriety on the Open Government Division of the Office of the Attorney General under

R.I.G.L. § 38-2-8 to state in a written response to an APRA Complainant dated January 19,

2023, that the Open Government Division is aware of this pending matter in Superior Court

where the APRA Complaint is the same, and therefore yields jurisdiction to the Superior

Court, but **fails** to disclose to the Plaintiff that the Attorney General is the attorney of record

for the Defendants, and therefore has a conflict of interest. The Attorney General's failure

to disclose that he is the attorney of record in the Superior Court matter for the defendants

in his Open Government Division letter dated January 19, 2023 to the Plaintiff, if he is the

attorney of record in that matter for the Defendants, as Coleman represents to the Court and the RI DHS staff attorneys who appeared in January 12, 2023 WebEx hearing by way of their affirmative silence in subornation of Coleman's perjury on this material issue, would also be **material in active subornation of perjury**.

104.    If the Attorney General is not the attorney of record for the Defendants in this matter, then the Defendant agency's staff lawyers who are Officers of the Court who collectively, by lack of action (when under Oath, they have a <u>duty</u> to act as Officers of the Court) and by explicit words, represent to the Court that the Attorney General is the attorney of record for the Defendants when he is not, for the purpose of attacking jurisdiction of this Court over the Defendants pursuant to the Rhode Island Government Tort Liability Act, R.I.G.L. § 9-31-1, *et seq*., is pertinently and relevantly material, and as such furthered a scheme to deceive the Court, by several defendant agency staff Officers of the Court, to dismiss this matter for lack of jurisdiction.

105.    The Office of Attorney General, through its Open Government function vested by R.I.G.L. § 38-2-1, *et seq*., has a duty to disclose to the Plaintiff, the APRA Complainant, that the Attorney General is the attorney of record for the Defendants, in its letter to the Plaintiff dated January 19, 2023 that stated the Attorney General yielded jurisdiction to the Superior Court, as the APRA Complaint in this matter is the same as the APRA Complaint the Plaintiff filed with the Attorney General under R.I.G.L. § 38-2-8.  Therefore, Coleman and the Defendant agency's senior staff lawyers, who are Officers of the Court, have implicated the Attorney General – why does the Open Government Division of the Office of Attorney

General fail to disclose that the Attorney General is the attorney of record for the

Defendants in this APRA matter, when it has a duty of disclosure.

106.    Upon information and belief, the scheme was hashed out to commit perjury by the

defendants prior to January 12, 2023.  Defendant Barclay was copied on the December 16,

2022 letter from Ms. Martinelli , Esq., who states she is writing on behalf of Secretary

Novais of the RI EOHHS that oversees RI DHS and RI Office of Child Support Services, the

Defendant agencies; this letter advised the Plaintiff to appeal the agency APRA denial to the

Office of the Attorney General.  If there is a pending litigation in Family Court by the

Defendant agency, RI DHS OCSS, against the Plaintiff, there is a duty to disclose this is a

basis of APRA denial by the Officer of Court, Defendant Barclay.  But the December 16, 2022

does not mention any pending or anticipated litigation against the Plaintiff by the APRA

denial agency, the Defendant agencies.  Critically, after Barclay, was copied on Ms.

Martinelli's letter of December 16, 2022, Barclay failed to disclose to the Plaintiff, the APRA

requester, of any pending litigation at the time of agency APRA denial, if that is indeed the

fact and basis for APRA denial.

107.    Defendant Pinsonneault, staff lawyer of the Defendant agency RI OCSS, personally

emailed the APRA Requester, the Plaintiff, on December 13, 2022, denying Plaintiff's APRA

request.  Similarly, she advised the Plaintiff to appeal agency APRA request to the Attorney

General.   Pinsonneault similarly did not mention any pending litigation of the APRA denial

agency against the APRA requester, the Plaintiff.  Pinsonneault, Officer of the Court, goes

further to email the Plaintiff that the Defendant agency did NOT file any motions against the

APRA requester Plaintiff.   Pinsonneault, Officer of the Court, staff lawyer of the Defendant

agency RI OCSS, also appeared at the January 12, 2023 WebEx hearing in this matter. She

has a duty to disclose she personally emailed the APRA requester Plaintiff that the agency

did NOT file a motion against the Plaintiff to start litigation against the Plaintiff subsequent

to the Plaintiff's APRA request and at the time of the agency's APRA denial, if that is indeed

the fact.

