UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

**MARY SEGUIN,**

*Plaintiff,*

VS.                                                     Civil Action No. 1:23-cv-00126

**RHODE ISLAND DEPARTMENT OF HUMAN SERVICES** in its official capacity; **MICHAEL D. COLEMAN, DEBORAH A. BARCLAY** in their individual and official capacities; **RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES** in its official capacity; **LISA PINSONNEAULT, CARL BEAUREGARD**, in their individual and official capacities; **GERO MEYERSIEK**

*Defendants*

### PLAINTIFF'S MOTION FOR AN EXTENSION OF TIME TO AMEND COMPLAINT

The Plaintiff, MARY SEGUIN, respectfully requests a 60-day extension of time from the due date of August 28, 2023 that is provided by Fed. R. Civ. P. 15(a) (Plaintiff hereby invokes Rule 15), to amend Plaintiff's complaint and respectfully requests an extension through to and including **October 27, 2023**.  In addition to the **_new evidence_** the Plaintiff obtained through the Family court-ordered discovery, the Plaintiff discovered and verified **_new facts_** yesterday, on August 7, 2023, that the **Rhode Island Family Court**, through its adoption and promulgation of **Administrative Order 2021-01 A2).** mandated that all child support interest matters shall be heard remotely via WebEx.  Further, **Administrative Order 2021-01 B1)** mandated that all non-emergency filings shall be filed using the electronic filing system in accordance with the Family Court Rules of Domestic Relations Procedure, which is the **Odyssey system**.  *See attached* **Exhibit A**. "**Rhode Island Family Court Administrative Order 2021-01**"  Disturbingly, the State Defendant Rhode Island Office of Child Support Services, in violation of all relevant R.I. court rules, statutes and regulations, ***systemically and routinely*** file, as a matter of State policy and practice, remote hearing court filings using an ***unnamed legacy electronic filing system and_not_*** ***through the Rhode Island Court electronic filing system, Odessy***.  This results in the fact that

filings by the State Defendants Rhode Island Office of Child Support Services in Family Court are <u>not</u> accessible to Pro-Se Litigants, the Public, and not even to the Rhode Island Judiciary Virtual Clerk in Family Court-mandated remote proceedings concerning child support matters, per **Rhode Island Family Court Administrative Order 2021-01**.  The Rhode Island Family Court knew and should have known the aforesaid facts, and knew and should have known the routine First Amendment and Fourteenth Amendment due process violations of conducting remote hearings in child support matters in which the Rhode Island Office of Child Support Services is a party, when the State's filings are not filed through the electronic filing system Odyssey in Family Court, and are filed routinely, by State policy and practice, using a different, unnamed legacy electronic system resulting in their filings not noticed to opposing parties, not visible to pro-se litigants, and not even visible to the Rhode Island Court's virtual clerks.

Moreover, on July 10, 2023, the Plaintiff discovered and verified even more disturbing and new relevant facts that the **Rhode Island State Courts** and/or **Rhode Island State Judiciary** and/or the **Rhode Island Superior Court Bench Bar Committee,** through their adoption and promulgation of **"RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION, Rule 5. Access to Case Information, (c) Remote Access to Case Information. (1) Policy. To allow *limited* Remote Access to the Database through the Public Portal.  Non-public case types shall not be remotely accessible except for certain case types to attorneys who have entered an appearance in a case.  (2) Content. (a) The Public, Self-represented Litigants and Parties. The Public, self-represented litigants, and parties shall have Remote Access to the register of actions or Docket but shall *<u>not</u>* have Remote Access to other Electronic Case Information"** *bar, deny, violate, abridge, infringe and interfere with Pro Se Litigants' and the Public's fundamental rights to access public court records and Pro Se Litigants' fundamental right to meaningful access to the courts*.  *See* <u>Exhibit B</u>, "<u>RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION</u>"  <u>Rule 5(c)(2)(a)</u> "<u>The Public, Self-represented Litigants and Parties. The Public, self-represented litigants, and parties shall have Remote Access to the register of actions or Docket but shall not have Remote Access to other Electronic Case Information.</u>"  *See also* <u>Exhibit C</u>, "<u>RHODE ISLAND JUDICIARY, Access to Case Information,  2. Remote Access to Case</u>

**Information A. The Public, Self-represented Litigants, and Parties to a Case, The public, self-represented litigants, and parties in a case shall have remote access to the register of actions or docket but shall not have remote access to other electronic case information**."

The **Texas** Plaintiff is an ***out-of-state diversity*** and a ***pro-se*** litigant in two **state** proceedings in **Rhode Island**, and who has been unconstitutionally singled out and targeted by the Rhode Island State Judiciary, by category "**self-represented litigant**," to be *__barred__* from accessing electronic case information in which state court cases ***she is the pro-se party***, and therefore has standing to raise claims against this unconstitutional state practice *and* unconstitutional state court practice and rules.  The Texas pro-se Plaintiff's fundamental First Amendment constitutional right and **common law right** to equal, meaningful, and timely access to judicial records and public court records in litigation are **fundamental First Amendment and Fourteenth Amendment rights**.  Critically, the unconstitutional abridgement, infringement, and denial of judicial and court records to out-of-state pro-se litigants by the Rhode Island State Courts, Rhode Island State Judiciary and the Rhode Island Superior Court Bench Bar Committee directly relate to Younger Abstention Exception, a vital and complex issue that the Texas pro-se Plaintiff respectfully requests this Federal Court the extension of time to fully present and fully plead, raise her claim and amend her complaint.  The Plaintiff respectfully requests the extension of time to amend her complaint.

Moreover, the Texas Plaintiff obtained *__new evidence__* that the State Defendants deliberately abuses the State Court's abridgement, infringement, and denial of equal access to court and judicial records to pro-se litigants to maliciously deprive the Texas Plaintiff of her Constitutional right to meaningfully petition for redress in the state court proceedings. Specifically, the State Defendants deliberately file all the State's pleadings **outside of the State's electronic filing system**, "Odyssey," and deliberately use a wholly different un-named electronic filing system, ***different*** and ***separate*** from that ("Odyssey") provided for pro-se litigants, so that pro-se litigants do not receive any requisite automated electronic notices of court motions or pleadings the State Defendants file electronically, nor are pro se litigants able to electronically access the content information of the State Defendants' electronically-filed pleadings.  The only way the pro se litigant, such as the Texas Plaintiff, can access the court

record is to personally go to the courthouse in Rhode Island to access the court pleading information, or get a "courtesy notice" via email or get a "courtesy notice" through U.S. Mail sent by the State Defendants at whim.   U.S. Mail takes approximately 14 days to deliver from Rhode Island to Texas, rendering even courtesy notices two weeks late and untimely, when the court rules mandate electronic filing using the Odyssey filing system that would provide instantaneous notice of filings to opposing parties.  Moreover, State Defendants deliberately fail to send the notices electronically or by U.S. Mail, and the state courts deliberately promulgated court rules disallowing the public, pro-se litigants and even the parties who are represented by lawyers, remote access to court records, and critically, deny access to crucial court decisions, judgments and orders of public cases, as well as deny remote access to the transcripts ordered by pro-se litigants for appeal.  Critically, the State court's abridgment and denial of access of court documents to the pro se litigant and the general public result in the unconstitutional abridgment and denial of equal, timely and meaningful access to court complaints, decisions, judgments and orders.  What is truly shocking is that the Rhode Island Judiciary even denies and/or bars pro-se litigants remote access of court transcripts that were ordered by pro-se litigants for appeal.  The pro-se Texas Plaintiff respectfully requests the extension of time to prepare and present the ***newly verified facts*** and ***evidence***, and the requests the extension of time to amend the complaint.

