UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

**MARY SEGUIN**
***Pro se***

*Plaintiff,*

VS.                                                    Civil Action No. 1:23-cv-00126

**RHODE ISLAND DEPARTMENT OF HUMAN SERVICES** in its official capacity; **MICHAEL D. COLEMAN, DEBORAH A. BARCLAY** in their individual and official capacities;
**RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES** in its official capacity; **LISA PINSONNEAULT, CARL BEAUREGARD**, in their individual and official capacities; **GERO MEYERSIEK**

*Defendants*

<u>**PRO SE DIVERSITY PLAINTIFF'S MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**</u>
<u>**And**</u>
<u>**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**</u>

I.     **Introduction**

The Pro Se Texas Plaintiff's <u>self-represented status is a material fact in this case</u>.  This case in part concerns the coordinated attempts within associated enterprises of named Defendants (and additional defendants that the Plaintiff intends to add, and accordingly has filed a timely  motion for extension of time to amend complaint, [ECF 12]), with the aim to defraud and unlawfully change the determinative outcome, coordinated attempts to deny, obstruct (access to), impede, infringe, restrict, abrogate, the pro se Texas Plaintiff's fundamental First Amendment, Fifth Amendment, and Fourteenth Amendment equal and meaningful access (1) to her Title IV-D records, (2) to tribunals, both administrative and judicial, and (3) to justice, via wire and via Mail, on an interstate basis.

Through the adoption nine years ago in 2014 of Rhode Island State Judiciary policies, practice, rules and administrative orders mandating electronic filing of all court filings through

the State's electronic filing and case management system, Odyssey, while at the same time denying pro se litigants electronic access via the internet to the contents of court records, self-represented litigants (like the Texas pro se Plaintiff) have been targeted because of their exercise of the First Amendment and the Rhode Island Article I's constitutional right to all natural persons to access the courts, self-represented or with counsel.  This explicitly articulated policy to limit access denying by category pro se litigants only, that effectively denies equal access to the state courts and denies equal access to justice discriminating self-represented litigants, is further exacerbated by the state Family Court mandating time-sensitive child support matters to be heard remotely, which by extension requires remote access to the court, including remote access to court records, but which are not granted access to pro se litigants.  Meanwhile, an exclusive club of attorneys, state agencies and federal agencies are accorded by policy and practice by the State Judiciary, <u>instant</u> remote access, <u>instant</u> notice, and enjoy remote court record access to court records, instant notices, and instant access.  Throughout the COVID-19 closures of State Judicial Buildings in which physical portals are installed with the advertised provision for pro se litigants and the public, this exclusive club of attorneys and government actors enjoyed remote access, instant notices and instant access from the safety of their homes.  But pro se litigants were continuously denied this basic health and safety safeguard, as well as denied access to their case records.   Pro se litigants are thus shut out of meaningful participation in fully developing the record, and shut out of access to justice, through articulated State Judiciary policy.  Within this illegal judicial procedural framework that was implemented in 2014 and made permanent in 2018 and shockingly maintained throughout the COVID-19 Pandemic and continuing to this day, even more shockingly, the State Defendants have engaged and continues to engage in a policy and routine practice of wholesale electronically filing in state court proceedings in state Family Courts in **Title IV-D** program proceedings that are related to time-sensitive child support matters using an unnamed, **separate and different legacy Odyssey** electronic filing system, that results in pro se litigants not being noticed, as well as neither pro se litigants nor even the Rhode Island Virtual Court Clerk being able to view the contents of their pleadings, but only the electronic docket of the court case remotely, concretely showing prohibited government court record content

infringement discriminating against pro se litigants.  So, while activity on a docket sheet can be discerned, Virtual Clerks cannot see what kind of activity it is, what kind of pleading it is, nor the content of that pleading.  Further, not even the content of court orders proposed and routinely electronically filed by State Defendants using this legacy electronic filing system can be seen by the Virtual Clerk.  However, the judge of the proceeding can see it, meaning the State Judiciary assured to integrate the structures of the legacy filing system with the current Odyssey electronic case management system architecture in such a way so that the judges can see the court filings of the State Defendants routine filings, implying the State Judiciary is fully cognizant of the legacy e-filing system the State Defendants use.   As if the above is not bad enough, the Family Court Judiciary adopted the Family Court Administrative Order in 2021 during the COVID-19 Pandemic mandating Title IV-D child support related matters to be heard remotely, thereby institutionalizing the remote nature of judicial tribunals in Title IV-D Program proceedings.  Yet, while institutionalizing the remote nature of such Title IV-D federally funded judicial tribunal proceedings, the State Judiciary continues to maintain the articulated policy of restrictive remote access to court records.   This coordinated targeting of self-represented litigants in the State's judicial tribunals discriminates against and infringes upon the pro se Texas Plaintiff's Federal Constitutional rights as a citizen of Texas, and wholesale denies her federal constitutional rights of speech, and equal access and meaningful access to the courts, equal access to justice, and due process rights.  Compounding the complexity of this coordinated attempt targeting pro se litigants to alter the determinative outcomes, the State Judiciary employees' verbal and written misrepresentations, whether via email, over the phone, or published online on the Judiciary's official website explicitly labeled, "Self-Help Center" "Representing Yourself," nowhere is this material fact of access denial to pro litigants of court records disclosed to the pro se Texas Plaintiff – instead, for example, emails from employees of the State Judiciary misrepresent to the Plaintiff that a copy of the transcript is available to the parties online through the portal when the Plaintiff filed an Order for Transcripts, for example. Only after taking the Plaintiff's payment and after Plaintiff's repeated subsequent inquiries as to how to access the transcript through the portal did the State Judiciary employees state they did not know how it works and to call the Help Desk.  Nobody answers the phone at the Help

Desk when the Plaintiff calls, therefore the State Judiciary Self-Help Center Webpage is misleading the Judiciary provides pro se litigants court administrative "accommodation" when there are proceedings that relate to time-sensitive matters.  The campaign of disinformation, misinformation and lack of information is consistent with a State Judiciary that has explicitly articulated a policy that illegally contravenes requisite judicial <u>duty</u> to <u>assure</u> reasonable accommodation to pro se litigants, as mandated by the U.S. Supreme Court ***Turner v. Rogers, et al.*, 564 U.S. 431 (2011).**  In other words, the Plaintiff avers this is deliberate and by design, as Turner mandated ***additional pro se*** procedural accommodation, but the State Judiciary instead knowingly stripped away pro se litigants' fundamental procedural safeguards.  Therefore, to continue the charade of providing a "Self-Help Center" the State Judiciary necessarily misrepresents to the pro se Plaintiff that she has remote access, in order to conceal their constitutional deprivations and the sham nature of the proceedings.  For example,  when the Plaintiff submitted an Access to Public Records Act ("APRA") record request to the Rhode Island Judiciary requesting all documents relating to the Judiciary's Remote Access Policy relative to pro se litigants vis-à-vis the attorney and government agencies, as well as the reasons behind the adopted policy, the Plaintiff received a belated, untimely curt official written response that took 30 days to revert  via email that the State Judiciary does not possess any records and that even if it did, they are "attorney-client privileged." Just who is representing whom in what matter in that State Judiciary APRA response?  That's not stated either.  Therefore, the APRA record request response by the State Judiciary shows a coordinated attempt to conceal this unconstitutionally access obstructive tribunal structure.  The Texas pro se Plaintiff to this day is continuing to discover and verify concealed facts about the above-described architecture, exercising the federal and state access to public records statutory rights.  This State Defendant and State Judiciary coordinated concealment necessarily results in delaying the Plaintiff's access to and investigation into verified facts to comply by the letter with the Federal Rules of Civil Procedures here, with each verified record obtained shocks the Plaintiff further. The pro se Texas Plaintiff is further over 2,500 miles away from Rhode Island.  Therefore, based on these exceptional and specific circumstances of hardship up against coordinated attempts to close the ranks by powerful and resourceful State actors, the pro se Texas Plaintiff respectfully

requests the Court to consider the above circumstances of this case, and specifically invokes the due process judicial duty in *Turner v. Rogers* **(2011)** that above all emphasizes the Court's duty to arrive at the merits of the controversy before it.  The pro se Plaintiff further invokes and relies on applicable safeguards enumerated in the First Amendment, the Fifth Amendment and the Fourteenth Amendment, and seeks protective safeguards from this Court to protect the pro se diversity Texas Plaintiff against the State actors in this Court.

Into the afore-described wholesale (e.g., denial of access to court records, denial of full participation in developing the court record, denial of access to court orders, denial of access to court transcripts that the Plaintiff ordered and paid for, denial by the RI Superior Court State Judiciary to transfer file to the Supreme Court for appeal, denial of equal and timely notice in time-sensitive matters, etc.)  First Amendment deprivation State tribunal, the State Defendants hauled the pro se Texas Plaintiff for remote proceedings, ***State of Rhode Island Ex Rel. Gero Meyersiek v. Seguin, K2001M0521M***,  with the remote nature mandated by administrative order, in which she is, by policy and in practice, blinded, not noticed, for alleged "child support proceedings" for interest arrearage, when the State Defendants themselves acting as agent for the Defendant Gero Meyersiek brokered an agreement with the pro se Plaintiff in Texas of interest waiver in consideration of a very large lump sum pay-off payment by the Plaintiff, which the Plaintiff in good faith accepted and executed.   The Plaintiff's attached supporting Affidavit in support of her Rule 65 motions, similarly attaches an audio recording evidence respectfully submitted into evidence, that documents the contract: The Plaintiff, who is a telephonic participant in Texas of the telephonic conference, in which the RI EOHHS Hearing Officer and John Langlois are participants in Rhode Island, recorded the audio recording that records the State Defendant Office of Child Support Services in-house counsel, John Langlois, Esq., at the October 5, 2023 prehearing conference, stating the following, "what happened in this case is when Mary's representative, her attorney, called us in late November 2021 and said she wants her passport released, what does she have to do to release her passport, they put her in touch with Karla, who gave her the $104k number.  Where that number came from was the department attorney contacted the custodial parent, Mr. MEYERSIEK.  So, we contacted his attorney, it wasn't me, it was somebody else in my office, and said, if she was willing to make a

$104k payment to pay off the principle, would you be willing to waive the $75k or $73k in arrears. At that time, he said yes. So Karla notified Mary that if she paid the $104k, it would be paid in full because he was willing to waive the interest, that was just the principle. What happened was the day after Karla told Mary to wire the $104k the attorney for Mr. Meyersiek contacted us again and said he changed his mind. Please put the interest back on the system. So we did." This evidence was also respectfully submitted into the record by the pro se Plaintiff in the related ***Seguin v. Rhode Island Office of Child Support Services et al,*** **Civil Action No. 1:23-cv-0034-WES-PAS**.

        Similarly to State Defendants' deprivation of Plaintiff's First Amendment access to her own child support records in the Title IV-D RI EOHHS administrative tribunal in 2022, the State Defendants denied her First Amendment statutory access to her case file under APRA in 2022, then RI State Superior Court denied her First Amendment remote access to the state court in 2023 all the while disseminating false information about remote access to court records, then the RI State Judiciary denied her First Amendment remote access to the court records, then State Defendants hauled her into the RI Family Court on a meritless claim that can only be obtained through coordinated attempts to alter the determinative outcome through coordinated deprivation of First Amendment right to access court records which they file into a separate filing system that nobody can see but themselves, lawyers and the Family Court Judge, then the RI State Superior Court Clerks denied her First Amendment access to the RI Supreme Court by not transferring the case, then the State Judiciary denies her First Amendment APRA access to State Judiciary public records on their pro se remote access policy, and this list is not exhaustive. It is well-settled that even minimal loss of First Amendment freedoms, "unquestionably constitutes irreparable injury." ***Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976)** (plurality)); *see also **Elrod*, 427 U.S. at 373.; *N.Y. Times v. United States*, 403 U.S. 713, 715 (1971).** Accordingly, Plaintiff has a strong likelihood of success on the merits, will suffer irreparable injury without an injunction, and an injunction will not substantially injure others while furthering the public interest. Plaintiff seeks preliminary injunction enjoining the Defendants from depriving her property without due process in unlawful coordinated attempts that include e-filing using a legacy electronic filing system that

fails to give notice in the unconstitutional state courts purposely designed to target self-represented litigants from any access to the contents of court records remotely, except the docket sheet, in Title IV-D proceedings on child support matters that are mandated by state Family Court to be heard remotely.  This Court should, therefore, grant Plaintiff's request for a restraining order and a preliminary injunction**.**

A note on the extraordinary set of circumstances and Plaintiff's undue hardship is also due here: In accordance with the Federal Rules of Civil Procedure 15, the Plaintiff additionally could not amend her Complaint until after the Defendants were served, which this matter's record shows similarly took extraordinary delay beyond the Plaintiff's control.

Much of the aforesaid verified facts could not be obtained until recently after Plaintiff's labored investigation that constitutes severe hardship on the Plaintiff – such as verified material fact just a week ago on August 7, 2023, of the institutionalization of remote hearings in child support matters by the State Judiciary's Administrative Order in 2021 that should have been produced under Plaintiff's June APRA request to the State Judiciary, but was fraudulently withheld - as a direct result of the State Defendants and the State Judiciary's coordinated attempts to conceal the true nature of restrictions by State policy on pro se Plaintiff's First Amendment access to court records developed in remote hearings by administrative court order for child support matters under Title IV-D.

Plaintiff timely filed a Rule 15 and Rule 6 Motion for Extension of Time to Amend Complaint, [ECF 12] in which the Plaintiff raised on the record verified facts to show good cause to respectfully request the time extension.

State Defendants have repeatedly raised ***State of Rhode Island Ex Rel. Gero Meyersiek v. Seguin, K2001M0521M*** here and in the related case,  ***Seguin v. Rhode Island Office of Child Support Services et al,*** **Civil Action No. 1:23-cv-0034-WES-PAS**, as basis for their requests for substantial extensions of time and to dismiss the Plaintiff's federal claims.  The Court has therefore repeatedly considered ***State of Rhode Island Ex Rel. Gero Meyersiek v. Seguin, K2001M0521M***, and granted the State Defendants show cause extension of time relief.   The

Plaintiff attached herein her **Affidavit** in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunctive Relief.

