UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                          Civil Action No. 1:23-cv-126-WES-PAS


RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL
D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;
RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN
TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA
CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD,
PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and
official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL
A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE
ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF
STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF
THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in
its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL
TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN
JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE
ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities;
TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

*Defendants*

## PLAINTIFF'S Fed. R. App. P. 8 MOTION TO STAY JUDGMENT PENDING APPEAL


Now comes the *diversity* Plaintiff, MARY SEGUIN, proceeding from Texas as Citizen of
Texas, pro se, and pursuant to Fed. R. App. P. 8, respectfully submits Plaintiff's Fed. R. App. P.
8 Motion to Stay Judgment Pending Appeal. In support of her motion, Plaintiff invokes and
relies on Article III and Article VI of the United States Constitution, the legal precedents,
authorities, statutes, arguments, legal standard and conclusions Plaintiff raises in the attached
Fed. R. App. P. 8 Motion to Stay Judgment Pending Appeal.

Before these inferior federal courts, Plaintiff hereby specifically invokes and relies on the
following Constitutional and legal authorities. Plaintiff reserves the right to invoke additional
authorities on appeal as they are too numerous to invoke at this junction:

(1) Article III of the United States Constitution, with emphasis on original jurisdiction;

(2) Article VI of the United States Constitution, [the Supremacy Clause];

(3) Privileges and Immunities Clause of the United States Constitution

(4) 28 U.S.C. § 1331

(5) 28 U.S.C. § 1332

(6) 28 U.S.C. § 1367

(7) 28 U.S.C. § 1441

(8) 42 U.S.C. §§ 654, 666

(9) 42 U.S.C. § 1983 federal causes of action enacted by Congress explicitly to confer federal courts **original** jurisdiction to adjudicate federal claims that arise under the Constitution and federal law in order to **place** federal courts between U.S. Citizens and the states, with a deliberate definition of the Constitution (replete with the Reconstruction-Era 13th, 14th and 15th Amendments), Article III and the Supremacy Clause as the Supreme Law of the Land in relation to the states, *and* with the explicit intent to combat unconstitutional state legislative, executive and judicial acts under color of state laws that are codified, such as the Black Codes and Jim Crow laws, e.g., *Laws of the State of Mississippi* (Jackson, Miss:  J.J. Shannon & Sons, 1866), 82-86, 91, 165; *Acts of the General Assembly of the State of South Carolina* (Columbia, SC: Julian A. Selby, 1866), 14-15, 34-44.

(10) 18 U.S. Code §§ 1964, 1965 - Civil remedies, venue

(11) *Cohens v. Virginia*, 19 U.S. 264, 404 (1821) ("[w]e have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be **treason** to the [C]onstitution."

(12) *Sheldon v. Sill*, 49 U.S. 441, 448-49 (1850) (stating that since the inferior federal courts created by Congress do not exercise all the Article III powers not given to the Supreme Court, there remains no conclusion except that Congress must define their respective jurisdictions); *Sheldon*, 49 U.S. at 448

(13) *Lauf v. E.G. Shinner & Co.*, 303 U.S. 323, 330 (1938) (stating that "[t]here can be no question of the power of Congress thus to define and limit the jurisdiction of the inferior courts of the United States")

(14) *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938) – the Erie Doctrine

(15) *Meredith v. City of Winter Haven*, 320 U.S. 228, 237 (1943) (stating that *Erie R.R. Co. v. Tompkins* did not free federal courts from the duty of deciding questions of state law in diversity cases; rather, it placed a greater responsibility on federal courts to interpret and apply state laws in cases within their jurisdiction where federal law did not apply)

(16) *Testa* v. *Katt*, 330 U.S. at 330 U.S. 393 (1947) (the U.S. Supreme Court cited R.I. Gen. Laws ch. 631, § 4 (1938) to find it <u>only authorizes the State District Court and Superior Court</u> to entertain actions for monetary damages).

(17) *Howlett v. Rose*, 496 U.S. 356 (1990) (applies the Supremacy Clause, again citing *Testa* v. *Katt*, 330 U.S. at 330 U.S. 393 (1947) to again reinforce only adequate general jurisdiction forums of the Rhode Island state courts has concurrent jurisdiction to hear federal causes of action such as Section 1983 within the American Federalism model, e.g., Superior Court constituted under R.I. Gen. Laws ch. 631, § 4 (1938))

(18) *Haywood v. Drown*, 556 U.S. 729 (2009) (relying on *Howlett v. Rose*, 496 U.S. 356 (1990), the U.S. Supreme Court applies the Supremacy Clause, Article III and the

Privileges and Immunities Clause *forbidding* court abdication of Congress conferred jurisdiction in the furtherance of ***policies relieving congestion of the court dockets*** within our American comity and Federalism.  The U.S. Supreme Court again cites *Howlett* and *Testa* v. *Katt*, 330 U.S. at 330 U.S. 393 (1947) to *again* reinforce only adequate general jurisdiction forums of the Rhode Island state courts has concurrent jurisdiction to hear federal causes of action such as Section 1983 within the American Federalism model, e.g., Superior Court constituted under R.I. Gen. Laws ch. 631, § 4 (1938)). [*emphasis added*].

(19)    *Georgia v, Public Resources Org.*, at 590 U. S. _____ (2020) (the century-old ***government edicts doctrine***, making clear that judicial and all officials empowered to speak with the force of law cannot be the authors of—and therefore cannot monopolize access—the works they create in the course of their official duties - their "whole work" is deemed part of the "authentic exposition and interpretation of the law" and must be "free for publication to all." *Ibid.* The Supreme Court explicitly rejects allowing the States to "monetize its entire suite of legislative and judicial history. "With today's ***_digital_*** *tools*, States might even launch a subscription or pay-per-law service" making clear that the U.S. Supreme Court contemplates "the whole works" is deemed part of the exposition and interpretation of the law and *must* be accessible to all, that **state digital court records must be made accessible to all**.

(20)    *Turner v. Rogers*, 564 U.S. 431 (2011) (a South Carolina case concerning the procedural rights of child support obligors in civil contempt proceedings that could result in incarceration) and the modern-day Black Code:  Michael S. Schmidt & Matt Apuzzo, *South Carolina Officer Is Charged with Murder of Walter Scott*, N.Y. TIMES (Apr. 7, 2015), www.nytimes.com/2015/04/08/us/south-carolina-officer-is-charged-with-murder-in-black-mans-death.html?_r=0; *Walter Scott Dogged by System that "Criminalizes" Debt*, POST & COURIER (Apr. 9, 2015), http://www.postandcourier.com/news/walter-scott-dogged-by-system-that-criminalizes-debt/ article_e211c5c9-c6ba-5ded-a92e-a2fc363d179c.html;

(21)    *Henry v. Purnell*, 652 F.3d 524 (4th Cir. 2011) Another law enforcement shooting of a fleeing child support obligor is described.

(22)    28 U.S.C. § 455

(23)    Judicial Code of Conduct

Respectfully submitted,

Mary Seguin

Pro Se

/s/    *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: December 4, 2023

## PLAINTIFF'S Fed. R. App. P. 8 MOTION FOR STAY OF JUDGMENT PENDING APPEAL

1. Plaintiff, proceeding from and as a citizen of Texas, respectfully requests pursuant to Fed. R. App. P. 8 and the following Authorities that this Court stay, pending appeal, its October 19, 2023 Final Judgment [ECF 31], as well as seeks to remove to federal court, under 28 U.S.C. § 1441, the federal questions, and under federal diversity of the state proceeding *Gero Meyersiek v. Mary Seguin,* K20010521M, as the state proceeding proceeded under federal law 42 U.S.C. §§ 654, 666, and is 66% federally funded under 42 U.S.C. §§ 654, 666.

Before these inferior federal courts, Plaintiff hereby specifically invokes and relies on the following Constitutional and legal authorities.  (Plaintiff reserves the right to invoke additional authorities on appeal as they are too numerous to invoke at this junction):

(1) Article III of the United States Constitution, with emphasis on original jurisdiction;
(2) Article VI of the United States Constitution, [the Supremacy Clause];
(3) Privileges and Immunities Clause of the United States Constitution
(4) 28 U.S.C. § 1331
(5) 28 U.S.C. § 1332
(6) 28 U.S.C. § 1367
(7) 28 U.S.C. § 1441
(8) 42 U.S.C. §§ 654, 666
(9) 42 U.S.C. § 1983 federal causes of action enacted by Congress explicitly to confer federal courts *original* jurisdiction to adjudicate federal claims that arise under the Constitution and federal law in order to *place* federal courts between U.S. Citizens and the states, with a deliberate definition of the Constitution (replete with the Reconstruction-Era 13th, 14th and 15th Amendments), Article III and the Supremacy Clause as the Supreme Law of the Land in relation to the states, *and* with the explicit intent to combat unconstitutional state legislative, executive and judicial acts under color of state laws that are codified, such as the Black Codes and Jim Crow laws, e.g., *Laws of the State of Mississippi* (Jackson, Miss:  J.J. Shannon & Sons, 1866), 82-86, 91, 165; *Acts of the General Assembly of the State of South Carolina* (Columbia, SC: Julian A. Selby, 1866), 14-15, 34-44.
(10)    18 U.S. Code §§ 1964, 1965 - Civil remedies, venue
(11)    *Cohens v. Virginia*, 19 U.S. 264, 404 (1821) ("[w]e have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be *treason* to the [C]onstitution."

(12)   *Sheldon v. Sill*, 49 U.S. 441, 448-49 (1850) (stating that since the inferior federal courts created by Congress do not exercise all the Article III powers not given to the Supreme Court, there remains no conclusion except that Congress must define their respective jurisdictions); *Sheldon*, 49 U.S. at 448

(13)   *Lauf v. E.G. Shinner & Co*., 303 U.S. 323, 330 (1938) (stating that "[t]here can be no question of the power of Congress thus to define and limit the jurisdiction of the inferior courts of the United States")

(14)   *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938) – the Erie Doctrine

(15)   *Meredith v. City of Winter Haven*, 320 U.S. 228, 237 (1943) (stating that *Erie R.R. Co. v. Tompkins* did not free federal courts from the duty of deciding questions of state law in diversity cases; rather, it placed a greater responsibility on federal courts to interpret and apply state laws in cases within their jurisdiction where federal law did not apply)

(16)   *Testa* v. *Katt*, 330 U.S. at 330 U.S. 393 (1947) (the U.S. Supreme Court cited R.I. Gen. Laws ch. 631, § 4 (1938) to find it <u>only authorizes the State District Court and Superior Court</u> to entertain actions for monetary damages).

(17)   *Howlett v. Rose*, 496 U.S. 356 (1990) (applies the Supremacy Clause, again citing *Testa* v. *Katt*, 330 U.S. at 330 U.S. 393 (1947) to again reinforce only adequate general jurisdiction forums of the Rhode Island state courts has concurrent jurisdiction to hear federal causes of action such as Section 1983 within the American Federalism model, e.g., Superior Court constituted under R.I. Gen. Laws ch. 631, § 4 (1938))

(18)   *Haywood v. Drown*, 556 U.S. 729 (2009) (relying on *Howlett v. Rose*, 496 U.S. 356 (1990), the U.S. Supreme Court applies the Supremacy Clause, Article III and the Privileges and Immunities Clause *forbidding* court abdication of Congress conferred jurisdiction in the furtherance of ***policies relieving congestion of the court dockets*** within our American comity and Federalism.  The U.S. Supreme Court again cites *Howlett* and *Testa* v. *Katt*, 330 U.S. at 330 U.S. 393 (1947) to *again* reinforce only adequate general jurisdiction forums of the Rhode Island state courts has concurrent jurisdiction to hear federal causes of action such as Section 1983 within the American Federalism model, e.g., Superior Court constituted under R.I. Gen. Laws ch. 631, § 4 (1938)). [*emphasis added*].

(19)   *Georgia v, Public Resources Org.*, at 590 U. S. ____ (2020) (the century-old ***government edicts doctrine***, making clear that judicial and all officials empowered to speak with the force of law cannot be the authors of—and therefore cannot monopolize access—the works they create in the course of their official duties - their "whole work" is deemed part of the "authentic exposition and interpretation of the law" and must be "free for publication to all." *Ibid.* The Supreme Court explicitly rejects allowing the States to "monetize its entire suite of legislative and judicial history. "With today's ***_digital_*** *tools*, States might even launch a subscription or pay-per-law service" making clear that the U.S. Supreme Court contemplates "the whole works" is deemed part of the exposition and interpretation of the law and *must* be accessible to all, that **<u>state digital court records must be made accessible to all</u>**.