108.    Therefore, Barclay's and Pinsonnault's calculated affirmative silence and inaction in

subornation of perjury at the WebEx hearing in this matter on January 12, 2023, when they

heard Coleman attack the Superior Court's jurisdiction over the Defendant agency by

representing that he is not the Defendants' lawyer and the Attorney General is the attorney

of record of the Defendants, is material. Similarly, Beauregard, after being called by Judge

Cruise to argue the case (even though he was not called by either party to argue or testify)

has a duty to disclose that the Attorney General is not the attorney of record for the

Defendants, if that is indeed the fact. But Beauregard similarly remained silent on the issue;

none of the Defendant agency staff lawyers or of RI DHS Officers of the Court present at the

WebEx hearing refuted any of Coleman's claims to the Court, in subornation of perjury.

However, they have personal knowledge of the untruthfulness of Mr. Coleman's material

representations to the Court.

109.    Judge Cruise's posture at the hearing is acceptance of Coleman's false representations

to the Court that was affirmed by silence by the named defendants herein who were

present as a deliberate collection of officers of the court for the purpose of subornation of

Coleman's perjury to lend appearance of support and credence to it by their silent

affirmative presence, and denied Plaintiff's Motion, without stating on the record the basis of denial.

110.    Coleman never withdrew his limited special appearance after the January 12, 2023 WebEx hearing.

111.    Coleman never entered his appearance as the attorney of record for the Defendants.

112.    Subsequent to making the material perjury to the Court at the January 12, 2023 hearing that he is NOT the attorney of the Defendants and that the Attorney General is the attorney of record for the Defendants for the purpose of attacking the Court's jurisdiction over the Defendants for insufficiency of process under the Rhode Island Government Tort Liability Act, R.I.G.L. § 9-31-1, *et seq*., Coleman never filed any pleading or notice or filings otherwise certifying that he is the attorney of record for the Defendants, contrary to his material representation in Court that he is not the attorney of record.

113.    The Attorney General never entered appearance in that matter in any shape or form. The Attorney General represents awareness of that matter, per the letter dated January 19, 2023 sent to the Plaintiff from its Open Government Division.

114.        Instead, Coleman filed a barrage of pleadings: Defendants' Motions to Dismiss, Memorandum in Support of Motion to Dismiss, Objections and Defendants' Memorandum of Law in Support of Their Objection to Plaintiff's Motion to Strike Defendants' Rule 12(b)(1) Motion to Dismiss, all signed "DEFENDANTS, By Their Attorney."   The Plaintiff filed several motions under Rule 11 to strike these pleadings, and finally filed a Rule 11 Motion for Sanctions on February 6, 2023, prior to the scheduled February 7, 2023 WebEx hearing in that matter.

115.    But the prejudicial damage to the Plaintiff intended by the Defendant agencies and

Coleman through the afore-described scheme of lies of counsel representation calculated to

attack the Court's jurisdiction over the Defendants to the Court had been done.  Judge

Cruise, who knew and should have known that collateral issues such as Rule 11 Motion for

Sanctions, are required to be resolved by the Court, irrespective of the Court dismissing the

case pursuant to Coleman's "Defendants' Rule 12(b)(1) Motion to Dismiss," initially had his

clerk email the Plaintiff that Plaintiff's Rule 11 Motion for Sanctions was moot after he

dismissed the case.  The Plaintiff relies on established United States Supreme Court case

law, **Cooter & Gell v. Hartmarx Corp.110 S. Ct. 2447 (1990),** ruled that a Rule 11 sanction is

an issue collateral to the main action and may be addressed after the suit has been

dismissed.  What is critical here is, the representation by Coleman that the Attorney

General is the attorney of record for the Defendants and he is not, was used for the very

purpose of attacking jurisdiction of the Court in that matter.  Therefore, Coleman's

representation to Court of who is the counsel of record for the Defendants is material to

that case.  The Court never got to the merits of the APRA Complaint.