Thirdly, the Texas Pro-Se Plaintiff newly discovered and verified the fact, on or about July 7, 2023, that the Rhode Island Judiciary, using the aforesaid state court rule barring, by category, pro-se litigants from accessing court case information remotely, bars the Plaintiff by category ("self-represented litigant") from accessing state court proceeding transcripts that the Texas Plaintiff ordered and paid for, for appeal.  In other words, the RI Supreme Court Clerk stated to the Texas Plaintiff that the Plaintiff, in Texas, is unconstitutionally **barred** from remotely accessing the transcripts of court proceedings that she ordered and paid for in her appeal to the RI Supreme Court in the Plaintiff-initiated APRA action ***Seguin v. RI Office of Child Support Services,*** **PC-22-07215,** and yet the State Defendants are inequitably granted instant and free remote access to those very transcripts that the Texas Plaintiff ordered and paid for,

for appeal.  The federal Texas Plaintiff respectfully requests this Court the extension of time to present the new evidence and plead the verified facts.

Fourthly, the Texas Plaintiff discovered and verified the fact, on or about July 11, 2023, that, despite the Texas Plaintiff's several phone inquiries to the RI Superior Court in the past several weeks regarding the status of the appeal, the RI Superior Court, for undisclosed reasons, failed and continue to fail to relinquish jurisdiction and transfer the court case file of *Seguin v. RI Office of Child Support Services,* PC-22-07215 to the RI Supreme Court within the requisite 60 days after Plaintiff's filing of Notice of Appeal on April 3, 2023, as required by the RI Supreme Court rules and procedures.  At the same time, the Texas Plaintiff verified the fact that the Plaintiff-ordered transcripts of the state proceedings in the Federal Plaintiff-initiated state APRA action *Seguin v. RI Office of Child Support Services,* PC-22-07215 show the RI Superior Court further unconstitutionally sought to deny the Texas Plaintiff access to the state court by outright threatening the Plaintiff in open court that the Judge, David Cruise, during two hearings, one in February 2023 and the second one on March 24, 2023 in that matter, shall and did *use the state court's discretionary power to deny all of the Texas pro-se Plaintiff's petitions for remote WebEx hearings to effectively deny her access to the state superior court.* The Texas Plaintiff avers this is a direct contributory reason for the RI Superior Court's failure to transfer the case file to the Supreme Court within 60 days (by June 3, 2023) of the Plaintiff's filing of Notice of Appeal on April 3, 2023 in *Seguin v. RI Office of Child Support Services,* PC-22-07215.   The federal Texas Plaintiff respectfully requests this Court the extension of time to amend the complaint, to ***present the new evidence*** and ***plead the newly verified facts***.

Fifthly, the Plaintiff presents to this Court and respectfully requests the Court to take judicial notice of the undisputed fact of the court rule-making process in Rhode Island.  The 1966 Rules were promulgated by the justices of the superior court pursuant to **section 8-6-2 of the General Laws of Rhode Island**.  This enabling act departed from the Federal Rules Enabling Act and most state enabling legislation conferring rule-making power on the supreme courts of the respective governments.  The **Rhode Island Enabling Act** was adopted in 1940, ***1940 R.I. Pub. Laws ch. 943, sec. 1***.  It conferred the power on the justices of the superior court and the 1966 reform was the product of that court.  In 1969 an amendment to section 8-6-2 made the

Rules thereafter adopted by the trial courts subject to the approval of the Supreme Court. ***1969 R.I. Pub. Laws ch. 239, sec 2***.  Therefore, all public records relating to the adoption and promulgation of the "**RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION**" are "made in the course of, made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency, ""agency" or "public body" means any executive, legislative, **judicial**, regulatory, or administrative body of the state, or any political subdivision thereof" as per **R.I. Gen. Laws § 38-2-2**, a.k.a. **RI Access to Public Records Act** ("**APRA**").  Even though the Rhode Island Enabling Act conferred the power on the judiciary public body to promulgate and adopt court rules, a.k.a. rule-making process, the Rhode Island Judiciary, pursuant to the Plaintiff's APRA request for public records, denied the Plaintiff's APRA request within the 10 business day period, as well as ***denies*** it possesses public records, as defined by APRA, relating to the rule-making process by the judiciary of the "**RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION**," including denying possession of public records that show the intent of the rule-makers to promulgate and adopt court rules denying fundamental right of public access to electronic case information remotely to the public, to self-represented litigants, and to parties to a case.  *See* **Exhibit D** fourteen (14) APRA correspondence emails between the Plaintiff and/with Mr. Justin Correa, Esq. and Ms. Alexandra Kriss of the Rhode Island Judiciary from June 10, 2023 to July 10, 2023.  The Texas pro-se Plaintiff respectfully requests the extension of time to amend the complaint, ***present the new evidence*** and ***plead the newly verified facts*** and claims, and amend the complaint, which is further in the interest of judicial economy.  The Plaintiff further seeks to appeal and file her claim against the implausible ***denial by the RI Judiciary***, which is conferred by the Rhode Island Enabling Act to make rules of the court, ***that it possesses public records relating to the*** "**RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION**," that the judiciary, conferred power by the Rhode Island Enabling Act, "made in the course of, made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency, ""agency" or "public body" means any executive, legislative, **judicial**, regulatory, or administrative body of the state, or any political subdivision

thereof" as per **R.I. Gen. Laws § 38-2-2**, a.k.a. RI Access to Public Records Act ("APRA"). Because the RI Superior Court clearly ruled in *Seguin v. RI Office of Child Support Services,* **PC-22-07215** that it lacked subject matter jurisdiction to hear the Texas Plaintiff's APRA-related claims, the Texas Plaintiff now exercises her statutory and constitutional rights to petition this Federal Court, invoking **28 U.S.C. § 1343(a)(3) (civil rights)** and **28 U.S.C. § 1367** that provides supplemental jurisdiction over the state law tort claims that arose from the same common nuclei of facts, invoking **28 U.S.C. § 1331 (federal question),** and invoking **42 U.S.C. § 1983** for violations of civil rights under the **First and Fourteenth Amendments to the United States Constitution.** The Plaintiff respectfully requests this Court for the extension of time to amend the complaint and file her claims.

**APRA**, which is modeled after the **Freedom of Information Act** ("**FOIA**"), is a statutory **right of access under the First Amendment**, and exists under the **common law right of access,** including judicial records and documents. There is a common law right of access, since "the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns*, **435 U.S. 589, 597, 98 S. Ct. 1306, 55 L. Ed.2d 570 (1978)**. That right derives from the interest of the public "to keep a watchful eye" on the workings of government. *See id.* at *598-99, 602, 98 S. Ct. 1306*. APRA and the FOIA are statutory rights of access that embody the same sort of concerns as t he common law right of access. "FOIA is often explained as a means for citizens to know what their Government is up to," reflecting "a structural necessity in a real democracy." *Nat'l Archives & Records Admin. V. Favish*, **541 U.S. 157, 171-72, 124 S. Ct. 1570, 158 L.Ed.2d 319 (2004).** The R.I. Supreme Court on numerous occasions pronounced that the Rhode Island Access to Public Records Act ("APRA") is directly modeled after the federal **Freedom Of Information Act** ("FOIA"). See, e.g., *Providence Journal Co. v. Convention Ctr. Auth.*, **774 A. 2d 40, 46 (RI 2001)**("Because APRA mirrors the Freedom of Information Act (citation omitted), it is appropriate to look to Federal case law interpreting FOIA to assist in our interpretation of the statute.")