II.    **FACTS**

The Plaintiff respectfully requests judicial notice that this case concerns the First Amendment, Fifth Amendment and Fourteenth Amendment Equal Protection and due process protections that apply in not solely child support state enforcement programs and "child support" related proceedings – but indeed in all state proceedings.  Failure in the State's adherence to/compliance with the constitutional due process requirements explicitly spelled out in "child support related" matters as per Federal Title IV-D programs is distinguishable in that the State further loses eligibility to participate in such and related federal funding and federally funded programs.   The state child-support enforcement program at issue in the case, like that in every other State, is part of one of the largest cooperative federal-state programs, established under the **Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 et seq.) (adding Title IV-D to the Social Security Act)**. The program, which is administered by the United States Secretary of Health and Human Services (Secretary), provides that States with approved plans for child and spousal support that meet federal requirements are reimbursed by the federal government for a significant ***sixty-six percent 66%* of the costs of operating their child-support enforcement programs**. **42 U.S.C. (1) 2 655(a)(2)(C).**  In 1975, Congress adopted Title IV-D, 42 U.S.C. 651 et seq., and established the general statutory framework that exists today. *See* 1975 Act § 101(a), 88 Stat. 2351; ***Blessing v. Freestone,* 520 U.S. 329, 333-335 (1997)** (describing program).  Congress ultimately set the federal share of reimbursable expenditures at ***66%***, 42 U.S.C. 655(a)(2), but expanded the availability of matching funds at the ***90%*** level for (optional) State expenditures for ***automating data processing systems*** to improve "the monitoring of support payments, the ***maintenance of accurate records regarding the payment of support***, and the prompt provision of notice to appropriate officials with respect to any arrearages in support payments which may occur." 1984 Amendments § 6, 98 Stat. 1314; 42 U.S.C. 654(16); 655(a)(3)(A).  Congress amended Title IV-D again in 1988 to improve the rate of child-support collection. Family Support Act of 1988 (1988 Act), Pub. L. No. 100-485, 5 102 Stat. 2343. Because effective child-support enforcement

"had long been thwarted by localized enforcement systems that were unable to quickly and effectively track delinquent parents who crossed county and state lines," ***Hodges v. Shalala,*** **121 F. Supp. 2d 854, 874 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002)**, cert. denied, 540 U.S. 811 (2003), Congress in the 1988 Act emphasized centralized, automated record-keeping and information retrieval in order to improve collection rates. In particular, Congress **mandated "automated data processing and information retrieval system[s]**" that had previously been optional. 1988 Act § 123(a)(C), 102 Stat. 2352; 42 U.S.C. 654(24). The Title IV-D regulations were amended after adoption of the 1988 Act. As amended, the regulations omitted specific references to contempt proceedings as required means for enforcing child-support obligations. *See* 45 C.F.R. 303.6, 303.20(c)(7) (1989);2 cf. pp. 3-4, supra.  Finally, Congress made further changes to the child-support enforcement system in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (1996 Act), Pub. L. No. 104-193, 110 Stat. 2105, which, among other things, again emphasized a centralized, automated approach to child-support. The amended statute established detailed requirements for the "statewide automated data processing and information retrieval systems" made mandatory in 1988. Id. § 344(a)(2), 110 Stat. 2235, 42 U.S.C. 654a(a). Among other things, the system must include a state case registry that includes every child-support case in the State, including the amount of monthly support owed and collected in all cases administered by the state agency. 42 U.S.C. 654a(e)(1) and (4); see 42 U.S.C. 654a(e)(5) (States must "promptly * * * update" case records when circumstances change). The States are required to use their centralized databases "to the maximum extent feasible, to assist and facilitate the collection and disbursement of support payments," including by establishing wage-withholding orders and sending wage-withholding notices to employers. 42 U.S.C. 654a(g)(1); see 42 U.S.C. 666(c).

Critically relevant to this case is that Congress and the Secretary of the U.S. Department of Health and Human Services have demonstrated their concern that child-support-related proceedings be conducted fairly by repeatedly making ***compliance with procedural due process*** rules **a requirement** of State participation in the program.  *See*, e.g., **42 U.S.C. 666(a)(3)(A)** (reduction of non-custodial parents' state income tax refunds to pay overdue support permitted only "after full compliance with all procedural due process requirements of the

State"); **42 U.S.C. 666(a)(7)(B)(i)** (States must report child-support delinquency to credit bureaus "only after [the] parent has been afforded all due process required under State law, including notice and a reasonable opportunity to contest the accuracy of such information."); **42 U.S.C. 666(a)(8)(B)(iv)** (income withholding "must be carried out in full compliance with all procedural due process requirements of the State"); **42 U.S.C. 666(c)(1)(H)** (expedited State agency procedures "shall be subject to due process safeguards, including (as appropriate) requirements for notice, opportunity to contest the action, and opportunity for an appeal on the record to an independent administrative or judicial tribunal"); *see* also **45 C.F.R. 302.70(a)(5)(iii), 303.5(g)(2)(iii), 303.100(a)(6) & (f)(4), 303.101(c)(2), 303.102(c)(1), 303.104(b).**

The United States Supreme Court has therefore held, pursuant to the positions argued in the amicus brief filed by the United States Department of Justice and the United States Department of Health and Human Services, that due process requires the state courts provide minimum safeguards for unrepresented litigants, **in order to assure that the record is fully developed**. ***Turner v. Rogers***, **564 U.S. 431 (2011).**   The Plaintiff hereby specifically <u>invokes</u> ***Turner v. Rogers***, **564 U.S. 431 (2011), the case's syllabus, and all applicable briefs filed in association with that seminal case.**  The ***Turner*** Court-mandated fully developed court record plainly *<u>cannot</u>* be fully developed when the Rhode Island Judiciary and the State Defendants coordinate attempts to unlawfully alter the outcome of the adversarial contest in the state court of law, through:

(1) The State Defendants by policy and design, electronically file all pleadings and court documents using a **<u>legacy</u>** electronic filing system that fails to provide notice to the pro se litigant <u>and</u> results in neither the pro se litigant nor the Rhode Island Virtual Court Clerk being able to access the content of the filings and/or court records.

(2) The Rhode Island Judiciary adopts policy, court rules, court practice and regulations that aim to limit remote access of public court records to Pro Se Litigants and the Public, including the Press.  Additionally, the remote access denial is content based – the Rhode Island Judiciary only grants remote access to the pro se litigant and the

public copies of the docket sheet, but not any of the contents of the court records, including all pleadings, court orders, and transcripts of public court proceedings.

(3) The Rhode Island Judiciary adopted court rules since 2014 that requires all court filings to be filed electronically using the **Odessey** electronic filing system, but fails to disclose the material fact, and therefore conceals the material fact that the State Defendants Agencies that administer and enforce the **Title IV-D** programs in state courts file electronically using an unnamed **LEGACY** electronic filing system that fails to provide notice to the pro se litigant and results in neither the pro se litigant nor the Rhode Island Virtual Court Clerk being able to access the content of the filings and/or court records, which is plainly violative of the due process safeguards required by _**Turner v. Rogers**_, **564 U.S. 431 (2011).** The fact that somehow the judges and magistrates in the state courts can view the State Defendants' legacy filing system pleadings, and that the docket sheet registers the State Defendants' legacy filing system pleadings concretely and definitively show that the Rhode Island Judiciary, by design and purposely, integrated the State Defendants' legacy electronic filing system and the current Odyssey system in such a way as to _further_ the Judiciary's publicly declared policy objective, to **limit access to the court records of public cases to pro se litigants and to the public, including the press**.  This obvious coordinated attempt to alter the outcome of the adversarial contest of our justice system in state proceedings concerning Federal Title IV-D programs relating to child support matters that plainly violate First Amendment, Fifth Amendment and Fourteenth Amendment safeguards required by _**Turner v. Rogers**_, **564 U.S. 431 (2011) and violate the requisite _compliance with procedural due process_ rules that condition** State participation in the Title IV-D program, essentially since 2014.

(4) The Rhode Island Family Court, by policy and by regulation, since 2021 at the height of the COVID-19 pandemic when state court houses were either shut or reduced operations, adopted the policy, rule, practice and regulation that Title IV-D program child support-related matters and enforcement be heard remotely, that incorporates, by default, all the above-described unconstitutional, illegal and

coordinated attempts to alter the outcome of the adversarial contest of state proceedings targeting pro se litigants, and that simultaneously are covered up by denying remote access of public court records to the public, including the press.

(5) State Defendants' consistent <u>Denial</u> of the Texas pro se Plaintiff's First Amendment and due process right access to her own child support case records maintained by the State Defendants that the Federal Title IV-D program mandates to be accurate records using **automated data processing and information retrieval system[s]** is a consistent First Amendment and Due Process denial throughout the Plaintiff-initiated RI EOHHS agency appeal, then throughout the Plaintiff's Rhode Island Access to Public Records Act request for public records, and culminating throughout all the state court proceedings that require electronic filing by the parties but fails to electronically notice the pro se Texas Plaintiff, as well as denies the Texas pro se plaintiff remote access to the electronically filed records of the State Defendants, the Court, and transcripts of public hearings ordered and paid for by the Plaintiff for appeal.

(6) The Rhode Island Judiciary employees and website disseminate misinformation to pro se litigants regarding their U.S. and State constitutional rights to access the courts, including the failure of the Rhode Island Judiciary Website under the section "Self-Help Center" for self-represented litigants to disclose the material fact that self-represented litigants are denied remote access to all court records, only the docket sheet, and that the State Defendants by policy and in practice electronically file pleadings using a legacy electronic filing system that fails to notice pro se litigants and results in the content of the filings neither visible nor accessible to neither pro se litigants nor the Rhode Island Virtual Court Clerk, as well as misrepresenting that the pro se litigant can access transcripts of public court hearings for appeal remotely that she orders and pays for, and misrepresenting that she, a Texas pro se litigant, is not permitted by the court to access the court remotely through Rhode Island Judiciary WebEx hearings, even during the COVID-19

Pandemic.  **See Exhibit E**, emails from employees of Rhode Island Judiciary, and website.

(7) Members of the Rhode Island Bar, who are officers of the court, that include the State Defendants, Counsels for Defendants, including the Rhode Island Attorney General by and through the Office Department handling appeals of Rhode Island Access to Public Records Act ("APRA"), lying and concealing and/or failing to disclose the material fact, whether on court document Notices sent via U.S. Mail or through email from Rhode Island to Texas, that pro se litigants in the state courts are denied access to a copy of all court records and/or filings and/or transcripts for appeal, even transcripts paid for by the pro-se litigant.

(8) The above-described actions by State employees, agencies, members of the bar, officers of the state courts, and the Rhode Island Judiciary-adopted rules, practices and regulations plainly show coordinated attempts to alter the outcome of the adversarial contest in the state courts to violate pro-se litigants' First Amendment, Fifth Amendment, and Fourteenth Amendment rights conducting sham proceedings, employing wire fraud and mail fraud.  See Exhibit G – e.g., Emails from the Attorney General Office handling public appeal of APRA denial, Adam Roach; Notice of Entry of Appearance sent by U.S. Mail from Rhode Island to Texas.

Glaringly relevant to this case is that the U.S. Supreme Court in ***Turner*** held that in state civil proceedings, the pro se litigant did not have a categorical constitutional right to counsel because, in part, the proceeding could include "a set of 'substitute procedural safeguards,' which, if employed together, can significantly reduce the risk of an erroneous deprivation." *Id.* at 447 (quoting ***Mathews v. Eldridge*****, 424 U.S. 319, 335 (1976)**) (also holding that counsel was not required since the opposing party was also unrepresented and the issue was not complex). Thus, in ***Turner***, the court's refusal to find a right to counsel ***did not end the access to justice inquiry***. Rather, the court required that, for due process purposes, "substitute procedural safeguards" had to be "employed together" in the absence of the appointment of counsel. *Id.* Those safeguards include clear notice of the central issue, the use of forms or other means to elicit relevant factual information from the unrepresented party, and giving that party an

opportunity to respond at the hearing to the factual issues raised in opposition to his defenses. *Id*. at 447-48.  It is also important to note that the Supreme Court reversed the determination due in part to the judge's failure to ask "follow-up questions" after the litigant's rambling short statement to elicit key facts or to "otherwise address" the central factual issue in the case. *Id*. at 437–38.  Rather, all the judge asked was "anything you want to say." *Id*. at 437.  The Supreme Court found that "[t]he record indicates that Turner received neither counsel nor the benefit of alternative procedures like those we have described.... Under these circumstances Turner's incarceration violated the Due Process Clause." *Id.* at 449.

Therefore, the facts remain that the ***Turner*** court did emphasize that the absence of counsel *does not* relieve the court (including this federal Court) of its due process duty to provide alternative means by which the unrepresented litigant is given a full and fair opportunity to be heard, i.e., that s/he is given **equal access to justice** in spite of her/his inability to afford counsel.   Without question, State Defendants, Counsel for Defendants, and the Rhode Island Judiciary ignore the implications of the litigant's unrepresented status on her/his access to justice if s/he is deprived of both a right to counsel and appropriate interventions by the court – instead, the above-described coordinated attempts are calculated to strip pro se litigants, such as the Pro Se Texas Plaintiff, of her constitutional right to equal access to justice, that essentially haul pro se litigants, like the pro se Texas Plaintiff, through sham state proceedings, since 2014.

A. **Travel of the State Defendants' and Counsels' First Amendment, Equal Protection and Due Process Violative Actions and Inactions, as Agents of Defendant GERO MEYERSIEK**

1.) The state court proceeding, ***State of Rhode Island ex rel. Gero Meyersiek v. Seguin,*** **K20010521M** that the State Defendants opted for instead of the RI EOHHS agency appeal from which that the State Defendants voluntarily withdrew in 2022, achieves the very objective of the State Defendants from the get go, namely First Amendment denial of access to the Plaintiff's own records created and maintained under the Title IV-D Program, and due process rights.  The State Family Court proceeding's

electronic management system is design, by State policy, to integrate State Defendants' LEGACY unnamed electronic filing system that makes court records they filed into invisible remotely, except to the filers themselves and to the judges of the proceedings, making proceedings one-sided noncontests in favor of the State – making the State actors' coordinated attempts aimed at altering the outcomes and manipulated by the State.  The outcomes are predetermined, especially against pro se litigants, like the Plaintiff, when the adversarial contest is thus manipulated to be thoroughly unevenly matched.  Even State Judiciary Virtual Clerks cannot see the contents of the State Defendants' pleadings.  The legacy system does not notice the opposing party electronically.  Allegedly legacy system generated State filings are mailed by U.S. Mail, however, that is labeled "curtesy" and discretionary, that violates notice requirements of due process.  Nonetheless, mail notice across the country over 2,500 miles away to Texas would be untimely in time-sensitive matters, and is unequal access to justice.  Obviously, without remote access to the contents of court records in mandated remote hearing defending against State Defendants' invisible prosecutions, renders the pro se litigant going into hearings, blind, blind-sided, and gagged.  This is diametrically opposite to the mandate in Turner, to which the State Judiciary shows not just indifference but a measure of revolt, by adopting this First Amendment court access denial targeting pro se litigants, as explicitly articulated policy:  The articulated "restricted" access policy only discriminates pro se litigants, not lawyers, not government actors.