(20)    *Turner v. Rogers*, 564 U.S. 431 (2011) (a South Carolina case concerning the procedural rights of child support obligors in civil contempt proceedings that could result in incarceration) and the modern-day Black Code:  Michael S. Schmidt & Matt Apuzzo, *South Carolina Officer Is Charged with Murder of Walter Scott*, N.Y. TIMES (Apr. 7, 2015), www.nytimes.com/2015/04/08/us/south-carolina-officer-is-charged-with-murder-in-black-mans-death.html?_r=0; *Walter Scott Dogged by System that "Criminalizes" Debt*, POST & COURIER (Apr. 9, 2015), http://www.postandcourier.com/news/walter-scott-dogged-by-system-that-criminalizes-debt/ article_e211c5c9-c6ba-5ded-a92e-a2fc363d179c.html;

(21)    *Henry v. Purnell*, 652 F.3d 524 (4th Cir. 2011) Another law enforcement shooting of a fleeing child support obligor is described.

(22)    28 U.S.C. § 455

(23)    Judicial Code of Conduct


**A. The Conflict Between Abstention in civil proceedings and the Article III Duty to Exercise Federal Jurisdiction Where It Exists**


2. Plaintiff filed the Notice of Appeal on November 17, 2023.  *See* [ECF No. 32] and the Supplemental Notice of Appeal (within 30 days of the entry of Judgment on October 19, 2023) merging the Text Order dated November 20, 2023. *See* [ECF No. 38].  Moreover, in Plaintiff's Notice of Appeal Docket Statement of the case dated November 17, 2023, [ECF 32]  Plaintiff explicitly stated that Plaintiff, proceeding pro se from and as a citizen of Texas, respectfully states to the U.S. Court of Appeals for the First Circuit and the United States District Court of the District of Rhode Island that this case is related to the pending First Circuit appellate case, *Mary Seguin v. Rhode Island Office of Child Support Services, et al*, Case Number 23-1851.  As such Plaintiff incorporates Plaintiff's raised arguments therein as fully raised herein.

3. Plaintiff hereby invokes the legal fact that the various abstention doctrines all involve the refusal of a federal court to exercise jurisdiction where it exists. However, the Supreme Court has repeatedly held that federal courts have a virtually unflagging obligation to exercise the jurisdiction given them. In fact, this principle is so old and venerated that it can be traced to the Supreme Court's decision in *Cohens v. Virginia,* at 19 U.S. 264, 404 (1821) - all the way back

two hundred years ago in 1821. The *Cohens* court stated that "[w]e have no more right to decline the exercise of jurisdiction which is given, than to **usurp** that which is not given. The one or the other would be treason to the [C]onstitution." Consequently, the entire practice of abstention is one that on its face risks treason to the Constitution. It is this fact which forced the Supreme Court to recognize that "[t]he doctrine of abstention . . . is an extraordinary and **narrow exception** to the **duty** of a District Court to adjudicate a controversy properly before it." *Allegheny County v. Frank Mashuda Co.*, 360 U.S. at 188-89 (1959).

**B. Congress confers concurrent jurisdiction to State forums of <u>General</u> Jurisdiction**

4. Article III of the United States Constitution makes clear that both federal and state courts' adopted policy of reducing cases on its court dockets through one form or other of "abstention" using the singular excuse of lopsided consideration of "state or local interest" violates the Constitutional – abstentions that merely consider a state interest with no consideration of the adequacy of the state forum nor the interest of federal original jurisdiction, federal question, federal interests and individuals' privileges and immunities under the entire Constitution are on its face unconstitutional. The Supreme Court in *Howlett v. Rose*, 496 U.S. 356, at 371 (1990) made clear, "When Congress, in the exertion of the power confided to it by the Constitution, adopted that act, it spoke for **<u>all the people</u>** and **all the States**, and thereby established a **<u>policy for all</u>**. That policy is as much the policy of the State as if the act had emanated from its own legislature, and should be respected accordingly in the courts of the State." *Id*. Congress, in creating the lower federal courts through the power granted to it in Article III, enacted federal laws and conferred *original* jurisdiction to the federal courts, explicitly placed the federal courts between the people and the State, as Article III plainly instructs, to safeguard the people's federal rights from state persons – 42 U.S.C. . The federal

court has neither right nor authority to abdicate the safeguarding *original* jurisdiction duty conferred by Congress, then unconstitutionally "delegate" jurisdiction to any <u>insufficient or inadequate</u> *limited* jurisdiction state forum that lacks jurisdiction to provide all the remedies provided by the federal causes of action, such as 42 U.S.C. § 1983 or §1331, §1332 or §1367 or 18 U.S.C. §§1964, 1965 to decide federal questions or federal laws 42 U.S.C. §§ 654, 666, that were properly invoked in the First Amended Complaint in this matter [ECF 25].  Nor does Article III permit the inferior federal courts created by Congress to unconstitutionally confer concurrent jurisdiction to state courts of inadequate and insufficient LIMITED JURISDICTION to adjudicate federal question and federal laws, as judge Smith did in this matter. Emphatically, the Supreme Court in *Haywood v. Drown*, 556 U.S. 729 (2009) and the precedent *Howlett v. Rose*, 496 U.S. 356, at 371 (1990) remind us all that *only* Congress, *not* federal courts, has the authority to confer concurrent  jurisdiction to state courts of GENERAL JURISDICTION, and <u>never conferred concurrent jurisdiction</u> to the <u>limited</u> jurisdiction state forums, such as state family courts, constituted by the states, e.g., state family courts of limited jurisdiction/state licensing boards/state dentistry boards, etc., as adequate or sufficient to provide all remedies under all provisions of federal causes of action such as 42 U.S.C. § 1983.

5.  It should come as no surprise to this Appeals Court, the federal district court, as well as the State of Rhode Island, that the question of which state forum in Rhode Island is sufficiently adequate to adjudicate federal claims has been repeatedly reviewed multiple times by the U.S. Supreme Court, at least *THREE* TIMES: *Testa* v. *Katt*, 330 U.S. at 330 U.S. 393 (1947); *Howlett v. Rose*, 496 U.S. 356, at 371 (1990); *Haywood v. Drown*, 556 U.S. 729 (2009), and *EACH* time, the U.S. Supreme Court repeatedly and consistently found only the Superior Court (and District Court for controversies under $5,000-$10,000) have been constituted by R.I. Gen.

Laws ch. 631, § 4 (1938) as fit to adjudicate federal causes of action – and NOT the state family court.  Judge Smith's repeated ad nauseum convoluted assertion that Plaintiff failed to demonstrate why she cannot raise her federal monetary damages claims in the **limited** jurisdiction state family court (per R.I. Gen. Laws 8-10-3) has become on its face a demonstration of judicial misconduct – the United States Supreme Court time and time over, from 1947 to 2009 consistently held that only the Superior Court has been constituted by R.I. Gen Laws ch. 631, § 4 (1938) as the court of general jurisdiction fit to adjudicate federal causes of action for damages over $10,000 – and <u>NOT</u> the state family court.

6.  Federal law is law in the State as much as laws passed by the state legislature: "state court cannot refuse to enforce the right arising from the law of the United States because of conceptions of impolicy or want of wisdom on the part of Congress in having called into play its lawful powers." *Testa* v. *Katt*, 330 U.S. at 330 U.S. 393 (1947).  An excuse that is inconsistent with or violates federal law is not a valid excuse; the Supremacy Clause forbids state courts to dissociate themselves from federal law because of disagreement with its content or a refusal to recognize the SUPERIOR AUTHORITY of its source. *Howlett v. Rose*, 496 U.S. 356, at 371 (1990). "When Congress, in the exertion of the power confided to it by the Constitution, adopted that act, it spoke for all the **people** and all the States, and thereby established a policy for all. That policy is as much the policy of the State as if the act had emanated from its own legislature, and should be respected accordingly in the courts of the State." *Id*.

7. Plaintiff respectfully <mark>requests that the Court resolve the instant motion by December 5, 2023</mark>, to afford Plaintiff the opportunity to file an emergency motion in the First Circuit requesting a stay pursuant to Fed. R. App. P. 8.   Among many egregious issues is the issue concerning Judge Smith's prejudicial, harmful, explicit and overt chilling of and

interference with Plaintiff's Constitutional right exercisable under Congressionally enacted 28 U.S.C. § 1331, 28 U.S.C. §§ 1441-1453; Fed. R. Civ. Pro. 81(c) to remove the pending state court action, *Gero Meyersiek v. Mary Seguin*, K2001-0521M, in which there is an absolute and explicit need for the Federal Court to determine the meaning or application of laws of the United States, namely 42 U.S.C. §§ 654 to 666 under Title IV-D of the Social Security Act. *See,* 19 U.S. 264, 379 (1821) *Cf. Franchise Tax Bd v. Construction Laborers Vacation Trust,* 463 U.S. 1, 9 (1983), (quoting *T.B. Harms Co. v. Eliscu*, 339 F.2d 823, 827 (2nd Cir. 1964)) ("[A] case may 'arise under' a law of the United States if the complaint discloses a need for determining the meaning or application of such a law.") *See* Article III, Section 2, Clause I of the United States Constitution.  Article III, S2.C1.11.3 states, "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; - to *all* Controversies between a State and Citizens of another State, between Citizens of different States."  The pending state court action involves controversy of 12% compounded interest under federal laws 42 U.S.C. §§ 654, 666 in the amount of $86,000 in *Gero Meyersiek v. Mary Seguin*, K2001M, which fits the exact bill of Article III, S2.C1.11.3 of the United States Constitution, which from this Court's jurisdiction is created – this Court's flouting of the explicit purpose enshrined in the Constitution for its very creation and existence is abjectly unlawful and nullifies actions to the contrary of the expressly explicit purpose of its creation.  *Gero Meyersiek v. Mary Seguin*, K2001M is further related to Plaintiff's past federal litigations, Seguin v. Chafee et al., Civil No. 12-cv-708-JD (D.R.I. 2013), Seguin v. Bedrosian et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013), (in which Plaintiff sued them, *inter alia*, for monetary damages claims for extortion by the Rhode Island state court's under color of state law abuse of

the legal frame work of another federal-funded human services program Violence Against Women Act, 34 U.S.C. § 12471 *et seq.*, through which Rhode Island demanded that Plaintiff pay the state court actor $55,000.00 per visitation if she wanted to see her children in Rhode Island, because the state court stated in writing they believed Plaintiff married "a rich oil man" in Texas, absent any other legally sufficient basis.  Plaintiff had reported this *prima facie* extortion under color of state law and under color of federal law 34 U.S.C. § 12471 *et seq.*, to the federal law enforcement authorities, *e.g.*, the F.B.I. in Texas and the Office of the U.S. Department of Justice in Texas).  Judge Smith, *along with all judges in the U.S. District Court of the District of Rhode Island*, were disqualified under 28 U.S.C. § 455 and s*ua sponte* recused from Seguin v. Chafee et al., Civil No. 12-cv-708-JD (D.R.I. 2013), Seguin v. Bedrosian et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013).  Today ten years later in 2023,  here, this matter is similarly related to *State Rel. Gero Meyersiek v. Mary Seguin*, K2001M, however Judge Smith not only refused to similarly disqualify under 28 U.S.C. § 455, but goes a step further to obstruct the docketing by instructing  in this federal Court of Record lawfully, Court-compliant and Court rule-compliant timely filed THREE Rule 59 and Rule 60 petitions filed under THREE separate emails.  *See*, Text Orders dated November 17, 2023, then Notice of Appeal ECF No. 32 docketed November 17, 2023, then Text Order dated November 20, 2023, then Notice of Appeal ECF No. 38 docketed November 20, 2023; then Plaintiff's Reply to State Defendants' Responses ECF No. 44  Actions by the historically-disqualified federal judiciary in the District Court in the District of Rhode Island (*see* Seguin v. Chafee et al., Civil No. 12-cv-708-JD (D.R.I. 2013), Seguin v. Bedrosian et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013) that are alongside the State Judiciary Defendants to manipulate to the state government actors's

advantage the records of, firstly Rhode Island State and then, the federal digital courts in the U.S. District of Rhode Island are at issue.  Justifiably, the Plaintiff, proceeding from Texas, is concerned that similarly Plaintiff's properly and timely filed Notices of Removal package pursuant to similarly will be obstructed from being docketed, based on which then the District Court can deny Plaintiff's removal and levy heavy attorney's fees against the Plaintiff to chill and punish Plaintiff's exercise of her First Amendment rights of access to the federal court. Judge Smith's extrajudicial actions effectively functions as a denial of Plaintiff's access to this Court of law to redress her legal monetary damages claims and breach of contract damages claims.  It is well-settled that even minimal loss of First Amendment freedoms, "unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) (plurality)); *see* also *Elrod*, 427 U.S. at 373.; *N.Y. Times v. United States*, 403 U.S. 713, 715 (1971).  Given the explicit language of Article III, Section 2, Clause I of the Constitution that created the existence of the Court, Judge Smith's actions obstructing the docketing of Plaintiff's federal question petitions are tantamount to actions violating the explicit language of Article III, Section 2, Clause I of the Constitution.