116.    **Cooter & Gell v. Hartmarx Corp.110 S. Ct. 2447 (1990),** ruled that the judge considering

the sanction motion must examine all the circumstances of the case and conclude whether

an attorney's pre-filing inquiry was reasonable, comparing this level of inquiry to that of a

determination in negligence.

117.    Was Coleman negligent in representing to the Court that he is not the attorney of the

Defendants and then filing pleadings signing that he is?  Coleman's representation to the

Court went several steps beyond merely stating he is not the Defendants' lawyer – He

represented to the Court that the Attorney General is the attorney of record for the Defendants for the purpose of dismissing that action for insufficiency of process under the Rhode Island Government Tort Liability Act, arguing that the Summons and Complaint must be served upon the Attorney General, not upon the Defendants directly, as the Plaintiff did. Several staff lawyers of the Defendant agency RI OCSS and RI DHS appeared at the Court hearing remained silent.  They are clearly part of the ruse.  Judge Cruise on his own called on Beauregard, a staff attorney of the Defendant agency, who is not a named defendant and never entered appearance in that matter in any capacity, and who was never called by either party to testify, to argue the case; he too remained silent on the issue of the attorney of record of the Defendants and failed to refute Coleman's representations to the Court.

118.    The sole function of a motion to dismiss is to test the sufficiency of the complaint and the Court *must* assume all allegations are true, resolving any doubts in plaintiff's favor and thus is confined to the four corners of the complaint. A court *may* consider any evidence it deems necessary to settle the jurisdictional question.

119.    Plaintiff raised the above-described evidence to the Superior Court.  At the March 24, 2023 WebEx hearing in that matter, Judge Cruise questioned Mr. Coleman as to what he had to say.  Mr. Coleman merely replied, "Mr. Beauregard and the others appeared as observers."  Mr. Coleman did not admit to perjury.

120.    (In relevant parts, RI Gen L § 11-33-1 (2016) (d) states,  "Where in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits the declaration to be false, that admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially

affected the proceeding, or it has not become manifest that the falsity has been or will be exposed.")

121.    Plaintiff then raised to the Court Plaintiff's objection as to Beauregard, as an observer, testifying in Court without the administration of Oath, to affirm Beauregard's duty under oath to the Court, as "an observer" per Coleman.   Judge Cruise ruled over the Plaintiff's objection, by affirming that Beauregard is an Officer of the Court, as all lawyers are, and as such are under Oath; Judge Cruise further emphasized the importance of this Oath on Officers of the Court, as "their livelihoods depend on it."  However, Judge Cruise does not apply the duty of Officers of the Court under Oath to Coleman who represented to the Court he is not the Defendant's attorney and the Attorney General is the attorney of record for the Defendants for the purpose of dismissing Plaintiff's claim for lack of jurisdiction, then never withdrew his limited appearance, never entered appearance as the defendant or on behalf of the defendant, simply morphed magically into attorney of record for the defendants – Judge Cruise denied Plaintiff's Rule 11 Motion for Sanctions, stating the Defendant agency is under Coleman.

122.    The afore-described representation to the Court by Coleman and his team of Officers of the Court comprised of staff attorneys of the Defendant agency who are not named parties to the Complaint and who are "observers" per Coleman, was a calculated ruse.  Through the ruse, the above-mentioned actors implicated the Open Government function of the Attorney General who is vested with jurisdiction over APRA complaints under R.I.G.L. § 38-2-1, *et seq*. specifically R.I.G.L. § 38-2-8.  Meanwhile, the Attorney General, by way of the

January 19, 2023 email to the Plaintiff, states awareness of this matter pending before the

Superior Court, but does nothing.

123.    Plaintiff filed a breach of contract and other torts action in Federal Court against the RI

OCSS on January 17, 2023. *Seguin v. RI OCSS et al, Civil Action No. 1:23-cv-00034*

124.    On January 30, 2023, the Rhode Island Sheriff served the Summons and Complaint of

*Seguin v. RI OCSS et al, Civil Action No. 1:23-cv-00034* upon the defendants directly, not the

Attorney General. The Attorney General entered appearance on behalf of the State

defendants on February 3, 2023 in *Seguin v. RI OCSS et al, Civil Action No. 1:23-cv-00034* so

it is affirmed that sometime after January 30, 2023 and definitely as of February 3, 2023,

the Attorney General has full knowledge of Coleman's lies in Superior Court, as the official

attorney of record of the same RI OCSS defendants under similar nexus of facts, but did

nothing, and never entered appearance either in the APRA action in Superior Court.