In addition, the Plaintiff raises and avers the following undisputed facts and evidence, federal statutory rights and U.S. Supreme Court and Appellate caselaw:

A. **RHODE ISLAND COURT RULES SPECIFICALLY DENY PRO SE LITIGANTS, PARTIES REPRESENTED BY COUNSEL, AND THE PUBLIC REMOTE ACCESS TO COURT AND JUDICIAL RECORDS, EVEN GOING SO FAR TO DENY PRO-SE LITIGANTS REMOTE ACCESS TO COURT TRANSCRIPTS ORDERED AND PAID FOR BY PRO-SE LITIGANTS FOR APPEAL; HOWEVER, RHODE ISLAND FAMILY COURT MANDATES THAT CHILD SUPPORT MATTERS SHALL BE HEARD REMOTELY, KNOWINGLY CONDUCTING PROCEEDINGS THAT VIOLATE FIRST AMENDMENT AND FOURTEENTH AMENDMENT RIGHTS**

1) State Defendants do not dispute the facts alleged in Plaintiff's Amended Complaint [ECF 12] that the ***Texas* Federal Court Plaintiff**, ***initiated*** the state court proceeding ***against*** the State Defendants that ***preceded*** the State Defendants' re-opening of the concurrent/parallel Family Court proceeding:

   a. **Plaintiff-initiated Appeal of State Defendants' Denial of Plaintiff's Request for Public Records of her case file pursuant to the Access to Public Records Act ("APRA")** *Seguin v. RI Office of Child Support Services,* PC-22-07215

      i. Nature: Remedial proceeding initiated by Texas Federal Plaintiff

      ii. Disposition: February 2023: The R.I. Superior Court ***dismissed Plaintiff-initiated*** APRA action ***against*** the State Defendants in the early pleading stage ***without going into the merits*** for ***lack of subject-matter jurisdiction*** (Texas Federal Plaintiff filed the initial APRA record request on December 1, 2022*).*

2) State Defendant's in-house lawyer, Lisa Pinsonneault, Esq., filed several pleadings in June 2023 in the Family Court proceeding, ***Meyersiek v. Seguin*, K20010521M**, confirming the State Defendants re-opened the ten-year dormant case through filing their ***Motion to Set Arrears*** in Family Court on ***January 31, 2023, one day <u>after</u> the State Defendants were served this federal Summons and Complaint***. *See attached State Defendants' Family Court pleadings stating they filed the Motion to Set Arrears on January 31, 2023.* **Exhibit E**.

3) The Plaintiff learned and verified on July 10, 2023 directly from the Rhode Island Judiciary itself through numerous (14) correspondences with the Rhode Island

Judiciary from June 10, 2023 to July 10, 2023, pursuant to the Plaintiff's RI Access to Public Records Act ("APRA") request for public records from the Rhode Island Judiciary, that as a matter of State policy, State Court Rule, and Judiciary Rule, the State Court and state court proceedings deny remote access of court and judicial records, including court decisions and court transcripts ordered by pro-se litigants, to the Public, pro-se litigants, and parties to the litigation (who are represented by counsel). The Rhode Island State Court only grants remote access to court and judicial records to Rhode Island attorneys and state and federal agencies. *See attached* **Exhibit D** Rhode Island Court Rule, fourteen (14) APRA correspondence emails with Mr. Justin Correa, Esq. and Ms. Alexandra Kriss of the Rhode Island Judiciary from June 10, 2023 to July 10, 2023.

4) The State Defendants have full knowledge of the State Court's "**RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION**," that states, "**The Public, Self-represented Litigants and Parties. The Public, self-represented litigants, and parties shall have Remote Access to the register of actions or Docket but shall not have Remote Access to other Electronic Case Information.**" Specifically, the State Defendants with full knowledge of the "**RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION**," go a step further to initiate a child support matter proceeding that Family Court Administrative Order 2021-01 mandates shall be conducted remotely, then file all the State's pleadings **outside of the State's electronic filing system**, "Odyssey," and use a wholly different un-named electronic filing system, *different* and *separate* from that ("Odyssey") provided for pro-se litigants, with the result that pro-se litigants do not receive any requisite automated instantaneous electronic notices of court motions or pleadings the State Defendants file electronically, nor are pro se litigants able to electronically access the content information of the State Defendants' electronically-filed pleadings. The only way the pro se litigant, such as the Texas Plaintiff, can access the court record is to personally go to the courthouse in Rhode Island to access the court pleading information, or

get a "courtesy notice" via email or get a "courtesy notice" through U.S. Mail sent by the State Defendants. U.S. Mail takes up to 14 days to deliver mail from Rhode Island to Texas, effectively resulting in untimely notice, when notice by the court electronic filing system should be instantaneous. This is plainly violative of the pro-se Texas litigant's First Amendment and Fourteenth Amendment rights, and the proceedings are violative of the First Amendment and the Fourteenth Amendment.

5) The State Defendants have full knowledge that the Rhode Island Judiciary, using the aforesaid state court rule "**RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION**" barring, by category, pro-se litigants from accessing court case information remotely, bars the Plaintiff by category ("self-represented litigant") from accessing state court proceeding transcripts that the Texas Plaintiff ordered and paid for, for appeal.

6) The State Defendants initiated the Family Court mandated **remote** state court proceeding *Meyersiek v. Seguin*, **K20010521M** against the out-of-state Texas Plaintiff with full knowledge of the aforesaid state court rule "**RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION**" *barring, by category, the public, pro-se litigants and parties from accessing court case information remotely*.

7) The State Defendants and Counsel for the State Defendants have full knowledge and/or should have known, including through access to the Plaintiff-ordered transcripts of the state proceedings in the Federal Plaintiff-initiated state APRA action *Seguin v. RI Office of Child Support Services,* **PC-22-07215** that show the RI Superior Court further unconstitutionally sought to deny the Texas Plaintiff access to the state court by outright threatening the Plaintiff in open court that the Judge, David Cruise, during the hearing of March 24, 2023 in that matter, shall *use the state court's discretionary power in the future to deny all of the Texas pro-se Plaintiff's petitions for remote WebEx hearings to effectively deny her access to the state court.*

8) The State Defendants do not dispute the alleged facts in the Complaint that the Plaintiff demanded her case records several times during the Plaintiff-initiated RI EOHHS agency appeal, to which the State Defendants denied, and that immediately after the State Defendants' withdrawal from the Plaintiff-initiated RI EOHHS agency appeal, the Plaintiff sought her case file pursuant to the Rhode Island Access to Public Records Act on December 1, 2022. The R.I. Supreme Court on numerous occasions pronounced that the Rhode Island Access to Public Records Act ("APRA") is directly modeled after the federal **Freedom Of Information Act** ("FOIA"). See, e.g., ***Providence Journal Co. v. Convention Ctr. Auth.*, 774 A. 2d 40, 46 (RI 2001)**("Because APRA mirrors the Freedom of Information Act (citation omitted), it is appropriate to look to Federal case law interpreting FOIA to assist in our interpretation of the statute.") The United States Supreme Court on numerous occasions pronounced that the FOIA "SETS FORTH A POLICY OF BROAD DISCLOSURE OF Government documents in order to "ensure an informed citizenry, vital to the functioning of democratic society" and "seeks to permit access to official information long shielded unnecessarily from public view" and "ensure an informed citizenry and provide a check against corruption by holding the government accountable," and "FOIA applies to official information shedding light on an agency's performance of statutory duties," ***NLRB v. Robbins Tire Rubber Co.*, 437 U.S. 214 (1976)**; ***EPA v. Mink*, 410 U.S. 73 (1973)**; in other words, the undisputed fact remains, the Texas Plaintiff has been investigating and continue to investigate, through federal laws and state laws mirrored after FOIA, *e.g.*, APRA, etc., the legality and the validity of the State Defendants issued Liens and the legality and the validity of the State Defendant agency's actions committed from December 7, 2021 to the present, as well as **the legality/constitutionality of the state proceedings that fail to afford a full and fair opportunity to litigate the federal claim**, which the FOIA (and similar laws mirrored after it) that embodies the common law right of access and the First Amendment right of access "provides a check against corruption by holding the government accountable."