2.) In December 2021, employees of the State Defendants, acting on behalf of Defendant GERO MEYERSIEK, brokered an agreement with the Texas pro se Plaintiff over the phone and via email, in which the State Defendants represented to the Plaintiff that GERO MEYERSIEK waived

interest in consideration of the Texas Plaintiff paying off child support in a lump sum of $104,185.98.  The Plaintiff accepted and immediately executed on the agreement on the same day.  Unbeknownst to the Plaintiff in Texas, after Plaintiff communicated to the State Defendants she made the agreed upon payment on December 7, 2021, the State Defendants allegedly received a phone call from GERO MEYERSIEK's attorney, Barbara Grady, that GERO MEYERSIEK changed his mind, and to "put the interest back on the system."  The "system" is allegedly the **"automated data processing and information retrieval system[s]"** under federal Title IV-D for the explicit purpose of improving "the monitoring of support payments, the *__maintenance of accurate records regarding the payment of support__*,1988 Act § 123(a)(C), 102 Stat. 2352; 42 U.S.C. 654(24).**  Among other things, the system must include a state case registry that includes every child-support case in the State, including the amount of monthly support owed and collected in all cases administered by the state agency. **42 U.S.C. 654a(e)(1) and (4)**; see **42 U.S.C. 654a(e)(5)** (States must "promptly * * * update" case records when circumstances change). The States are required to use their centralized databases "to the maximum extent feasible, to assist and facilitate the collection and disbursement of support payments," including by establishing wage-withholding orders and sending wage-withholding notices to employers. **42 U.S.C. 654a(g)(1);** see **42 U.S.C. 666(c)**.

3.) The State Defendants, as agents of Defendant Gero Meyersiek, complied with Defendant GERO MEYERSIEK's directive without any question, and immediately set in motion actions to seize the Plaintiff's property in Texas under the guise of "collecting interest."

4.) Meanwhile, with this glaringly tortious **42 U.S.C. 654a(e)(5)**  "change in circumstances," the State Defendants failed to promptly update Plaintiff's case records.  On the contrary, post-Plaintiff's payment, in response to

Plaintiff's inquiry as to when Plaintiff's $104,185.98 payment would be reflected on her child support online account (the accounting amounts paid and amounts owed that is shown in Plaintiff's online account is fed by the **automated data processing and information retrieval system[s]** under federal Title IV-D for the explicit purpose of improving "the monitoring of support payments, the ***maintenance of accurate records regarding the payment of support***,**1988 Act § 123(a)(C), 102 Stat. 2352; 42 U.S.C. 654(24))**, State Defendants lied to the Plaintiff and mislead the Plaintiff that because it was the Christmas and New Years holiday season (December 2021), the records would not be updated for a while after the Plaintiff's lump sum payment, in order to put the Plaintiff off of monitoring her account.  Similarly, the State Defendants never disclosed to the Plaintiff from December 2021 to October 2022 the material fact that the State put the interest back on the system ***within hours*** of her paying the agreed upon lump sum payment to pay off child support.

5.) Further, the State Defendants fail to comply with Title IV-D's requirement to ***maintain accurate records regarding the payment of support***,**1988 Act § 123(a)(C), 102 Stat. 2352; 42 U.S.C. 654(24))**.  On December 6, 2021, the Plaintiff took a screen shot of her State Defendants-maintained online account that stated $93,214.56 under "Arrears" and $0.00 under "Interest."  Obviously, $93,214.56 is not, per the State Defendants' assertions that payoff arrears is $104,185.98, showing the significant inaccuracy of record keeping by approximately a whopping $11,000 in excess of the amount demanded/collected, or more than 15% margin of error, that violates the terms of Title IV-D program.

6.) When the Plaintiff requested an accounting or statement of the total due, the State Defendants failed to provide a proper statement of accounts, and instead sent her an email that stated, "Accounting says… $104,185.98."

7.) At the time, the pro se Texas Plaintiff in good faith justifiably relied on the State Defendants' misrepresentations, lies and deceit, to her detriment.

8.) Unbeknownst to the Plaintiff, from December 2021, after (within hours of) Plaintiff's payment of the agreed upon pay-off $104,185.98, to March 2021, the State Defendants actively set in motion seizing and levying her properties in Texas, without notifying the Plaintiff the very material "change of circumstances" relating to the contract the State Defendants brokered.  Not alerting the Plaintiff in Texas achieves the State Defendants' objective to enable unfettered seizure and deprivation of Plaintiff's property without due process and without access to accurate records or accounting information.  Only in March 2022, did the Plaintiff in Texas receive a notice of lien via U.S. Mail sent from Rhode Island by the State Defendants, notifying placing a lien on her Texas property for a very large sum of $75,638.00 that provided no explanation, no accounting and no justification, executed under the federal **Title IV-D** program.  How $75,638.00 was computed is anybody's guess, because the figure does not appear on any **automated data processing and information retrieval system[s]** under federal Title IV-D for the explicit purpose of improving "the monitoring of support payments, the ***maintenance of accurate records regarding the payment of support***,**1988 Act § 123(a)(C), 102 Stat. 2352; 42 U.S.C. 654(24))**, and the State Defendants deny to this day the pro se Texas Plaintiff's right to access her case file records that show how this very large $75,638.00 amount that appears in interstate liens and levies executed in the name of the federal Title IV-D Program by the State Defendants on Plaintiff's Texas property is computed or justified, or what it represents, principle or interest, or both.  However, the State Defendants maintain this lien is "system-generated," showing this is also "legacy system(s)" generated that are inaccurate.

9.) The Plaintiff timely appealed the lien, which docketed at the Title IV-D Program Appeals Office of the Rhode Island Executive Office of Health and Human Services ("RI EOHHS"). **RI EOHHS Appeal Docket# 2022-2116.** It is amply clear that Title IV-D requires due process compliance as a condition for State participation in federal funding under the program, as afore-discussed.

10.) However, throughout the entire seven-month duration of the Title IV-D appeal (April 2022 to November 2022), the State Defendants denied everyone of the more than ten (10) First Amendment and due process requests by the Texas pro se Plaintiff, violating her First Amendment and due process right to access her own child support records guaranteed by Congress and the Secretary; *See*, e.g., **42 U.S.C. 666(a)(3)(A)**; **42 U.S.C. 666(a)(7)(B)(i)**; **42 U.S.C. 666(a)(8)(B)(iv)** (income withholding "must be carried out in full compliance with all procedural due process requirements of the State"); **42 U.S.C. 666(c)(1)(H)** (expedited State agency procedures "**shall be subject to due process safeguards, including (as appropriate) requirements for notice, opportunity to contest the action, and opportunity for an appeal on the record to an independent administrative or _judicial_ tribunal"**); *see* also **45 C.F.R. 302.70(a)(5)(iii), 303.5(g)(2)(iii), 303.100(a)(6) & (f)(4), 303.101(c)(2), 303.102(c)(1), 303.104(b).** Therefore, the Texas pro se Plaintiff respectfully emphasizes to this Court that the facts show it is as plain as day, including to any self-represented layman with or without a college education that Congress intended and the United States Supreme Court in **_Turner_** held that ALL administrative and/or judicial tribunals have a DUE PROCESS DUTY concerning child-support related matters under Title IV-D that are before them. **The Pro Se Plaintiff respectfully places on the record and avers that this due process duty of judicial tribunals where a pro se litigant is a party similarly applies to actions and torts**

**arising out of state actions relating to child-support related matters under Title IV-D that are properly before <u>this</u> federal Court, as <u>here.</u>**

11.)       To address the State Defendants' noncompliance with requisite access by the Pro se Texas Plaintiff to her own case records throughout the Plaintiff-initiated RI EOHHS Appeal, on October 5, 2022, the hearing officer held a telephonic conference in which the hearing officer and staff counsel for State Defendant RI Office of Child Support Services in Rhode Island participated, and in which the Texas pro se Plaintiff participated in Texas.  The Texas pro se Plaintiff recorded the entire telephone call in Texas that was over one and a half hour long and submitted/offered into evidence in the related case ***Seguin v. RI Office of Child Support Services et al,*** **C.A. WES-PAS-23-36** the part of the telephone recording in which the staff counsel of the State Defendant RI Office of Child Support Services, John Langlois, Esq.,  stated, "what happened in this case is when Mary's representative, her attorney, called us in late November 2021 and said she wants her passport released, what does she have to do to release her passport, they put her in touch with Karla, who gave her the $104k number.  Where that number came from was the department attorney contacted the custodial parent, Mr. MEYERSIEK.  So, we contacted his attorney, it wasn't me, it was somebody else in my office, and said, if she was willing to make a $104k payment to pay off the principle, would you be willing to waive the $75k or $73k in arrears.  At that time, he said yes.  So Karla notified Mary that if she paid the $104k, it would be paid in full because he was willing to waive the interest, that was just the principle.  What happened was the day after Karla told Mary to wire the $104k the attorney for Mr. Meyersiek contacted us again and said he changed his mind.  Please put the interest back on the system.  So we did."

12.)    The State Defendants' denial of the Plaintiff's First Amendment and Due Process right and request to access her own child support case records is motivated by the State Defendants' plainly shown desire to obstruct Plaintiff's access to Plaintiff's case records that obviously document the above activities, that show coordinated attempts of tortious and obstruction to justice activities by the Defendants, through wire and the U.S. Mail.

13.)    The Texas pro se Plaintiff at this juncture respectfully requests the Court to take Judicial Notice of the fact that the Plaintiff filed a Motion for Extension of Time to Amend Complaint [ECF 12] on August 8, 2023, attaching documentary evidence of email and court order exhibits attached to this herein motion, for the expressed purpose of requesting an extension of time to prepare and present discovery-obtained evidence and newly verified facts obtained through First Amendment federal and state access to public records statutes, that goes to show facts relating to **Younger Abstention Exceptions**. Younger Abstention Exceptions include (1) **improper state motives**, (2) **harassment**, and (3) **due process-defective state proceedings**. Facts relating to these exceptions are of public interest import and material to the issues raised in this case, that ready meet the low threshold good cause standards. The ***Turner*** Court held what that due process requirement in proceedings where the party proceeds pro se ought to be, and proves and shows that not only are **unconstitutional judicial tribunals systemic** in this country, they are capable of "repetition but evading review." The Turner Court recognized that unconstitutional judicial tribunals are totally plausible and are capable of repetition but evading review. This view is similarly shared by the United States Department of Justice in its amicus brief to the ***Turner*** Court. Obviously, the unconstitutional state judicial tribunals in Rhode Island that deny pro se litigants' First Amendment, due process and equal

rights to access the courts and court records, that explicitly wholesale deny requisite constitutional rights across the state in all state judicial tribunals, plainly repeat systemically on a daily basis, yet succeeded in evading review for the past **nine years** since **2014**, (in part through the apparent success rate of the coordinated campaign by the State Judiciary of disinformation, misrepresentation and omission of material facts of the Judiciary's restrictive policy targeting pro se litigants) and the denial is on-going, and discriminatorily targets pro se litigants such as the diversity Texas Plaintiff, who is self-represented.  The Plaintiff shall later below place on the record supported by documentary evidence just how pervasively and extensively that coordinated attempt by the State actors targeting pro se litigants adversely impact the most disadvantaged members of the public, who are self-represented litigants.  Over 30 million people across the country every year appear self-represented before judicial tribunals, comprising between a staggering 60% to 100% of all court litigants, according to the American Bar Association ("ABA").  Report found here:

https://www.srln.org/system/files/attachments/AppendixA.ABA%20rem ote.117-annual-2020.pdf

14.)    The State judicial tribunals that outright deny pro se litigants their First Amendment rights of equal and meaningful access, and equal access to the court record and deny equal protections and due process to the pro se litigants, plainly show coordinated attempts to weaponize the justice system against 60% to 100% of court litigants, that alter the outcome of the adversarial contest aimed to the detriment of 60% to 100% of the court litigants and to the detriment of the American public.  Because the Texas pro se Plaintiff had raised on the record and attached the undisputed Rhode Island Judiciary court orders and rules and practices denying First Amendment, equal protection and due process

constitutional rights of self-represented litigants concretely showing systemic unconstitutional proceedings in the state judicial tribunals targeting self-represented litigants [ECF 12] on August 8, 2023, the Plaintiff hereby places on the record for review <u>the due process duty of this federal Court's action and/or inaction in its review of the First Amendment irreparable harm before this judicial tribunal</u>.  The Plaintiff is astounded that post-***Turner***, the State Judiciary is emboldened enough to adopt an articulated policy that restrict court access to pro se litigants (**and the public and the press**) since 2014, yet has evaded review in the First Circuit, and further preserves on the record for review this Court's necessary review of the record here in this Memorandum documenting the aforesaid facts of systemic unconstitutional proceedings in the Rhode Island state judicial tribunals targeting pro se litigants like the Plaintiff within the context of the ABA Report, that documents the fact that **60%** to **100%** of the 30 million litigants who appear before judicial tribunals every year in this country, are self-represented. *See* American Bar Association Report at

https://www.srln.org/system/files/attachments/AppendixA.ABA%20remote.117-annual-2020.pdf

15.)    The Texas pro se Plaintiff, in good faith, seeks to advance case law.

16.)    After being told by the RI EOHHS Appeal Officer to produce the Plaintiff's child support case file and to testify at the upcoming appeals hearing what the State Defendant RI OCSS revealed at the October 5, 2022 pre-hearing Conference, the State Defendant RI OCSS voluntarily withdrew from the Plaintiff-initiated appeals hearing, for the purpose of avoiding testifying to the facts on the record in the appeals hearing, and to avoid agreed-upon production of the Plaintiff's child support case file under Title IV-D.  State Defendants' coordinated withdrawal to subvert

Title IV-D mandated due process and to obstruct justice is a criminal act, and the State's deliberate coordinated noncompliance with due process mandates of Title IV-D renders the State Program ineligible for Federal funding, per the statutory language of Title IV-D eligibility requirements.