8. Plaintiff further requests that, should the Court deny the instant motion, it issue a 14-day administrative stay to enable Plaintiff to seek a stay pending appeal from the First Circuit.

9. A stay of the order is necessary to prevent irreparable harm to Plaintiff, and to Americans across the First Circuit (judicial notice needs to be taken on the other states' compliance with the 0-6% simple interest stipulated by 42 U.S.C. § 654(21)(A): New Hampshire: 0%; Maine: 0-6%; Massachusetts 6% - Rhode Island is the ONLY state with abject 12% compound interest in explicit violation of federal law §654(21)(A) AND fraudulently procuring federal funding to the tune of 66% federal funding of these illegal support

proceedings) who would be needlessly deprived of access to the federal courts of law conferred by Congress through §1983 litigation in the First Circuit for monetary damages redress through the judicially created arguably treasonous doctrine of Younger Abstention that functioned as a court of equity regarding Rhode Island's policy of flouting the Supremacy Clause of the United States Constitution, whether it be to single out pro se litigants and the Public, barring them from accessing the State's electronic court's records and judgments via the internet (which unconstitutionally hinders the exercise of federal removal pursuant to 28 U.S.C. § 1441, 1446, 1447 when the Public and pro se litigants are denied access to the state court records), whether it be the state court's (and Tyler Technologies's) knowing partial integration of legacy electronic case management systems used by the Rhode Island Department of Human Services and Rhode Island Department of Child Support Services with Odyssey in a manner that results in allowing only the government agencies and the judges to view the agencies' filings and agencies' prepared orders entered by the judges, but not pro se litigants nor the Public nor the Rhode Island Virtual Clerk, that in itself violates all federal due process protections in accordance with the U.S. Constitution, as well as violative of the requisite federal due process protections repeatedly explicit in 42 U.S.C. §§ 654, 666; whether it be Defendant Rhode Island Office of Child Support Services' unlawful seizures of interstate Texas properties in Texas outside of Rhode Island under color of Rhode Island state law based on legally insufficient interest charge totally over $86,000.00 on overdue support based on the unlawful rate of 12% compound interest that is disallowed under Title IV-D Program of the Social Security Act, specifically the uniform 42 U.S.C. § 654(21)(A) that provides States *may* opt to charge a fee, and *if* the State opts to do so, between *3% to 6% simple interest*, *not* 12% compound interest.  And this is on top of Defendants' breach of contract that was brokered by Defendant Rhode Island Office of Child

Support Services on behalf of the agency's client; the contract between the custodial parent

client, defendant Gero Meyersiek and the Texas Plaintiff stipulated that the custodial parent

waived interest upon the Texas Plaintiff paying a lump sum of $104,185.98 pay-off amount,

which Plaintiff performed from Texas on December 7, 2021.  Even at the point of contractual

agreement, Defendant Rhode Island Office of Child Support Services in conjunction with

Defendant Gero Meyersiek, misrepresented there was lawful and enforceable interest to be

waived, as they removed the accrued interest from the Title IV-D Program mandated support

record system in order to cover up from the Plaintiff, and from federal and Texas authorities,

their unlawful 12% compound rate.  After fraudulently inducing Plaintiff in Texas to agree to

and to perform on the contract, the Defendants immediately put the interest back into the Title

IV-D Program-mandated automated support record system and started to seize Plaintiff's

properties in Texas to the tune of the knee-buckling $86,000.00 under color of Rhode Island state

law.  Rhode Island's popularly-coined "Administrative State," whether judicial or executive, is

*repugnant* to public interest, *repudiates* the Supremacy Clause and *repudiates* the Privileges and

Immunities Clause – Younger Abstention applied in its current form today in this matter violates

every letter of the Constitution, take your pick: Article III, Section 2, Clause 1 and/or the

Supremacy Clause and/or Privileges and Immunities Clause, by a judge who obstructs the

docketing of petitions filed to the Federal District Court in abject violation of Article III, Section

2, Clause 1.

10. The final judgment is on its face violative of Article III, Section 2, Clause I of the

United States Constitution.  Article III, S2.C1 states, "The judicial Power shall extend to all

Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and

Treaties made, or which shall be made, under their Authority; - to *all* Controversies between a

State and Citizens of another State, between Citizens of different States.  The federal courts' authority to hear federal question cases is rooted in both constitutional text and a number of implementing statutes.  This federal Court has *original* jurisdiction to hear federal questions and damages claims under diversity jurisdiction and Article III, Section 2, Clause 1 and 28 U.S.C. § 1332.  This federal Court has *original* jurisdiction to hear not just this matter but also the federal questions concerning the Social Security Act and based on the diversity of the Citizenship of the parties, including the State of Rhode Island relative to the Texas federal Plaintiff that arise in *Gero Meyersiek v. Mary Seguin*, K2001M.

 11. Younger Abstention, even functioning as a court of equity, and definitely functioning as a court of law, disturbingly is developed on questionable, shaky, unconstitutional and forbidden motivations -  **to reduce federal court docket congestion** – a policy has long been overturned since Younger, if not contradicted by subsequent United States Supreme Court case law interpreting the Supremacy Clause and the Privileges and Immunities Clause.  The Younger Abstention "doctrine" is a method developed to reduce the congestion of the federal court docket which is federal judicial *policy* that contradicts and violates the letter of Article III, Section 2, Clause 1. as well as Congressionally enacted causes of action. *See, e.g.*  Note, ***Developments in the Law- Section 1983 and Federalism*, 90 Harv. L. Rev. 1133, 1283, 1295 (1977).**  Contrast the federal court policy motive behind the *Younger* Court with the subsequent U.S. Supreme Court's binding caselaw that applied the **Supremacy Clause** concerning the State of New York's policies to close its courts to federal causes of action, such as 42 U.S.C. § 1983, which the Supreme Court **similarly found to be motivated by a scheme to avoid congestion of the court docket**.  *See Haywood v. Drown*, 556 U.S. 729 (2009).  Federal statutes such as 42 U.S.C. § 1983 necessarily is founded and predicated on placing the federal Court between the States

replete with their state courts and U.S. Citizens to safeguard the Citizen's U.S. Constitutional rights that are reinforced by the Fourteenth Amendment. **Plaintiff will outline the Section 1983 enactment background later in the section "II. Argument," to show how state family courts in Rhode Island (as well as the general jurisdiction digital courts of Superior Court and R.I. Supreme Court) and South Carolina, as demonstrated by the *Turner v. Rogers*, 564 U.S 431 (2011) Court, proceed as modern day Black Code and Jim Crow equivalents**. The *Haywood v. Drown* Court is explicitly instructive that the federal Supremacy Clause's application scrutinizes the State court forum to determine whether it is an appropriate court of *general* jurisdiction to raise 42 U.S.C. § 1983, explicitly recognizing that state courts of *limited* jurisdiction can neither satisfy the *damages* causes of action in Section 1983, nor call a jury in damages actions. The Haywood Court's specific recognition of the wholistic relief provided in 42 U.S.C. § 1983 that cannot be addressed in state forums of limited jurisdiction goes towards destroying the flimsy premises of judicial application of Younger Abstention in civil cases altogether – the vast majority of Younger's civil applications are in *state limited jurisdiction* forums, whether they be in agency administrative proceedings or limited jurisdiction courts like family courts – Younger's claim that "federal Section 1983 claims that can be raised in the state civil proceedings" in *limited* jurisdiction state forums that lack any jurisdiction or power over the State in a countersuit or counterclaim to award damages on its face *emasculates* and limits/eradicates the federal Section 1983-afforded plaintiff's right to raise counterclaims as well as counterclaims for damages under 42 U.S.C. § 1983, a statute which Congress conferred *federal courts original* jurisdiction with the explicit purpose to place the federal courts between the State courts and the U.S. Citizen to safeguard constitutional rights, specifically the Fourteenth Amendment that was recently ratified in 1868 which Younger's civil applications

unconstitutionally rejected.  The Reconstruction Era Section 1983 was enacted to protect U.S. Citizens from state rules and regulations that find their nexus in the Black Codes.  Today, Rhode Island's judiciary developed digital courts through court rules and partial integration of legacy electronic case management systems that effectively function as active participants and enablers of "the Black Codes" targeting the Public and pro se litigants – state courts' enabling and participating in modern day "Black Codes" are widely rampant – to wit documented in the seminal U.S. Supreme Court case, *Turner v. Rogers*, 564 U.S 431 (2011).   In other words, in the event that a state assembly enacts legislation empowering the state judiciary to promulgate court rules, and the state judiciary proceeds to promulgate unconstitutional court rules that further violate the Supremacy Clause, as here in Rhode Island, accordingly it has been and continues to be recognized by legal scholars and the Public as an abject lie, illusion, fallacy, phantom and violative of Article III.  The *Haywood* Court explicitly stated that the concept of comity and federalism is conditional on obeyance of Judges by the States to the Constitution and incorporates *foremost* the concept of the Supremacy of federal Law and the Constitution in the Supremacy Clause and the concept of the Privileges and Immunities Clause as a *condition* of comity and federalism.  The Civil War was the bloody enforcement of the Supremacy Clause and the Privileges and Immunities Clause, from whence the federal authority of 42 U.S.C. § 1983 derived. Younger's one-way sole singular *policy* focus on state interests with zero regard for the U.S. Citizen's individual federal constitutional rights and interests can be seen as a form of federal judicial revolt against Congressional intent that had been dissected applying the Supremacy Clause – Younger's singular focus on state interests with disproportionate little regard for individual federal rights of the Citizens under invocation of Section 1983 was subsequently **overruled by** the subsequent *Haywood* Court.

12. The *Haywood* Court makes clear that "New York is not at liberty to shut the courthouse door to federal claims that it considers at odds with its local policy." *Id*. Likewise, the federal court is not at liberty to shut *its* courthouse door to federal claims that it considers at odds with its policy of reducing its docket load.  The *Haywood* Court continues its analysis that the Supreme Court by *default* assumes that "state courts of ***general*** jurisdiction have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States." *quoting Tafflin v. Levitt*, 493 U.S. 455, 458 (1990).  "In determining whether a state law qualifies as a neutral rule of judicial administration, our cases have established that a State cannot employ a jurisdictional rule "to dissociate [itself] from federal law because of disagreement with its content or a refusal to recognize the superior authority of its source", *citing Howlett v. Rose*, 496 U.S., at 371. (1982).  The *Haywood* Court reaffirmed federal law is the law of the Land, and explicitly prohibits "a jurisdictional rule to dissociate itself from federal law because of states' disagreement with its content or a refusal to recognize the ***superior*** authority of its source."  The lower federal courts, creations of Congress that derives its authority from Article III of the Constitution, likewise "cannot employ a jurisdictional rule to dissociate itself from federal law because of disagreement with its content or a refusal to recognize the ***superior*** authority of its source."  Applying *Haywood*'s Constitutional Supremacy Clause application to the Rhode Island Judiciary, "In other words, although States retain substantial leeway to establish the contours of their judicial systems, they *lack authority to nullify a federal right* or cause of action they believe is inconsistent with their local policies. "The suggestion that [an] act of Congress is not in harmony with the policy of the State, and therefore that the courts of the State are free to decline jurisdiction, is quite inadmissible, because it presupposes what in legal contemplation does not exist", *quoting Second Employers' Liability Cases*, 223 U.S. 1,57 (1912).