125.    Perjury consists of making a false statement under oath, either in writing or verbally,

that one knows is false, and that is material to the proceedings in which the statement is

made. Perjury requires proof of more than just a false statement in a court proceeding or

otherwise under oath.

126.    Federal law defines two types of perjury, each of which has multiple elements. The first

type of perjury involves statements made under oath, and requires proof that:

127.    A person took an oath to truthfully testify, declare, depose, or certify, verbally or in

writing;

128.    The person made a statement that was not true;

129.    The person knew the statement to be untrue;

130.    The person made the false statement willfully; and

131.    The subject matter of the statement was material to the proceeding in which it was made.

132.    The second type of perjury involves unsworn statements, and requires proof that:

133.    A person made an **unsworn declaration** as permitted by federal law;

134.    The statement was made "under penalty of perjury";

135.    The person willfully made a statement that he or she did not believe to be true; and

136.    The subject matter of the statement was material.

137.    Judge Cruise reminded the Court that Officers of the Court are under Oath with respect to representations, testimony, statements to the Court.

138.    The specific act that constitutes perjury is not the false statement itself, but rather the oath or affirmation that the statement is true.

139.    Perjury statutes require proof that a person acted with knowledge of the falsity of the statement. The federal statute requires that a person acted "willfully," while Rhode Island's statute says the person must have acted "knowingly." The Plaintiff has raised this issue to the Court repeatedly throughout the APRA proceeding on the record and in filed pleadings, all to deaf ears.

140.    The requirement that a false statement is material to the proceeding may be the most important element of perjury. The U.S. Supreme Court defined material, in _**Kungys v. United States**_, as a statement that "has a natural tendency to influence, or was capable of influencing, the decision of the decision-making body to which it was addressed."(internal quotation marks omitted).

141.    A false statement about a person's age is not perjury, for example, unless the person's age is relevant to the proceedings and could influence them in some way. This could be the case if a person lied about his or her age in an application for public benefits based on age, in which case the person might have also committed welfare fraud.

142.    A related offense is the crime of subornation of perjury, which involves coaching or persuading a person to commit perjury. Attorneys and other people who might advise a witness may be targets of subornation of perjury accusations.

143.    RI Gen L § 11-33-1 (2016) § 11-33-1 Perjury states:

(a) Every person under oath or affirmation who knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing it contains any false material declaration, shall be deemed guilty of perjury.

144.    (b) An indictment or information for violation of this section alleging that on oath or affirmation the defendant has knowingly made two (2) or more declarations which are inconsistent to the degree that one of them is necessarily false need not specify which declaration is false if:

145.    (1) Each declaration was material to the point in question; and

146.    (2) Each declaration was made within the period of the statute of limitations established in § 12-12-17.

147.    (c) In any prosecution under this section, the falsity of a declaration set forth in the indictment or information shall be established sufficient for conviction by proof that the defendant on oath or affirmation made irreconcilably contradictory declarations material to

the point in question. It shall be a defense to an indictment or information made pursuant to this subsection that the defendant, at the time he or she made each declaration, believed the declaration was true.

148.    (d) Where in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits the declaration to be false, that admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that the falsity has been or will be exposed.

149.    (e) Proof beyond a reasonable doubt under this section is sufficient for conviction. It shall not be necessary that proof be made by any particular number of witnesses or by documentary or other type of evidence.

Prosecution of Perjury

150.    Plaintiff further raises the above actions of the DHS agency and those under it of implicating the Attorney General and the Open Government function vested to the Attorney General by § 38-2-1 et seq.  The January 19, 2023 letter from the Open Government Division states that it defends Open Government of § 38-2-1 et seq, therefore if the Attorney General is actually the attorney of record for the Defendants, the Attorney General's failure to disclose that he is and his failure to enter appearance on behalf of the Defendants in the Superior Court APRA matter becomes material.

151.    If the Attorney General is actually not, the Attorney General's January 19, 2023 letter statement of awareness of this action and the subsequent inaction also become relevant.