9) Finally, the alleged Family Court <u>Order</u> filed by Counsel for State Defendants [ECF 11] is proof of lies, deceit and unconstitutionally electronic filing by the State Defendant Rhode Island Office of Child Support Services in Family Court.  The Plaintiff respectfully requests judicial notice of the fact that the document submitted by Counsel for the State Defendants does not bear any court entry markings, nor is it signed by the Judge.  There is no date provided in the space provided for the date of entry of an order or signed by a judge.  Therefore, it is amply clear that the document in [ECF 11] is plainly <u>NOT</u> an order.  It is merely a proposed order proposed by State Defendant Rhode Island Office of Child Support Services, that shows and serves as evidentiary proof that it was <u>not</u> filed using the mandated Rhode Island court electronic filing system, Odyssey, and that it certifies notice through U.S. Mail to the Texas Plaintiff in Texas, and not electronically, as is required, instantaneously. Notice via U.S. Mail that takes up to 14 days to deliver from Rhode Island to Texas, or is frequently lost, is untimely.

10) The Plaintiff respectfully requests the extension of time to amend the complaint and prepare and present new evidence and facts obtained relating to the above.

## B. UNITED STATES SUPREME COURT AND APPELLATE COURTS CASE LAW INSTRUCTIONS

### I.    FIRST AMENDMENT RIGHT TO ACCESS COURT INFORMATION

11) "**RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION**" specifically denies the public, the self-represented litigant, and the party to litigation remote access to electronic court case information, which is not only violative of the Texas pro-se Plaintiff's right to access electronic case information, but further fail to afford the out-of-state Texas pro-se litigant a full and fair opportunity to litigate the federal claims and federal civil rights claims.  First Amendment protection of speech is very powerful.  This is particularly true concerning political speech. "Speech concerning public affairs is more than self-expression; it is the essence of self-government." ***Connick v. Myers* , 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)** (alterations omitted) (quoting ***Garrison v. Louisiana* , 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125**

**(1964)** ). "Accordingly, the [Supreme] Court has frequently reaffirmed that speech on public issues occupies the highest rung of the [hierarchy] of First Amendment values, and is entitled to special protection." Id. (internal quotation marks omitted) (quoting ***NAACP v. Claiborne Hardware Co ., 458 U.S. 886, 913, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982)*** ). The Constitution thus allows only the most minimal interference with political speech. See, e.g. , ***N.Y. Times Co. v. Sullivan , 376 U.S. 254, 256, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)***. When the interference takes the form of a "prior restraint" on speech—which refers to a court order prohibiting specific speech—the interference is even presumptively unconstitutional. *See **N.Y. Times Co. v. United States** , 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)*.

12) An important corollary of the right to free speech is the right to receive information. Nor does a right of access exist only under the First Amendment. It may exist under one of at least three sources.

13) First, there's a common law right of access, since "the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." ***Nixon v. Warner Commc'ns , 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978)***. That right derives from the interest of the public and press "to keep a watchful eye" on the workings of government, but it must be balanced against other interests. *See id.* at **598–99, 602, 98 S.Ct. 1306**.

14) Second, there are statutory rights of access to government records and documents, normally accompanied by exemptions. These rights may be found in both federal statutes such as the Freedom of Information Act, originally enacted in 1966 and commonly called "FOIA," and state statutes like the Rhode Island Access to Public Records Act, or "APRA." These statutory rights of access embody the same sort of concerns as the common law right of access. "FOIA is often explained as a means for citizens to know what their Government is up to," reflecting "a structural necessity in a real democracy." ***Nat'l Archives & Records Admin. v. Favish , 541 U.S. 157, 171–72, 124 S.Ct. 1570, 158 L.Ed.2d 319 (2004)***.

15) Finally, there are constitutionally protected rights of access. The U.S. Supreme Court has consistently recognized that the public and press have a presumptive First Amendment right of access to judicial proceedings in criminal cases, finding that "a presumption of openness inheres in the very nature of a criminal trial under our system of justice." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (plurality opinion). Six of the eight sitting justices at the time indicated that the right of public access would also apply to civil trials. *Id. at 580 n. 17 (Burger, C.J.)* (plurality opinion) ("Whether the public has a right to attend trials of civil cases is a question not raised by this case, but we note that historically both civil and criminal trials have been presumptively open."); *id. at 596* (Brennan, J., concurring) (referring to the value of open proceedings in civil cases); *id. at 599 (Stewart, J., concurring)* ("[T]he First and Fourteenth Amendments clearly give the press and the public a right of access to trials themselves, civil as well as criminal.").

16) Every federal court of appeals to have considered whether the First Amendment guarantees a right of access to civil trials and to their related proceedings and records has concluded that it does. *N.Y.C.L.U. v. N.Y. City Transit Auth.*, 684 F.3d 286, 298 (2d Cir. 2012) (citing *Westmoreland v. Columbia Broad. Sys., Inc.,* 752 F.2d 16, 22 (2d Cir.1984);. *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253–54 (4th Cir.1988); I*n re Continental Ill. Secs. Litig.*, 732 F.2d 1302, 1308 (7th Cir. 1984); *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1070 (3d Cir.1984); *In re Iowa Freedom of Info. Council,* 724 F.2d 658, 661 (8th Cir.1983); *Newman v. Graddick*, 696 F.2d 796, 801 (11th Cir.1983)).

17) Some circuits have also recognized a constitutional right of access to court records, with one noting that "the public and press have a [F]irst [A]mendment right of access to pretrial documents in general." *Associated Press v. District Court*, 705 F.2d 1143, 1145 (9th Cir. 1983).

18) The roots of public access to court proceedings and records lie in "democratic values of accountability and openness." *In re Globe Newspaper*, 920 F.2d 88, 98 (1st Cir. 1990)

A. **Underline Amendment Right of Access in the First Circuit**

19) ***In re Providence Journal Co.*, 293 F.3d 1, 10 (1st Cir. 2002),** the **First Circuit** has "long recognized 'that public monitoring of the judicial system fosters the important values of quality, honesty and respect for our legal system.'" ***Id. at 9;*** see also ***Siedle v. Putnam Inv., Inc.*, 147 F.3d 7, 10 (1st Cir. 1998) (same)**. In addition, "[t]he appropriateness of making court files accessible is accentuated in cases where the government is a party: in such circumstances, the public's right to know what the executive branch is about coalesces with the concomitant right of the citizenry to appraise the judicial branch." ***FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987)**. There is a particular "societal interest" in public access to judicial records in cases involving challenges to state law on constitutional grounds. ***Nat'l Org. for Marriage v. McKee*, 2010 U.S. Dist. LEXIS 90749, *19 (D. Me. Aug. 24, 2010)**. The public's right of access to judicial records is "vibrant" (***Siedle*, 147 F.3d at 10**) and "strong and sturdy" (***FTC*, 830 F.2d at 410**). "The citizens' right to know is not lightly to be deflected. We agree . . . that 'only the most compelling reasons can justify non-disclosure of judicial records.'" ***FTC*, 830 F.2d at 410**.

20) When considering whether a constitutional presumption of access applies to particular proceedings or records, courts apply the "logic and experience test," also called the "Press-Enterprise test." The test considers "whether the place and process have historically been open to the press and general public," and "whether public access plays a significant positive role in the functioning of the particular process in question." ***Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8 (1986)** (citations omitted).

B. **Underline Amendment Right in the Second Circuit**

21) In the Second Circuit, public access to courts finds its "twin sources" in the common law right of public access to judicial documents and the First Amendment right to attend judicial proceedings. ***In re Omnicom Grp., Inc. Sec. Litig.*, No. 02 CIV. 4483 RCC/MHD, 2006 WL 3016311, at *1 (S.D.N.Y. Oct. 23, 2006)**. Litigants such as the Plaintiff seeking access to courts or judicial documents may ground their arguments

in either doctrine.  Though the right of access to criminal trials is not "explicitly mentioned in terms in the First Amendment . . . [the U.S. Supreme Court has] long eschewed any 'narrow, literal conception' of the Amendment's terms." ***Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596, 604, (1982)**.  The Second Circuit has also extended this right to civil proceedings. See, e.g., ***Westmoreland v. Columbia Broad. Sys., Inc.*, 752 F.2d 16, 23 (2d Cir.1984)** (asserting that "the First Amendment does secure to the public and to the press a right of access to civil proceedings").