17.)    The fact that Rhode Island Judiciary and the State Defendants have coordinated attempts described above through the policies and practices and rules and email communication to unsuspecting pro se litigants, like the Texas pro se Plaintiff, that are attached herein to this Motion and Memorandum, with the aim to subvert the constitutional rights of self-represented litigants, who comprise a disproportionate majority of litigants in cases before the Title IV-D judicial tribunals, such as the Family Court and the Superior Court, since 2014, for the past nine years, and is on-going, shows that per the letter of the law and intent of Congress, the Federal Funding Rhode Island state agencies, by and through their employees, received since 2014 as it relates to Title IV-D programs where due process is a requisite condition of state participation, was knowingly and is knowingly defrauded, and should rightfully be clawed back, as a matter of public interest.  The Texas pro se Plaintiff has a special interest in that the afore-described coordinated criminal activities were funded through Title IV-D to defraud the Plaintiff interstate.  For example, the "system-generated" lien is a system or outsourced service funded by Title IV-D Program for the purpose of legitimate interstate collection of child support, not collection activities that are violative of the mandated procedural due process statutory provisions of Title IV-D.  For example, throughout the Plaintiff-initiated RI EOHHS Appeals Process, the State Defendants impermissibly continued lien and levy property seizure of the Plaintiff's Texas property.  The RI EOHHS Hearing Officer at the PreHearing telephonic Conference on October 5, 2022 had to spend approximately 45 minutes to make the

State Defendants agree to rescind/cease and desist State Defendants from further property seizure/collection activity until adjudication of the appeal on the merits, showing State Defendants' actions are routine, systemic, capable to repetition and evading review, just like the circumstances in **_Turner_**, and disturbingly occurring 12 years post-**_Turner_**. This exchange over the telephone is audio recorded by the Plaintiff in Texas, a participant in the telephone conference.  State actors were in Rhode Island.

18.)      Immediately after the State Defendant RI OCSS's voluntary withdrawal from the Plaintiff-initialed RI EOHHS Appeal, the Plaintiff submitted on December 1, 2022 an Access to Public Record Act ("APRA") record request to the Secretary of RI EOHHS for her child support case records.  **APRA**, which is modeled after the Freedom of Information Act ("FOIA"), is a statutory right of access under the **First Amendment**, and exists under the common law right of access, including judicial records and documents.  There is a common law right of access, since "the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." **_Nixon v. Warner Commc'ns_**, **435 U.S. 589, 597, 98 S. Ct. 1306, 55 L. Ed.2d 570 (1978)**.  That right derives from the interest of the public "to keep a watchful eye" on the workings of government. *See* id. at 598-99, 602, 98 S. Ct. 1306.  APRA and the FOIA are statutory rights of access under the First Amendment that embody the same sort of concerns as the common law right of access. "FOIA is often explained as a means for citizens to know what their Government is up to," reflecting "a structural necessity in a real democracy." **_Nat'l Archives & Records Admin. V. Favish,_** **541 U.S. 157, 171-72, 124 S. Ct. 1570, 158 L.Ed.2d 319 (2004)**.  The R.I. Supreme Court on numerous occasions pronounced that the Rhode Island Access to Public Records Act ("APRA") is directly modeled after the

federal Freedom Of Information Act ("FOIA").  See, e.g., ***Providence Journal Co. v. Convention Ctr. Auth.,* 774 A. 2d 40, 46 (RI 2001)**("Because APRA mirrors the Freedom of Information Act (citation omitted), it is appropriate to look to Federal case law interpreting FOIA to assist in our interpretation of the statute.")

19.)     The State Defendant RI OCSS denied Plaintiff's APRA request on December 13, 2022, citing as the basis of denial, "unsegregable."  On December 16, 2022, the RI EOHHS emailed the Texas Plaintiff an official letter response through its Chief Counsel, Ms. Martinelli, Esq., claiming that the records sought by the Plaintiff are not maintained within the RI EOHHS agency that overlooks Defendant RI Department of Human Services that overlooks Defendant RI OCSS.  The letter further stated that appeal of the agency's record denial should be made to the then acting director of the State Defendant RI Department of Human Services, and that the Plaintiff can also appeal the agency denial to the Rhode Island Attorney General, counsel for State Defendants.  This letter stated cc: Debra Barclay, Esq., a State Defendant here.  Ms. Martinelli did not explain who Debra Barclay was, nor her role or function.  It is clear now that State Defendant Barclay is the Chief Counsel of State Defendant Department of Human Services that oversees RI OCSS, approved the RI OCSS's denial of Plaintiff's APRA request, and is therefore cc'ed in the Martinelli letter.

20.)     The Texas Plaintiff reasonably relied on Ms. Martinelli's APRA response letter from RI EOHHS and filed an appeal to the Office of Open Government of the Office of the RI Attorney General in January 2023.  At the same, reviewing the statutory language of APRA which states that nothing in the statute precludes the requester from filing an action in the RI Superior Court, the Plaintiff filed the same, in December 2022.  Prior to and after filing the APRA action in RI Superior Court, the Texas Plaintiff

consulted the RI Judiciary's website's "Self-help Center" targeting pro se litigants. Nothing on the webpage stated nor does it now state that self-represented litigants are denied remote access to their own case's court records. In December 2022, RI State courts were operating under COVID-19 Pandemic implemented rules, practices and procedures, many of which continue to be in effect today, that emphasized and continue to emphasize remote court access, which required litigants' e-filing of documents. The clerk's office stated over the phone to Plaintiff, who identified herself as self-represented, that out-of-state filers would be emailed the court documents such as the summons, court forms shall be downloaded from the website, filled out, and submitted through email back to the court clerk. Scheduling of hearings would be conducted with the court's clerks via emails in the same manner. Hearings would be conducted via WebEx. Nobody nor the RI Judiciary Self-help Center website (aimed at pro se litigants) disclosed the very material fact that out-of-state pro se litigants are effectively denied access to court records (e.g., contents of all pleadings filed by opposing party, transcripts of WebEx hearings, contents of all court orders, and contents of transcripts of court hearings/record for appeal.), but that attorneys, state and federal agencies have access. Essentially, this results in an adversarial court contest in which the pro se litigant is purposely blinded by the state judiciary, denied access to court records of pro se litigants' own public cases and public hearings, and can only file into the electronic filing system that immediately notice to the opposing party, in this case, the state government actors and lawyers who coordinated attempts to deny the Plaintiff's First Amendment right of access to her own child support case records, whether under statutory APRA or Title IV-D program appeal proceedings and tribunals.

21.)        Institutionalized First Amendment deprivations by the state judiciary of the disadvantaged pro se litigants' constitutional rights is especially egregious, as in fact and in practice, the state judicial tribunals are designed by the judiciary to be sham contests in all cases in which a pro se litigant is a party or both parties. Every person's, especially lay person's understanding and grasp of fairness is the reasonable expectation that what is filed remotely should also be available to be seen remotely on an equal basis, irrespective of the party's representation status. Therefore, with the disinformation disseminated by the Rhode Island Judiciary described above, the pro se Plaintiff was misled that it was a technology issue, like the one identified by the Federal Court clerk in this action, filing a complaint through PACER. Nobody at the state judiciary disclosed this material policy, rule, regulatory, and electric filing system architectural/structural denial of access to the pro se Plaintiff that is obviously designed to exclude 60% to 100% of all litigants who proceed pro se in state courts. What chances do pro se litigants stand against government agencies' lawyers' and the judiciary's coordinated attempts to subvert and obstruct access to child support case files under the Title IV-D program, obstructing justice? Without question, this is categorically violative of the due process requirements embodied in Title IV-D, intended and emphasized by Congress and the Secretary alike.  In essence, this corruptive coordination is a constitutional crisis that implicates hundreds of billions of dollars of federal funding under Title IV-D, to which, given the facts, Rhode Island is not eligible to participate in, at the very least since nine year ago when it started adopted unconstitutional proceedings denying access to the courts targeting pro se litigants in 2014.  This is especially disturbing that these are actions and adopted policies by the State Judiciary actors, in the branch of government whose duty is to adjudicate petitions FAIRLY.

Therefore, the Plaintiff respectfully places this constitutional crisis squarely before this Federal Court in the District of Rhode Island, how will this Court redress this egregious wrong? short of an issuance of temporary restraining order and preliminary injunction?

B. **Coordinated Attempts by Defendants and State Actors to Deprive and Deny Pro Se Texas of Access to the Public Records created and maintained under Title IV-D, Remote Access to Pro Se Litigant's court case records, Denial of access to the courts violative of Equal Protection and Due Process, for the furtherance of Altering the Outcome**

22.)    On January 19, 2023, the Office of the Attorney General (AG) emailed the pro se Plaintiff abstaining from reviewing the Plaintiff's APRA appeal because upon research of the court records in the RI Superior Court, the Office found the pending APRA action ***Seguin. Vs. RI Office of Child Support Services***, *PC-2022-02715*.  The email included recipient/Plaintiff's Texas address on the top of the email, the customary form of formal letters showing the AG knew the Plaintiff is a Texas citizen.  Minimum due diligence would require the State Attorney General's Office to identify Plaintiff's representation status in the APRA state court action is pro se, and that she is filing from the State of Texas over two thousand miles away, remotely.  While spending over two paragraphs in the email citing legal precedents supporting the Attorney General's decision to defer to the Superior Court APRA action the Plaintiff filed, the Office of Attorney General glaringly OMITS disclosing the material fact, which the Office of the Attorney General knew, that the Plaintiff's Superior Court proceeding pro se remotely necessarily involves a sham proceeding when the AG Office obviously knows and/or should have known, that the state judiciary adopted rules, practices and regulations denying remote access of court records to pro se litigants, who in this case, is out of state in Texas over two thousand miles away.

The Attorney General ("AG") of Rhode Island served for decades as a former Assistant U.S. Attorney General who resigned during the Trump Administration, and therefore as a former practitioner of federal law, specializes in federal and diversity issues over more specialized state practitioners, and knew and should have known the diversity, U.S. Constitutional issues and federal Title IV-D implications outlined in the APRA Complaint that impacts the State's eligibility for Title IV-D Federal funding.  Afterall, Plaintiff's APRA complaint is not an appeal of the localized request genre for arrest records of the son of former Governor Lincoln Chafee, or local townhall meeting minutes, that are regularly publicized by the AG's Office or the Press, for example.  Plaintiff's APRA Complaint contains elements of interstate deprivation of Constitutional rights of a Texas citizen in Texas and elements of coordinated obstruction of justice by RI state government actors relating to the interstate enforcement of child support under Title IV-D, violating codified Federal criminal statutes, such as Title 18 U.S.C., Section 241 – Conspiracy Against Rights.  However, the AG's Office not only fails to act on the complaint filed with his Office concerning these serious crimes, but further coordinates with the State Defendants to abstain from participating in any means, such as filing an amicus brief, or disclose to the pro se Texas Plaintiff that the APRA proceeding brought by the Texas Plaintiff is futile as it is a remote proceeding in which the pro se plaintiff/litigant is denied remote access to court records and notice by the state judiciary rules, practice and regulation by articulated policy – in other words, it is a sham proceeding by its very architecture and court structure.  This Court, is confronted with the show cause documentary-evidence-supported facts filed in Plaintiff's Motion for Extension of Time to Amend Complaint [ECF 12] filed on August 8, 2023, and the documentations evidence and Affidavit in support of the Rule 65 Motions filed herein.  The ***Turner***

Court, held that the judiciary has an affirmative due process duty to protect constitutional safeguards of pro se litigants to ensure justice can be equally accessed by pro se litigants.  In other words, in cases concerning deprivation of First Amendment, equal protection and due process rights, the judiciary, when confronted with the facts, has an affirmative due process duty to the pro se litigant.  Since the judiciary has an affirmative duty to the pro se litigant, the RI AG Office of Open Government similarly has an affirmative due process duty to the pro se APRA record denial appellant, the pro se Plaintiff.  Further, constitutionally, the RI AG is directly elected to enforce all applicable laws in the State of Rhode Island, including U.S. Supreme Court decisions and mandates.  The RI AG is not elected by state government actors who coordinate attempts to thwart constitutional rights of pro se litigants wholesale, whether in judicial tribunals or administrative tribunals.  The fact that the RI AG shirks his constitutional duty to enforce all applicable laws in Rhode Island for which he was elected, and shirks his special duty to the pro se Plaintiff, and instead opts to involve in the State Defendants' subornation of perjury and their collective coordinated attempts with state judiciary actors to thwart the pro se litigants' constitutional rights, are documentary-supported facts and issues raised and preserved throughout the record in this action and in *Seguin v. RI Office of Child Support Services*, Civil Action No. 1:23-cv-0034-WES-PAS

23.)     On January 17, 2023, the Texas pro se Plaintiff filed the Complaint in ***Seguin v. RI Office of Child Support Services***, **Civil Action No. 1:23-cv-0034-WES-PAS** and completed service of the summons on January 30, 2023.  The very next day, on January 31, 2023 the State Defendants initiated the Family Court action ***State of Rhode Island Ex rel. Gero Meyersiek vs. Seguin***, **K20010521M**, a "child-support related" proceeding that is mandated by Family Court to be remote, against the pro se Texas

Plaintiff, purposely filing, by state policy and practice, court papers using an unnamed legacy electronic filing system that fails to notice pro se litigants, such as the pro se Texas Plaintiff, in court proceedings designed by RI Judiciary actors that deny the pro se plaintiff remote access to the contents of all court records, except for the docket sheet, showing among other unlawful discriminatory motives, First Amendment deprivation that is content-based, discriminatingly targeting pro se litigants.

24.) At the time, the pro se Texas Plaintiff was misled by the Rhode Island Judiciary employees via email, by phone and on the State Judiciary website targeting self-represented litigants labeled, "Self-Help Center," and did not know that the State Defendants use a legacy Odyssey filing system in Family Court by policy and by design. Only when the pro se Plaintiff protested that she cannot see any of the filings by the State Defendants at the June 8, 2023 Family Court hearing, did the State Defendant RI OCSS state on the record the reason being the agency uses a legacy electronic filing system, to which the Family Court showed disinterest.

25.) Following this hearing, on June 10, 2023, the Plaintiff submitted an APRA request to the Rhode Island Judiciary for all records relating to the court rules, practices and regulations denying pro se litigants remote access to court records, including the reasons why. The State Judiciary responded on July 10, 2023 that the RI Judiciary does not possess any records other than a copy of the Rule itself, and that even if it did, those records are attorney-client privileged. This is categorically proof of coordinated concealment by the Judiciary of a policy they know is illegal. Who is the client and who is the attorney in which lawsuit? Are they anticipating being sued? By whom? By the Public? By the Press? By irreparably injured pro se litigants, such as the Plaintiff?