The *Haywood* Court makes clear to this lower federal Court created by Congress that "We have never treated a State's invocation of "jurisdiction" as a trump that ends the Supremacy Clause inquiry, see *Howlett*, 496 U.S., at 382-383, and we decline to do so in this case.  Because New York's supreme courts generally have personal jurisdiction over the parties in  § 1983 actions, we find little concerning power over the person and competence over the subject matter"; see *id*., at 378 (**conducting a similar analysis and concluding that the Florida courts of general jurisdiction were "fully competent to provide the remedies [§1983] requires"**).  It is abundantly clear that both the *Haywood* and the *Howlett* Courts *and* the intent by the Reconstruction-Era Congress enacting 42 U.S.C. § 1983 contemplate Section 1983 to be raised in fully competent courts or forums *competent* to provide the remedies  § 1983 requires, and ***not*** in inadequate and insufficient administrative state agencies or state government adjudicative board or state courts of limited jurisdiction like traffic court or family court utterly incompetent lacking both subject matter jurisdiction and personal jurisdiction over the parties in the Section 1983 action and claims, as unconstitutionally conferred by Younger Abstention federal courts in subsequent applications to civil state proceedings involving state licensing board forums or family court forums wholly incompetent to provide the remedies § 1983 requires, thus constituting federal judicial revolt, as clearly illustrated by the clear language of Article III that blatantly instructs federal courts have ***no Constitutional authority*** to itself confer concurrent federal jurisdiction on inadequate limited jurisdiction state forums.  Today, in this case, the civil application of the Younger Abstention fallacy analysis is equally on display.  The Reconstruction-Era Congress draws on the Supremacy Clause as well as the Privileges and Immunities Clause as it intended to, and Congress's broadly reaching intent is preserved in the language of Section 1983, that squarely places *individual* federal Constitutional interest *superior*

to state interests, because only in so doing can the federal courts safeguard U.S. Citizens against on-going state proceedings and state enforcement of Black Codes and Jim Crow modern day equivalents.  The federal courts' similar pattern of revolt against Section 1983 shamefully led to over a century of Jim Crow Reign, where state proceedings vindicated lynchings, torture and rape, essentially wide-spread domestic terrorism.  In Modern Day, it further directly led to countless unconstitutional incarcerations in abject violation of due process required by 42 U.S.C. § 666 in unconstitutional state proceedings, as witnessed in *Turner v. Rogers*, 564 U.S 431 (2011).  Judicial due process violation of state proceedings witnessed in *Turner v. Rogers*, 564 U.S 431 (2011) is precisely the type of state judicial due process violations Section 1983 is intended to safeguard as contemplated by the Reconstruction-Era Congress.  Routine state proceeding violations of the due process requirements and provisions of 42 U.S.C. § § 654, 666 are the norm, despite *Turner v. Rogers*, 564 U.S 431 (2011), in large part due to the federal judicial policy to close its doors for the purpose of avoiding court congestion – this policy violates Article III, the Supremacy Clause, and the Privileges and Immunities Clause  – the application of Younger to civil proceedings is diametrically and breathtakingly at odds with the Supremacy Clause that further selectively envisions a civil legal comity and federalism where the state board licensing proceeding and its jurisdictionally-lacking forum "tail" wags the dog, but only where individual Constitutional rights are concerned, where *any* State interest (such as licensing boards that are incompetent to provide all Section 1983 remedies) trump federal Constitutional rights guaranteed by the Privileges and Immunities Clause and the Fourteenth Amendment.  Obviously, this Younger vision of our Federalism is merely a smokescreen aimed to close the doors of the federal courthouse targeting individuals – it flings its courthouse doors broadly and widely to "persons" of the corporation ilk, like Sprint Communications Corporation

– if it involves a corporation and a muddled agency board that shows it is obviously incredulous that it has been imbued with the "jurisdiction" akin to a court of general jurisdiction to address federal claims "conferred" to it by the Younger fallacy under a selective botched notion of Federalism that the carefully constructed analysis in the long line of precedents under *Haywood, Howlett,* and *McKnett v. St. Louis & San Francisco R. Co*., 292 U.S. 230, 233 (1934) defeat, because they make clear, with soundly reasoned considerations of Article III, the Supremacy Clause, the Full Faith and Credit Clause and the Privileges and Immunities Clause, and then the states and their relations to Congress, that is wholly lacking in Younger – Younger is motivated by federal courts' policy of avoiding court congestion, a policy prohibited by the *Haywood* Court.

13. The *Haywood* Court makes clear that Judge Smith's application of Younger Abstention under the Younger unique brand and notion of comity citing the First Circuit's *Courthouse News Service v. Quinlan, Bangor Publishing Co., Inc.***,** No. 21-1624 (1st Cir. 2022) is prohibited as it relates to state court rule violations of the Supremacy Clause and the Privileges and Immunities Clause: Article VI, Clause 2 states unequivocally, "This Constitution, and the Laws of the United States which shall be  made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  The *Haywood* Court cites *Howlett v. Rose*, 496 U.S., at 381-382 to find **no merit** and **again soundly reject** the misplaced notion that States possess "the freedom to deny access to its courts howsoever much it may regard such withdrawal "the adjective law of the State', or the exercise of its right to regulate 'the practice and procedure' of its courts" quoting *Angel v. Bullington*, 330 U.S. 183, 188 (1947), noting that **the Constitution specifically has the authority to "fetter the freedom**

**of the State's" regulation of the practice and procedure of its courts**. *See Howlett*, 496 U.S., at 382-383.  Thus, to the extent that the First Circuit and the Eighth Circuit resurrect this misplaced argument under the judicially-created Younger "brand of comity" flies in the face of "the Supreme Law" stated in the Supremacy Clause that specifically prohibits state judges taking any state actions that denies the Public and pro se litigants free access to state-judges-created laws published online in Rhode Island's digital courts, which is in abject violate of the First Amendment of the Constitution, the Privileges and Immunities Clause, the Due Process and Equal Protection Clause of the Fourteenth and Fourth and Fifth Amendments, and forbidden by the Supreme Court in *GEORGIA, ET AL., PETITIONERS v. PUBLIC.RESOURCE.ORG, INC*, 590 U.S. ___ (2020).  Article VI makes clear that American Federalism and notions of comity are ___**not**___ predicated on a model of federal Constitution subordination to state interests, no matter how important; the *Haywood* Court cited a **long** line of precedents that rejected federal Constitution subordination to state interests, as must the inferior federal courts in the First Circuit.   Judge Smith's application of Younger impermissibly creates a blind spot in the Supremacy Clause – he lacks the authority to castrate the Supremacy Clause; he is similarly bound to the Constitution.  The Haywood Court already affirmed that when a state like Rhode Island decides to employ a procedural rule to burden the enforcement of federal law, the Supreme Court shall find the scheme unconstitutional *(Id*. *footnote* 8), as in this case where Rhode Island Judiciary promulgated Rule 5 to single out a category of people denying the Public and pro se litigants online access to judge-created laws in Rhode Island's digital courts.  Judicial denial of digital access to digitally published and hosted judge-created laws contained in the digital court records results in the denial of the due process opportunity to be heard, which requires not a mere statement by a party of his/her position, but meaningful through the force and

rule of law that supports his/her position that would *bind* the court to arrive at a lawful decision. Covering up the judge-created law from the Public and pro se litigants who are thus compelled into states of ignorance of judge-created laws that are issued daily rendered in electronic courts that are contained in the digital court records, not only deliberately set up the Public and induce people into unwittingly unable to follow judge-created laws, it further set people up for unfair prosecution for violation of judge-created laws that the court then denies people access, access to which is requisite in order to defend themselves or exercise due process right to the opportunity to be heard.  Obviously, due process contemplates the incorporation of unfettered access to the court of record and the record of judge created laws, just as the judge sitting in judgment is provided the benefit of his clerk through public funds and given access to the digital law library also provided through public funds.  To deprive any litigant equal access would be a fundamental affront to the notion of fairness and legitimacy in any justice system.  In the current world of digital courts in both the federal and state court system, digital access to judge-created laws has already been contemplated by Chief Judge John Roberts, Jr., and the majority of the Justices in the seminal case in 2020 reaffirmed, in *GEORGIA, ET AL., PETITIONERS v. PUBLIC.RESOURCE.ORG, INC*, 590 U.S. ___ (2020), the century-old government edicts doctrine, making clear that officials empowered to speak with the force of law cannot be the authors of—and therefore cannot monopolize access—the works they create in the course of their official duties - their "whole work" is deemed part of the "authentic exposition and interpretation of the law" and must be "free for publication to all." *Ibid*. The Supreme Court explicitly rejects allowing the States to "monetize its entire suite of legislative and judicial history. With today's ***digital*** *tools*, States might even launch a subscription or pay-per-law service." *See Georgia v, Public Resources Org. at 590 U. S. ____ (2020)*  It is obviously

explicitly clear that the Supreme Court explicitly refers to the prohibition against the Rhode Island Judiciary and Tyler Technology's monopolization of the digital publication of DIGITAL COURT JUDICIAL COURT RECORDS that denies publication access of judge-created laws and their work materials to the Public and to Pro Se Litigants – the Supreme Court explicit binds all States under the Supremacy Clause and the Privileges and Immunities Clause to make judge-created laws and their works freely accessible to all in today's digital courts – specifically to encompass that *digital* courts implemented by the States must comply with federal laws and the Constitution that explicitly prohibits discrimination of any class of court users, and explicitly require States to comply with the Supremacy Clause in its promulgation of court rules that must comply with the Constitution, not local policies, as the *Haywood* Court makes clear, in *digital* courts. Obviously, a patchwork of disparate unconstitutional state court rules and procedures, whether in digital courts or paper courts, was **never** contemplated nor permitted by the Constitution as a viable framework of comity and American Federalism.

14. The Final judgment is on its face violative of binding First Circuit caselaw that mandates lower courts to ***stay*** monetary damages claims when applying Younger Abstention. *See DeMauro v. DeMauro,* 115 F.3d 94, 98 (1st Cir. 1997) (relying on *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706 (1996) in holding that abstention does not allow for dismissal of damages claim). Although Younger abstention courts spend inordinate time discussing comity and federalism, the legal and Constitutional basis behind the Younger Court's holding to stay federal damages claims applied to state civil proceeding scenarios is the painfully obvious glaring fact that the majority of the state proceedings occur in proceedings held in limited jurisdiction forums or lack any jurisdiction whatsoever over federal causes of action against state actors, as in this case – this utter violation of the Supremacy Clause, the Full Faith and Credit Clause and the

Privileges and Immunity Clause is an front to our Constitutional democracy. To spell out the obvious, the limited jurisdiction family court in almost every state in the Union lacks both subject matter jurisdiction to hear federal causes of damages action and lacks personal jurisdiction over the state actors contemplated in federal causes of damages action – as here. Plaintiff repeatedly raised before the Court *ad nauseum* that proof requires no further than the plain reading of **R.I. General Laws § 8-10-3** that creates, as per the section's title - the ***limited jurisdiction*** Rhode Island family court. Judge Smith and his cohort former clients, the State Defendants, confronted with the repeated demonstration that R.I. General Laws § 8-10-3 created a limited jurisdiction family court that lacks both subject matter jurisdiction and personal jurisdiction over the state parties in federal causes of damages actions, talk out of both sides of their mouths, audaciously claiming that nothing in the record demonstrates that monetary damages cannot be raised in family court, under pains and perjury of Fed. Rules of Civ. P. 11. Further, the federal Plaintiff has the right to choose the federal forum with the original jurisdiction for questions arising from federal law and the U.S. Constitution and no federal court judge has the authority to force any party to litigate federal questions and federal claims in the state courts by closing the doors of federal courts to federal litigants' properly invoked federal claims under federal causes of action. Not to be overlooked is the federal Plaintiff's right to litigate Plaintiff's federal questions in a federal forum if the resort to the state system does not dispose of the matter. Rhode Island's digital courts are set up to be impotent to dispose of federal question matters. The all important federal question in this matter is the state's motive, that Plaintiff seeks to litigate in the federal court of original jurisdiction as to the State Court's intent to cover up its routine establishment and enforcement of support obligations under Title VI-D of the Social Security Act, federal laws 42 U.S.C. § § 654, 666, that federal courts further

has original jurisdiction over which it is forbidden to shirk under Article III. Adding insult to injury is the glaring spectacle that the due process violative Rhode Island digital court proceedings under Rhode Island's State Plan under Title IV-D are mostly funded by FEDERAL funds to the tune of 66%, that it is funded **conditioned** on adherence to due process and unform application by the states that also are repeatedly drummed in by every provision of Title IV-D of the Social Security Act. These specific federal funding provisions make clear that the Supremacy Clause's application in this case is paramount – and that the federal court's original jurisdiction to decide federal questions is especially imperative, and not left to disparate interpretations by limited courts of incompetent jurisdictions, such as the state family court that is predisposed to covering up their own complicity in violating 42 U.S.C. 42 U.S.C. § § 654(21)(A), 666 ordering and enforcing the illegal collection of unlawful compound 12% interest as state government debt unlawfully enriching the coffers of the state of Rhode Island.