152.    RI OCSS and RI DHS officials acted as Meyersiek's agent who at certain points colluded to conceal public record documents containing their unlawful actions at all costs: Coleman, Barclay, Tighe, Caballeros, Fobert, Adams, Flynn, Dibiase, Bonin, Langlois, Gould, Beauregard and Pinsonneault.

153.    Barbara Grady at all times acted as Meyersiek's agent.

154.    RI OCSS acted as Seguin's agent in brokering the contract and has a duty to represent the true facts to Seguin.

155.    RI OCSS forgave interest by agreement in consideration of Seguin's lump sum payment of $104,185.98 that the agency offered to Seguin on December 7, 2021, which Seguin accepted, and executed on the agreement by paying the agreed upon lump sum of $104,185.98.

156.    Meyersiek's agents, RI OCSS and RI DHS officials, Coleman, Barclay, Tighe, Flynn, Langlois, Gould, Beauregard and Pinsonneault, are attorneys obligated by higher standards of duty of care, and as such committed professional negligence and subornation of perjury.

157.    RI OCSS officials are government officials that owe Seguin, the noncustodial parent, specialty duty.  RI OCSS owes Seguin, the noncustodial parent, special duty.

158.    After depriving Seguin of her Texas Attorney, as the RI OCSS brokers of Seguin's contract with Meyersiek, RI OCSS officials assumed dual agent duty to Seguin, as well as special duty as government officials.

159.    RI OCSS officials owe Seguin a fiduciary duty and breached it.

160.    RI OCSS contracted with Seguin directly for the $104,185.98 payoff amount with contract term forgiving interest, which was waived by Meyersiek.

161. RI OCSS breached the contract with Seguin. RI OCSS levied Seguin's property without probable cause, without proper authority under common law and under the laws of the United States and the State of Rhode Island.

162. To conceal the six (6) different books of accounts RI OCSS of alleged interest debt which RI OCSS forgave by contract, RI OCSS refused and denied Seguin's right to review itemized accounting with credit, payments and interest of particular dates and to validate and verify RI OCSS's self-admitted but unspecified calculation errors.

## IV.    COUNTS

### COUNT I: MISREPRESENTATION

163. Seguin, hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint as though fully stated herein.

164. Seguin suffered economic harm, distress and mental anguish due to the misrepresentation of the defendants.

165. Due to Meyersiek's, RI OCSS's, RI DHS's and defendants' individual misrepresentations and omissions, Seguin is entitled to legal and equitable relief, including damages and punitive damages, interest, costs, attorney's fees and/or other relief deemed appropriate.

### COUNT II: NEGLIGENT MISREPRESENTATION

166. Seguin, hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint as though fully stated herein.

167. Seguin suffered economic harm, distress and mental anguish due to the negligent misrepresentation of the defendants.

168.    Due to Meyersiek's, RI OCSS's, RI DHS's and defendants' individual negligent misrepresentations and omissions, Seguin is entitled to legal and equitable relief, including damages and punitive damages, interest, costs, attorney's fees and/or other relief deemed appropriate.

### COUNT III: INTENTIONAL/FRAUDULENT MISREPRESENTATION

169.    Seguin, hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint as though fully stated herein.

170.    Seguin suffered economic harm, distress and mental anguish due to the intentional/fraudulent misrepresentation of the defendants.

171.    Due to Meyersiek's, RI OCSS's, RI DHS's and defendants' individual intentional/fraudulent misrepresentations and omissions, Seguin is entitled to legal and equitable relief, including damages and punitive damages, interest, costs, attorney's fees and/or other relief deemed appropriate.

### COUNT IV: COMMON LAW BAD FAITH

172.    Seguin, hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint as though fully stated herein.

173.    Seguin suffered economic harm, distress and mental anguish due to the common law bad faith of the defendants.

174.    Due to Meyersiek's, RI OCSS's, RI DHS's and the individual RI OCSS defendants' bad faith, Seguin is entitled to legal and equitable relief, including damages and punitive damages to deter bad faith actions by Meyersiek and his RI OCSS and RI DHS agents in the future, interest, costs, attorney's fees and/or other relief deemed appropriate.