22) The right of access applies to certain "judicial documents" filed in connection with litigation.  To determine whether a document qualifies as such, the Second Circuit uses the "experience and logic" test articulated by the Supreme Court in ***Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 9 (1986)**.  This test requires the court to consider both (1) whether the documents "have historically been open to the press and general public" and (2) whether "public access plays a significant positive role in the functioning of the particular process in question." ***Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006)** (quoting ***Press-Enter. Co.*, 478 U.S. at 8**).  As further explained by the Second Circuit in ***Lugosch,* 453 F.3d at 120**, "courts that have undertaken this type of inquiry have generally invoked the common law right of access to judicial documents in support of finding a history of openness. The second approach considers the extent to which the judicial documents are derived from or [are] a ***necessary corollary of the capacity to attend the relevant proceedings***." (internal quotation marks and citations omitted).

C. <u>First Amendment Right of Access in Third, Fourth, Fifth, Sixth, Seventh, Eighth and Ninth Circuits</u>

23) The U.S. Supreme Court has found that the First Amendment to the U.S. Constitution guarantees the press and the public a qualified right of access to attend and observe criminal proceedings. ***Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 9 (1986); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 603 (1982)**.  The U.S. Court of Appeals for the Third Circuit has recognized that this right extends to civil

proceedings as well. ***Publicker Indus., Inc. v. Cohen***, **733 F.2d 1059, 1067 (3d Cir. 1984)**.

24) In the Fourth Circuit, the right of public access to judicial proceedings and records derives from two independent sources: the common law and the First Amendment. ***Va. Dep't of State Police v. Wash. Post***, **386 F.3d 567, 575 (4th Cir. 2004); *Doe v. Pub. Citizen*, 749 F.3d 246, 265 (4th Cir. 2014)**. The common law right of access reflects the historical practice of American courts to permit public access to judicial proceedings and records. The First Amendment right of access arises from the amalgam of its guarantees of speech, press and assembly. ***Nixon v. Warner Commc'ns, Inc.***, **435 U.S. 589, 597 (1978); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 577 (1980).**

25) **T**he Fifth Circuit has affirmed that there is a constitutionally-embedded presumption of openness in judicial proceedings. ***Doe v. Jackson Nat'l Life Ins. Co.***, **944 F. Supp. 488 (S.D. Miss. 1995), aff'd sub nom., *Deramus v. Jackson Nat'l Life Ins. Co.*, 92 F.3d 274 (5th Cir. 1996).** The judiciary, like the legislative and executive branches, is a branch of democratic government, and the public has no less right under the First Amendment to receive information about judicial proceedings than it has to know how other governmental agencies work and to receive other ideas and information. ***In re Express-News Corp.***, **695 F.2d 807, 809 (5th Cir. 1982).**

26) Generally, the Sixth Circuit adheres "to a policy of openness in judicial proceedings." ***Applications of Nat'l Broad. Co.***, **828 F.2d 340, 343 (6th Cir. 1987) (**citing ***Brown & Williamson Tobacco Corp. v. FTC***, **710 F.2d 1165, 1176–81 (6th Cir. 1983)).** "Openness in judicial proceedings promotes public confidence in the courts." *Id.* **at 347.** The Sixth Circuit has traced the roots of the rights of access back to the 19th Century when the D.C. Circuit explained that "[a]ny attempt to maintain secrecy, as to the records of this court, would seem to be inconsistent with the common understanding of what belongs to a public court of record, to which all persons have the right of access." ***In re Knoxville News-Sentinel Co.***, **723 F.2d 470, (6th Cir. 1983) (**quoting ***Ex Parte Drawbaugh***, **2 App. D.C. 404, 407 (1894)).** Similarly, "[t]hroughout

our history, the open courtroom has been a fundamental feature of the American judicial system." ***Brown & Williamson,* 710 F.2d at 1177.**  "Openness in judicial proceedings promotes public confidence in courts." ***Applications of NBC*, 828 F.2d at 347.**  The same principles that support access to court rooms also supports access to court records because "court records often provide important, sometimes the only, bases or explanations for a court's decisions." ***Brown & Williamson*, 710 F.2d at 1177.**  "[T]he First Amendment right of access to criminal proceedings is grounded generally in a 'purpose of assuring freedom of communication on matters relating to the functioning of government.'" ***Indianapolis Star v. United States*, 692 F.3d 424, 429 (6th Cir. 2012)** (quoting ***Richmond Newspapers v. Virginia*, 448 U.S. 555, 575 (1980)).**  This right of access extends to more than just a criminal trial, but also generally applies to other criminal proceedings, criminal records, civil proceedings, and civil records.  *Id.* **429–30;** ***Detroit Free Press v. Ashcroft*, 303 F.3d 695 n.11 (6th Cir. 2002)** (explaining that the Sixth Circuit and all other circuit courts that have addressed the issue have "agreed that the press and public have a First Amendment right to attend civil proceedings…")**; *Applications of NBC*, 828 F.2d at 347** ("the importance of some pretrial proceedings dictates that the rule of openness not be confined to the actual trial"); ***Brown & Williamson*, 710 F.2d at 1177–78** ("The Supreme Court's analysis of the justifications for access to the criminal courtroom apply as well to the civil trial" and the same justifications require that access to judicial records also be subject to the First Amendment right of access).

27) In the Seventh Circuit, the "public's right of access to court proceedings and documents is well-established" and is "grounded in three important policy concerns. 'Public scrutiny over the court system serves to (1) promote community respect for the rule of law, (2) provide a check on the activities of judges and litigants, and (3) foster more accurate fact finding.'" ***In re Associated Press*, 162 F.3d 503, 506 (7th Cir. 1998)** (quoting ***Grove Fresh Distribs., Inc. v. Everfresh Juice Co*., 24 F.3d 893, 897 (7th Cir. 1994)**)).  "Born of the common law, this right also has constitutional underpinnings. . . . Indeed, the First Amendment provides a presumption that there

is a right of access to 'proceedings and documents which have "historically been open to the public" and where the disclosure of which would serve a significant role in the functioning of the process in question.'" *See also **Am. Civil Liberties Union of Ill. v. Alvarez**, 679 F.3d 583, 599 n. 7 (7th Cir. 2012)* (Supreme Court has recognized "a qualified right of the press and public to attend certain governmental proceedings, at least where the proceeding 'historically has been open to the press and general public,' and public access 'plays a particularly significant role' in the functioning of the proceeding in question and 'the government as a whole'") (quoting ***Globe Newsp. Co. v. Superior Court**, 457 U.S. 596, 605-606, 102 S.Ct. 2613 (1982))*.