## III. <u>ARGUMENT</u>

A. **First Amendment Irreparable Injury**

The Pro Se Texas Plaintiff seeks a preliminary injunction and temporary restraining order to prevent the State Defendants RI Office of Child Support Services and Department of Human Services, and their employees and agents, from hauling the pro se Texas Plaintiff to facially systemic unconstitutional Rhode Island state judicial tribunals, such as the Family Court, pending a determination of the constitutionality of the State Defendants' actions by this Court. The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.  There is a paramount public interest in the exercise of constitutional rights, particularly those guaranteed by the First Amendment.   As Justice Gorsuch stated in 2021, "[e]ven in times of crisis— perhaps *especially* in times of crises—we have a duty to hold governments to the Constitution." ___***South Bay United Pentecostal Church v. Newsom***___, **141 S. Ct. 716, 718 (2021)** (Gorsuch, J., statement) (bold emphasis added; italics original).  Put simply, "restrictions inexplicably applied to one group and exempted from another do little to further [the government's] goals and do much to burden First Amendment freedom." ___***Maryville Baptist Church, Inc. v. Beshear***___, **957 F.3d at 615 (6th Cir. 2020)**.  Where, as here, First Amendment rights are at issue, "the government must shoulder a correspondingly heavier burden and is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights." ___***Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council***___ **31, 138 S. Ct. 2448, 2472 (2018)**.  Here, because State Defendants haul the pro se Texas Plaintiff to Rhode Island's First Amendment infirm remote judicial tribunal and their legacy system electronic filing designed to coordinate the denial of pro se litigants' right to access court records remotely singles out pro se litigants and excludes pro se litigants from a full and fair hearing, that implicate Plaintiff's First Amendment rights, Rhode Island "must do more than simply posit the existence of the restriction. It must demonstrate that the recited harms are real, not merely conjectural." ___***Turner Broad. Sys., Inc. v. FCC***___, **512 U.S. 622, 664 (1994); see also ___*Edenfield v. Fane*___, 507 U.S. 761, 770 (1993).** This is so because "[d]eference to [the government] cannot limit judicial inquiry when First

Amendment rights are at stake." ***Landmark Commc'ns, Inc. v. Maine***, **435 U.S. 829, 843 (1978).**

However, here in this case, the Rhode Island Judiciary notably neither stated nor provided any compelling government reason or interest for denying pro se litigants remote access to court records that is content-based, namely, allowing pro se litigants remote access of case docket, but not any other court records, in its official July 10, 2023 written email response to Plaintiff's APRA requests for records.  In response to Plaintiff's request for records relating to the reason why the judiciary adopted the restrictive court policy against pro se litigants only, namely rules and practice single out pro se litigants denying them as a class of litigants remote access to court records in their own cases, while permitting attorneys and state and federal government officials remote access, the State claimed it does not possess any records.  Instead, the State went so far as to claim attorney-client privilege of such records, if any.  Since there isn't any pending legal action on or about July 10, 2023 between the Plaintiff and the State Judiciary, there is no basis in fact for attorney-client privilege over documents they claim are not in their possession.  It is plainly obvious the State Judiciary is coordinating with the above named State Defendants and State actors to deprive pro se litigants and the Public and the Press First Amendment rights to public records and remote access to court records of public hearings.

A district court must balance four factors in determining whether to grant a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." ***Winter v. Nat. Res. Def. Council, Inc.***, **555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)**. A preliminary injunction preserves the court's ability to grant final relief. *See **11A C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure § 2948.1 (3d ed. Apr. 2021 update).*** The court requires a showing of irreparable harm before granting a preliminary injunction since that harm would "impair the court's ability to grant an effective remedy" following a decision on the merits. *See id.*  (This is especially so in this case when coordinated one-sided state judicial tribunals that

discriminatorily handicap remote access to pro se litigants conspire to manipulate the outcome against pro se litigants here, similar to the circumstances in **_Turner_**.  As in **_Turner_**, the child is now 23 years old and long emancipated.  Defendant Meyersiek waived his right to child support interest and by agreement.  The Defendant paid off the principle in one lump sum. The difference here, unlike the Turner circumstance of both pro se parties in TANF case, is that Meyersiek is represented by two personal counsels in family court proceedings, on top of the legal might and resources of State Defendants and State Judiciary, while the Texas Plaintiff is pro se – the contest is an even more uneven match than in **_Turner_**.)

This is a flexible standard where the four factors are not prerequisites but instead are balanced by the Court. **_Frisch's Rest., Inc. v. Shoney's Inc_**.**, 759 F.2d 1261, 1263 (6th Cir. 1985) (citing I**n**_re DeLorean Motor Co._**, 755 F.2d 1223, 1229 (6th Cir. 1985)**. [T]he purpose of the [balance of harms] test is . . . to underscore the flexibility which traditionally has characterized the law of equity. It permits the district court, in its discretion, to grant a preliminary injunction even where the plaintiff fails to show a strong or substantial probability of ultimate success on the merits of his claim, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued.

See also **_Worthington Foods, Inc. v. Kellogg Co_**.**, 732 F. Supp. 1417, 1427 (S.D. Ohio 1990)** ("That is, a strong showing of irreparable harm, decidedly outweighing harm to the defendant, may justify an injunction even where the movant cannot make a strong showing of likelihood of success on the merits, as long as the plaintiff can show serious questions going to the merits of the suit.") (citing **_Frisch's_**, **759 F.2d at 1263; DeLorean, 755 F.2d at 1229)**; **_Chaplaincy of Full Gospel Churches v. England,_** **454 F.3d 290, 297 (D.C. Cir. 2006)** ("If the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak.").

"In short, 'because the questions of harm to the parties and the public interest cannot be addressed properly in the First Amendment context without first determining if there is a

constitutional violation, the crucial inquiry often is . . . whether the [law] at issue is likely to be found constitutional." Id. See also ***Tumblebus Inc. v. Cranmer***, **399 F.3d 754, 760 (6th Cir. 2005). Case 1:19-cv-00614 ECF No. 4 filed 07/30/19 PageID.69 Page 17 of 40 11** Moreover, the Third and Fourth factors merge when the government is a defendant. See ***Nken v. Holder***, **556 U.S. 418, 435 (2009).** Applying these principles to the facts of this case, leads inevitably to the conclusion that this Court should grant Plaintiff's request for a preliminary injunction and restraining order.

The State Defendants haul the Texas pro se Plaintiff to the institutionalized remote state family court proceeding concerning child support matters in coordinated attempts to re-establish interest when they themselves brokered an agreement in which child support interest was waived under the Title IV-D program, and such proceeding excludes pro se litigants like the Plaintiff, by category, of her First Amendment Right to remote access to court records based on her self-represented status.

## B. Impermissible Content-Based First Amendment Deprivation

Further, the First Amendment prohibits the restriction of speech in simple but definite terms: "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Those same terms, and their guarantee of free speech, now apply to states and municipalities as well as to the federal government. *See* ***Cruz v. Ferre***, **755 F.2d 1415, 1418 (11th Cir. 1985).**

This is a case that in part concerns what public records maintained by the State Defendants the First Amendment allows the government to ban access, and what court records the First Amendment allows the government to ban remote access in remote court hearings via WebEx in proceedings that require e-filing of court documents to a class of litigants solely because they are unrepresented by counsel. So the first question this Court needs to consider is whether the denial of access to records this Pro Se Litigant seeks are content-based regulations. If they are, this Court must analyze them under strict scrutiny. ***Wollschlaeger v. Governor, Fla***., **848 F.3d 1293, 1307 (11th Cir. 2017)** (en banc).

The answer to the content-based-or-not question turns out to be as easy here as it was in ***Wollschlaeger***: because the government denial depends on the content of the public records, be it court records relating to public hearings, or child support records underlying a publicly issued child support lien interstate from Rhode Island to Texas under the Title IV-D program that is appealable, the government denial of access are content-based restrictions that must receive strict scrutiny.

Forbidding the government from choosing favored and disfavored messages is at the core of the First Amendment's free-speech guarantee. See ***Police Dep't of Chicago v. Mosley***, **408 U.S. 92, 96 (1972)**. Few categories of regulation have been as disfavored as content-based speech restrictions, which are "**presumptively invalid**." ***R.A.V. v. City of St. Paul,*** **505 U.S. 377, 382 (1992)**. That's because, "above all else, the First Amendment means that government has no power to restrict expression because of its subject matter, or its content." ***Mosley***, **408 U.S. at 95**. So, regulations that are grounded in the content of speech, and that allow the government "to discriminate on the basis of the content" of that speech, "cannot be tolerated under the First Amendment." ***Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd***., **502 U.S. 105, 116 (1991)** (quotation omitted). The "mere assertion of a content-neutral purpose" is not enough "to save a law which, on its face, discriminates based on content." ***Turner***, **512 U.S. at 642– 43**. So the first question is not about a law's purpose, but about its effect—whether it restricts or penalizes speech on the basis of that speech's content.

One reliable way to tell if a law restricting speech is content-based is to ask whether enforcement authorities must "examine the content that is conveyed" to know whether the law has been violated. ***McCullen v. Coakley***, **573 U.S. 464, 479 (2014)** (quoting ***FCC v. League of Women Voters of Cal.***, **468 U.S. 364, 383 (1984)**). Take a recent example from the Supreme Court. To see if a robocall was legal, authorities needed to know what the call was about: collecting government debt or anything else. "That is about as content-based as it gets." ***Barr v. Am. Ass'n of Pol. Consultants, Inc.***, **140 S. Ct. 2335, 2346 (2020) (plurality opinion)**; see also ***League of Women Voters***, **468 U.S. at 383** (to determine whether a

particular statement was prohibited, "enforcement authorities must necessarily examine the content of the message that is conveyed").

First Amendment protection of speech is very powerful.  This is particularly true concerning political speech. "Speech concerning public affairs is more than self-expression; it is the essence of self-government." **Connick v. Myers , 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)** (alterations omitted) (quoting **Garrison v. Louisiana , 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)** ). "Accordingly, the [Supreme] Court has frequently reaffirmed that speech on public issues occupies the highest rung of the [hierarchy] of First Amendment values, and is entitled to special protection." Id. (internal quotation marks omitted) (quoting **NAACP v. Claiborne Hardware Co ., 458 U.S. 886, 913, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982)** ). The Constitution thus allows only the most minimal interference with political speech. See, e.g. , **N.Y. Times Co. v. Sullivan , 376 U.S. 254, 256, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)**. When the interference takes the form of a "prior restraint" on speech—which refers to a court order prohibiting specific speech—the interference is even presumptively unconstitutional. *See* **N.Y. Times Co. v. United States , 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)**.

An important corollary of the right to free speech is the right to receive information. Nor does a right of access exist only under the First Amendment.

The U.S. Supreme Court has consistently recognized a presumptive First Amendment right of access to judicial proceedings in criminal cases, finding that "a presumption of openness inheres in the very nature of a criminal trial under our system of justice." ***Richmond Newspapers, Inc. v. Virginia*, 448  U.S. 555, 573 (1980)** (plurality opinion). Pro se Plaintiff's right to receive information consisting of court records and their contents in her own case, of proceedings in which she is a party, is a presumptive First Amendment right of access to judicial proceedings.  Six of the eight sitting justices at the time indicated that the right of public access would also apply to civil trials. Id. at 580 n. 17 (Burger, C.J.) (plurality opinion) ("Whether the public has a right to attend trials of civil cases is a question not raised by this case, but we note that historically both civil and criminal trials have been

presumptively open."); id. at 596 (Brennan, J., concurring) (referring to the value of open proceedings in civil cases); id. at 599 (Stewart, J., concurring) ("[T]he First and Fourteenth Amendments clearly give the press and the public a right of access to trials themselves, civil as well as criminal.").

Every federal court of appeals to have considered whether the First Amendment guarantees a right of access to civil trials and to their related proceedings and records has concluded that it does. ***N.Y.C.L.U. v. N.Y. City Transit Auth*., 684 F.3d 286, 298 (2d Cir. 2012)** (citing ***Westmoreland v. Columbia Broad. Sys., Inc.,* 752 F.2d 16, 22 (2d Cir.1984)**;. ***Rushford v. New Yorker Magazine, Inc*., 846 F.2d 249, 253–54 (4th Cir.1988)**; ***In re Continental Ill. Secs. Litig.,* 732 F.2d 1302, 1308 (7th Cir. 1984)**; ***Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1070 (3d Cir.1984)**; **In *re Iowa Freedom of Info. Council*, 724 F.2d 658, 661 (8th Cir.1983)**; ***Newman v. Graddick*, 696 F.2d 796, 801 (11th Cir.1983)**).

Some circuits have also recognized a constitutional right of access to court records, with one noting that "the public and press have a [F]irst [A]mendment right of access to pretrial documents in general." ***Associated Press v. District Court*, 705 F.2d 1143, 1145 (9th Cir. 1983).**

The roots of access to court proceedings and records lie in "democratic values of accountability and openness." ***In re Globe Newspaper, 920 F.2d 88, 98 **(1st Cir. 1990)

A.    **First Amendment Right of Access in the First Circuit**

***In re Providence Journal Co*., 293 F.3d 1, 10 (1st Cir. 2002)**, the First Circuit has "long recognized 'that public monitoring of the judicial system fosters the important values of quality, honesty and respect for our legal system.'" Id. at 9; see also ***Siedle v. Putnam Inv., Inc.,* 147 F.3d 7, 10 (1st Cir. 1998)** (same). In addition, "[t]he appropriateness of making court files accessible is accentuated in cases where the government is a party: in such circumstances, the public's right to know what the executive branch is about coalesces with the concomitant right of the citizenry to appraise the judicial branch." ***FTC v. Standard Fin. Mgmt. Corp.,* 830 F.2d 404, 410 (1st Cir. 1987)**. There is a particular "societal interest" in public access to judicial records in cases involving challenges to state law on constitutional

grounds.  ***Nat'l Org. for Marriage v. McKee***, **2010 U.S. Dist. LEXIS 90749, \*19 (D. Me. Aug. 24, 2010).**  The public's right of access to judicial records is "vibrant" (***Siedle***, 147 F.3d at 10) and "strong and sturdy" (***FTC***, 830 F.2d at 410).  "The citizens' right to know is not lightly to be deflected.  We agree . . . that 'only the most compelling reasons can justify non-disclosure of judicial records.'"  ***FTC***, 830 F.2d at 410.  This case concerns in part challenges to state regulation, policies and practices denying the pro se litigant's right to know her own court case records on constitutional grounds.

When considering whether a constitutional presumption of access applies to particular proceedings or records, courts apply the "logic and experience test," also called the "Press-Enterprise test." The test considers "whether the place and process have historically been open to the press and general public," and "whether public access plays a significant positive role in the functioning of the particular process in question."  ***Press-Enterprise Co. v. Superior Court***, **478 U.S. 1, 8 (1986)** (citations omitted).