15. 42 U.S.C. § 654(21)(A) has been in effect since the enactment of the Title IV-D Program of the Social Security Act several decades ago, and Congress's original intent was to combat poverty within the populace of single mothers and children in welfare cases; Congress at no time intended to shift the undue burden of Rhode Island's 12% compound interest on overdue support under color of Rhode Island state law to noncustodial parents, whether targeting Texas or across the country, which in welfare cases Rhode Island converts the 12% compound interest to assigned debts owed by noncustodial parents to Rhode Island's state agencies and state government, representing underhanded unlawful state revenue unlawfully obtained through the legal framework of Title IV-D Program of the Social Security Act, targeting unsuspecting noncustodial parents victims. As a legal point of a state's lawful application of 42 U.S.C. § 654(21)(A) within the First Circuit, New Hampshire, in compliance with the letter of federal law,

opts into Title IV-D Program and opts not to charge any interest whatsoever, as per the letter of law and the original intent of Congress, 42 U.S.C. § 654(21)(A).  Similarly, Texas charges 6% in compliance with 42 U.S.C. § 654(21)(A).

16. Defendant Rhode Island Office of Child Support Service's illegal denial and obstruction of access to Plaintiff's own child support case file that contains the incriminating illegal and arguably criminal scheme of removing the interest rate from the Title IV-D Program mandated and federally funded support record system to cover up the unlawful 12% compound interest from federal and Texas authorities, as well as from the Plaintiff in Texas, violates due process, obstructs justice, obstructs a federally funded and federal program proceeding, and the legal framework of Title IV-D of the Social Security Act, specifically, 42 U.S.C. § 654 and 42 U.S.C. § 666.

17. Judge Smith's dismissal of Texas Plaintiff's legal remedy monetary damages and breach of contract damages claims under Younger Abstention in this Court of law represents irreparable harm violative of the Fourth Amendment, Fifth Amendment, the Fourteenth Amendment, the Seventh Amendment and the First Amendment access to the Court.  The undisputable fact remains, Plaintiff's legal remedy request for monetary damages in this court of law consisting of twenty-two causes of action that cannot be dismissed under Younger Abstention, namely monetary damages claims of breach of contract, breach of implied contract, unjust enrichment, misrepresentation, negligent misrepresentation, intentional/fraudulent misrepresentation, common law bad faith, breach of the covenant of good faith and fair dealings, tortious breach of the covenant of good faith and fair dealings, breach of fraudulent concealment/common law fraud, concealed fraud, tort of deceit, reckless indifference to the rights of Plaintiff, deliberate indifference to the rights of Plaintiff, abuse of process, breach of

duty, accounting fraud, fraud cover up, RI Government Tort Liability (R.I. Gen. Laws 9-31-1, *et seq.*), 42 U.S.C. § 1983 Claim for Reckless Indifference of Plaintiff's Clearly Established Constitutional Rights, 42 U.S.C. § 1983 claim of Fourth Amendment Illegal Seizure of Plaintiff's Property, state tort of liability against defendants under 42 U.S.C. § 1983. [ECF 25].

18. Judge Smith's legally-unsupported and factually-unsupported, and "legally insufficient" opinion that the limited jurisdiction family court is an adequate forum to raise Plaintiff's federal legal damages claims of breach of contract et al., contravenes Rhode Island law: R.I. Gen Laws 8-10-3 makes clear that family court is not a court of general jurisdiction, can only conduct bench trials functioning as a court of equity, not of law, and prohibits family court from exercising jurisdiction over breach of contract claims et al between the Texas Plaintiff and the Defendants; family court lacks jurisdiction over the Plaintiff's federal causes of actions; lacks the jurisdiction to summon a jury for jury trial in a court of law.

19. Finally, but equally critically, days post judgment Plaintiff discovered troubling new evidence in November, 2023, that Judge Smith appears to have impermissibly acted in favor of the interests of the defendants – he is automatically disqualified under 28 U.S.C. § 455, because in his past practice and firm, the state government and the state courts were his clients under a flat fee contract and he has knowledge of the defendants' actions in this action and the state courts continue to remain the firm's major clients to date, in which Judge Smith is a partner – his past clients, the state government actors and the state courts actors, cooperate in the routine establishment and enforcement of 12% compound interest under the legal framework of Title IV-D Program of the Social Security Act, where 12% compound interest is disallowed under 42 U.S.C. § 654(21)(A), while illegally procuring federal funding under 42 U.S.C. 42 U.S.C. § § 654, 666 that funds 66% of the cost of these illegal state activities.  To the objective observer,

having knowledge of the facts and circumstances of this case, Judge Smith appears biased in favor of the defendants' interest to continue raking in state revenue under the auspices of 42 U.S.C. § 654(21))(A) that explicitly disallows state debts of 12% compound interest assigned to Rhode Island that the state actors who cover up the 12% compound rate by obstructing the noncustodial parent's access to her own child support case file that is further violative of the due process provisions under 42 U.S.C. § 654 and §666, in Rhode Island's federally funded operation with funds appropriated by Congress intended for the *lawful* operation of Title IV-D of the Social Security Act.  Although under the judicial self-executing expectation under 28 U.S.C. §455, the Texas Plaintiff is not expected to cull court records in the Rhode Island state courts for judicial conflict of interest, nevertheless the Plaintiff in good faith and diligently attempted to perform a remote search of Rhode Island's electronic court case management system, Odyssey in 2023.  In so doing, Plaintiff discovered troubling newly-discovered evidence that the Rhode Island Judiciary, while publicly representing that the 2014 $6 million state transition from paper courts to electronic courts promises *all court users* will be able to call up court documents remotely from their mobile devices, in reality Rhode Island adopted rules only denying the public and pro se litigants remote access to court case information, including pro-se litigants' own case records, that both the public and all litigants had equal statutory, common law and constitutional rights of access in paper courts – Judge Smith's former clients, the Rhode Island Judiciary, therefore implemented electronic court public access denials that obstructed Plaintiff's and the public's discovery of Judge Smith's judicial disqualification regarding his former clients such as the state courts, the defendant state actors and other conflict entities.

## I. LEGAL STANDARD

20. Courts consider four factors in assessing the propriety of granting a motion to stay a

judgment pending appeal, pursuant to Fed. R. App. P. 8: (1) the movant's likelihood of prevailing on the merits of the appeal, (2) whether the movant will suffer irreparable damage absent a stay, (3) the harm that other parties will suffer if a stay is granted, and (4) the public interest. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410 (5th Cir. 2013). When the Government is a party, its interests and the public interest overlap in the balancing of harms (*contrast* this balancing with the one-sided consideration of state interests only in Younger – Younger is the only jurisprudence that flouts federal law supremacy by a lopsided consideration of just state interests, not citizens' federal rights secured by federal laws – it wholly ignores other provisions of the Constitution, including the Full Faith Credit Clause, the Supremacy Clause and the Privileges and Immunities Clause, which the *Haywood* Court repeatedly stated that the Supreme Court rejects holdings that ignores all other provisions of the Constitution). *See Nken v. Holder*, 556 U.S. 418, 426 (2009). Under those standards, Plaintiff is entitled to a stay of the Court's Younger Abstention dismissal of Plaintiff's monetary damages and breach of contract claims. Fundamentally all other provisions of the Constitution make federal laws protections supreme to State local policies and interests that are facially violations of federal law and the Constitution, as here.

21.  There is no legitimate Rhode Island government interest in the knowing deprivation of Public access and pro se litigants' access to court records and judge-created laws in digital courts of the state's establishment nor enforcement of unlawful 12% compound interest violative of explicitly clear 42 U.S.C. § 654(21)(A) within the legal framework of the federal Title IV-D Program two-thirds funded by federal funding that violate federal laws and federal rights targeting noncustodial parties outside of Rhode Island that Rhode Island already knows is

unenforceable in Texas, and thus had removed the 12% compound interest in 2018 calculated to cover it up from both federal and Texas authorities.  Rhode Island's abuse of the legal framework of Title IV-D Program is diametrically at odds with the intent of Congress and this federal court created by Congress under Article III is obligated without exceptions like judicial policies to "relieve congestion of the dockets" to dismiss meritorious federal claims for monetary damages under invocation of federal question and diversity original jurisdiction.  *See Turner v. Rogers*, 131 S. Ct. 2507, 2518 (2011).  *See Haywood v. Drown,* 556 U.S, 729 (2009)*; See* HOUSE COMM. WAYS & MEANS, Section 8: Child Support Enforcement Program, in 2004 GREEN BOOK: BACKGROUND MATERIAL AND DATA ON THE PROGRAMS WITHIN THE JURISDICTION OF THE COMMITTEE ON WAYS AND MEANS 8-1, 8-2 (2004). *See* Social Services Amendments of 1974, Pub. L. No. 93-647, § 101, 88 Stat. 2337, 2351.  *See* Where the mother receives public aid, federal and state governments will provide the child support payment to the mother and hold the father indebted to the government for that amount. In cases where the mother is not dependent on welfare, the government has largely stayed out of the fray. *See* HOUSE COMM. WAYS & MEANS, *supra* note 38.  Yet, this case does not involve a welfare case, as the custodial father is wealthy, but the Defendants are motivated by retaliation against the Plaintiff for suing them ten years ago in Seguin v. Chafee et al., Civil No. 12-cv-708-JD (D.R.I. 2013), Seguin v. Bedrosian et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013), in which Plaintiff sued them, *inter alia*, for monetary damages claims for extortion by the Rhode Island state court's under color of state law abuse of the legal frame work of another federal-funded human services program Violence Against Women Act, 34 U.S.C. § 12471 *et seq.*, through which Rhode Island demanded that Plaintiff pay the state court actor $55,000.00 per visitation if she wanted to see

her children in Rhode Island, because the state court stated in writing they believed Plaintiff married "a rich oil man" in Texas, absent any other legally sufficient basis.  Plaintiff had reported this *prima facie* extortion under color of state law and under color of federal law 34 U.S.C. § 12471 *et seq*., to the federal law enforcement authorities, *e.g*., the F.B.I. in Texas and the Office of the U.S. Department of Justice in Texas.  Here, Plaintiff's retaliation damages claims have been issues pending before the Court since September 12, 2023 [ECF 68], at which point Judge Smith was disqualified under the self-executing expectation under 28 U.S.C. § 455, additionally given the fact Judge Smith had also self-recused from Seguin v. Chafee et al., Civil No. 12-cv-708-JD (D.R.I. 2013), Seguin v. Bedrosian et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013) ten years ago.  *See In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998) ("[under §455] the judge is expected to recuse sua sponte, where necessary, even if no party has requested it").

22.  Plaintiff's 91-page complaint [ECF 25] filed on September 1, 2023 seeks monetary damages against the Rhode Island State Defendants and the private actor Defendants for:

(1) The Rhode Island Judiciary and Tyler Technologies' monopoly of publication of law.

(2) The Rhode Island Judiciary and Tyler Technologies' denial to the Public and to all Pro Se Litigants all access and the denial of free access to the contents of the law created, authored, and deliberated by the Rhode Island Judiciary, and in so doing to deny pro se litigants due process of law that requires notice (of the law/judgment by judges in digital courts),  the opportunity to be heard (to access the judge-created laws relative to the litigant's position), by a fair impartial adjudicator (e.g., someone not complicit in denying access to the laws in the records of the digital courts).

(3) The civil conspiracy by the Rhode Island Judiciary and Tyler Technologies to knowingly fail to properly integrate the legacy electronic court case management systems used by Rhode Island Department of Human Services and Office of Child Support Services during the implementation of Odyssey from 2013 to 2014 (the State's official electronic court filing and electronic case management system), so that these state agencies' filings are discriminately invisible only to the Public, to Pro Se Litigants and to the Rhode Island Virtual Clerk of the Courts in the Rhode Island Family Court, a limited jurisdiction court of record. The State's filings are only visible to the judges and to the State filers, thus manipulating the proceeding towards a foregone conclusion in favor of the State filers.

(4) The civil conspiracy by the Rhode Island Judiciary and Tyler Technologies to misrepresent to the Public and to the Pro Se Litigants that the implemented electronic court case records of judge created laws are available to *all* court users, in order to cover up their monopolization of the publication of law denies the Public and the Pro Se Litigant access to the judge-created laws.

(5) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Office of Child Support Services that the State routinely establishes and enforces 12% compound interest on child and spousal support in Title IV of the Social Security Act state family court proceedings, in violation of the uniform statutory requirement of 42 U.S.C. § 654(21)(A) that provides States *may* opt to charge a fee, and *if* the State opts to do so, between *3% to 6% simple interest*, *not* 12% compound interest, targeting noncustodial parents victims. In welfare cases, support are assigned by the custodial parent to the State, and the 12% compound interest represents a fee for the

State's "services" in the support's establishment and enforcement paid to the State, which at 12% compound interest represents lucrative, illegally obtained revenue to the State actors, who are financially incentivized to obtain as much as possible.