## COUNT V: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALINGS

175.    Seguin, hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint as though fully stated herein.

176.    Seguin suffered economic harm, distress and mental anguish due to the breach by the defendants

177.    Due to Meyersiek', RI OCSS's, RI DHS's and the individual RI OCSS defendants' breach of the covenant of good faith and fair dealings, Seguin is entitled to legal and equitable relief, including damages, interest, costs, attorney's fees and/or other relief deemed appropriated.

## COUNT VI: TORTIOUS BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALINGS

178.    Seguin, hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint as though fully stated herein.

179.    Seguin suffered economic harm, distress and mental anguish due to the tortious breach of the defendants.

180.    Due to Meyersiek's and the Defendants' collective tortious breach of the covenant of good faith and fair dealings, Seguin is entitled to legal and equitable relief, including damages, and punitive damages to deter tortious actions by Meyersiek, RI OCSS, RI DHS and the defendants individually in the future, interest, costs, attorney's fees and/or other relief deemed appropriate.

## COUNT VII: BREACH OF FRAUDULENT CONCEALMENT/ COMMON LAW FRAUD

181.    Seguin, hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint as though fully stated herein.

182.    Seguin suffered economic harm, distress and mental anguish due to the breach of fraudulent concealment/common law fraud of the defendants

183.    Due to Meyersiek's and the RI OCSS and RI DHS defendants' breach of fraudulent concealment/common law fraud, Seguin is entitled to legal and equitable relief, including damages, and punitive damages to deter fraudulent actions by Meyersiek and RI OCSS and RI DHS in the future, interest, costs, attorney's fees and/or other relief deemed appropriate.

**COUNT VIII: CONCEALED FRAUD**

184.    Seguin, hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint as though fully stated herein.

185.    Seguin suffered economic harm, distress and mental anguish due to the concealed fraud of the defendants.

186.    Due to Defendants' concealed fraud, Seguin is entitled to legal and equitable relief, including damages, and punitive damages to deter concealed fraud actions by Meyersiek and RI OCSS and RI DHS in the future, interest, costs, attorney's fees and/or other relief deemed appropriate.

**COUNT IX: TORT OF DECEIT**

187.    Seguin, hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint as though fully stated herein.

188.    Seguin suffered economic harm, distress and mental anguish due to the deceit of the defendants

189.    Due to Defendants' deceit, Seguin is entitled to legal and equitable relief, including

damages, and punitive damages to deter deceit by Meyersiek and RI OCSS and RI DHS in the

future, interest, costs, attorney's fees and/or other relief deemed appropriate.

**COUNT X: RECKLESS INDIFFERENCE TO THE RIGHTS OF SEGUIN**

190.    Seguin, hereby incorporates by reference all the allegations contained in the preceding

paragraphs of this complaint as though fully stated herein.

191.    Seguin suffered economic harm, distress and mental anguish due to the reckless

indifference of the defendants.

192.    Due to Defendants' reckless indifference to the rights of Seguin, Seguin is entitled to

legal and equitable relief, including damages, and punitive damages to deter the reckless

indifference to the rights of Seguin (others) by Meyersiek and RI OCSS and RI DHS in the

future, interest, costs, attorney's fees and/or other relief deemed appropriate.

**COUNT XI: DELIBERATE INDIFFERENCE TO THE RIGHTS OF SEGUIN**

193.    Seguin, hereby incorporates by reference all the allegations contained in the preceding

paragraphs of this complaint as though fully stated herein.

194.    Seguin suffered economic harm, distress and mental anguish due to the deliberate

indifference to the rights of Seguin by the defendants

195.    Due to Defendants' deliberate indifference to the rights of Seguin, Seguin is entitled to

legal and equitable relief, including damages, and punitive damages to deter the deliberate

indifference to the rights of Seguin (others) by Meyersiek and RI OCSS and RI DHS in the

future, interest, costs, attorney's fees and/or other relief deemed appropriate.

**COUNT XII: ABUSE OF PROCESS**

196.    Seguin, hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint as though fully stated herein.

197.    Seguin suffered economic harm, distress and mental anguish due to the abuse of process of the defendants.

198.    Due to Defendants' abuse of process, Seguin is entitled to legal and equitable relief, including damages, and punitive damages to deter abuse of process by Meyersiek and RI OCSS and RI DHS in the future, interest, costs, attorney's fees and/or other relief deemed appropriate.