28) The Eighth Circuit has consistently upheld that the right to a public trial may be "invoked by the press or the public" under First Amendment jurisprudence. ***United States v. Thompson**, 713 F.3d 388, 392 (8th Cir. 2013).*  When a party requests access to proceedings or documents, the Eighth Circuit looks to the two-prong test introduced in ***Press-Enterprise Co. v. Super. Ct.**, 471 U.S. 1 (1986) ("Press-Enterprise II")* to determine whether the presumptive First Amendment right of access applies. ***Zink v. Lombardi**, 783 F.3d 1089, 1112 (8th Cir. 2015).* In doing so, courts will consider "whether the place and process have historically been open to the press and general public" as well as "whether public access plays a significant positive role in the functioning of the particular process in question." *Id*. (quoting ***Press-Enterprise II**, 471 U.S. at 8).* These are often referred to more simply as the "experience and logic" tests. ***Flynt v. Lombardi,** 885 F.3d 508, 512–13 (8th Cir. 2018).*

## II.    COMMON LAW RIGHT TO ACCESS COURT INFORMATION

29) In addition to the constitutional right – and even where it does not apply – "the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." ***Nixon v. Warner Commc'ns, Inc.**, 435 U.S. 589, 597 (1978)* (footnote omitted). Indeed, the Third

Circuit found that in both civil and criminal cases "the existence of a common law right of access to … inspect judicial records is beyond dispute." ***Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1066 (3rd Cir. 1984)**. Courts declining to extend a constitutional presumption of access to particular proceedings often likewise conclude that the proceedings are open "by force of tradition." ***In re Krynicki*, 983 F.2d 74, 75 (7th Cir. 1992)**.

30) Historically, at common law, "both civil and criminal trials have been presumptively open." ***E*Trade Fin. Corp. v. Deutsche Bank AG*, 582 F. Supp. 2d 528, 531 (S.D.N.Y. 2008)** (citing ***Richmond Newspapers v. Virginia*, 448 U.S. 555, 580 n.17 (1980)**).  As with the First Amendment, the right of access also extends to judicial documents. The Second Circuit has emphasized that "the common law right of public access to judicial documents is firmly rooted in our nation's history."  ***Lugosch***, **435 F.3d at 119**.

31) In addition to a First Amendment right of access, the Third Circuit recognizes a "common law right of access to judicial proceedings" in "both criminal and civil cases." ***United States v. Wecht*, 484 F.3d 194, 207–08 (3d Cir. 2007)** (quoting ***In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001)**).

32) The right of public access to judicial proceedings and records derives from two independent sources: the common law and the First Amendment. ***Va. Dep't of State Police v. Wash. Post,* 386 F.3d 567, 575 (4th Cir. 2004)**; ***Doe v. Pub. Citizen*, 749 F.3d 246, 265 (4th Cir. 2014).**  The common law right of access reflects the historical practice of American courts to permit public access to judicial proceedings and records. The First Amendment right of access arises from the amalgam of its guarantees of speech, press and assembly. ***Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 577 (1980).**

33) The Fifth Circuit has held that in addition to the First Amendment right, there is a right of public access derived from common law that creates a presumption of

access. ***Sec. & Exch. Comm'n v. Van Waeyenberghe*, 990 F.2d 845, 848 (5th Cir. 1993); *Belo Broad. Corp. v. Clark*, 654 F.2d 423, 429 (5th Cir. 1981).**

34) The Sixth Circuit held that "[a] common law right of access generally applies to all public records and documents, including judicial records and documents." ***In re Morning Song Bird Food Litig.*, 831 F.3d 765, 777–78 (6th Cir. 2016)** (citing ***Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589, 597 (1978)).**

35) The Seventh Circuit held that "the common-law right of access establishes that court files and documents should be open to the public." ***Grove Fresh*, 24 F.3d at 897**; ***Corbitt*, 879 F.2d at 228**.

36) The Supreme Court and Eighth Circuit have both noted that the public's right to access judicial proceedings and records originated in English common law. ***United States v. Powers*, 622 F.2d 317, 323–24 (8th Cir. 1980)** (stating that this right has had "seemingly universal recognition in this country since the earliest times") (quoting ***Gannett Co. v. DePasquale*, 443 U.S. 368, 414 (1979)**).  The U.S. Supreme Court has recognized a common law right of access to "judicial records and documents." ***Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978)**.  The Eighth Circuit has recognized a common law right of access to court records in civil cases. *See, e.g.,* I*DT Corp. v. eBay*, **709 F.3d 1220 (8th Cir. 2013)**.

37) The common law right of access also encompasses the right to inspect and copy judicial records in both civil and criminal cases.  ***United States v. Criden*, 648 F.2d 814, 819 (3d Cir. 1981); *United States v. Wecht*, 484 F.3d 194 (3d Cir. 2007).**

**III.    Rhode Island Supreme Court Law on Right to Access Court Information**

38) The Rhode Island Supreme Court recognizes two sources of the right to access court information.  One is "a general right" under the common law "to inspect and copy public records and documents, including judicial records and documents." ***Providence Journal Co. v. Rodgers,* 711 A.2d 1131, 1135 (R.I. 1998)** (quoting ***Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978)**); ***Hillside Assocs. v. Stravato,* 642 A.2d 664, 669 (R.I. 1994)** ("[P]ublic policy supports open access to the courts[.]").  The other is the First Amendment right of public access to criminal trials.

*Rodgers*, **711 A.2d at 1135** ("That the press and the public have a First Amendment right of access to criminal trials is beyond dispute." (quoting ***Richmond Newspapers Inc. v. Virginia*, 448 U.S. 555, 580 (1980)**)); see also ***In re Derderian,* 972 A.2d 613, 617 (R.I. 2009)**.

IV.    T**HE FIRST AMENDMENT AND CASELAW ESTABLISH THE FUNDAMENTAL IMPORTANCE OF PUBLIC ACCESS TO COURT RECORDS, AND PROVIDE THAT PUBLIC ACCESS MAY BE DENIED ONLY FOR COMPELLING REASONS**

39) Over several decades, the courts and legislatures have worked out doctrines, rules, and procedures governing public access to court records that balance the interests served by public access against the interests of litigants and other participants in legal proceedings in maintaining secrecy. Obviously, any rules regulating access to trial court records maintained in electronic form must be consistent with the requirements of this existing body of law. As or more importantly, the adoption of any new rules governing access to court records should be informed by the careful and deliberate work of those who have considered, debated, and resolved the issues presented by the proposed rules.

**A. The United States Supreme Court and the Federal Courts Have Consistently Recognized the Profound Public Interest in Access to Judicial Proceedings and Records.**

40) The United States Supreme Court consistently has held that the First Amendment guarantees the press and the public the right to attend criminal trials and pre-trial proceedings. ***Richmond Newspapers, Inc.*, 448 U.S. 555; *Globe Newspaper Co.*, 457 U.S. 596; *PressEnterprise I*, 464 U.S. 501; *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) ("PressEnterprise II"); *El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147 (1993) (per curiam).**

41) Although the issue has not been expressly addressed by the United States Supreme Court, this First Amendment guarantee clearly applies to criminal judicial records as well as proceedings. *See, e.g.*, ***Press-Enterprise II*, 478 U.S. 1** (First Amendment right

of access applied to transcripts of voir dire proceedings); ***Associated Press v. United States District Court,* 705 F.2d 1143, 1147 (9th Cir. 1983).**