In addition, while the United States Supreme Court has not specifically held that the First Amendment right of access applies to civil cases, most of the federal circuits have squarely faced this issue and have recognized that the First Amendment right of access applies to civil proceedings. *See, e.g.,* ***Westmoreland v. Columbia Broadcasting System, Inc.***, **752 F.2d 16, 23 (2d Cir. 1984),** cert. denied, ***Cable News Network, Inc. v. U.S. District Court***, **472 U.S. 1017 (1985);** ***Publicker Industries, Inc. v. Cohen***, **733 F.2d 1059, 1067-71 (3d Cir. 1984);** ***Rushford v. New Yorker Magazine, Inc.***, **846 F.2d 249, 253 (4th Cir. 1988);** ***Brown & Williamson Tobacco Corp. v. Federal Trade Comm'n***, **710 F.2d 1165, 1179 (6th Cir. 1983)**, cert. denied, **465 U.S. 1100 (1984)**; ***In re Continental Illinois Securities Litigation***, **732 F.2d 1302, 1308 (7th Cir. 1983)**. Many of these cases have specifically applied the First Amendment right of access to requests for documents pertaining to civil proceedings. *See, e.g.*, ***Rushford***, **846 F.2d at 253** ("We believe that the more rigorous First Amendment standard should also apply to documents filed in connection with a summary judgment motion in a civil case."); ***Brown & Williamson Tobacco Corp.***, **710 F.2d 1165** (administrative record and other documents filed in connection with pretrial motions); ***In re Continental Illinois Securities Litigation***, **732 F.2d at 1308-1309**  (report of special litigation committee

formed to evaluate shareholder derivative claims, filed in connection with motion to terminate claims); *Publicker Industries, Inc.,* **733 F.2d at 1074** (closure of hearing on motion for preliminary injunction and sealing of hearing transcript violated First Amendment).In short, the vast body of federal case law, decided over the course of three decades, has recognized that there is a constitutional—and not merely a common law—right of public access to court records of both civil and criminal judicial proceedings. Applying this constitutional right of access, the courts have established stringent requirements that must be met before the public may be denied access to judicial records: the sealing of documents must be "'strictly and inescapably necessary'" to protect a compelling interest such as a criminal defendant's right to a fair trial. *Associated Press*, **705 F.2d at 1145**, quoting *United States v. Brooklier*, **685 F.2d 1162,  1167 (9th Cir. 1982)** (emphasis added). Thus, the party seeking nondisclosure must establish that there exists:

(1) "a substantial probability" of "irreparable damage" to a compelling government interest if the documents are unsealed;

(2) a "substantial probability" that alternatives to nondisclosure cannot adequately protect the government interest; and

(3) a "substantial probability" that nondisclosure will be "effective in protecting

against the perceived harm."

*Brooklier,* **685 F.2d at 1167 (9th Cir. 1982);** *Phoenix Newspapers, Inc. v. United States District Court,* **156 F.3d 940, 949 (9th Cir. 1998);** *Associated Press*, **705 F.2d at 1146.**

Even federal common law, however, creates a strong presumption of public access to court records. The United States Supreme Court has expressly recognized that there is a common law right to "inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Communications*, **435 U.S. 589, 597 (1978).** The Court indicated that this right includes a "presumption—however gauged—in favor of public access to judicial records." **Id. at 602**. Thus, "[t]he existence of this [common law]

right, which antedates the Constitution and which is applicable in both criminal and civil cases, is now 'beyond dispute.'"

*Leucadia, Inc. v. Applied Extrusion Technologies, Inc.*, 998 F.2d 157, 161 (3d Cir. 1993)(citation omitted). *See also Littlejohn v. BIC Corp.*, 851 F.2d 673, 677-78 (3d Cir. 1988). The Ninth Circuit has recognized and applied the common law right in both civil and criminal cases. *Hagestad v. Tragesser*, 49 F.3d 1430 (9th Cir. 1995); *EEOC v. Erection Co., Inc.*, 900 F.2d 168 (9th Cir. 1990); *Valley Broadcasting Co. v. United States District Court*, 798 F.2d 1289 (9th Cir. 1986). In the most recent of these cases, the Ninth Circuit explained the application of the common law right to documents filed in a civil case as follows:.

> "The Ninth Circuit has adopted the Seventh Circuit's approach for determining
> whether the common law right of access should be overridden, requiring courts to
> start with a strong presumption in favor of access. This presumption of access
> may be overcome only "on the basis of articulable facts known to the court, not
> on the basis of unsupported hypothesis or conjecture." . . . After taking all
> relevant factors into consideration, the district court must base its decision on a
> compelling reason and articulate the factual basis for its ruling . . . ." *Hagestad*, 49 F.3d
> at 1434 (citations omitted). In short, no matter what body of federal law is
> applied, court records may be withheld from the public only for compelling reasons.

Moreover, the United States Supreme Court and lower federal courts have emphasized that the determination of whether court proceedings or records can be sealed must be made on a case-by-case basis. *See, e.g.*, *El Vocero de Puerto Rico, 508 U.S. at 151; Globe Newspaper Co.*, 457 U.S. at 607-608; *United States v. Schlette*, 842 F.2d 1547, 1583 (9th Cir. 1988). Therefore, as a general rule categorical sealing of particular types of information is not permissible. Rather, denial of public access must be based on a particularized showing that release of the information at issue would impair an overriding interest. *See, e.g.*, *Federal Trade Comm'n v. Standard Financial Management Corp.*, 830 F.2d 404, 412 (1st

**Cir. 1987);** *Joy v. North*, **692 F.2d 880, 894 (2d Cir. 1982); L***eucadia, Inc. v. Applied Extrusion Technologies, Inc.*, **998 F.2d 157, 166 (3d Cir. 1993).**

These decisions proceed from the recognition of the profound importance of public access: Openness enhances both the basic fairness of judicial proceedings and the appearance of fairness so essential to public confidence in the judicial system. ***Press-Enterprise II*, 478 U.S. at 13.** Undue restrictions on access to trial court records maintained in electronic form, and in particular broad categorical prohibitions on access, undermine these fundamental goals.

**B. Federal Law Does Not Support the Imposition by Rhode Island Judiciary of Restrictions on Electronic Access to Court Records that Do Not Apply to Court Records Generally**

The courts have consistently recognized that the dissemination of information contained in court records does not give rise to any actionable invasion of privacy. *See, e.g.*, ***Cox Broadcasting v. Cohn*, 420 U.S. 469, 491 (1975)**; ***Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 103-104 (1979)**.

The Rhode Island Court Rules, "**RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION,"** have **no basis** for imposing substantial restrictions on electronic access to court records to the public and to the pro-se litigant not currently imposed on public access to hardcopy court records, and therefore obviously does not support the State Judiciary's imposition of broad categorical restrictions on access to public court records.

It is then categorically clear that access to court records ensures a fair trial, and that denial of access to court records is presumed not to be fair.

Under strict scrutiny, content-based restrictions "are presumptively unconstitutional." ***Reed***, **576 U.S. at 163**. And they can be justified "only if the government proves that they are narrowly tailored to serve compelling state interests.

Additionally, it is not enough for the defendants to identify a compelling interest. To survive strict scrutiny, they must prove that the access denial "further[]" that compelling interest and are "narrowly tailored to that end." ***Reed***, **576 U.S. at 171**. According to the Supreme Court, it is "rare that a regulation restricting speech because of its content will ever be permissible." ***Brown***, **564 U.S. at 799** (internal citation omitted). The government carries the burden of proof and, "because it bears the risk of uncertainty, ambiguous proof will not" satisfy the "demanding standard" it must meet. *Id*. at 799–800 (internal citation omitted).

The "point of the First Amendment," however, "is that majority preferences must be expressed in some fashion other than silencing speech on the basis of its content." ***R.A.V.***, **505 U.S. at 392**. Strict scrutiny cannot be satisfied by professional societies' opposition to speech, such as the Rhode Island State Bar Association or State Employee Union, etc..  Their institutional positions cannot define the boundaries of constitutional rights.  ***NIFLA***, **138 S. Ct. at 2373** (citing ***NAACP v. Button***, **371 U.S. 415, 438 (1963)**). People who actually hurt children can be held accountable, but "[b]road prophylactic rules in the area of free expression are suspect." ***Button***, **371 U.S. at 438**. In other words, "[e]ven where the protection of children is the object, the constitutional limits on governmental action apply." ***Brown***, **564 U.S. at 804–05**.

The First Amendment requires that content-based speech restrictions satisfy strict scrutiny. *Id. at 799*. And unless restrictions meet that "demanding standard," whether the speech they target should be tolerated is simply not a question that we are allowed to consider, or a choice that we are allowed to make. *Id*. "The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it." ***Stevens***, *559 U.S. at 470.* I\

The Plaintiff would suffer the delay of further proceedings in the meantime. Relief is definitionally incomplete if it forces the plaintiff to continue holding their First Amendment

rights in abeyance. *See Cate*, 707 F.2d at 1188; FF Cosms., 866 F.3d at 1298; cf. *Zwickler v. Koota*, 389 U.S. 241, 252 (1967) <mark>(forcing plaintiff to "suffer the delay of state court proceedings might itself effect the impermissible chilling of the very constitutional right" they seek to protect)</mark>

     Denial of First Amendment right to access the court to pro se litigants require strict scrutiny, which the State cannot satisfy. The denial regulation is not narrowly tailored to any legitimate, much less compelling, government interest. There is no legitimate purpose in suppressing access to the court records in order to suppress the lawful exercise of the right to equal access to justice.  Plaintiff therefore already has and will continue to suffer irreparable harm, and Plaintiff accordingly request a temporary restraining order and preliminary injunction by no later than August 18, 2023.

     The second requirement is "irreparable injury." Because the State Defendants'" invisible" filings in the judicial tribunal are an unconstitutional "direct penalization" and "direction denial" of protected First Amendment court record access, continued deprivation, "for even minimal periods of time," constitutes a per se irreparable injury. *Cate v. Oldham,* 707 F.2d 1176, 1188 (11th Cir. 1983)  (quotation omitted); *see also FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) ("[A]n ongoing violation of the First Amendment constitutes an irreparable injury."). The nonmovant is the government, so the third and fourth requirements— "damage to the opposing party" and "public interest"—can be consolidated. It is clear that neither the government nor the public has any legitimate interest in continuing subjecting pro se litigants to unconstitutional court record deprivations. *See, e.g.*, *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006)  Further, State Defendants' continuing due process and First Amendment deprivations in due process violative judicial tribunals is directly violative of Title IV-D, and State Defendants' continuation would only further render the State ineligible to participate in Title IV-D; therefore it is in the State's interest to be restrained from hauling the pro se Texas Plaintiff into due process defective state judicial tribunals that is explicitly prohibited by the *Turner v. Rogers* Court.

Failure to restrain the State Defendants violates the principle of 'equality before the law' underlying our system." Secondly, the court's integrity is eroded when it is not fully accessible by all groups. ***Bothwell v. Republic Tobacco Co.*, 912 F. Supp. 1221, 1225–30 (D. Neb. 1995).**

### C.  Right To Access The Court Of Pro Se Litigants

#### a.  Federal Statutory Right

A litigant's ability to represent himself before a court is a right deeply rooted in the American legal system.  The right to represent oneself in the federal courts can be traced to medieval England. In 1215, the Magna Carta raised the possibility of self-representation, announcing that "[t]o no one will we sell, to no one will we refuse or delay, right or justice." **MAGNA CARTA art. XL (1215)**. Since the American legal system preserved much of the British common law system, it is unsurprising that the ability to proceed pro se was established early in U.S. history. The **Judiciary Act of 1789** proclaimed "[t]hat in all courts of the United States, the parties may plead and manage their own causes personally or by the assistance of such counsel or attorneys at law as by the rules of the said courts respectively." **JUDICIARY ACT OF 1789 § 35 (1789)**, available at http://www.constitution.org/uslaw/ judiciary_1789.htm.

Congress ultimately incorporated the right to proceed pro se into the United States Code, adopting much of the language of the Judiciary Act of 1789.  **28 U.S.C. § 1654 (2005)**

#### b.  Rhode Island Constitutional Right of Access – Right to Access courts is a constitutional right

**Article 1, section 5** of the Rhode Island Constitution declares that: "Every person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or

wrongs which may be received in one's person, property, or character. Every person ought to obtain right and justice freely, and without purchase, completely and without denial; promptly and without delay; conformably to the laws."

The R.I. Supreme Court has recognized that the purpose of article 1, section 5 of the Rhode Island Constitution is to "forbid[] the denial of access to the courts for the adjudication of a recognized claim." **Bandoni, 715 A.2d at 595; see also Bartlett v. Danti, 503 A.2d 515, 518 (R.I. 1986)** (conducting judicial review of a statute based on article 1, section 5 and finding that the statute was unconstitutional because it prevented litigants from *effectively* pursuing claims); **Lemoine v. Martineau, 115 R.I. 233, 239, 342 A.2d 616, 621 (1975)** (invalidating a statute that impinged on "art. I, § 5's edict that <u>any person</u> having recourse to the legal processes shall be afforded the opportunity of having the wrong he sustained remedied promptly and <u>without delay</u>").

Article 1 of the Rhode Island Constitution "established, maintained, and preserved" certain "essential and unquestionable rights" that "shall be of paramount obligation in all legislative, judicial and executive proceedings." R.I. Const., art. 1, Intro. Thus, since 1843 when the Rhode Island Constitution first became effective, the people of this state have enjoyed a constitutionally protected right of access to the courts. R.I. Const., art. 1, § 5 ("Every person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs" and should "obtain right and justice freely, * * * completely and without denial[.]"). The right of access to the courts is a fundamental right guaranteed by the state constitution. *See* **Palazzo v. Alves, 944 A.2d 144, 150 (R.I. 2008)** (stating that statutes that limit citizens' ability to bring lawsuits must "be limited in scope lest the constitutional right of access to the courts * * * be improperly thwarted")

*See* **<u>Cok v. Read</u>, 770 A.2d 441, 444, 445 (R.I. 2001)** (vacating an order that prohibited a plaintiff from appearing as a pro se litigant in any Superior Court civil action because the "[a]cross the board restriction[] to court access" was not supported by specific findings that the "abuse is so continuous and widespread as to suggest no reasonable alternative" (quoting **<u>Cok v. Family Court of Rhode Island</u>, 985 F.2d 32, 36 (1st Cir. 1993)**))). Moreover,

the constitutional "requirement of access to the courts is not dependent on the type of legal matter involved * * * and indeed may extend to all civil actions[.]" ***Souza v. Travisono***, **368 F. Supp. 959, 966 (D.R.I. 1973), aff'd, 498 F.2d 1120, 1124 (1st Cir. 1974)**

The Rhode Island Court Rules and Practices and State Defendants' filing in blind inaccessible unnamed legacy e-filing system that the pro se litigant cannot see the contents of, implicate "an expressly enumerated constitutional right" under the state constitution, "this Court must examine the statute with 'strict scrutiny.'" ***Cherenzia v. Lynch***, **847 A.2d 818, 823 (R.I. 2004)** (quoting ***Kennedy v. State***, **654 A.2d 708, 712 (R.I. 1995)**). Because strict scrutiny is the proper basis under which to examine the civil death statute, "the burden is no longer on the challenger to prove that it is unconstitutional beyond a reasonable doubt." ***Federal Hill Capital, LLC v. City of Providence*** by and through ***Lombardi,*** **227 A.3d 980, 985 n.6 (R.I. 2020)**. Rather, the burden shifts to "the state to demonstrate that the legislation was 'justified by a compelling government interest and was narrowly drawn to serve that interest[.]'" Id. (brackets omitted) (quoting ***Brown v. Entertainment Merchants Association,*** **564 U.S. 786, 799 (2011)**).