(6) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Office of Child Support Services and Tyler Technologies to knowingly fail to properly integrate Odyssey with the State's legacy electronic court filing system resulting in the State's filings seeking illegal 12% compound interest, as well as to deny the Public and to Pro Se Litigants' access to their publication of judge-created law records for the purpose of cover up of this wholesale illegal defraud of the court, extortionary defraud under color of state law targeting the unsuspecting noncustodial parents victims, and defraud of the United States (66% of the cost of these child support "operations" is funded by the U.S. Department of Health and Human Services through Title IV of the Social Security Act through funds appropriated by Congress through the annual budget appropriations.)

(7) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Tyler Technologies to operate the Title IV Program of the Social Security Act in all manners violative of due process, in prima facie due process violative State Electronic Courts, for the purpose of generating state revenue through fraud and deceit, through conspired tortious interference of rights of access to the courts, rights of access to state case documents, and rights of access to judge-created laws targeting litigants, targeting the Public and targeting Pro Se Litigants.

(8) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Tyler Technologies to cover up their public-access-denied

publication of state judge-created laws of illegal 12% compound interest benefiting the state's revenue by adopting a State policy not to establish nor enforce any interest in *interstate* support cases only, calculated to cover up the collective fraud from federal enforcement officials and other states' enforcement officials of court orders (laws) showing 12% compounded interest established and funded under Title IV that are facially illegally violative of 42 U.S.C. § 654(21)(A) which explicitly provides States *may* opt to charge a fee, and *if* the State opts to do so, between *3% to 6% simple interest*, *not* 12% compound interest. The federal Title IV Program regulation by Congressional intent explicitly preempts any related state laws of all participating states.

(9) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Office of Child Support Services and Barbara Grady and Gero Meyersiek to use the fraudulent, First Amendment-, Fourth Amendment-, Fifth Amendment-, Seventh Amendment-, and Fourteenth Amendment violative state court machinery weaponizing Title IV-D Program of the Social Security Act to target the Plaintiff *pro se* noncustodial parent in Texas to retaliate against Plaintiff for her past lawsuits against them, namely ten years ago in <u>Seguin v. Chafee et al</u>., Civil No. 12-cv-708-JD (D.R.I. 2013), <u>Seguin v. Bedrosian et al,</u> Civil No. 12-cv-614-JD (D.R.I. 2013), and <u>Seguin v. Suttell et al</u>, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013), in which Plaintiff sued them, *inter alia*, for monetary damages claims for extortion by the Rhode Island state court's under color of state law abuse of the legal frame work of another federal-funded human services program Violence Against Women Act, 34 U.S.C. § 12471 *et seq.*, through which Rhode Island demanded that Plaintiff pay the state court actor $55,000.00 per visitation if Plaintiff wanted to see her children in Rhode Island, because

the state court stated in writing they believed Plaintiff married "a rich oil man" in Texas, absent any other legally sufficient basis.  Plaintiff had reported this *prima facie* extortion under color of state law and under color of federal law 34 U.S.C. § 12471 *et seq*., to the federal law enforcement authorities, *e.g*., the F.B.I. in Texas and the Office of the U.S. Department of Justice in Texas.  Here, Plaintiff's ==*retaliation*== damages claims have been issues pending before the Court since September 1, 2023 [ECF 25], at which point Judge Smith was disqualified under the self-executing expectation under 28 U.S.C. § 455, additionally given the fact Judge Smith had also self-recused from Seguin v. Chafee et al., Civil No. 12-cv-708-JD (D.R.I. 2013), Seguin v. Bedrosian et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013) ten years ago.  *See In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998) ("[under §455] the judge is expected to recuse sua sponte, where necessary, even if no party has requested it").  Their retaliation includes, inter alia, fraudulent inducement targeting the Plaintiff in Texas to induce Plaintiff to enter into an agreement to pay a large lump sum pay-off sum of $104,185.98 in return for the waiver of illegal unenforceable interest (12% compound interest that they took off the system so that Plaintiff could not see the interest sum) in Texas, and then immediately after inducing Plaintiff payment, placed back on the system  the 12% compound interest sum unbeknownst to the Plaintiff under color of state law, the knee-buckling sum of $86,000 that they proceeded to seize Plaintiff's properties in Texas, targeting Texas properties and persons that are protected by Texas laws and federal laws to defraud.

(10) The Rhode Island Judiciary continues the pattern of cover up by denying Plaintiff's request for public judicial records related to the monopoly of publication of judge-created

records submitted to the State Judiciary pursuant to the Rhode Island Access to Public

Records Act ("RI APRA").

# II. ARGUMENT

**A.** *Patsy v. Bd. of Regents of State of Fla.*, **457 U.S. 496 (1982) - Section 1983 is the foundational federal statute authorizing private civil suits against state judicial and executive actors for violations of the Constitution**

23. Plaintiff has appealed the Court's judgment in its entirety and respectfully submits

that she is likely to secure a complete reversal of this Court's holding that the judicially created

doctrine of Younger Abstention as it applies to the *dismissal* of her monetary damages and

breach of contract damages claims.

24. Plaintiff further submits that she is likely to secure a complete reversal of this Court's

holding that Plaintiff can raise her federal monetary damages claims and breach of contract

claims in the jurisdictionally defective Rhode Island family court, that R.I. Gen. Laws 8-10-3

plainly states the family court is ***not*** a court of general jurisdiction, and which lacks the

jurisdiction over the controversy for legal relief of monetary damages federal claims, tort claims

and breach of contract damages claims over both the Plaintiff and all the named defendants.

25.  Plaintiff seeks to remove to federal court the state proceeding *Gero Meyersiek v.

Mary Seguin, K2001-0521M* as well as seeks a stay pending appeal as Plaintiff's likelihood of

success on appeal, together with the lopsided balance of hardships, weigh heavily in favor of

granting the stay being sought pending appellate review.

26. Section 1983 is the foundational federal statute authorizing private civil suits against

state actors for violations of the Constitution.  It is properly available for Plaintiffs' suit seeking

monetary damages for the conspiracy involving coordinated constitutionally defective due

process violative Rhode Island state digital courts that are calculated to manipulate state family court proceedings to a foregone conclusion in favor of the state actors, to defraud 12% compound interest in state proceedings funded by Title IV-D that violate 42 U.S.C. § 654(21)(A) and violate Title IV-D mandated due process safeguards.

27. Congress enacted Section 1983 in 1871, in response to the failure of state law **enforcement officials** and **state courts** to respond to widespread violations of federal constitutional rights in the southern States during Reconstruction, as well as their active contribution to such violations. Section 1983's objective was to empower federal courts to prevent and redress violations of federal rights by both state officials and private entities acting at the State's encouragement. In keeping with that aim, Section 1983 has become a crucial mechanism for vindicating the Constitution's core guarantees and other federal rights. See, e.g., *Dennis v. Higgins*, 498 U.S. 439, 444- 45 (1991) (explaining that this Court has "given full effect to [Section 1983's] broad language" and "refused to limit" its reach only "to civil rights or equal protection laws"); *Mitchum v. Foster*, 407 U.S. 225, 238-39 (1972) ("[Section] 1983 was thus an important part of the basic alteration in our federal system" through which "the role of the Federal Government as a guarantor of basic federal rights against state power was clearly established.").

28. Rhode Island Judiciary, Tyler Technologies, and Rhode Island Department of Human Services along with Gero Meyersiek's manipulation of the digital courts and digital child support record keeping system (also federally funded up to 90% of the cost under Title IV-D) is precisely the type of state maneuver to deprive individuals of their federal constitutional rights that Section 1983 was intended to redress. Section 1983 was enacted 150 years ago to combat the violation of federal constitutional rights by a recalcitrant State. Its remedy is available when States act

directly to violate constitutional rights, when they conspire with private actors to facilitate those violations, or when they willfully turn a blind eye to assaults on fundamental rights. The Defendants' scheme of state-sanctioned private vigilantism to thwart the Texas Plaintiff's constitutional right recalls the genesis of Section 1983 and the threats that it was meant to neutralize. Indeed, its unprecedented approach is even more blatant because the Rhode Island Judiciary's digital courts and manipulation of the child support record keeping system are designed to explicitly incite vigilantism and is designed to avoid any meaningful pre-enforcement review. It would be as if a State in 1870 had passed a law purporting to delegate to private individuals in concert with the state the ability to sue Black people who exercised their right to vote; promising a bounty as a reward; providing unique and previously unknown litigation advantages to such vigilantes; and designing the law deliberately to evade any meaningful pre-enforcement review. Plainly such a law would have been the type of unlawful state action that Congress sought to put an end to with Section 1983.

29. This Court has repeatedly held that States, including their officials and courts, cannot extinguish federal remedies, including under Section 1983. *See*, e.g., *Haywood v. Drown*, 556 U.S. 729 (2009). Refusing to allow this Section 1983 action against the Defendants to proceed because of Rhode Island's express attempt to authorize the violation of federal constitutional rights by its citizens and the state actors, and insulate those violations from meaningful enforcement review would contravene this Court's consistent refusal to permit state policy and state law to encroach on federal remedies. It also would be directly contrary to Section 1983's core purpose: preventing States from collaborating (whether actively or tacitly) with private actors to deny federal constitutional rights to their residents and residents of other States.

**B. SECTION 1983 WAS ENACTED IN RESPONSE TO STATE-SANCTIONED PRIVATE VIGILANTISM THAT VIOLATED FEDERAL CONSTITUTIONAL RIGHTS AND EXISTS TO PREVENT SUCH CONDUCT**

30. Section 1983, originally enacted as Section 1 of the Civil Rights Act of 1871 (also called the Ku Klux Klan Act), provides a federal cause of action against persons acting under color of state law to deprive others of federal constitutional rights. 42 U.S.C. § 1983; *see Mitchum*, 407 U.S. at 238; *Steven H. Steinglass, Section 1983 Litigation in State and Federal Courts.* In full, 42 U.S.C. § 1983 now provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia." The objective of Section 1983 was "to provide civil rights protection against official inaction and the toleration of private lawlessness" that were enabling vigilante violence against Black people in southern States during Reconstruction and preventing them from exercising their federal constitutional rights. *Developments in the Law—Section 1983 and Federalism, 90 Harv. L. Rev. 1133, 1153 (1977)* ("Developments in the Law"); *see* also *Eugene Gressman, The Unhappy History of Civil Rights Legislation, 50 Mich. L. Rev. 1323, 1334 (1952)* ("[The Civil Rights Act of 1871] was the indignant reaction of Congress to conditions in the southern states wherein the Klan and other lawless elements were rendering life and property insecure."). Section 1983 became an

imperative as resistance to Reconstruction in the South remained strong in the years following enactment of the Thirteenth, Fourteenth, and Fifteenth Amendments. See, e.g., Erwin Chemerinsky, *Federal Jurisdiction 529* (8th ed. 2021). "[V]iolence against blacks was endemic throughout the South." *Id.* "Members of the Ku Klux Klan, for example, terrorized black citizens for exercising their right to vote, running for public office, and serving on juries." *Wilson v. Garcia*, 471 U.S. 261, 276 (1985) ("The specific historical catalyst for the Civil Rights Act of 1871 was the campaign of violence and deception in the South, fomented by the Ku Klux Klan, which was denying decent citizens their civil and political rights."); *Developments in the Law at 1153 n.104* (describing the Klan's "[o]rganized terrorism in the Reconstruction South").  see also Mitchum, 407 U.S. at 240 ("[S]tate courts were being used to harass and injure individuals, either because the state courts were powerless to stop deprivations or were in league with those who were bent upon abrogation of federally protected rights."). For example, a 600-page Senate report from 1871 details "the unwillingness or inability of Southern states to control the activities of the Klan." Chemerinsky at 529 (citing S. Rep. No. 1, 42d Cong., 1st Sess. (1871)). Both Congress and President Ulysses S. Grant recognized that "remedy[ing] this situation required a further shift in the federal-state balance towards a greater, although still limited, national role in the internal operations of the states." *Developments in the Law* at 1153. Accordingly, "[o]n March 23, 1871, President Grant requested emergency legislation in a special message, stating that a virtual state of anarchy existed in the South and affirming that the states were powerless to control the widespread violence." *Id*. Congress responded by enacting the Civil Rights Act of 1871 one month later "to provide civil rights protection against official inaction and the toleration of private lawlessness." *Id*. In describing the 1871 Act's objective, members of Congress focused on the need for a federal remedy to address the complicity of state actors