## COUNT XIII: BREACH OF DUTY

199.    Seguin, hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint as though fully stated herein.

200.    Seguin suffered economic harm, distress and mental anguish due to the breach of duty by the defendants.

201.    Due to Defendant RI OCSS, RI DHS  and the individual RI OCSS and RI DHS Defendants' breach of duty, who, as a government agency and officers of the court officials of the agency, owe Seguin, the noncustodial parent, a duty, Seguin is entitled to legal and equitable relief, including damages, and punitive damages to deter breach of duty by RI OCSS and RI DHS agents in the future, interest, costs, attorney's fees and/or other relief deemed appropriate.

## COUNT XIV: COVER-UP

202.    Seguin, hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint as though fully stated herein.

203.    Meyersiek and RI OCSS and RI DHS Defendants know that Seguin is entitled to access to public records contained in her files that contains incriminating evidence of accounting fraud, breach of contract and illegal seizure of Seguin's property and other unlawful tortious actions and have covered up evidence of Meyersiek's and RI OCSS's breach of contract documented in Seguin's RI OCSS case file by denying Seguin access to her case file.  Even after Seguin petitioned for her case file pursuant to the RI APRA under R.I. Gen. Laws sec. 38-2-1, et seq. to the Secretary of RI EOHHS, RI OCSS denied Seguin's APRA request and only partially released records, withholding telephonic records, notes, accounting statements and other records evidentiary of defendants' waiving of and forgiving interest and all documents relating to RI OCSS maintained by RI OCSS of RI OCSS clandestinely seizing Seguin's properties in the State of Texas through legally insufficient liens and levy of the substantial amount $75,638.00, in breach of contract for interest that Meyersiek already waived and RI OCSS already forgave.  After levying Seguin's bank account on April 28, 2022, RI OCSS defendants never credited Seguin's RI OCSS child support account for RI OCSS's seizure of Seguin's bank assets.  RI DHS and RI OCSS, condoned by Meyersiek, schemed to commit perjury in Seguin's APRA action in Superior Court for the purpose of cover up through denying Seguin access to public records in her files that contain incriminating evidence against the defendants.

204.    Seguin suffered economic harm, distress and mental anguish due to the fraud cover-up by the defendants.

205.    Due to defendants' fraud cover-up, Seguin is entitled to legal and equitable relief, including damages, and punitive damages to deter fraud cover-up by Meyersiek and RI

OCSS and RI DHS defendants who are professionals and Officers of the Court (lawyers), in the future, interest, costs, attorney's fees and/or other relief deemed appropriate.

### COUNT XV: RI GOVERNMENT TORT LIABILITY AGAINST RI OCSS and RI DHS DEFENDANTS

206.    Seguin hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint as though fully stated herein.

207.    Defendant RI OCSS and RI DHS and individual defendant RI OCSS and RI DHS agents know that there is no claim for interest having forgiven interest that Meyersiek waived by agreement and schemed perjury and subornation of perjury in Seguin's APRA action in Superior Court for the purpose of cover up through denying Seguin access to public records in her files that contain incriminating evidence against the defendants.

208.    Due to the tortious acts committed by RI OCSS and RI DHS, who, as government agencies, absolutely owe Seguin, the noncustodial parent, a duty of disclosure, a duty to honest services and dealings, Seguin is entitled to legal and equitable relief, including damages, and punitive damages to deter tortious acts by RI OCSS and RI DHS agents who are professionals and Officers of the Court(lawyers), in the future, interest, costs, attorney's fees and/or other relief deemed appropriate.

### COUNT XVI: 42 U.S.C. § 1983 CLAIM AGAINST RI OCSS DEFENDANTS FOR RECKLESS INDIFFERENCE TO PLAINTIFF'S CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS

209.    Seguin, hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint as though fully stated herein.

210.    RI OCSS's and RI DHS's official and unofficial policies and customs encouraged, caused, allowed, and/or enabled Defendants Coleman, Barclay, Pinsonneault, Beauregard to violate

Plaintiff's constitutional and state rights without fear of discipline for those violations.  See *Monell v. Department of Social Services*, 436 U.S. 638 (1978).