42) In addition, while the United States Supreme Court has not specifically held that the First Amendment right of access applies to civil cases, most of the federal circuits have squarely faced this issue and have recognized that the First Amendment right of access applies to civil proceedings. *See, e.g.,* ***Westmoreland v. Columbia Broadcasting System, Inc.*, 752 F.2d 16, 23 (2d Cir. 1984),** cert. denied, ***Cable News Network, Inc. v. U.S. District Court*, 472 U.S. 1017 (1985); *Publicker Industries, Inc. v. Cohen*, 733 F.2d 1059, 1067-71 (3d Cir. 1984); *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988); *Brown & Williamson Tobacco Corp. v. Federal Trade Comm'n*, 710 F.2d 1165, 1179 (6th Cir. 1983)**, cert. denied, **465 U.S. 1100 (1984)**; ***In re Continental Illinois Securities Litigation*, 732 F.2d 1302, 1308 (7th Cir. 1983)**. Many of these cases have specifically applied the First Amendment right of access to requests for documents pertaining to civil proceedings. *See, e.g.,* ***Rushford*, 846 F.2d at 253** ("We believe that the more rigorous First Amendment standard should also apply to documents filed in connection with a summary judgment motion in a civil case."); ***Brown & Williamson Tobacco Corp*., 710 F.2d 1165** (administrative record and other documents filed in connection with pretrial motions); ***In re Continental Illinois Securities Litigation*, 732 F.2d at 1308-1309** (report of special litigation committee formed to evaluate shareholder derivative claims, filed in connection with motion to terminate claims); ***Publicker Industries, Inc.*, 733 F.2d at 1074** (closure of hearing on motion for preliminary injunction and sealing of hearing transcript violated First Amendment).In short, the vast body of federal case law, decided over the course of three decades, has recognized that there is a constitutional—and not merely a common law—right of public access to court records of both civil and criminal judicial proceedings. Applying this constitutional right of access, the courts have established stringent requirements that must be met before the public may be denied access to judicial records: the sealing of documents must be "'strictly and inescapably necessary'" to protect a

compelling interest such as a criminal defendant's right to a fair trial. ***Associated Press*, 705 F.2d at 1145**, quoting ***United States v. Brooklier*, 685 F.2d 1162, 1167 (9th Cir. 1982)** (emphasis added). Thus, the party seeking nondisclosure must establish that there exists:

(1) "a substantial probability" of "irreparable damage" to a compelling government interest if the documents are unsealed;

(2) a "substantial probability" that alternatives to nondisclosure cannot adequately protect the government interest; and

(3) a "substantial probability" that nondisclosure will be "effective in protecting against the perceived harm."

***Brooklier*, 685 F.2d at 1167 (9th Cir. 1982); *Phoenix Newspapers, Inc. v. United States District Court*, 156 F.3d 940, 949 (9th Cir. 1998); *Associated Press*, 705 F.2d at 1146.**

43) Even federal common law, however, creates a strong presumption of public access to court records. The United States Supreme Court has expressly recognized that there is a common law right to "inspect and copy public records and documents, including judicial records and documents." ***Nixon v. Warner Communications*, 435 U.S. 589, 597 (1978).** The Court indicated that this right includes a "presumption—however gauged—in favor of public access to judicial records." **Id. at 602**. Thus, "[t]he existence of this [common law] right, which antedates the Constitution and which is applicable in both criminal and civil cases, is now 'beyond dispute.'" ***Leucadia, Inc. v. Applied Extrusion Technologies, Inc.*, 998 F.2d 157, 161 (3d Cir. 1993)**(citation omitted). *See also **Littlejohn v. BIC Corp.*, 851 F.2d 673, 677-78 (3d Cir. 1988).** The Ninth Circuit has recognized and applied the common law right in both civil and criminal cases. ***Hagestad v. Tragesser*, 49 F.3d 1430 (9th Cir. 1995); *EEOC v. Erection Co., Inc.*, 900 F.2d 168 (9th Cir. 1990); *Valley Broadcasting Co. v. United States District Court*, 798 F.2d 1289 (9th Cir. 1986)**. In the most recent of these cases, the Ninth Circuit explained the application of the common law right to documents filed in a civil case as follows:.

"The Ninth Circuit has adopted the Seventh Circuit's approach for determining whether the common law right of access should be overridden, requiring courts to start with a strong presumption in favor of access. This presumption of access may be overcome only "on the basis of articulable facts known to the court, not on the basis of unsupported hypothesis or conjecture." . . . After taking all relevant factors into consideration, the district court must base its decision on a compelling reason and articulate the factual basis for its ruling . . . ." **Hagestad, 49 F.3d at 1434** (citations omitted). In short, no matter what body of federal law is applied, court records may be withheld from the public only for compelling reasons.

44) Moreover, the United States Supreme Court and lower federal courts have emphasized that the determination of whether court proceedings or records can be sealed must be made on a case-bycase basis. *See, e.g*.**, *El Vocero de Puerto Rico, 508 U.S. at 151; Globe Newspaper Co*., 457 U.S. at 607-608; *United States v. Schlette,* 842 F.2d 1547, 1583 (9th Cir. 1988).** Therefore, as a general rule categorical sealing of particular types of information is not permissible. Rather, denial of public access must be based on a particularized showing that release of the information at issue would impair an overriding interest. *See, e.g., **Federal Trade Comm'n v. Standard Financial Management Corp**., 830 F.2d 404, 412 (1st Cir. 1987); **Joy v. North**, 692 F.2d 880, 894 (2d Cir. 1982);* L***eucadia, Inc. v. Applied Extrusion Technologies, Inc.*, 998 F.2d 157, 166 (3d Cir. 1993).**

45) These decisions proceed from the recognition of the profound importance of public access: Openness enhances both the basic fairness of judicial proceedings and the appearance of fairness so essential to public confidence in the judicial system. ***Press-Enterprise II*, 478 U.S. at 13.** Undue restrictions on access to trial court records maintained in electronic form, and in particular broad categorical prohibitions on access, undermine these fundamental goals.

**B.  Federal Law Does Not Support the Imposition by Rhode Island Judiciary of Restrictions on Electronic Access to Court Records that Do Not Apply to Court Records Generally**

46) The courts have consistently recognized that the dissemination of information contained in court records does not give rise to any actionable invasion of privacy. *See, e.g.,* ***Cox Broadcasting v. Cohn*, 420 U.S. 469, 491 (1975)**; ***Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 103-104 (1979)**.

47) The Rhode Island Court Rules, "<u>**RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION,**</u>" have <u>**no basis**</u> for imposing substantial restrictions on electronic access to court records to the public and to the pro-se litigant not currently imposed on public access to hardcopy court records, and therefore obviously does not support the State Judiciary's imposition of broad categorical restrictions on access to public court records.

## V. PATSY v. FLORIDA BOARD OF REGENTS – THE LEGISLATIVE INTENT OF THE 1871 CONGRESS

48) The State Defendants do not dispute the fact that the Rhode Island Superior Court had dismissed the Texas Plaintiff's claims for lack of subject matter jurisdiction authority to hear the Plaintiff's claims in ***Seguin v. RI DHS OCSS*, PC-2022-02715**.  In all applicable state court proceedings, the Texas pro-se Plaintiff is barred and unconstitutionally denied her federal right by the RI state court rules from electronically accessing the court case information in which cases she is a pro-se party and litigant.  These two very issues, the Plaintiff preserves herein now, and respectfully requests the extension of time to prepare, present and plead the Texas Plaintiff's federal claims, that are directedly related to the Congressionally debated issues enumerated in ***Patsy v. Florida Board of Regents*, 457 U.S. 496 (1982)** regarding the perception of the 1871 Congress that state courts deny individuals' federal constitutional rights, that prompted the 1871 Congress to enact 42 U.S.C. section 1983, the Civil Rights Act of 1871, along with the Fourteenth Amendment:

49) The Civil Rights Act of 1871, along with the Fourteenth Amendment it was enacted to enforce, were crucial ingredients in the basic alteration of our federal system accomplished during the Reconstruction Era.  During that time, the Federal Government was clearly established as a guarantor of the basic federal rights of individuals against incursions by state power. As the Supreme Court recognized in

*Mitchum v. Foster*, 407 U.S. 225, 242 (1972) (quoting *Ex parte Virginia*, 100 U.S. 339, 346 (1880)), "[t]he very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights — to protect the people from unconstitutional action under color of state law, `whether that action be executive, legislative, or judicial.'"

50) First, in passing § 1, Congress assigned to the federal courts a paramount role in protecting constitutional rights. Representative Dawes expressed this view as follows:

"The first remedy proposed by this bill is a resort to the courts of the United States. Is that a proper place in which to find redress for any such wrongs? If there be power to call into courts of the United States an offender against these rights, privileges, and immunities, and hold him to an account there, either civilly or criminally, for their infringement, I submit to the calm and candid judgment of every member of this House that there is no tribunal so fitted, where equal and exact justice would be more likely to be meted out in temper, in moderation, in severity, if need be, but always according to the law and the fact, as that great tribunal of the Constitution." Cong. Globe, 42d Cong., 1st Sess., 476 (1871) (hereinafter Globe).