*See* ***United States v. Butler***, **297 U.S. 1, 63 (1936)** ("This [C]ourt neither approves nor condemns any legislative policy. Its delicate and difficult office is to ascertain and declare whether the legislation is in accordance with, or in contravention of, the provisions of the Constitution; and, having done that, its duty ends.")

### c.   First Amendment Right to Meaningful Access

Pro se litigants, as well as those represented by counsel, are entitled to meaningful access to the courts. *See B****ounds v. Smith***, **430 U.S. 817, 828 (1977);** ***Wolff v. McDonnell***, **418 U.S. 539, 579 (1974);** ***Ross v. Moffitt,*** **417 U.S. 600, 612-15 (1974) ;** ***Johnson v. Avery***, **393 U.S. 483, 485 (1969);** R***udolph v. Locke***, **594 F.2d 1076, 1078 (5th Cir. 1979).**

Sufficient access to the courts, a right protected by the due process clause of the fourteenth amendment (*See* ***Wolff***, **418 U.S. at 579-80;** ***Corpus v. Estelle,*** **409 F. Supp. 1090, 1097 (S.D. Tex. 1975)**, aff'd, **542 F.2d 573 (5th Cir. 1976)** and the first amendment (*See Cruz v. Beto,* **405 U.S. 319, 321 (1972)** (right to petition Government for redress of grievances);

*NAACP v. Button*, 371 U.S. 415, 428-29 (1963)(same).) guarantees to <u>all persons</u> use of the judicial process to redress alleged grievances. *See Bounds v. Smith*, 430 U.S. 817, 825 **(1977); *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974); *Johnson v. Avery*, 393 U.S. 483, 488 (1969).**

### d.  The Frequency of Pro Se Litigation – Family Court is one of the highest

Having pro se litigants in American courts across the country at every level is a reality. In "poor people courts"—the state courts that handle traffic, landlord/tenant, and ***child support or other domestic relations issues***—the number of cases in which at least one side is pro se far outnumbers those in which counsel represents both parties.[1] Some reports indicate that 80% to 90% percent or more of family law cases involve at least one pro se litigant.[2] While in many cases both sides will be unrepresented, in perhaps one-third or more of all litigation, a pro se litigant opposes a represented party.[3]  Even more spectacular than the number of pro se litigants is the growth rate of pro se litigation. For instance, in 1971, only one percent of litigants in divorce cases in California were pro se.[4]  Regardless of the exact percentages, pro se litigation rates have been growing at an exponential rate and many commentators believe they are much higher now than ever before in United States history.[5]  In many essential and **time-sensitive** civil proceedings, such as family court proceedings, litigants are not represented by counsel. Depending on case type and location,

---

[1] Russell Engler, And Justice For All—Including the Unrepresented Poor: Revisiting the Roles of the Judges, Mediators, and Clerks, 67 FORDHAM L. REV. 1987, 2022 (1999).

[2] See, e.g., Engler, supra note 4, at 2047; Margaret Martin Barry, Accessing Justice: Are Pro Se Clinics a Reasonable Response to the Lack of Pro Bono Legal Services and Should Law School Clinics Conduct Them?, 67 FORDHAM L. REV. 1879, 1884 (1999) (reporting the results of an Arizona study that found approximately ninety percent of divorce cases involved at least one pro se litigant and in fifty-two percent of divorce cases both parties were pro se); Bonnie Rose Hough, Description of California Court's Programs for Self-Represented Litigants, prepared for the meeting of the International Legal Aid Group, Harvard University (2003)

[3] Engler, supra, at 2048.

[4] *Hough*, supra; Goldschmidt, The Pro Se Litigant's Struggle for Access to Justice: Meeting the Challenge of Bench and Bar Resistance. By 1985, the rate had risen to forty-seven percent and currently, the rate is approaching seventy-five percent. Frances L. Harrison et al., Courts Responding to Communities: California's Family Law Facilitator Program: A New Paradigm for the Courts, 2 J. CENTER CHILD. & CTS. 61 (2000) (citations omitted)

[5] See Paul D. Healey, In Search of the Delicate Balance: Legal and Ethical Questions in Assisting the Pro Se Patron, 90 LAW LIBR. J. 129, 132 (1998)(citations omitted) (referring to the increase as a "floodtide").

between 65% and 100% of litigants in civil cases are self-represented, which translates into an estimated 30 million self-represented litigants per year going through the civil courts. [6]

Therefore, it is an abundantly absolute fact that allowing State Defendants to haul the pro se Plaintiff into required remote hearings for child support matters in the state family court, where the vast majority, ranging from 80% to 90% of cases, involves at least one pro se litigant, and structurally/by policy deny pro se litigants remote access to court records, but grant remote access to opposing party's lawyers, resulting in blinding the pro se litigants and denying pro se litigants meaningful access, as here in Rhode Island State's policy and practice treatment of the pro se Texas Plaintiff, render those proceedings not just unequal access, but systemically constitutionally violative of the First Amendment, Fifth Amendment and Fourteenth Amendment– and making the State ineligible to participate in federal funding of Title IV-D Program as a consequence.  More importantly, for Title IV-D Program State participant agencies, namely the State Defendants, by policy and practice, to additionally electronically file through a legacy system that results in no notice to pro se litigants, and results in neither pro se litigant nor the Rhode Island Virtual Court Clerk to be able to view the e-filed documents remotely, makes the State agency ineligible to participate in federal funding of Title IV-D Program as a consequence.  Therefore, the State facially cannot show a governmental interest in its constitutional denial of this magnitude for itself, nor a public interest.  Proceedings in which the pro se litigant is blinded and not noticed by policy and by practice, but lawyers have instant access and instant notices are essentially Kangaroo courts, and State Defendants' actions targeting the pro se plaintiff pose irreparable harm of First Amendment magnitude to the Texas pro se Plaintiff.

That another day is permitted to pass, allowing the State Defendants to continue hauling pro se litigants such as the Texas pro se Plaintiff, to the State's Family Court under these undeniable factual circumstances, calls into question the integrity of the judiciary and the justice system.

---

[6] *Self-Represented Litigant Network Brief, How many SRL's? (SRLN 2019), available at* https://www.srln.org/node/548/srln-brief-how-many-srls-srln-2019

To federally fund this type of coordinated and organized constitutional deprivation targeting 80% to 90% of litigants based on pro se status in Title IV-D proceedings is unconscionable and a direct defraudment of the United States and citizens thereof.  *See* State of Georgia's Indictment of President Donald Trump CRIMINAL-INDICTMENT-Trump-Fulton-County-GA.pdf (d3i6fh83elv35t.cloudfront.net)

### e.  RI Judiciary Policy and Practice of Denying Remote Access to Pro Se Litigants

(1) Judge Cruise, outside of the courtroom, directed his clerk, a RI Judiciary employee, to email the Texas Plaintiff that there are no more WebEx hearings and Rule 11 motions are moot post dismissal, during a scheduling email exchange – denial of remote access to court.

RI Judiciary Misrepresentation on Remote Access to Courts to Pro Se Litigant

(2) RI Judiciary emailing the pro se Texas Plaintiff that transcripts are available remotely, when in fact they are not.

(3) RI Judiciary Self-Help Desk says nothing about denial of remote access to pro se litigants

(4) RI Judiciary takes Texas Plaintiff's transcript fee but fails to transfer case to RI Supreme is Court in 60 Days

(5) RI Judiciary charges and received pro se Texas Plaintiff's transcript fee, misrepresents to the pro se Plaintiff they are available for viewing but denies pro se Plaintiff remote access to the transcripts after payment

***Turner v. Roger***[7] reversed a child support civil contempt incarceration for failure to provide procedures that would ensure sufficient fairness and accuracy to a self-represented litigant,

---

[7] Turner v. Rogers, 131 S. Ct. 2507 (2011). A different article in this Symposium Issue analyses how prior cases, together with Turner, create a right of access, as opposed to a right to counsel, and how that right can be met in many ways. Implicit in that analysis is the idea that there is a right to triage to decide which of those services is required to obtain access. Indeed, such a right with respect to whether counsel is needed in a particular case dates at least to Lassiter v. Department of Social Services, 452 U.S. 18 (1981), although sadly the access community has long ignored that aspect of the case, focusing instead on the no-automatic right-to-counsel holding of the case as an example of the hostility of the system to access. See generally Archive for Symposium on Turner v. Rogers,

and indicated that the procedures needed would depend on the particular circumstances of the case, it was in effect endorsing the need for triage, at least in cases in which such accuracy and fairness were not protected by the provision of counsel. It is of interest that in a recent speech Justice Breyer, the author of Turner, urged those with views to engage in the debate on the need for triage.[8]

### f.  Rhode Island Judiciary Policy Contradicts National Judiciary Trends

Having establish pro se litigants' First Amendment, Fifth Amendment and Fourteenth Amendment rights to meaningful and equal access to the court, the unabated continuation of State Defendants' unlawful  hauling of the pro se Texas Plaintiff into First Amendment violative state proceedings pose irreparable harm.

A wholesale state judicial system up through the appeal chain that explicitly states the denial is by policy (see Rules and Practice) that discriminates against pro se litigants in the 21st century by denying pro se litigants remote access to court records in their own cases represents a Constitutionally prohibited long continuum of First Amendment violations.

Since at least the 1990s, courts in the United States have risen to the challenge posed by the increasing number of litigants who are representing themselves in court.[9]

Rather than ignoring the phenomenon or simply grumbling about it, nationwide (not Rhode Island) local and state jurisdictions have developed innovative programs to make the courts less mystifying for self-represented litigants and are continuing to be inventive and resourceful particularly as they share their best practices in national forums.

---

CONCURRING OPINIONS, http://www.concurringopinions.com/archives/category/symposium -turner-v-rogers (last visited April 10, 2012).

[8] Justice Stephen Breyer, Speech to National Legal Aid and Defender Association Annual Conference, NAT¶L LEGAL AID & DEFENDER¶S ASSOC. (December 9, 2011), http://www.nlada100years.org/audiopage?q=node/13002

[9] See Goldschmidt, Mahoney, Solomon, and Green, Meeting the Challenge of Pro Se Litigation (AJS 1998) A way to keep track of the innovations is to visit the American Judicature Society pro se forum at www.ajs.org/prose/home.asp and to subscribe to www.selfhelpsupport.org.)

g. **The Turner Case Was Decided In 2011, pre-widescale implementation of electronic filing and pre-Pandemic implementation of remote judicial tribunals.**

There are a number of important points about the opinion as a whole that should be emphasized:

1.  While the decision itself focuses on incarceration (and, indeed, states the importance of the private interest at stake in such situations), it relies on the due-process clause, which is implicated in every case dealing with the potential deprivation by a court of a constitutionally protected interest— which means almost every nontrivial self-represented-litigant case.

2.  Moreover, since the case discusses the needs of the party seeking the deprivation, the decision supports the idea that due process applies to the person seeking the deprivation as well as the party potentially subject to it Turner v. Rogers, 2011: slip opinion at 13-14).

3.  The touchstone for whether procedures satisfy due process is whether they provide sufficient fairness and accuracy—in this case in determining the capacity to pay (Turner v. Rogers, 2011: slip opinion at 14-15)—thus potentially raising that key question in every self-represented litigant case.

4.  The Supreme Court explicitly approved—indeed in some cases required—the use of forms in self-represented-litigant cases, thereby putting to final rest any claim of their inappropriateness (Turner v. Rogers, 2011: slip opinion, 14-16).

5.  The Supreme Court similarly approved, and in some situations required, engaged judicial questioning, also shutting off any objection that such neutral questioning is forbidden (Turner v. Rogers, 2011: slip opinion, 14- 16).

6. The Court reached out to endorse the concept of neutral court staff providing assistance to litigants, even though the facts did not include such staffing (Turner v. Rogers, 2011: slip opinion, 14-15).

Some state court systems might respond to the decision by a cursory review of their procedures and conclude that since a) they do not use civil-contempt incarceration in child support cases, b) they provide counsel in such cases, or c) provide the notice, forms, questioning, and fact finding required in Turner in such cases, they do not need to pay attention to the case. Such an approach would be seriously flawed. It would fail to recognize the broad legal import of the decision, particularly its groundbreaking application of the due-process clause to the rights of the self-represented, and would fail to embrace the opportunity for expanding the already launched systemic access-to-justice improvements upon which the decision implicitly relies. Moreover, the Supreme Court's effective endorsement of innovations that are already being broadly deployed—such as greater judicial engagement and user-friendly forms—should reassure the states that their access innovation efforts will find support at the highest judicial levels. Rhode Island State Defendants and State Judiciary did the opposite.

### h.  Implications for Judges and for Judicial Education

The decision, and its endorsement of an engaged role for judges in self-represented cases, provides clear permission for judges to continue on their current path of experimenting with ways to make sure that the self-represented are fully heard. Those who have felt inhibited in doing so for fear of being perceived as non-neutral should be reassured that they have received both Department of Justice (DOJ) and Supreme Court imprimatur for such engagement, provided, of course, that it is neutral and consistent with ethical rules. Those who have believed that their lack of engagement is required by the Constitution would be advised to reconsider their position. It may be that part of the reason that DOJ felt able to support, and the Supreme Court endorsed, such judicial questioning is that there are now extensive questioning, particularly when carefully structured in an engaged context, runs little if any risk of being, or even appearing, non-neutral. Examples of such best practices are making clear in the "framing" of the case that questions are likely, but not an indication of sympathy or leanings, as are

follow-up questions that elicit the detail needed to decide the case on sufficiently full information.