(active or otherwise) in enabling private actors to violate recognized federal constitutional rights: "Sheriffs, having eyes to see, see not; judges, having ears to hear, hear not; witnesses conceal the truth or falsify it; grand and petit juries act as if they might be accomplices . . . . [A]ll the apparatus and machinery of civil government, all the processes of justice, skulk away as if government and justice were crimes and feared detection. Among the most dangerous things an injured party can do is to appeal to justice." Cong. Globe 42d Cong., 1st Sess. App. at 78 (1871) (remarks of Rep. Perry). • "It is said that the States are not doing the objectionable acts. This argument is more specious than real . . . . What practical security would this provision give if it could do no more than to abrogate and nullify the overt acts and legislation of a State?" Id. at 375 (remarks of Rep. Lowe). • "[E]ven where the laws are just and equal on their face, yet, by a systematic maladministration of them, or a neglect or refusal to enforce their provisions, a portion of the people are denied equal protection under them." Id. at 153 (remarks of Rep. (and later President) Garfield). • "The principal danger that menaces us today is from the effort within the States to deprive considerable numbers of persons of the civil and equal rights which the General Government is endeavoring to secure to them." Id. at 335 (remarks of Rep. Hoar). • "Governors, judges, and juries give way to a mania which sometimes seizes hold of the popular mind." Id. at 368 (remarks of Rep. Sheldon). • "[T]he States do not protect the rights of the people; . . . [and] State courts are powerless to redress these wrongs. The great fact remains that large classes of people . . . are without legal remedy in the courts of the States." *Id*. at 252 (remarks of Sen. Morton). • "[T]he courts are in many instances under the control of those who are wholly inimical to the impartial administration of law and equity." *Id.* at 394 (remarks of Rep. Rainey). • "[T]he decisions of the county judges," who have "almost without exception" exercised powers "against Republicans without regard to law or justice, make up a catalogue of

wrongs, outrageous violations, and evasions of the spirit of the new constitution . . . ." *Id.* at 186 (remarks of Rep. Platt). These legislator statements "compel[] the conclusion that the Act was aimed at least as much at the abdication of law enforcement responsibilities by Southern officials as it was at the Klan's outrages." *Developments in the Law* at 1154; see also Chemerinsky at 529.

31. This Court has repeatedly recognized that the activity Congress sought to address with the Civil Rights Act of 1871 was state endorsement of or indifference to the infringement of fundamental rights by private actors. For example, the Court in *Monroe v. Pape* explained that the Act created a federal cause of action "because, by reason of prejudice, passion, neglect, intolerance, or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies." 365 U.S. 167, 180 (1961). In *Mitchum v. Foster*, the Court likewise observed that Congress "was concerned that state instrumentalities could not protect [federal constitutional] rights; it realized that state officers might, in fact, be antipathetic to the vindication of those rights." 407 U.S. at 242; see also *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 505 (1982) ("A major factor motivating the expansion of federal jurisdiction through §§ 1 and 2 of the bill was the belief of the 1871 Congress that the state authorities had been unable or unwilling to protect the constitutional rights of individuals or to punish those who violated these rights." (citing legislators' remarks)); id. at 505 n.8 (noting that President Grant and the House Judiciary Committee likewise recognized "[t]he inability of state authorities to protect constitutional rights"); *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 686 n.45 (1978) ("[S]upporters were quite clear that § 1 of the Act extended a remedy not only

where a State had passed an unconstitutional statute, but also where officers of the State were deliberately indifferent to the rights of black citizens.").

### C. Section 1983's Broad Remedy Depends Upon Access to the Federal Courts

32. This Court has further confirmed that Section 1983 was intended to afford "a broad remedy for violations of federally protected civil rights." *Monell,* 436 U.S. at 685. In *Owen v. City of Independence*, 445 U.S. 622 (1980), the Court explained that "the congressional debates surrounding the passage of § 1 . . . —the forerunner of § 1983—confirm the expansive sweep of the statutory language," and quoted at length the introductory remarks of Representative Shellabarger, the bill's author and manager in the House: I have a single remark to make in regard to the rule of interpretation of those provisions of the Constitution under which all the sections of the bill are framed. This act is remedial, and in aid of the preservation of human liberty and human rights. All statutes and constitutional provisions authorizing such statutes are liberally and beneficently construed. It would be most strange and, in civilized law, monstrous, were this not the rule of interpretation. As has been again and again decided by your own Supreme Court of the United States, and everywhere else where there is wise judicial interpretation, the largest latitude consistent with the words employed is uniformly given in construing 12 such statutes and constitutional provisions as are meant to protect and defend and give remedies for their wrongs to all people. Id. at 635-36 (quoting Cong. Globe, 42d Cong., 1st Sess., App. at 68 (1871)). Without question, "[t]he 1871 Congress intended § 1" to provide "individuals who [are] threatened with . . . the deprivation of constitutional rights . . . immediate access to the federal courts notwithstanding any provision of state law to the contrary." *Patsy*, 457 U.S. at 504. In keeping with its plain text and remedial purpose, this Court has "repeatedly held that the coverage of [Section 1983] must be broadly construed." *Golden State Transit Corp.*

*v. City of Los Angeles*, 493 U.S. 103, 105 (1989). There is nothing in the history of either Section 1983 as originally enacted or as amended that indicates Congress intended to foreclose suits against judges when necessary to cure a constitutional injury or where no other redress is available to prospectively stop the enforcement of a plainly unconstitutional state law, court rule, court denial of court records discriminating pro se litigants and the Public, or partial integration of digital courts so that pro se litigants and the Public cannot see state agency filings (including submitted orders that are then entered).

### D. THE SUPREMACY CLAUSE ENSURES THAT A STATE OR AN INFERIOR FEDERAL COURT CANNOT ELIMINATE A FEDERAL REMEDY, INCLUDING UNDER SECTION 1983.

33. The Supremacy Clause prohibits a State or an inferior federal court created by Congress from interfering with the exercise of a federal constitutional right or eliminating a federal remedy. *See Testa v. Katt*, 330 U.S. 386, 391 (1947) (holding that the obligation of the state courts under the Supremacy Clause to enforce federal law "is not lessened by the form in which they are cast or the remedy which they provide"). Yet that is exactly what Judge Smith's dismissal under Younger purports to accomplish. In attempting to grant state officials absolute immunity for constitutional violations by deputizing and incentivizing state agencies, private persons and private citizens to carry out those violations, Rhode Island and Judge Smith expressly aim to override the remedies otherwise afforded under Section 1983. Ascertaining that aim does not require any guesswork or inferences by this Court. The key architect Rule 5 of the Rhode Island Rules denying access to Rhode Island's digital courts targeting the Public and pro se litigants was clear about the intent behind the law's design: the Rhode Island Judiciary lied to the public that digital court records will be readily called on mobile devices by all court users, and then clandestinely closes the court records to the Public, the Press and pro se litigants, so that

these 12% compound interests targeting pro se noncustodial parents litigants in family court would be covered up, and the noncustodial parents do not even have access to the court order judge created laws.

34. This Court has repeatedly held that States and their courts cannot extinguish federal remedies, including under Section 1983. In *Haywood v. Drown*, 556 U.S. 729 (2009), this Court held that a State cannot use a jurisdictional rule "to nullify a federal right or cause of action." *Id*. at 736. There, New York had passed a law prohibiting its courts from exercising jurisdiction over Section 1983 claims for damages against state corrections officers, believing those suits to be "too numerous or too frivolous (or both)." *Id*. The law forced plaintiffs instead to sue the State directly in the Court of Claims without access to "the same relief, or the same procedural protections" as would be available under Section 1983. *Id.* at 734. *Haywood* held that the law violated the Supremacy Clause, emphasizing that a State "is not at liberty to shut the courthouse door to federal claims that it considers at odds with its local policy." *Id*. at 740.

35. Similarly, in *Dice v. Akron, C & Y R. Co*., 342 U.S. 359 (1952), the Court rejected the application of a state law that defeated a right to damages under the Federal Employers' Liability Act in state court. There, a court had overturned a verdict in the plaintiff's favor by relying on a state common law doctrine providing that signed liability releases, even if fraudulently obtained, nullified any right to damages. *Id*. at 360- 61. This Court reversed and reinstated the verdict, holding that Congress had "granted petitioner a right to recover against his employer for damages negligently inflicted" and "[s]tate laws are not controlling in determining what the incidents of this federal right shall be." Id. at 361. "[I]f states were permitted to have the final say as to what defenses could and could not be properly interposed to suits under the Act," this Court explained, then "the federal rights affording relief to injured railroad employees under a federally

declared standard could be defeated." Id. Such a result, moreover, would undermine the

"uniform application throughout the country essential to effectuate [the law's] purposes." Id.

Other cases have applied this same principle that a state court may not extinguish federal

remedies. See, e.g., *Felder v. Casey*, 487 U.S. 131, 139 (1988) ("[W]e have held that a state law

that immunizes government conduct otherwise subject to suit under § 1983 is preempted . . .

because the application of the state immunity law would thwart the congressional remedy."

(collecting cases)); id. at 139-40 ("[I]n actions brought in federal courts, we have disapproved

the adoption of state statutes of limitation that provide only a truncated period of time within

which to file suit, because such statutes inadequately accommodate the complexities of federal

civil rights litigation and are thus inconsistent with Congress' compensatory aims." (collecting

cases)); *Brown v. W. Ry. of Ala*., 338 U.S. 294, 299 (1949) (holding that "desirable uniformity in

adjudication of federally created rights could not be achieved" if overly exacting state pleading

requirements were allowed to defeat recovery under FELA); *Testa,* 330 U.S. at 394 (state courts

with adequate jurisdiction to adjudicate federal claims "are not free to refuse enforcement of

[the] claim"). In keeping with this long line of cases protecting the availability of federal

remedies, this Court should not allow Rhode Island's unprecedented procedural manipulation to

thwart enforcement actions for monetary damages under Section 1983. It is up to Congress—not

the States or the inferior federal courts Congress created—to decide when federal claims and

remedies are (or are not) available. Congress's decisions are "made on behalf of all the People."

*Howlett v. Rose*, 496 U.S. 356, 383 (1990). Rhode Island is not "free to nullify for [its] own

people or the people of Texas (the Plaintiff) the legislative decision[] that Congress" made in

enacting Section 1983, *id.*, a statute whose "very purpose . . . was to "interpose the federal courts

between the States and the people, as guardians of the people's federal rights." *Mitchum,* 407 U.S. at 242.

36.  Rhode Island creates a scheme of State-sponsored conspiracy to violate federal constitutional rights in a deliberate effort to evade federal judicial review of Rhode Island's 12% Compound interest violating 42 U.S.C. sec. 654(21)(A) and thwart "[t]he 'general rule' . . . that plaintiffs may bring constitutional claims under § 1983." *Knick v. Township of Scott*, 139 S. Ct. 2162, 2172 (2019)– precisely what Section 1983 was intended to protect against.