211.   RI DHS and RI OCSS have not disciplined Defendants Barclay, Coleman, Pinsonneault, Beauregard for their violations of Plaintiff's constitutional rights and therefore has implicitly approved, ratified, or adopted Barclay, Coleman, Pinsonneault and Beauregard's unconstitutional actions, yet RI DHS and RI OCSS are responsible for RI DHS and RI OCSS Defendants' supervision, training, and discipline through its policy making powers and personnel decisions.

212.   There is an obvious need for RI DHS and RI OCSS to train all their employees on Fourth and Fourteenth Amendment rights.  RI DHS and RI OCSS, therefore, have demonstrated a policy of deliberate indifference to such civil rights violations.  See *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

213.   RI OCSS's and RI DHS's reckless actions under color of state law before, during, and after Seguin's loss have caused Plaintiff to suffer and continue to suffer the damages Plaintiff has described.

214.   These deprivations under color of state law are actionable under and may be redressed by 42 U.S.C. § 1983.

**COUNT XVII: 42 U.S.C. § 1983 CLAIM OF SIXTH AMENDMENT RIGHT TO A FAIR TRIBUNAL**

215.   Seguin, hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint as though fully stated herein.

216.    Defendants under color of law deprived Plaintiff of Plaintiff's fair tribunal rights which are secured through the Fourteenth Amendment, by perjury and subornation of perjury in Plaintiff's APRA action to access Public Records in her files under RI APRA.

217.    Defendants further covered up their deprivation by denying Seguin's right to access her own case records, a right secured by the Fourteenth Amendment to the United States Constitution.

218.    In depriving the Plaintiff of these rights, Defendants committed these unlawful violations under color of state law in bad faith and with malicious purpose in reckless disregard of Plaintiff's rights.

219.    The deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

**COUNT XVIII: STATE TORT OF LIABILITY AGAINST DEFENDANTS UNDER 42 U.S.C § 1983**

220.    Seguin, hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint as though fully stated herein.

221.    Defendants actions underlying their scheme of perjury and subornation of perjury to the Plaintiff are illegal under the United States Constitution's Sixth Amendment as applied to the States via the Fourteenth Amendment.

222.    This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

**COUNT XIX: CIVIL RICO**

223.    Seguin, hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint as though fully stated herein.

224.    Seguin suffered economic harm, distress and mental anguish due to the breach of duty by the defendants.

225.    Due to Defendant RI OCSS, RI DHS  and the individual RI OCSS and RI DHS Defendants' conspiracy to commit perjury and subornation of perjury, via wire fraud at WebEx Hearings conducted by the Superior Court of Rhode Island, for the purpose of dismissing Seguin's meritorious APRA claim by which to access public records contained in her own case file in the control and created by Defendants RI DHS and RI OCSS, who, as a government agency and Officers of the Court officials of the agency, owe Seguin, the noncustodial parent, a duty, Seguin is entitled to legal and equitable relief, including treble damages, and punitive damages to deter breach of duty by RI OCSS and RI DHS agents in the future, interest, costs, attorney's fees and/or other relief deemed appropriate.

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiff, respectfully requests of this Honorable Court the following relief:

a.    Plaintiff hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint as though fully stated herein.

b.    Trial by jury on all issues so triable;

c.    Pre-judgment and post-judgment interest;

d.    Treble damages, including pecuniary damages, in excess of $1,000,000.00.

e.    Damages, costs, and attorney fees where applicable;

f.    Punitive damages, costs, and attorney fees where applicable;

g.  Plaintiff costs of suit, including without limitation, its attorney's fees, expert fees, and actual incurred costs;

h.  Award to Plaintiff of reasonable attorney's fees and costs incurred in connection with this action from the Defendant pursuant to 42 U.S.C. § 1983; and

i.  Such other further relief as the Court deems just and proper or that is necessary to make the Plaintiff whole.

## JURY DEMAND

Plaintiff respectfully requests a jury trial of all issues alleged herein.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 30, 2023, I filed the within Complaint with the Clerk of the Court via the ECF filing system.

Respectfully submitted,

Mary Seguin

Pro Se

/s/    *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: March 30, 2023