51) The 1871 Congress intended § 1 to "throw open the doors of the United States courts" to individuals who were threatened with, or who had suffered, the deprivation of constitutional rights, id., at 376 (remarks of Rep. Lowe), and to provide these individuals immediate access to the federal courts notwithstanding any provision of state law to the contrary. For example, Senator Edmunds, who introduced the bill in the Senate, stated in his closing remarks that the bill was similar in principle to an earlier act upheld by this Court in *Prigg v. Pennsylvania*, 16 Pet. 539 (1842):

"[T]he Supreme Court decided . . . that it was the solemn duty of Congress under the Constitution to secure to the individual, in spite of the State, or with its aid, as the case might be, precisely the rights that the Constitution gave him, and that there

should be no intermediate authority to arrest or oppose the direct performance of this duty by Congress." Globe 692 (emphasis added).

52) Similarly, Representative Elliott viewed the issue as whether "the Government of the United States [has] the right, under the Constitution, to protect a citizen in the exercise of his vested rights as an American citizen by . . . the assertion of immediate jurisdiction through its courts, without the appeal or agency of the State in which the citizen is domiciled."  Id., at 389 (emphasis added). See, e. g., id., at 459 (remarks of Rep. Coburn); id., at 807 (remarks of Rep. Garfield); id., at 609 (remarks of Sen. Pool); Globe App. 141 (remarks of Rep. Shanks).

53) Opponents criticized this provision on this very ground. For example, Representative Storm lamented:

> "[Section one] does not even give the State courts a chance to try questions, or to show whether they will try the questions that might come before them under the first section of the fourteenth amendment, fairly or not. It takes the whole question away from them in the beginning." Id., at 86.

54) See also Globe 416 (remarks of Rep. Biggs) ("for the violation of the rights, privileges, and immunities of the citizen a civil remedy is to be had by proceedings in the Federal courts, State authorization in the premises to the contrary notwithstanding"); id., at 337 (remarks of Rep. Whitthorne); id., at 373 (remarks of Rep. Archer); Globe App. 216 (remarks of Sen. Thurman).

55) A second theme in the debates further suggests that the 1871 Congress would not have wanted to impose an exhaustion requirement. A major factor motivating the expansion of federal jurisdiction through §§ 1 and 2 of the bill was the belief of the 1871 Congress that **the state authorities had been unable or unwilling to protect the constitutional rights of individuals or to punish those who violated these rights**. See, e. g., Globe 321 (remarks of Rep. Stoughton) ("**The State authorities and local courts are unable or unwilling to check the evil or punish the criminals**"); id., at 374 (remarks of Rep. Lowe) ("**the local administrations have been found**

**inadequate or unwilling to apply the proper corrective**"); id., at 459 (remarks of Rep. Coburn); id., at 609 (remarks of Sen. Pool); id., at 687 (remarks of Sen. Shurz); id., at 691 (remarks of Sen. Edmunds); Globe App. 185 (remarks of Rep. Platt). Of primary importance… was the mistrust that the 1871 Congress held for the factfinding processes of state institutions. See, e. g., Globe 320 (testimony of Hon. Thomas Settle, Justice of the North Carolina Supreme Court, before the House Judiciary Committee) ("The defect lies not so much with the courts as with the juries"); id., at 394 (remarks of Rep. Rainey); Globe App. 311 (remarks of Rep. Maynard). **This Congress believed that federal courts would be less susceptible to local prejudice and to the existing defects in the factfinding processes of the state courts.** See, e. g., Globe 322 (remarks of Rep. Stoughton); id., at 459 (remarks of Rep. Coburn). This perceived defect in the States' factfinding processes is particularly relevant.

56) This view was expressed in the Presidential message urging the passing of corrective legislation. See Globe 244 ("That the power to correct these evils is beyond the control of State authorities I do not doubt") (message of President Grant). The inability of state authorities to protect constitutional rights was also expressed in the findings of the House Judiciary Committee, which had been directed to investigate the situation. See Page 506 id., at 320. The resolution introduced by Senator Sherman instructing the Senate Judiciary Committee to report a bill expressed a similar view. See Globe App. 210 (state "**courts are rendered utterly powerless by organized perjury to punish crime**").

57) Opponents viewed the bill as a declaration of mistrust for state tribunals. See, e. g., Globe 361 (remarks of Rep. Swann); id., at 397 (remarks of Rep. Rice); id., at 454 (remarks of Rep. Cox); Globe App. 216 (remarks of Sen. Thurman). Representative McHenry found particularly offensive the removal of the factfinding function from the local institutions. See Globe 429.

58) A third feature of the debates that is relevant is the fact that many legislators interpreted the bill to provide dual or concurrent forums in the state and federal

system, enabling the plaintiff to choose the forum in which to seek relief. Cf. ***Monroe v. Pape*, 365 U.S. 167, 183 (1961**) ("The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked"). For example, Senator Thurman noted:

59) "I object to [§ 1], first, because of the centralizing tendency of transferring all mere private suits, as well as the punishment of offenses, from the State into the Federal courts. I do not say that this section gives to the Federal courts exclusive jurisdiction. I do not suppose that it is so understood. It leaves it, I presume, in the option of the person who imagines himself to be injured to sue in the State court or in the Federal court, an option that he who has been the least injured, but who has some malice to gratify, will be the most likely to avail himself of." Globe App. 216.

60) See also Globe 578, 694-695 (remarks of Sen. Edmunds); id., at 334 (remarks of Rep. Hoar); id., at 514 (remarks of Rep. Farnworth); Globe App. 85 (remarks of Rep. Bingham) ("Admitting that the States have concurrent power to enforce the Constitution of the United States within their respective limits, must we wait for their action?").

61) The RI Superior Court has ruled that it, the state court, lacks subject matter jurisdiction to hear Plaintiff's claims; here and now in 2023, the RI Superior Court ruled it lacks concurrent jurisdiction to hear the Texas Plaintiff's claims that involve the enforcement of the Constitution of the United States; additionally the RI Court Rules governing all applicable state proceedings bar and deny the Plaintiff's federal constitutional and common law rights to access court information and records of those state proceedings – mirroring the exact concerns and perception of errant State actors and courts by the 1871 Congress which are preserved in the records of the 1871 Congressional debates reviewed by the Supreme Court in ***Patsy v. Florida Board of Regents***, that additionally go to show the precise intent of the 1871 Congress that enacted **§ 1983**. Accordingly, the Plaintiff respectfully preserves these issues, and respectfully requests the extension of time to amend the complaint, and prepare and present Plaintiff's federal claims as they relate to these issues.

**Prayer**

      **WHEREFORE**, the Plaintiff respectfully requests an extension of time of 60 days to file an amended complaint.  The Plaintiff respectfully requests an extension through to and including **October 27, 2023**.  The Plaintiff obtained *__new evidence__* and *__newly verified facts__* through the Family court-ordered discovery and state and federal access to public records statutory rights, and respectfully requests the extension to amend the complaint, and to prepare and present the new evidence and plead federal claims.

      Plaintiff respectfully requests the Court to grant any and all further relief to the Plaintiff that is fair and just in the circumstances.

Respectfully submitted,
August 8, 2023

                          FOR PLAINTIFF
                          MARY SEGUIN, Pro Se.

                          By: ____*Mary Seguin*_____
                          Mary Seguin
                          P.O. Box 22022
                          Houston, TX 77019
                          maryseguin22022@gmail.com

**CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that on August 8, 2023, I filed the within Motion via the ECF filing system and that a copy is available for viewing and downloading.

                        *Mary Seguin*
                   _____