More generally, judges might be wise to bear in mind the teaching of Turner that in self-represented cases the procedures of the case as a whole must be sufficient to provide the accuracy and fairness appropriate to the stake and situation. Turner encourages judges to consider how their discretion in applying governing procedural rules can be used to ensure that there is such sufficient accuracy and fairness. Implicit in Turner is the perhaps obvious point that the many court opinions reiterating that the same rules must be applied, regardless of whether someone has a lawyer, do not and cannot mean that those rules have to be applied without taking into account the representation status of the parties. It must always be remembered that to refuse to consider an exercise of discretion is an abuse of discretion. Moreover, judges might decide to remain alert in all cases to the possibility of insufficiency in meeting due-process standards. Moreover, to the extent that they viewed this (with good reason) as placing an impossible sua sponte burden on them, they might wish to ensure that the court has in place services and procedures sufficient to ensure that such standards are met, thereby freeing them of the ongoing review obligation.

While Turner identifies as "available" only two specific nonjudicial procedures that were desirable but absent in the facts of that case—notice of the key issue and forms—the analysis is clear that the totality of the procedures are to be considered in the due-process fairness-and-accuracy analysis

### i. <u>Implications for Justice System Coordination and Innovation</u>

The process of review and innovation envisioned by this article will not occur without leadership. For states with access-to-justice commissions, the choice of who should lead the process may be simple. The commissions have the credibility of being creatures of the court system, but also the leverage that comes from having members from a wide variety of constituencies. Moreover, they may be found to be more appropriate review vehicles than the state supreme court, given that the Court might ultimately be asked to rule on the sufficiency of the state's procedures under Turner due-process standards. In such states,

indeed, the state supreme court might find it appropriate to formally ask the access-to-justice commission to work with the state administrative office of the courts to conduct such a comprehensive Turner review of key case types for the self-represented, with a particular focus on those in which the stake for the litigants is greatest, such as loss of home or family integrity. In states without a commission, the court might find it appropriate to create a special body, one which might indeed evolve into a commission

Turner v. Rogers is a highly significant decision for the day-to-day operations of the courts, one that plays a major role in fulfilling the core promise of courts as institutions that offer access to justice for all. Court leaders and staff at all levels have the opportunity to participate in giving life and meaning to this vision and these values.

**j.** **RI State Defendants and RI Judiciary Violate the Mandates held by the Turner Court discriminating against the pro se litigant, the Texas pro se Plaintiff and deny her First Amendment rights**

Turner's Mandate to all lower Courts' treatment of pro se litigation that State Defendants and State AG violate fundamental First Amendment rights of this Plaintiff:

a. liberally construing pleadings, liberally allowing amendments, and asking questions to clarify evidence - cannot even be considered accommodations for self-represented litigants; they are requirements in all cases and for all litigants although they take on greater urgency in cases involving self-represented litigants.

b. remove some of the mystery from a system that is supposed to serve its citizens, not baffle them. Even the more ambitious suggestions - relaxing some of the rules of evidence and instructing a self-represented litigant in the proper way to accomplish a procedural step - are logical extensions of the principle that fundamental justice should not be sacrificed to procedural rules,

c. A judge may abuse his or her discretion if he or she fails to take into account a litigant's self **Traguth v. Zuck, 710 F.2d 90, 95 (2nd Circuit 1983)** taking pro se status into consideration does not indicate partiality but addresses "a categorical disparity between

the parties' abilities to obtain a just resolution to their dispute." **Jacobsen v. Filler, 790 F.2d 1362, 1369 (9th Circuit 1985)**

During briefing of the case, the solicitor general, representing the United States, urged rejection of both the self-represented litigant's right-to-counsel claim and the respondent's urging of affirmance. The solicitor general urged that although there was no categorical right to counsel in such cases, the failure of the trial court to follow available alternative procedures that would have protected the litigant's due-process rights required reversal.

**The 2011 decision in Turner did not happen in a vacuum,** as the facts of that case clearly show that pro se litigants' plight is capable of repeating but evading review. It is founded on a body of common law that has long since held Impartiality does not require passivity. See Zorza, "The Disconnect Between the Requirements of Judicial Neutrality and Those of the Appearance of Neutrality when Parties Appear Pro Se: Causes, Solutions, Recommendations, and Implications," *See* Georgetown Journal of Legal Ethics 423 (2004). ***Commonwealth v. Sapoznik*, 549 N.E.2d 116, 120 n.4** (Massachusetts Appeals Court 1990).

Moreover, intervening to ensure that a pro se litigant gets at least a fair chance to present his or her case is consistent with the proper role of a judge. Whether a party is represented by counsel at a trial or represents himself, the judge's role remains the same. The judge's function at any trial is to be "the directing and controlling mind at the trial, and not a mere functionary to preserve order and lend ceremonial dignity to the proceedings."

Providing reasonable accommodations for self-represented litigants is consistent with the principle that the "'rules of procedure do not require sacrifice of the rules of fundamental justice." ***United States v. Sanchez*, 88 F.3d 1243, 1248 (D.C. Circuit 1996)**, quoting ***Hormel v. Helvering,* 312 U.S. 552, 557 (1941)**

Numerous decisions direct judges to treat self-represented litigants with "understanding of the difficulties encountered by a self-represented litigant." ***Irvin v. City of Clarksville*, 767 S.W.2d 649, 652 (Tennessee Court of Appeals 1989).**

The different treatment is variously described as providing, by way of illustration, **reasonable accommodations**, (Fitzgerald v. Fitzgerald, 629 N.W.2d 115, 119 (Minnesota Court of Appeals 2001); Kasson State Bank v. Haugen, 410 N.W.2d 392, 395 (Minnesota Court of Appeals 1987); Blair v. Maynard, 324 S.E.2d 391, 396 (West Virginia 1984), **affording latitude** (Liptak v. State ex rel. City of New Hope, 340 N.W.2d 366, 367 (Minnesota Court of Appeals 1983); Black v. City of Tupelo, 853 So. 2d 1221, 1226 (Mississippi 2003); In re Mosso, 6 A.D.3d 872, 776 N.Y.S.2d 599 (New York Supreme Court, Appellate Division, 3rd Department 2004); Conservation Commission v. Price, 479 A.2d 187, 192 n.4 (Connecticut 1984)), or **even great latitude**, (Bitoni v. Tucker, 295 A.2d 545, 546 (Connecticut 1972)., **being lenient** (Lundahl v. Quinn, 67 P.3d 1000, 1002 (Utah 2003), and **solicitous** (. Macriocostas v. Kovacs, 787 A.2d 64 (Connecticut Appellate Court 2001); Borzeka v. Heckler, 739 F.2d 444, 447 n.2 (9th Circuit 1984), **making allowances**,( Kelley v. Watson, 77 P.3d 691, 692 (Wyoming 2003),**less stringent standards** (Haines v. Kerner, 404 U.S. 519, 520-21 (1972); Madyun v. Thompson, 657 F.2d 868, 876 (7th Circuit 1981); Bates v. Jean, 745 F.2d 1146, 1150 (7th Circuit 1984); United States v. Sanchez, 88 F.3d 1243, 1247 (D.C. Circuit 1996). g**iving self-represented litigants leeway (**In the Matter of Bales, 461 N.Y.S.2d 365, 367 (New York Supreme Court, Appellate Division, 2nd Department 1983); Gomes v. Avco Corp., 964 F.2d 1330,1335-36 (4th Circuit 1991).and **every consideration** (Heathman v. Hatch, 372 P.2d 990, 991 (Utah 1962); this list is not exhaustive.

Therefore, in 2011, the Turner court based its decision on a vast body of existing common law in this country and the foundational principle of meaningful access to courts that affirmed the uniform judicial due process duty, where pro se litigants are party to judicial proceedings.

Post-Turner, to issue an explicit policy three years later in 2014 explicitly described as "restrictive" that discriminates AGAINST pro se litigants as class, the Rhode Island Judiciary's policies and procedures are unconstitutional and unfair on their face. Within this illegal judicial proceeding framework that blinds the pro se litigant which directly contravenes the Turner mandate for judicial tribunals to accommodate pro se litigants tailored to the specific needs of each case to assure due process, State Defendants' policy and routine

practice to e-file and "develop the record" through a legacy e-filing system that makes the contents of the records invisible to virtual court clerks and pro se litigants alike, shuts out pro se litigants access right to develop that record, making this a clear cut case of a rigged proceeding requiring issuance of a restraining order and preliminary injunction.

RI Judiciary explicitly articulated Policy since 2014, post Turner, targeting pro se litigants: "Policy. To allow limited Remote Access to the Database through the Public Access Portal. "2. Content. a. The Public, Self-represented Litigants and Parties. Remote public access to electronic case information will not be immediately available to the Public, parties, and self-represented litigants but may be made available in the future at which point these Public Access Rules will be amended accordingly.

BUT

Attorneys. Attorneys who have entered an appearance on behalf of a client in a case shall have remote electronic access to all documents and information about a case in which they are representing a party. Upon termination of representation, or if an attorney's client is no longer a party to a pending case, an attorneys' remote electronic access to the subject case shall be terminated. For all other cases in which they are not directly involved, attorneys shall have remote access to the register of actions or Docket but shall not have remote access to other electronic case information.

c. State Agencies. State agencies and employees thereof authorized by the Judiciary to access electronic case information shall have remote electronic access to public electronic case information. This access may not include access to sealed cases or documents, or confidential documents or information as defined in these Public Access Rules.

In 2018, the denial was made permanent and is on-going:

(c) Remote Access to Case Information. (1) Policy. To allow limited Remote Access to the Database through the Public Portal. Non-public case types shall not be remotely accessible except for certain case types to attorneys who have entered an appearance in a case. (2)

Content. (a) The Public, Self-represented Litigants and Parties. The Public, self-represented litigants, and parties shall have Remote Access to the register of actions or Docket but shall not have Remote Access to other Electronic Case Information.

BUT

(b) Attorneys. Attorneys who have entered an appearance in a case shall have Remote Access to all documents and information about a case in which they are representing a party. This access does not include access to sealed cases or documents. For all other cases in which they are not directly involved, attorneys shall have Remote Access to Public Electronic Case Information.

(c) State or Federal Agencies. State or federal agencies and employees thereof authorized by the Judiciary to access Electronic Case Information shall have Remote Access to Public Electronic Case Information. This access does not include access to sealed cases or documents, or non-public case types, documents or information as defined in these Public Access Rules except in specific circumstances as authorized by the Judiciary. State or federal agencies shall be approved for access by the Supreme Cour

### k.  Defendant GERO MEYERSIEK enjoys multiple counsel representation

In addition to the State Defendants and their counsels, Defendant Gero Meyersiek appears in the family court proceeding armed with two different lawyers, who either observe, or enter then withdraw appearances, namely counsel here, and Barbara E. Grady, the attorney in question who represented Defendant Meyersiek in the waiver of child support interest agreement with Plaintiff.  In other words, Meyersiek is represented by counsel(s) at all times, including the State's multiple counsels and attorneys who are named defendants here and counsel to state defendants, the Attorney General.  The Texas pro se Plaintiff remains self-represented in all proceedings.

THEREFORE , after Turner in 2011, the State Defendants' actions coordinating with RI Judiciary's current policies since 2014 of restricting remote access to court records to pro se constyitute knowing violations of constitutional rights that they know are no longer discretionary and passive, for the same type of child support case under Title IV-D as in Turner, no less.  In other words, state judiciaries and Title IV-D programs post Turner are explicitly prohibited from adopting policies and procedures that deny pro se litigants due process rights, as are the State Defendants, and as the U.S. Department of Justice has briefed the Supreme Court,  lose eligibility to participate in Title IV-D per the letter of the law.

I.    **State Defendants' and Counsels for State Defendants Plainly Obvious Legal Strategy**:

Within the afore-described illegally sham procedurally defective and First Amendment violative  ***State of Rhode Island Ex. Rel. Gero Meyersiek v. Seguin*** **K20010521M** family court proceeding State Defendants, State actors and the State Judiciary coordinate to delay the pleading stage of the federal proceedings as much as possible to give them time to illegally alter the outcome of the state proceeding, as the State actors did in Turner, and then use it here to attempt to dismiss Plaintiff's meritorious claims.

Plaintiff was defrauded by RI Judiciary and State Defendants' misrepresentation about pro se access to court records – it is clear that the Attorney General's position is that pro se litigants' wholesale denial of access to court records remotely in time-sensitive remote proceedings while lawyers have instant access, or state agencies like his has instant access, is a governmental, sovereign prerogative of Rhode Island.  Counsel for State Defendants argued as much, stating, "this applies to all pro se litigants, not just the Plaintiff."  He is wrong.  The U.S. Supreme Court in Turner held in 2011 that pro se status requires affirmative judicial due process duty to assure the court record is fully developed in judicial tribunals in every Sovereign State, and describes a slew of innovative judicial accommodations, and categorically not the opposite, as the State stakes its outrageous position.  Not only is he wrong, it is troubling that a constitutionally elected Top Lawyer,

chartered as the law enforcement officer in the State, including U.S. Supreme Court mandates, argues in the Federal Court the State is justified in shutting out pro se litigants from access to the court record, when access is corollary to fully developing the record, in a crystal clear coordinated attempt with the State Defendants to obstruct pro se litigants' meaningful access to the courts. The Rhode Island state constitution is the foundational charter from which all laws are derived in the State. This common law axiom is derived from the English common law foundation, the Magna Carta.

   **WHEREFORE**, the Texas pro-se Plaintiff respectfully request the Court grant her Rule 65 Motions and issue a preliminary injunction and issue a temporary restraining order. The Plaintiff requests issuance of a preliminary injunction and temporary restraining order that enjoins and restrains the Defendants from continuing prosecution of the family court proceeding against the Plaintiff, and from hauling the Texas pro se Plaintiff to unconstitutional proceedings in the state courts relating to child support matters pursuant to Title IV-D programs that deprive her of her property in violation of the First Amendment, the Fifth Amendment due process and the Fourteenth Amendment equal protection and due process guarantees, which is specifically violative of the constitutional mandates in ***Turner v. Rogers, et al.*, 564 U.S. 431 (2011)**. The pro se Texas Plaintiff further requests any and all relief that is just in the circumstances. The Plaintiff's requested relief includes referral of the matters reported and placed on the record as they relate to the State's unconstitutional noncompliance with **Title IV-D**, including the coordinated attempts to thwart the Plaintiff's enumerated constitutional rights, to the appropriate Federal law enforcement authorities, such as the U.S. Departments of Justice agencies that filed briefs in support of holding judicial tribunals to its due process duty in the ***Turner*** Court.

Respectfully submitted,
August 17, 2023

                                        FOR PLAINTIFF
                                        MARY SEGUIN, Pro Se.

By: _____
Mary Seguin
P.O. Box 22022
Houston, TX 77019
maryseguin22022@gmail.com


**CERTIFICATE OF SERVICE**

     I HEREBY CERTIFY that on August 17, 2023, I filed the within Memorandum via the ECF filing system and that a copy is available for viewing and downloading to the public and to the parties, represented and pro-se alike.


_____