37. "The 1871 Congress intended [Section 1983] to 'throw open the doors of the United States courts' to individuals who were threatened with, or who had suffered, the deprivation of constitutional rights." *Patsy*, 457 U.S. at 504 (quoting Cong. Globe, 42d Cong., 1st Sess., App. at 376 (1871) (remarks of Rep. Lowe)). Rhode Island's digital courts try to slam those same doors shut, as does the state courts' former lawyer, Judge Smith, tries to slam shut the doors of the federal court.  This Court has never allowed a State or a State's former lawyer sitting as judge in this Court to foreclose specific categories of Section 1983 suits or to impose a state-created barrier uniquely extinguishing Section 1983 remedies. It certainly should not do so here, where Rhode Island's scheme is "manifestly inconsistent with the purposes of [Section 1983]." *Felder*, 487 U.S. at 141. Plaintiff's Section 1983 claims should be allowed to proceed so that she may vindicate the federal constitutional rights at issue.  Moreover, the *Turner* Court demonstrated conclusively that state family court proceedings held under 42 U.S.C. sec. 654, 666 that are additionally federally funded up to 66% of the cost, are modern equivalents of Black Codes.  See Lauren Sausser, *Walter Scott Dogged by System that "Criminalizes" Debt*, POST & COURIER (Apr. 9, 2015), http://www.postandcourier.com/news/walter-scott-dogged-by-system-that-criminalizes-debt/ article_e211c5c9-c6ba-5ded-a92e-a2fc363d179c.html; Another law

enforcement shooting of a fleeing child support obligor is described in *Henry v. Purnell*, 652 F.3d 524 (4th Cir. 2011); Michael S. Schmidt & Matt Apuzzo, *South Carolina Officer Is Charged with Murder of Walter Scott*, N.Y. TIMES (Apr. 7, 2015), www.nytimes.com/2015/04/08/us/south-carolina-officer-is-charged-with-murder-in-black-mans-death.html?_r=0.; On April 4, 2015, Walter Scott was shot to death while running from a policeman in North Charleston, South Carolina. It was one of a series of police shootings of black men that grabbed the nation's attention in the spring and summer of 2015. In Walter Scott's case, the incident focused attention not only on law enforcement officers' use of excessive force, but also on a second, less visible issue that clouds the lives of many low-income men and some women—the difficulty of staying current with their child support obligations and the potential jail time if they fail.  Many persons wondered why Scott ran from a police officer who pulled him over for something as minor as a broken tail light. Family members opined that he was probably afraid of being jailed again for delinquent child support payments. At the time of the shooting, Scott was the subject of an outstanding order to appear before a family court judge and explain his failure to make the mandated payments. If found to be willfully noncompliant, he could have been held in contempt of court and incarcerated, as happens to hundreds of noncustodial fathers in South Carolina, many of whom are low-income and without permanent employment. Scott's flight may have been motivated by a fear that he would be jailed even if his delinquency were merely a reflection of a lack of resources. Many observers believe that such a fear would be well justified.  The U.S. Supreme Court heard and decided the case of Turner v. Rogers, a South Carolina case concerning the procedural rights of child support obligors in civil contempt proceedings that could result in incarceration.

Prior to the decision in *Turner*, the researchers conducted a study in which 326 South Carolina child support contempt hearings were observed to assess the quality of the decision-making on the "ability to pay" issue. The study, presented in an amicus curiae brief filed in *Turner*, (Brief of Elizabeth G. Patterson et. al as Amici Curiae in Support of Petitioner, Turner v. Rogers, 564 U.S. 431 (2011) (No. 10-10), 2011 WL 141223, at *5–22) indicated that the practices and procedures used in those hearings resulted in incarceration of large numbers of child support obligors who lacked the ability to make their child support payments and who would not be able to pay the purge amounts necessary to secure their release. The Supreme Court held in Turner that the proceedings in Mr. Turner's contempt hearing, which were in most respects typical of the hearings observed in the study, violated the obligor's right to due process of law.  Similarly, not only are Rhode Island's state-wide digital courts due process violative discriminating against pro se litigants and denying access to the Public, Rhode Island itself violates federal law by illegally charging 12% compound interest, fraudulently manipulates child support records to cover up their illegal 12% compound interest, and procures through fraud 66% of the cost of operating these fraudulent schemes under color of state law that are *never* eligible for federal funding from the United Stated Department of Health and Human Services. The issues and claims litigated are irrefutably federal questions, issues of federal law, federal funding of illegal operations under the guise of a federal welfare entitlement program, and interstate fraud.

**E. Plaintiff is Likely To Succeed On Appeal Of the Judgment Ordered By the Court:**

38. *Testa v. Katt*, 330 U.S. at 330 U.S. 394 n. 13 (1947) instructs this lower federal Court that the Court <u>cannot</u> conclude the state court has jurisdiction adequate and appropriate under established local law to adjudicate the federal claim UNLESS the federal Court looks to Rhode

Island code – which only authorizes the State District Court and Superior Court to entertain

actions for monetary damages, citing R.I. Gen. Laws ch. 631, § 4 (1938).   R.I. Gen. Laws 8-10-3

does not authorize the State family court to entertain actions for monetary damages under tort

claims or federal claims.  Although Plaintiff recognizes that the Court has ruled against her as to

the scope of relief, Plaintiff is likely to succeed on appeal of those issues, and has raised serious

legal questions and presented a substantial case. *See Arnold v. Garlock, Inc*., 278 F.3d 426,

438-39 (5th Cir. 2001).

39. Plaintiff emphasizes that the Supreme Court in *Patsy v. Board of Regents of Fla.*, 457

U.S. 496, 506-507 (1982) canvassed the legislative debates of the 19871 Congress and noted that

Section 1983 enabled the Plaintiff **the right to choose** the **forum in which to seek relief, which**

**cannot be taken away** nor abrogated.

40. Plaintiff reserves the right to make any and all arguments on appeal.

41. Among the substantial questions raised by Plaintiff is whether the Court erred in

awarding Defendants dismissal of Plaintiff's monetary damages claim in this First Circuit under

Younger Abstention and erred in failing to self-execute 28 U.S.C. § 455. And Plaintiff

respectfully submits that she is likely to succeed on appeal in arguing that, in these

circumstances, dismissal was not properly ordered in the particular circumstances of this case

pursuant to established binding First Circuit caselaws on both the Court's errors applying

Younger Abstention as well as judicial disqualification. *See DeMauro v. DeMauro,* 115 F.3d 94,

98 (1st Cir. 1997)**;** *In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998); *Quackenbush v.*

*Allstate Ins. Co*., 517 U.S. 706 (1996).  *See* also *Allen v. La. State Bd. of Dentistry*, 835 F.2d 100,

104 (5th Cir. 1988). ("Younger abstention does not apply to claims for monetary damages.")

42. Absence of a stay of the judgment will erode confidence in the Judiciary in the First Circuit by creating an impression that it is setting national policy regarding the Title IV-D Program.  It may also have the effect of setting national policy regarding digital courts compliance to the Constitution and the Government Edicts Doctrine. See, *Georgia v, Public Resources Org.*, at 590 U. S. ____ (2020).  Additionally it may have the effect of "encouraging forum shopping." *Trump v. Hawaii,* 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring). It further "undermines the judicial system's goals of allowing the 'airing of competing views' and permitting multiple judges and circuits to weigh in on significant issues." *See* also *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (traditional remedial principles account for "the public interest" and "the balance of equities"); *EME Homer City Generation, LP v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015) (Kavanaugh, J.) (declining to vacate unlawful agency action under the APA because "vacatur could cause substantial disruption"). In this context, the dismissal of Plaintiff's state government tort monetary damages claims entered by the Court could cause substantial disruption to the *uniform* application of the legal framework of the Title IV-D Program Congress explicitly intended.

43. The serious legal questions raised in this case regarding the scope of remedy go beyond the questions of whether a Younger abstention is applicable to federal monetary damages claims—and indeed, those questions should not have even entered into this case. Here, among Plaintiff's challenges was to state agency actions, and Plaintiff pursued breach of contract damages claims and tort monetary damages claims only.  Instead, the Court at law cannot vacate a federal statute—i.e., cannot "delete a previously enacted statute from the books" such as 42 U.S.C. § 1983.  *See* also Jonathan F. Mitchell, The Writ-of-Erasure Fallacy, 104 Va. L. Rev. 933, 936 (2018) ("The federal courts have no authority to erase a duly enacted law from the

statute books, and they have no power to veto or suspend a statute. The power of judicial review is more limited." (footnotes omitted). Legal monetary damages relief under 42 U.S.C. § 1983 that would hold the Rhode Island state government accountable under the Rhode Island Government Tort Act for Rhode Island government actors' tortious actions violating the legal framework of the Title IV-D Program federal statutes targeting the Plaintiff in Texas was a legal remedy conferred by Congress to federal courts to grant legal relief appropriate in this case. The Court has an unflagging obligation to exercise jurisdiction conferred to it by Congress.  *See Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013).

44. Plaintiff has demonstrated a likelihood of success on appeal of the Final Judgment sufficient to justify a stay of the judgment.

### F. The Balance of the Equities Overwhelmingly Favors the Requested Stay

45. The balance of the equities overwhelmingly favors a stay: The State of Rhode Island plainly lacks any legitimate interest in the State's systemic knowing violation of 42 U.S.C. § 654(21)(A) and due process requirements of digital courts that they now target Plaintiff in Texas, and which they sought to cover up from federal and Texas authorities, as well as from Plaintiff, by knowingly and unlawfully removing interest from the automated support record system. Americans outside of Rhode Island will be fraudulently, unlawfully and systemically fleeced by Rhode Island's illegal scheme.

46. Defendants will face no harm from Plaintiff's requested stay. The judgment that is specifically directed to and protects the prevailing Defendants from legal accountability of their illegal actions, is further issued by a disqualified judge, Judge Smith, who was the former counsel for the Defendants, *e.g.*, Rhode Island state government entities, including the state

courts and state agencies.  The requested stay will thus impose no hardship on the prevailing Defendants at all.

47. By contrast, the public and the Plaintiff face significant harm if the judgment is not stayed. As an initial matter, "any time a [government]" violates "statutes enacted by representatives of its people," the people "suffer a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted).  But the harm here is much greater and more far-reaching. The Rhode Island Judiciary deliberately implemented a due process digital court system and deliberately lied to the Public that all court users will enjoy greater access to judge-created court records, when in reality access is denied to the Public, the Press and the pro se litigants, to cover up Rhode Island's illegal 12% compound interest in Title IV-D Program proceedings that are 66% federally funded – the due process violative digital court proceedings further violate Title IV-D of the Social Security Act.  Also, Title IV-D requires the *uniform* application and compliance by participating States with the Social Security Act.  Congress's as well as the United States through the Secretary of the U.S. Department of Health and Human Services' interest in the uniform compliance of 42 U.S.C. § 654(21)(A), § 654 and 42 U.S.C. § 666 are well established.  The States are reimbursed 66% of the cost of operations through federal funding appropriated by Congress under Title IV-D of the Social Security Act.  The Defendants' arbitrary illegal removal of the illegal unenforceable 12% compound interest from the automated support record system and cover up of their illegal 12% compound interest scheme from the federal and Texas authorities targeting Texas properties and targeting the Plaintiff in Texas demonstrates Rhode Island government agencies (who are former clients of Judge Smith) knowingly committed criminal schemes illegally seizing Plaintiff's properties interstate in Texas that they know are violative of federal criminal codes and Texas

civil and penal codes.  *See,* e.g., Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 et seq.) (adding Title IV-D to the Social Security Act). The program, which is administered by the United States Secretary of Health and Human Services (Secretary), provides that States with approved plans for child and spousal support that meet federal requirements are reimbursed by the federal government for a significant sixty-six percent (66%) of the costs of operating their child-support enforcement programs. 42 U.S.C. §v655(a)(2)(C).  In 1975, Congress adopted Title IV-D, 42 U.S.C. §v651 *et seq.*, and established the general statutory framework that exists today. See 1975 Act § 101(a), 88 Stat. 2351; *Blessing v. Freestone*, 520 U.S. 329, 333-335 (1997) (describing program).  Congress ultimately set the federal share of reimbursable expenditures at 66%, 42 U.S.C. 655(a)(2), but expanded the availability of matching funds at the 90% level for State expenditures for automating data processing systems to improve "the monitoring of support payments, the maintenance of accurate records regarding the payment of support.  Therefore, the Defendants' illegal operations cannot be funded by Congressional appropriations.

48. Judge Smith's failure to self-execute his disqualification under 28 U.S.C. § 455 as well as Canon 3E of the Code of Judicial Conduct, then his subsequent refusal to recuse upon Plaintiff's request after she raised newly discovered discovery post judgment on October 6, 2023 of his direct and past public sector law practice's contract legal representation of the Defendants, state courts, state agencies and other conflict entities, have the appearance, to the objective observer, of the Court's issuance of judgment in favor of the Defendants in error that contravenes established First Circuit case law on Younger Abstention as well as disqualification, calculated to benefit the interests of his former clients, the Rhode Island state government.

49. Moreover, the Court's judgment effectively functions as a denial of Plaintiff's access to this Court of law to redress her legal monetary damages claims and breach of contract damages claims. It is well-settled that even minimal loss of First Amendment freedoms, "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) (plurality)); *see also Elrod*, 427 U.S. at 373.; *N.Y. Times v. United States*, 403 U.S. 713, 715 (1971). Accordingly, Plaintiff has a strong likelihood of success on the merits, will suffer irreparable injury without a stay, and a stay will not injure others while furthering the public interest.

## III. CONCLUSION

50. For the foregoing reasons, Plaintiff has demonstrated a likelihood of success on appeal of the Judgment ordered, and has demonstrated that the balance of the equities favors a stay. Plaintiff respectfully requests that the Court stay the final judgment [ECF No. 31] for the duration of appellate proceedings.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 4, 2023, I filed the within Motion with the Clerk of the Court via email.

Respectfully submitted,

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX 77019

Dated: December 4, 2023